**SETH P. CHAZIN (CA SBN 133777)**
**Attorney at Law**
**LAW OFFICES OF SETH P. CHAZIN**
**1164 Solano Ave**
**Albany, CA 94706**
**Telephone: (510) 507-8100**
**Facsimile: (510) 525-0087**


**Attorney for Defendant**
**GERARD JONES**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **No. 3:17-cr-00070-VC** |
| **Plaintiff,** | ) |
| | ) **DEFENDANT GERARD JONES'S** |
| **vs.** | ) **SENTENCING MEMORANDUM** |
| | ) |
| | ) **Date: August 14, 2018** |
| **GERARD JONES,** | ) **Time: 10:30 a.m.** |
| | ) **Judge: Hon. Vince Chhabria** |
| **Defendant.** | ) **Courtroom: Courtroom 4, 17th Floor** |
| | ) |
| | ) |

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

STATEMENT OF FACTS....................................................................................................4

DISCUSSION ......................................................................................................................5

**I. THE COURT HAS DISCRETION TO IMPOSE A REASONABLE SENTENCE BELOW THE GUIDELINE RANGE.......................................................... 5**
    A.    POST-*BOOKER* SENTENCING PROCEDURES .........................................................5
    B.    THE DISTRICT COURT'S DISCRETION TO SENTENCE BELOW THE GUIDELINE RANGE ................................................................................................................8

**II. GUIDELINES CALCULATIONS: THE GUIDELINES RANGE IS EXCESSIVE AS APPLIED TO MR. JONES, AND HE IS ENTITLED TO THE THIRD LEVEL REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY. ..........................9**
    A.    THE CHILD PORNOGRAPHY GUIDELINE IS EXCESSIVE AND NOT BASED ON EMPIRICAL EVIDENCE. .........................................................................................9
    B.    THE THIRD LEVEL FOR ACCEPTANCE OF RESPONSIBILITY SHOULD BE APPLIED. .............15

**III. THE RELEVANT CHARACTERISTICS AND FACTORS UNDER 18 U.S.C. § 3553(a) OVERWHELMINGLY SUPPORT A DOWNWARD VARIANCE.................17**
    A.    ABERRANT CONDUCT FUELED BY ADDICTION .................................................18
    B.    LOW RISK OF RECIDIVISM .................................................................................20
    C.    USE OF RITALIN, ADDICTION, AND MENTAL HEALTH ....................................22
    D.    **SUPPORT OF FAMILY AND COMMUNITY**...........................................................24
    E.    POST-OFFENSE REHABILITATION AND CONTINUATION OF COUNSELING, TWELVE-STEP, AND OTHER REHABILITATIVE PROGRAMS .............................34
    F.    EXCELLENT EMPLOYMENT HISTORY ................................................................39
    G.    NEGLECT AND EMOTIONAL ABUSE AS A CHILD .............................................41
    H.    EXTREME REMORSE ..........................................................................................42
    I.    COLLATERAL CONSEQUENCES IN ADDITION TO INCARCERATION ....................42
    J.    VULNERABILITY TO ABUSE AND VICTIMIZATION IN PRISON ..........................44
    K.    EFFECT ON INNOCENT FAMILY MEMBERS AND COLLEAGUES ..........................45
    L.    DEFENDANT DID NOT INTEND TO DISTRIBUTE CHILD PORNOGRAPHY. ...........46
    M.    AVOIDING DISPARITY WITH OTHERS SIMILARLY SITUATED ...........................47
    N.    AVOIDING DISPARITY WITH STATE SENTENCES FOR SIMILAR CONDUCT............52
    O.    DEFENSE COUNSEL MIS-ADVISED MR. JONES ON THE APPLICABLE GUIDELINES RANGE. .............................................................................................................53
    P.    MERCY WARRANTS A BELOW GUIDELINE SENTENCE..........................................54
    Q.    THE COMBINATION OF ALL FACTORS CONSTITUTES A MITIGATING CIRCUMSTANCE JUSTIFYING A DOWNWARD VARIANCE.........................................55

**IV.  OBJECTIONS TO PRESENTENCE REPORT ........................................................56**
    A.    THE COURT SHOULD NOT CONSIDER THE ALLEGED CONDUCT INVOLVING "R.B." IN 2011. .......................................................................................................56

**V. THE COURT SHOULD ORDER MR. JONES TO PAY RESTITUTION IN THE AMOUNT OF $500..................................................................................60**

**CONCLUSION ..................................................................................................63**

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................... 6, 7, 8, 19, 35

*Kimbrough v. United States*, 552 U.S. 85 (2007) ................................................................. 9, 10, 19

*Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006) ............................................................. 41

*Paroline v. United States*, 134 S. Ct. 1710 (2014) .................................................................. 61, 62

*Pepper v. United States*, 131 S.Ct. 1229 (2011) .......................................................................... 35

*Rita v. United States,* 551 U.S. 338 (2007) ............................................................................... 6, 8

*United States v. Abraham*, 2013 WL 2099795 (D.Neb. May 15, 2013) ........................................ 48

*United States v. Adelson,* 441 F.Supp.2d 506 (S.D.N.Y. 2006) ............................................... 43, 55

*United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) .............................................................. 45

*United States v. Alba*, 933 F. 2d 1117 (2d Cir. 1991) .............................................................. 40, 45

*United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (*en banc*) ............................................. 8

*United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) ............................................................ 43

*United States v. Apodaca*, 641 F.3d 1077 (9th Cir. 2011) ................................................... 2, 12, 48

*United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) ................................................ 18, 19, 38

*United States v. Baird*, 580 F.Supp.2d 889 (D. Neb. 2008) ........................................................ 49

*United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) ................................................................. 38

*United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) ................................................... 7

*United States v. Barrow*, 606 F. App'x 335 (9th Cir. 2015) ......................................................... 16

*United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015) .................................................................. 59

*United States v. Big Crow*, 898 F.2d 1326 (8th Cir. 1990) ........................................................... 40

*United States v. Booker*, 543 U.S. 220 (2005) ......................................................................... 5, 14

*United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) ....................................................... 62

*United States v. Burns*, 2009 WL 3617448 (N.D.Ill. Oct. 27, 2009) ............................................. 14

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (*en banc*) ........................................................ 6

*United States v. Castillo*, 779 F.3d 318 (5th Cir. 2015) ..................................................................... 16

*United States v. Cherry*, 487 F.3d 366 (6th Cir. 2007) ...................................................................... 36

*United States v. Cook,* 938 F.2d 149 (9th Cir. 1991) .......................................................................... 55

*United States v. Cota-Guerrero*, 907 F.2d 87 (9th Cir. 1990) ............................................................ 58

*United States v. Crook*, 9 F.3d 1422 (9th Cir. 1993) .......................................................................... 43

*United States v. Cruikshank*, 667 F.Supp.2d 607 (S.D.W.Va. 2009) .................................................. 14

*United States v. D.M.,* 2013 WL 1846543 (E.D.N.Y. May 3, 2013) ............................................... 48-49

*United States v. Decora,* 177 F.3d 676 (8th Cir. 1999) ............................................................... 7, 8, 55

*United States v. Dickey*, 924 F.2d 836 (9th Cir. 1991) ....................................................................... 18

*United States v. Divens*, 650 F.3d 343, 348 (4th Cir. 2011) ............................................................... 16

*United States v. Doktor*, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008) ............................................. 49

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ........................................................................ 10

*United States v. Duane*, 533 F.3d 441 (6th Cir. 2008) ........................................................................ 18

*United States v. Durham*, 995 F.2d 936 (9th Cir. 1993) ..................................................................... 58

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ............................................................. 20, 21

*United States v. Fagan,* 162 F.3d 1280 (10th Cir. 1998) ..................................................................... 42

*United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) ....................................................................... 41

*United States v. G.L.,* 143 F.3d 1249 (9th Cir. 1998) ......................................................................... 59

*United States v. Garate*, 543 F.3d 1026 (8th Cir. 2008) ..................................................................... 43

*United States v. Garcia*, 182 F.3d 1165 (10th Cir. 1999) ............................................................. 25, 34

*United States v. Garcia*, 497 F.3d 964 (9th Cir. 2007) ....................................................................... 23

*United States v. Gardellini,* 545 F.3d 1089 (D.C. Cir. 2008) ....................................................... 42, 43

*United States v. Green*, 152 F.3d 1202 (9th Cir. 1998) ....................................................................... 35

*United States v. Grober*, 624 F.3d 592 (3d Cir. 2010) ................................................................... 10, 48

*United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008) .................................................................. 13

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

*United States v. Hahn*, 960 F.2d 903 (9th Cir. 1992) ................................................................56-57

*United States v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wis. 2008) .............................................. 11, 13

*United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011)............................. 2, 9, 10, 11, 12, 14, 52

*United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008) ........................................................ 18, 19

*United States v. Jagmohan*, 909 F.2d 61 (2d Cir. 1990).................................................................. 40

*United States v. Jaroszenko*, 92 F.3d 486 (7th Cir. 1996) .............................................................. 42

*United States v. Johnson*, 581 F.3d 994 (9th Cir. 2009).................................................................. 15

*United States v. Johnson*, 588 F.Supp.2d 997 (S.D. Iowa 2008)..................................................... 49

*United States v. Jones*, 948 F.2d 732 (D.C. Cir. 1991).................................................................... 57

*United States v. Kapitzke*, 130 F.3d 820 (8th Cir. 1997) ........................................................... 36, 37

*United States v. Kelly*, 868 F.Supp.2d 1202 (D.N.M. 2012) ........................................................... 49

*United States v. Lee*, 653 F.3d 170 (2d Cir. 2011).......................................................................... 16

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) ..................................................................... 35

*United States v. McElheney*, 630 F.Supp.2d 886 (E.D. Tenn. 2009).............................................. 49

*United States v. McFarlin,* 535 F.3d 808 (8th Cir. 2008) ............................................................... 35

*United States v. Menyweather*, 431 F.3d 692 (9th Cir. 2005) ........................................................... 7

*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) ......................................................... 45

*United States v. Miller,* 479 F.3d 984 (8th Cir. 2007) ...................................................................... 6

*United States v. Miller,* 991 F.2d 552 (9th Cir. 1993) ..................................................................... 44

*United States v. Miltier*, 2016 WL 6821087 (E.D.Va. Nov. 17, 2016) ........................................... 63

*United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008)....................................................... 38

*United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016) ...................................................... 43

*United States v. Newlon*, 212 F.3d 423 (8th Cir. 2000)................................................................... 36

*United States v. Ngatia*, 477 F.3d 496 (7th Cir. 2007) ................................................................... 36

*United States v. Noxon*, 2008 WL 4758583 (D.Kan. Oct. 28, 2008)............................................... 49

*United States v. Olhovsky*, 562 F.3d 530 (3d Cir. 2009) ................................................................. 38

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

*United States v. Olhovsky*, 562 F.3d. 530 (3d Cir. 2009) ................................................................ 7

*United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002).................................................................. 44

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ............................................................. 24, 43

*United States v. Phinney*, 599 F.Supp.2d 1037 (E.D.Wis. 2009) ..................................................... 49

*United States v. Polouizzi*, 760 F.Supp.2d 284 (E.D.N.Y. 2011) ..................................................... 10

*United States v. R.V.,* 157 F.Supp.3d 207 (E.D.N.Y. 2016) ............................................... 48, 52, 64

*United States v. Raby*, 2009 WL 5173964 (S.D.W.Va. Dec. 30, 2009) ......................................... 49

*United States v. Rausch*, 570 F.Supp.2d 1295 (D.Colo. 2008)....................................................... 44

*United States v. Ringgold*, 571 F.3d 948 (9th Cir. 2009).............................................................. 52

*United States v. Rojas-Millan*, 234 F.3d 464 (9th Cir. 2000) ........................................................ 18

*United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008)............................................... 23, 39, 40, 42

*United States v. Sahagun-Gallegos*, 782 F.3d 1094 (9th Cir. 2015) ............................................... 16

*United States v. Sally*, 116 F.3d 76 (3d Cir. 1997) ..................................................................... 36

*United States v. Santiago*, 906 F.2d 867 (2d Cir. 1990) ............................................................... 56

*United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009) ......................................................... 24, 34

*United States v. Shipley*, 560 F.Supp.2d 739 (S.D. Iowa 2008) ..................................................... 49

*United States v. Shonubi*, 998 F.2d 84 (2d Cir. 1993) ................................................................. 56

*United States v. Smith*, 683 F.2d 1236 (9th Cir. 1982) ............................................................... 43

*United States v. Stall*, 581 F.3d 276 (6th Cir. 2009).................................................................. 38

*United States v. Stone*, 575 F.3d 83 (1st Cir. 2009)................................................................... 10

*United States v. Sykes*, 7 F.3d 1331 (7th Cir. 1993) ................................................................... 57

*United States v. Tews*, 2010 WL 1608951 (E.D.Wis. Apr. 20, 2010) ........................................... 49

*United States v. Thomas*, 361 F.3d 653 (D.C. Cir. 2004) ............................................................. 58

*United States v. Thompson*, 315 F.3d 1071 (9th Cir. 2002)................................................. 23, 36, 37

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*) ......................................... 18, 25, 46

*United States v. Vieke,* 348 F.3d 811 (9th Cir. 2003) .................................................................. 23

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

*United States v. Wachowiak*, 412 F.Supp.2d 958, 964 (E.D.Wisc. 2006) ................................. 26, 34

*United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) ............................................................ 20, 21

*United States v. Wilke*, 995 F.Supp. 828 (N.D.Ill. 1998) ................................................................ 44

*United States v. Williams*, 910 F.2d 1574 (7th Cir. 1990) ............................................................. 58

*United States v. Yahnke*, 395 F.3d 823 (8th Cir. 2005) ................................................................... 6

*United States v. Zavala*, 443 F.3d 1165 (9th Cir. 2006) ................................................................. 6

*United v. Shasky*, 939 F.Supp. 695 (D.Neb. 1996) ......................................................................... 44

*Zavala v. United States*, 553 U.S. 1061 (2008) ............................................................................... 6

**Statutes**

18 U.S.C. § 2252(a)(2) ...................................................................................................................... 5

18 U.S.C. § 2252(a)(4)(B) ................................................................................................................ 5

18 U.S.C. § 3553(a) ................................................................................................................. *passim*

18 U.S.C. § 3661 ............................................................................................................................... 8

Cal. Pen. Code §§ 311.1, 311.2 ....................................................................................................... 53

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

## INTRODUCTION

It is not an overstatement to say that the story of this defendant, Gerard Jones, is truly extraordinary. By facing his demons head-on and refusing to make excuses, Gerard Jones has been exceptional in the way he has navigated what can only be described as a terrible human failing: viewing and collecting child pornography. Mr. Jones wishes he could turn back the hands of time, but he knows he cannot. He is deeply ashamed, understands he must be punished, and is prepared to accept the Court's judgment. But the strides he has taken since his arrest and the courage he has demonstrated in coming to terms with his former life—publicly admitting what was a shameful addiction so that he may heal and others might avoid the same mistakes—are to be commended.

Mr. Jones is extremely remorseful for his conduct, which has had a devastating impact on his wife, family, colleagues, and himself, not to mention those directly or indirectly affected by his addictive behaviors. He has written a letter to this Court stating this in no uncertain terms:

> I accept complete responsibility for my crimes, as I have since the night of my arrest. I downloaded folders and zip files containing thousands of files of child pornography and uploaded a video that turned out to contain child pornography.
>
> I feel horror and profound remorse for having done these things. I realize that child pornography is created through the abuse and exploitation of children and, as a parent myself, am deeply sorry for having participated in that horrific process in any way.
>
> By committing these crimes I hurt my wife and son terribly in every way, both emotionally and materially. I disappointed my friends and family and caused great inconvenience to some of my professional associates. I also participated in a subculture based on victimization.
>
> My behavior came out of pornography addiction and was influenced by my use of methylphenidate [Ritalin]. But I am still responsible for my actions.
>
> I have been working the Sex Addicts Anonymous program since immediately after my arrest; I now sponsor four other sex addicts, have been the featured speaker at SAA meetings throughout the

1

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Bay Area and will be speaking at the SAA International Convention on May 27. I have begun writing a book about my experience and the dangers of pornography addiction with the advice of three sex-addiction therapists; I intend to give all profits to NCMEC and SAA. I hope to use my visibility as an author to create greater awareness of the dangers of illegal pornography and the harm it does.

*United States Probation Department Presentence Investigation Report (hereafter "PSR")*, ¶ 33.

It is also important to note that while child pornography is a serious offense and a real and damaging problem in our society, it is widely agreed that the United States Sentencing Guidelines (hereafter "USSG" or "Guidelines") as applied to the possession and distribution of child pornography are overly harsh in light of the nature and overall seriousness of the offense and have been deconstructed time and again by courts throughout the country. See, e.g., *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011) and *United States v. Apodaca*, 641 F.3d 1077, 1083 (9th Cir. 2011); see also *Courts are giving reduced terms to many child-porn defendants*, ABA Journal, by Stephanie Francis Ward, August 2015, available at http://www.abajournal.com/magazine/article/courts_are_giving_reduced_terms_to_many_child_porn_defendants; see also *Argument II.A., infra*. Indeed, as described in further detail below, the Sentencing Commission and Congress have long been contemplating significant changes in this area for precisely these reasons.

Here, Mr. Jones's Guidelines calculation as presented in the PSR subjects him to an advisory custodial range of <u>11 to 14 years</u> (135-168 months), despite the fact that he is a first-time offender who fully cooperated with authorities, has since engaged in extraordinary post-offense rehabilitation, and will suffer many collateral consequences of his conviction beyond a prison sentence, not the least of which is lifetime sex offender registration.

In determining an appropriate sentence for Mr. Jones, we submit that the initial (and perhaps most important) question for the Court is: what should be the Court's starting point? Should it begin with the astronomical Guidelines range? By all accounts—including many court opinions, sentencing studies, recidivist statistics, and disparate sentence analyses—the answer to this question is that it should not. When adding the fact that state courts in this region will normally limit sentences for first-time offenders for these very offenses to a period of probation

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

and a term of county jail (rather than prison) for less than one year (which can typically be served through a non-custodial alternative sentencing program), this question should arguably involve little debate. Thus, the Court should not view this outrageously harsh Guidelines range as a reasonable or appropriate starting point when fashioning a sentence that is sufficient and appropriate but not greater than necessary.

With the above in mind, the United States Probation Office's recommendation of a prison term of 135 months (more than 11 years), which fails to recognize any grounds for a downward variance, is entirely unreasonable for a man convicted of possessing illegal photos and videos and momentarily attempting (but immediately aborting) distribution of a single video on YouTube. (Mr. Jones deleted the video and the account just minutes after attempting the upload once he realized it contained child pornography, and the video never went live. *PSR,* ¶ 26.)

On the contrary, the evidence before the Court supports a significant downward variance to (1) account for the overly harsh Guidelines range for this offense, and (2) account for the substantial mitigating factors under 18 U.S.C. § 3553(a) that are clearly present in this case. When looking at all the factors pertaining to Mr. Jones—his conduct, his personal history, and his present circumstances—these mitigating factors far outweigh any aggravating factors and enhancements. Aside from the abuse he suffered as a child at the hands of his mother and the neglect of his father, Mr. Jones was extraordinarily cooperative when apprehended and interviewed by the police, has exhibited extreme remorse and super acceptance of responsibility, was suffering from a mental condition at the time he committed the offense, and has made extraordinary efforts in not only rehabilitating himself but profoundly assisting others in their rehabilitation. Furthermore, in light of his age, physical stature, and the type of crime for which he will be sentenced, he will be especially vulnerable to abuse and victimization in prison.

Other mitigating factors include Mr. Jones's excellent behavior while on pretrial supervision and the various collateral consequences that he and his family will suffer including lifetime sex offender registration, the inability to make money as an author while in prison, the loss of income to his wife and son, and the permanent loss of voting rights, to name a few. Mr. Jones is also extremely unlikely to reoffend, has performed exceptionally good works in the community

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

with his church, has already served a lengthy period under pretrial house arrest, and enjoys incredibly strong family and community support. Lastly, the disparity between state and federal sentences for this crime bears repeating: the <u>maximum</u> prison sentence he could possibly face in state court for these offenses would be six years and eight months and, in reality, would likely be probation with a jail sentence of less than one year to be satisfied on electronic home monitoring.

In sum, Mr. Jones respectfully submits that a sentence of the mandatory minimum 60 months is more than sufficient but not greater than necessary to punish him for these offenses and at the same time achieve the goals of sentencing under 18 U.S.C. § 3553(a)(2). There is no question that there are many substantial mitigating factors pursuant to 18 U.S.C. § 3553(a) that apply to Mr. Jones, which in turn justify a significant downward variance. Sixty months (five years) in prison is still a very significant sentence for this defendant in light of all the facts and circumstances of this case.

## STATEMENT OF FACTS

After receiving a report of suspected child pornography from Google in September 2016, state law enforcement searched Mr. Jones's residence on December 29, 2016, and seized a number of electronic devices containing child pornography. *PSR*, ¶¶ 6-21. He was arrested by the San Francisco Police Department for child pornography-related offenses and was released on bail the following day. *Id.* at ¶¶ 4, 21. On January 4, 2017, Mr. Jones was charged in San Francisco Superior Court with possessing and distributing child pornography. However, he was later indicted in this Court on February 7, 2017. *Id.* at ¶ 1. He was arrested on March 7, 2017, while on his way to a court appearance in the state court proceeding (with his counsel at court wondering why Mr. Jones was not showing up for his court appearance) and made an initial appearance in this Court the next day, at which time he was remanded into custody. *Id.* at ¶ 22. On March 10, 2017, he was released on a $250,000 unsecured bond. *Id.* at ¶¶ 4, 22. He has been totally compliant with the conditions of his release while supervised by United States Pretrial Services, with not a single report of a violation. *Id.* at ¶ 4.

4

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

On April 2, 2018, Mr. Jones entered an open plea of guilty to the two counts in the indictment: Distribution of Child Pornography in violation of 18 U.S.C. § 2252(a)(2) (Count One) and Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (Count Two). *PSR,* ¶ 2. Count One carries a five-year mandatory minimum prison sentence.

The United States Probation Department has calculated Mr. Jones's total offense level to be 33. *PSR*, ¶ 47. Mr. Jones's Criminal History Category is decidedly a Category I since he has absolutely no prior criminal history whatsoever. *Id.* With an adjusted offense level of 33 and a Criminal History Category I, Probation has determined Mr. Jones's Guidelines range to be 135 to 168 months and is recommending a sentence at the low end of that range, 135 months.

## DISCUSSION

### I.

### THE COURT HAS DISCRETION TO IMPOSE A REASONABLE SENTENCE BELOW THE GUIDELINE RANGE

**A.    POST-*BOOKER* SENTENCING PROCEDURES**

The landmark decision in *United States v. Booker*, 543 U.S. 220 (2005) changed sentencing in the Federal Courts. *Booker* renders the Guidelines advisory only and instructs the sentencing courts to consider the Guidelines in the context of all of the factors enumerated in 18 U.S.C. § 3553(a). *Booker* at 245. With respect to appellate review of sentencing decisions, the Court stated:

> We infer appropriate review standards from related statutory language, the structure of the statute, and the "'sound administration of justice.'" [citation] And in this instance those factors, in addition to the past two decades of appellate practice in cases involving departures, imply a practical standard of review already familiar to appellate courts: review for "unreasonable[ness]." [citation] … Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.

*Booker* at 260-261 (internal citations omitted).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Sentencing courts may sentence outside the Guidelines range if such a sentence is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (*en banc*), cert. denied; *Zavala v. United States*, 553 U.S. 1061 (2008). The district court shall <u>not</u> presume that a within-guideline sentence is reasonable. *Gall* at 50 (emphasis added). The United States Supreme Court has addressed the issue of presumption of reasonableness of a within-guideline sentence in *Rita v. United States,* 551 U.S. 338 (2007) and instructed that a within-guideline sentence is presumed reasonable only upon appellate review.

Finally, the courts have stated that the "reasonableness" of a sentence is reviewed for abuse of discretion. *United States v. Yahnke*, 395 F.3d 823, 826 (8th Cir. 2005) (equating a sentence that is "reasonable" with a sentence that is "not an abuse of discretion"); see also *United States v. Miller,* 479 F.3d 984 (8th Cir. 2007) (holding that conflating departure considerations and the variance analysis can be harmless error where the ultimate sentence is not unreasonable). Determining "reasonableness" is a complicated and often subtle process that requires the court to consider all the complex factors inherent in any case and specifically related to the individual standing before it. Again, as the Ninth Circuit held in *Zavala* (prior to *Booker* and the subsequent *en banc* review):

> To put it another way, even though it is very likely that the Guideline calculation will yield a site within the borders of reasonable sentencing territory, that still does not mean either that there are no other sites within those borders, or that one of them will not prove to be the most reasonable sentence for the particular individual, or that the district court should resist being led to another site, or that the district court should not strive to reach the best site.

*United States v. Zavala*, 443 F.3d 1165, 1170 (9th Cir. 2006), on reh'g en banc sub nom.; *Carty*, 520 F.3d at 993.

In fact, jurists have repeatedly opined that the Guidelines are often too harsh. See, e.g., Testimony of Justice Kennedy before the Senate Judiciary Committee, February 14, 2007 ("Our sentences are too long, our sentences are too severe, our sentences are too harsh ... [and because there are so few pardons] there is no compassion in the system. There's no mercy in the system.")

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

(video link available at http://sentencing.typepad.com/sentencing_law_and_policy/2007/02/justice_kennedy.html); Speech of Justice Kennedy at the Ninth Circuit Judicial Conference, July 9, 2006 ("I think the guidelines are far too severe .... The fact that the prison guards' association lobbies for higher penalties is sick.") (http://talkleft.com/new_archives/015288.html); Speech of Justice Kennedy at the ABA Annual Meeting, August 9, 2003 ("Our resources are misspent, our punishments too severe, our sentences too long. ... The sentencing guidelines are responsible in part for the increased terms ... [and they] should be revised downward.") (http://www.abanews.org/kencomm/amkspeech03.html); see also *United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) (citing Justice Kennedy's August 9, 2003 comments and noting that the "increased prison population is due in large part to longer sentences. For the same crimes, American prisoners receive sentences twice as long as English prisoners, three times as long as Canadian prisoners, four times as long as Dutch prisoners, five to 10 times as long as French prisoners, and five times as long as Swedish prisoners. Yet these countries' rates of violent crime are lower than ours, and their rates of property crime are comparable.")

If the Court determines that a sentence outside the Guideline range is justified and reasonable, then it must decide what sentence is warranted, and must adequately explain its reasoning "to allow for meaningful appellate review and to promote the perception of fair sentencing," applying a "deferential abuse-of-discretion standard." *Gall* at 50.

Next, the Court must consider the pertinent Section 3553(a) factors and decide whether those factors call for a sentence outside the Guidelines. *Gall* at 49-50. The sentencing judge is required "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Olhovsky*, 562 F.3d. 530 (3d Cir. 2009), citing *Gall*, 552 U.S. at 597.

The Court may impose an out-of-guidelines sentence based on a combination of mitigating factors, including those which the advisory Guidelines previously prohibited or discouraged. *United States v. Decora,* 177 F.3d 676 (8th Cir. 1999); *United States v. Menyweather*, 431 F.3d 692, 700 (9th Cir. 2005). The Court is thus required to consider certain factors that the Guidelines effectively prohibited from consideration (i.e., *Age*, USSG 5H1.1; *Education and Vocational*

*Skills*, USSG 5H1.2; *Mental and Emotional Condition*, USSG 5H1.3; *Physical Condition Including Drug or Alcohol Dependence*, USSG 5H1.4; *Employment*, USSG 5H1.5; *Family Ties and Responsibilities,* USSG 5H1.6; *Socio-economic Status*, USSG 5H1.10; *Civic and Military Contributions*, USSG 5H1.11; and *Lack of Youthful Guidance*, USSG 5H1.12.). *Decora* at 678*; United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005) (*en banc*).

Finally, the overarching directive in Section 3553(a) is for sentencing courts to impose a sentence that is "sufficient, but not greater than necessary," to accomplish the purposes set forth in Section 3553(a)(2).[1] Thus, this Court must sentence below the advisory Guideline range where the Guideline sentence is greater than necessary to achieve those goals in a particular case.

The Court may consider without limitation any information concerning the background, character, and conduct of the defendant "which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

**B.      THE DISTRICT COURT'S DISCRETION TO SENTENCE BELOW THE GUIDELINE RANGE**

In *Rita*, the Supreme Court acknowledged that a district court may exercise its discretion to sentence below the Guideline range based on its own fact finding because "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or … the case warrants a different sentence regardless." *Rita* at 351 (citations omitted).

Sentencing courts may not require "'extraordinary' circumstances to justify a sentence outside the Guidelines range" and may not use a proportional formula "for determining the strength of the justifications required for a specific sentence.'" *Gall* at 47. The Court need only find that, due to pertinent factors, the appropriate sentence falls below the Guideline range. See *Rita* at 351.

---

[1] Those purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

## II.

### GUIDELINES CALCULATIONS: THE GUIDELINES RANGE IS EXCESSIVE AS APPLIED TO MR. JONES, AND HE IS ENTITLED TO THE THIRD LEVEL REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY.

### A.    THE CHILD PORNOGRAPHY GUIDELINE IS EXCESSIVE AND NOT BASED ON EMPIRICAL EVIDENCE.

In this case, USSG § 2G2.2 provides for an adjusted offense level of 33, including a two-level reduction for acceptance of responsibility. In addition to the base offense level of 22, there is a two-level enhancement for images of a prepubescent minor (USSG § 2G2.2(b)(2)); a four-level enhancement for material portraying sadistic or masochistic conduct (USSG § 2G2.2(b)(4)); a two-level enhancement for use of a computer (USSG § 2G2.2(b)(6)); and a five-level enhancement for 600 or more images. The resulting advisory sentencing range for this first-time offender is 135 to 168 months—***11 to 14 years of incarceration***—for the possession and attempted distribution of a single video of child pornography.

Ordinarily, the Guidelines are entitled to deference because they are the product of years of careful study. When a particular guideline is not the result of careful study or empirical analysis, by contrast, such deference is unfounded. See *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007). In *Kimbrough*, a case involving the sentencing disparity between crack cocaine and powder cocaine offenses, the Supreme Court held that district courts have discretion to vary from a correctly calculated Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Id*. at 101. In particular, the Court recognized that when guidelines are not the result of "empirical data and national experience, guided by a professional staff with appropriate expertise," they do not "exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109. In such cases, sentencing courts may conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Id*. at 110.

The Ninth Circuit has reached the same conclusion regarding § 2G2.2. See *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011). Not only does the *Henderson* decision recognize that

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

"district courts may vary from child pornography guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case," *id*. at 963, but it holds that a district court "commits procedural error when it fails to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines based on a categorical disagreement with them," *id*. at 964.[2]

The Guidelines for child pornography offenses have increased dramatically over the years, and in nearly every instance, these increases were mandated by Congress, often over the objection of the Sentencing Commission. See *Henderson*, 649 F.3d at 960-62. When possession of child pornography was criminalized in 1990, the Sentencing Commission created a new guideline for that offense, with a base offense level of 10 and a two-level enhancement for material involving a prepubescent minor. *Id.* (citations omitted). Congress was not satisfied, however, and in 1991, "over the objection of the Commission," Congress directed the Commission to increase penalties for child pornography offenses. *Id.* at 960. Among other changes, Congress "explicitly ordered the Commission" to increase the base offense levels to 15 (for receipt, transportation, and trafficking) and 13 (for possession). *Id*. at 960-61.

Congress demanded further increases in 1995, increasing the base offense level by two levels and adding a two-level enhancement for use of a computer. *Id*. When the Commission submitted a report to Congress that was critical of the congressionally mandated two-level computer enhancement because "it failed to distinguish serious commercial distributors from more run-of-the-mill users," Congress "responded with legislation that directed the Commission to add enhancements for the use of a computer to persuade, induce, entice, coerce or facilitate the

---

[2] Other Circuits have reached similar conclusions. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (holding that § 2G2.2 "can lead to unreasonable sentences that are inconsistent with what § 3553 requires"); *United States v. Grober*, 624 F.3d 592, 608-09 (3d Cir. 2010) (holding that because § 2G2.2 was not developed pursuant to the Commission's characteristic institutional role, district courts may vary from on policy grounds); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (same); *United States v. Polouizzi*, 760 F.Supp.2d 284, 286 (E.D.N.Y. 2011) ("The guidelines range is 135 to 168 months for four counts of receipt of child pornography and one count of possession (see § 2G2.2), with no criminal history. It is grossly excessive. Exercising discretion to impose a sentence within the Sentencing Guidelines would compound an unnecessary cruelty.")

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

transport of a child; to increase penalties in any case in which the defendant engaged in a pattern of activity; and to clarify that distribution included distribution for nonpecuniary gain." *Id*. at 961 (citations omitted).

With the enactment of the 2003 PROTECT Act, "Congress—for the first time and the only time to date—made direct amendments to the Guidelines." *Id*. (citation omitted). These amendments included an enhancement for images of sadistic or masochistic conduct and a range of enhancements based upon the number of images. *Id*.

> In sum, the child pornography guidelines have been substantively revised nine times during their 23 years of existence. Most of the revisions were Congressionally-mandated and not the result of an empirical study. As the Commission itself has explained, "The frequent mandatory minimum legislation and specific directives to the Commission to amend the [G]uidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress."

*Id*. (citation omitted).[3]

The result is that many of the individuals sentenced under § 2G2.2 face sentences that are excessive and unwarranted. Mr. Jones's case is illustrative. When the Commission promulgated the first set of guidelines in 1987, possession of child pornography was not a federal crime at that time. Three years earlier, distribution of child pornography that did not involve trafficking for pecuniary gain had been made a crime. See *Exhibit A* hereto[4] (*United States Sentencing Commission, The History of Child Pornography Guidelines* (Oct. 2009) at 9-11). Under the first set of Guidelines adopted in 1987, Mr. Jones's Guideline range with the adjustment for acceptance

---

[3] Not only were these revisions mandated without regard for the Commission's input, but many were "the result of arbitrary increases by Congress slipped into other bills, often with little or no debate." *United States v. Hanson*, 561 F.Supp.2d 1004, 1009 (E.D. Wis. 2008).

[4] All citations to exhibits herein refer to those attached to the Declaration of Counsel in Support of Sentencing Memorandum (hereafter "Chazin Decl."), filed herewith.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

of responsibility would have been 24 to 30 months. See *id.* at 12. [5]  Had he been sentenced under the 2001 version, his sentencing range would have been 51 to 63 months. *Id*. at 36.

After Congress passed the PROTECT Act of 2003, however, the applicable Guidelines range for Mr. Jones's conduct increased dramatically. By the time the Sentencing Commission implemented all of the changes mandated by the PROTECT Act, Mr. Jones's Guidelines range had increased to the current 135 to 168 months. See *id*. at 53.

The escalating Guideline ranges in child pornography cases have caused "widespread dissatisfaction" among district court judges. *United States v. Apodaca*, 641 F.3d 1077, 1083 (9th Cir. 2011) (citing U.S.S.C., *Results of Survey of United States District Judges January 2010 through March 2010* (2010) ("Judicial Survey"), available at http://www.ussc.gov/sites/default/ files/pdf/research-and-publications/research-projects-andsurveys/surveys/20100608_Judge_Survey .pdf). For example, 71 percent of the federal judges surveyed in 2010 believed that the mandatory minimum sentence for receipt of child pornography was too high, and 69 percent believed that the guidelines for receipt offenses were too high. See Judicial Survey, *supra*. The judiciary's discomfort with the child pornography guidelines is reflected in the sentences imposed. In fiscal year 2013, less than one third of the sentences imposed were within the advisory § 2G2.2 guideline range. See U.S.S.C, *2013 Sourcebook of Federal Sentencing Statistics (2013)* at Table 28, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports- and-source books/2013/Table28.pdf. [6]

Section 2G2.2's overly harsh sentencing ranges also run afoul of the requirement that the sentencing court impose a sentence based on the individual characteristics of the offender. See 18 U.S.C. § 3553(a); see also *Henderson*, 649 F.3d at 965 (Berzon, J., concurring). As Judge Berzon notes, "an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders

---

[5] The 1987 guideline for § 2G2.2 included a base offense level of 13, plus two levels for a minor under 12, plus five levels for distribution (this enhancement was based on the pecuniary value of the images, which is unknown here, so the minimum enhancement of five levels is used), less three levels for acceptance of responsibility.

[6] Specifically, of the 1,626 total cases sentenced under § 2G2.2, only 22 were above the range, 499 were within the range, and the remaining 1,105 were below the range. *Id.*

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

being sentenced to near the statutory maximum term," a result which "stands in significant tension with a sentencing judge's duties 'to consider every convicted person as an individual.'" *Id.* (citation omitted).

Moreover, as one district court judge has observed:

> [T]he enhancements for use of a computer and images containing children under age twelve are typical of this crime. Further, given the unfortunate ease of access to this type of material in the computer age, compiling a collection with hundreds of images is all too easy, yet carries a 5 level enhancement, which in this case nearly doubled the range.... The other large enhancement defendant received–4 levels for portrayal of sadistic conduct–applies whether or not the person specifically intended to possess such material, *see* U.S.S.G. § 2G2.2 cmt. n.2, which seems an odd way of measuring culpability.

*Hanson*, 561 F.Supp.2d at 1009. Indeed, specific offense characteristics applied in 99.9 percent of the cases sentenced under § 2G2.2 in fiscal year 2013. *See* U.S.S.C, Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2013, available at http://www.ussc.gov/sites /default/files/pdf/research-and-publications/federal-sentencingstatistics/guideline-application frequencies/2013/Use_of_Guidelines_and_Specific_Offense_Characteristics_Guideline_Calculati on_Based.pdf. According to the U.S. Sentencing Commission's fiscal year 2013 figures, the percentage of child pornography defendants who received the exact same enhancements that Mr. Jones receives are as follows:

| | |
|---|---|
| § 2G2.2(b)(2) victim under the age of 12 years (2 levels): | 96.1% of defendants |
| § 2G2.2(b)(4) sadistic/masochistic or other violence (4 levels): | 82.8% of defendants |
| § 2G2.2(b)(6) use of a computer (2 levels): | 95.3% of defendants |
| § 2G2.2(b)(7)(D) 600 images or more (5 levels): | 79.0% of defendants |

Because the enhancements apply in virtually every case, there is little room for the sentencing court to distinguish between more and less culpable offenders.[7]    Indeed they are not

---

[7] See *United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008) (variance from 135-168 months to 66 months justified in part because multiple enhancements [images of prepubescent minors, distributing for value, use of computer, etc.] were for similar activity that "improperly exaggerated

13

offense characteristics at all but considerations that are innate to the offense. In particular, § 2G2.2 makes it difficult to "differentiate between those who create child pornography and those who consume it." *United States v. Cruikshank*, 667 F.Supp.2d 607, 701-02 (S.D.W.Va. 2009). The enhancements also raise troubling issues regarding intent and knowledge. As one district court has observed, the "nature of file-sharing software is such that offenders often have little control over or awareness of the number of images being downloaded." *United States v. Burns,* 2009 WL 3617448, at *7 (N.D.Ill. Oct. 27, 2009). Similarly, defendants often acquire images that trigger enhancements—for example, images of prepubescent minors or images depicting sadistic or masochistic conduct—without intending to acquire such images or even realizing that they have done so. See *id.* This appears to be the case with Mr. Jones.

Yet another problem with § 2G2.2 was identified by Judge Berzon in her concurring opinion in *Henderson*: Section 2G2.2 often recommends "longer sentences for those who receive or distribute images of minors than the applicable Guidelines recommend for those who actually engage in sexual conduct with minors." *Henderson*, 649 F.3d at 965 (Berzon, J., concurring) (citation omitted). For example, a person pleading guilty to enticing a child to cross state lines and then molesting the child would have a lower recommended Guidelines range than Mr. Jones.[8] The sentences produced by other Guidelines that address very serious, violent conduct further highlight the excessive ranges produced by § 2G2.2: had Mr. Jones robbed a bank and brandished a gun to threaten bank employees, and committed a carjacking to effectuate his getaway, he would face an offense level 26.[9] Had he assaulted someone with the intent to commit a second degree murder and caused his victim a life-threatening injury, his offense level would be 28.[10]

---

the guidelines" and created punishment greater than necessary. Enhancements that "almost repeat one another ... speaks not to a problem of double counting but to a perception that the guidelines sentence is higher than this conduct deserves—a concern that *Booker* aptly allows a court to consider in applying advisory guidelines.").

[8] See USSG § 2G1.3 (base offense level 28 plus 2 levels for an offense involving a sexual act or sexual conduct less 3 levels for acceptance of responsibility results in adjusted offense level of 27).

[9] Guideline § 2B3.1(a) sets a base offense level of 20, to which two levels are added when a financial institution is robbed, and an additional five levels for the brandishing of a firearm, and

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Mr. Jones's advisory Guidelines sentence, even with the two-level reduction for acceptance of responsibility, is 11 to 14 years. Rather than simply defer to the Guidelines, the Court must craft a reasonable sentence based on all factors included in § 3553(a).

## B.    THE THIRD LEVEL FOR ACCEPTANCE OF RESPONSIBILITY SHOULD BE APPLIED.

The third level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b) should be applied in this case despite the government's refusal to move for the reduction itself.

USSG § 3E1.1 provides, "Acceptance of Responsibility ... (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level."

The government does not have unfettered discretion to refuse to file a motion for the third level reduction for acceptance of responsibility. See *United States v. Johnson*, 581 F.3d 994, 1001 (9th Cir. 2009) ("A district court may review the government's refusal to file a § 3E1.1(b) motion and grant the additional one-level reduction *sua sponte* if it finds that the decision was (1) animated by an unconstitutional motive (e.g., racial discrimination), or (2) arbitrary—i.e., not rationally related to a legitimate governmental interest."). Further, effective November 1, 2013, "the application notes to § 3E1.1 were amended to clarify that '[t]he government should not withhold [a motion for a third-level reduction] based on interests not identified in § 3E1.1, such as

two more for the carjacking, totaling 29 from which three levels would be deducted for acceptance of responsibility.

[10] Guideline § 2A2.1(a) sets a base offense level of 27, which would be increased by four levels for the life-threatening injury, adjusting the offense level to 31. With a three-level reduction for acceptance of responsibility, the total offense level is 28.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

whether the defendant agrees to waive his or her right to appeal.' U.S. Sentencing Guidelines Manual § 3E1.1 cmt. n.6 (2014)." *United States v. Sahagun-Gallegos*, 782 F.3d 1094, 1097 (9th Cir. 2015); USSG Amendment 775, effective November 1, 2013.

The language of USSG Amendment 775 notes with approval those circuits that have held that the government must show that the defendant's actions did not allow it "to avoid preparing for trial" before a third point can be correctly denied. See USSG Amendment 775 at p. 32; *United States v. Divens*, 650 F.3d 343, 348 (4th Cir. 2011) ("[T]he text of § 3E1.1(b) reveals a concern for the efficient allocation of *trial* resources, not *appellate* resources" [emphasis in original]); *United States v. Lee*, 653 F.3d 170, 174 (2d Cir. 2011) ("[T]he plain language of § 3E1.1(b) refers only to the prosecution resources saved when the defendant's timely guilty plea 'permit[s] the government to *avoid preparing for trial*.' U.S.S.G. § 3E1.1(b) (emphasis added)."). Case law interpreting the new commentary continues to focus on whether the change in plea allowed the government to avoid preparing for trial in determining whether it could properly withhold the third level. See *United States v. Castillo*, 779 F.3d 318, 325 (5th Cir. 2015) ("[W]e interpret Amendment 775's citing of the holding in Lee as implicitly endorsing it …. Accordingly, although the current version of the guideline refers to efficient allocation of governmental resources, it does so only in the context of preparing for trial.").

Indeed, the Ninth Circuit has recently acknowledged that "Amendment 775 to the U.S. Sentencing Guidelines changed the text of Application Note 6 of § 3E1.1(b), and clarified the scope of the government's discretion to withhold a third-level reduction." *United States v. Barrow*, 606 F. App'x 335, 336 (9th Cir. 2015) (memorandum opinion).

Here, Mr. Jones's plea clearly permitted the government to avoid preparing for trial. On November 28, 2017, the Court set the first trial date in this matter for March 19, 2018. On February 26, 2018, after ongoing settlement negotiations, conversations about problematic discovery issues, and a defense proposal to continue the trial as a result, the government sent defense counsel a draft plea agreement. On March 1, 2018, the parties stipulated to continue the trial to April 23, 2018, in order to continue settlement negotiations and allow time for the discovery issues to be resolved, and on March 5, 2018, the Court granted the stipulation. Even

16
DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

during that time—before the continuance was approved by the Court and with the trial date outstanding—the government was still willing to move for the third acceptance point as long as Mr. Jones plead before March 9. See *Exhibit I*, p. 4 (email from government counsel on March 2: "If your client pleads guilty at any time after March 9, I will not move for the third point for acceptance of responsibility."). During this time, defense counsel consistently communicated a continuing desire to enter a plea and settle the case short of trial. *Id.* at pp. 2 and 5 (emails from defense counsel on March 2: "That said I hope we are able to work something out with your office." "We are feeling that we are being pushed into having to plead open to the court ...."). Settlement negotiations continued over the next weeks, and defense counsel met with the criminal chief of the United States Attorney's Office on March 15. At that time, government counsel suggested vacating the trial date and setting a date for change of plea, and defense counsel agreed. *Id.* at pp. 11 and 13. Mr. Jones then plead open on April 2, 2018, over three weeks before the last trial date.

The understanding was always that Mr. Jones was going to plead either pursuant to a plea agreement or open to the Court; the issue was simply to what count(s) he would plead and what enhancements would be applicable. Thus, it is not reasonable to deny him the third level for acceptance of responsibility in this circumstance, and Mr. Jones respectfully requests that the Court apply this third level reduction despite the government's refusal to make such a motion.

### III.

### THE RELEVANT CHARACTERISTICS AND FACTORS UNDER 18 U.S.C. § 3553(a) OVERWHELMINGLY SUPPORT A DOWNWARD VARIANCE.

In order to impose a sentence that is sufficient but not greater than necessary, the Court must consider not only the facts surrounding the offense, but also the history and characteristics of the defendant and the specific goals of sentencing. See 18 U.S.C. § 3553(a). In this case, those factors overwhelmingly support a substantial downward variance below the Guidelines range.

17

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

## A.    ABERRANT CONDUCT FUELED BY ADDICTION

The Court may grant a downward variance where it appears that the defendant's criminal conduct was a marked deviation from an otherwise law-abiding life. *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009).

In *Autery*, the Ninth Circuit found that the district court's *sua sponte* variance to probation from a Guidelines range of 41 to 51 months for possession of child pornography was reasonable in part because it was the defendant's first conviction and the fact that his placement in Criminal History Category I "did not fully account for his complete lack of criminal history" because a defendant with a minor criminal history also falls into Category I. *Id.* at 874. The court also found that defendant did not "fit the profile of a pedophile" and noted defendant's other positive characteristics "such as his having no history of substance abuse, no 'interpersonal instability' nor 'sociopathic or criminalistic attitudes,' his motivation and intelligence, and that he has the support of his wife and children" as attributes that "undoubtedly constitute 'history and characteristics of the defendant'" justifying a variance below the Guidelines. *Id.*; see also *United States v. Rojas-Millan*, 234 F.3d 464, 474 (9th Cir. 2000) (sentencing court has authority to depart downward for aberrant behavior); *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir. 1991) (first offense may constitute a single act of truly aberrant behavior justifying a downward departure); *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*) (variance to probation reasonable in part because of defendant's minimal criminal record); *United States v. Duane*, 533 F.3d 441 (6th Cir. 2008) ("Because Duane had zero points at age 57, he might plausibly argue that even category I—which applies when a defendant has zero or one criminal history point(s)—overstated his criminal history to some degree.").

Similarly, in *United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008), the Tenth Circuit upheld a variance from a Guidelines range of 78 to 97 months to a sentence of 24 months in part because it was defendant's first conviction. The court rejected the government's argument that the Guidelines already consider this by placing defendant in Criminal History Category I: "[A]lthough the Guidelines discourage granting a downward departure based upon criminal history when the defendant has been placed in a criminal history category of I, this is a not a departure case, it is a

18

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

variance case. And, after *Gall* and *Kimbrough*, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a). Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis." *Id.* at 1318 (internal citations omitted); see also *Recidivism and the "First Offender,"* Report of the United States Sentencing Commission, May 2004 ("The analysis [of empirical data on reoffending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. *Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism risk of all.*" (emphasis added).)

Like the defendant in *Autery*, Mr. Jones exhibits virtually all of the positive characteristics that were identified by the *Autery* court as supporting a finding of aberrant conduct and thus a basis for a downward variance below the Guidelines range. These characteristics include no prior criminal record or arrests whatsoever, no history of substance abuse (aside from the prescribed use of Ritalin as discussed below); no sociopathic or criminalistic attitudes; various indicators from his professional writing career revealing that he is a motivated, intelligent, and well-respected author, teacher, and colleague; and a clear indication of enormous support from his wife, son, friends, colleagues and church and 12-step recovery communities. See *Autery* at 874 and *Exhibits G-1 to G-70;* see also *Exhibit F*, p. 14 (Confidential Report of Psychological Evaluation dated November 3, 2017, and CV of Jeremy Coles, Ph.D., wherein Dr. Coles finds that Mr. Jones's use of the pornographic contraband was both aberrant and situational in nature and not indicative of any deep underlying personality disorder or innate deviancy).

Accordingly, where Mr. Jones's offense conduct represented a marked deviation from an otherwise law-abiding life, a substantial downward variance is appropriate.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

**B.    LOW RISK OF RECIDIVISM**

A downward variance is also justified by a finding that the defendant presents a low risk to reoffend and thus a lengthy term of incarceration (with its heavy cost to taxpayers) is not truly necessary to protect the public or to act as a deterrent. *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) (variance from 18-24 months to probation for 67-year old defendant convicted of mail fraud was proper in part because "Wadena's age and recent deterioration in his health reduce the risk of reoffending, however, as do the terms of his probation"); *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (defendant convicted of bankruptcy fraud with Guidelines range of 27-33 months; court upheld sentence of probation with seven months house arrest in part because "Section 3553(a) … does not require the goal of general deterrence be met through a period of incarceration."); see also *Recidivism and the "First Offender," Report of the United States Sentencing Commission, supra.*

Mr. Jones's therapist, Cynthia Rinker, explains in her Risk Assessment that child pornography offenders typically reoffend at a very low rate, and research indicates that a higher recidivism risk is associated with the following characteristics: (1) the offender is young, (2) the offender has never been married, (3) the offender has a low level of education, (4) the offender has a prior criminal history (especially violent or sexual offense), (5) the offender has a history of conditional release failure, (6) the offender has substance use problems, and (7) the offender possesses non-internet child pornography. See *Exhibit D* (letter from Cynthia V. Rinker, MFT and Certified Sex Addiction Therapist (CSAT) at the San Francisco Forensic Institute (SFFI)), further noting that offenders who successfully complete treatment recidivate at a rate 50 percent less than those who participate but do not complete treatment). Applying these factors to Mr. Jones, Ms. Rinker concludes:

> In Mr. Jones's case, in terms of factor 1, he is of sufficient age for this factor to mitigate his risk. In terms of factor 2, he has maintained at least one long-term, marital relationship and continues to be in this relationship. In terms of factor 3, he has an advanced degree. This factor may separate him from typical recidivists. In terms of factor 4, Mr. Jones has no known prior criminal history. In terms of factor 5, Mr. Jones has never been on probation. This does not aggravate or mitigate risk. In terms of

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

factor 6, Mr. Jones denies a substance abuse problem. In terms of factor 7, Mr. Jones was not found to possess non-internet child pornography. Factors above except #5 support a lower risk than the average recidivist.

Mr. Jones was involved in compulsive, almost addictive-like behavior albeit with harmful material. He demonstrated anxious and depressive symptoms such as diminished interest or pleasure in activities that he normally found pleasure in, loss of energy, and excessive work to the detriment of himself. This behavior was likely a way for him to escape into a fantasy world that he would not likely act out in the real world. He denies a sexual interest in children and has demonstrated long-term relationships with women.

Mr. Jones presents as an exceptional candidate to successfully complete treatment. In short, I believe that with proper treatment, Mr. Jones will further lower his risk of re-offense. Addressing maladaptive behavior as soon as it is discovered provides the best potential for remission. Continuing with treatment would be in his benefit.

*Exhibit D*, p. 2; see also *Exhibit E* (second letter from Ms. Rinker regarding Mr. Jones's extraordinary rehabilitation success and concluding that Mr. Jones "is clearly doing solid work in the name of himself, victims, and others that may end up in similar situations. Continuing with this path of treatment and service to others uninterrupted would benefit him as long as possible prior to entering custody and returning to the community as soon as he is able."); *PSR*, ¶¶ 92-97.

Thus, in light of the factors referenced above by Ms. Rinker clearly establishing that Mr. Jones presents a low risk of recidivism, the least of which is that Mr. Jones is 61 years old with no prior criminal history, there is a sound basis for the Court to vary downward below the Guidelines range. *United States v. Wadena* and *United States v. Edwards*, *supra*; see also *Exhibit F* (Confidential Report of Psychological Evaluation wherein Dr. Coles concludes that Mr. Jones's risk of re-offense is "very low," that "there is little to no chance that he would not comply with the conditions of a community release plan," and that his demonstrated commitment to his treatment program presents a very positive prognosis).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

## C.      USE OF RITALIN, ADDICTION, AND MENTAL HEALTH

In addition to her findings noted above, Ms. Rinker also connected Mr. Jones's prescribed use of Ritalin with his serious bouts of obsessive sexual behavior and internet pornography use. *PSR*, ¶¶ 91, 99-101; *Exhibit D.*

Mr. Jones was first prescribed regular (quick-acting) Ritalin by his psychiatrist in January 2006 but did not end up taking it. *PSR*, ¶¶ 91, 99-101. It was prescribed again in 2010, and Mr. Jones took it periodically until late 2011. In November 2012, he was first prescribed extended-release Ritalin, which he began using in early 2013. *Id.* Perhaps not coincidentally, it was at this time that his use of legal internet pornography and chats took off. His heaviest Ritalin usage—including overlapping doses and taking more than was prescribed—came in late 2015, which is when his online behavior became its most compulsive. The mass downloading of illegal porn in December 2015 and January 2016 all occurred during his greatest use of extended-release Ritalin. *Id.* He then stopped using from mid-January until early June 2016, when he started again. This was also when he started uploading to YouTube, including the accidental attempted upload of child pornography. *Id.*

In his evaluation of Mr. Jones, Dr. Coles concluded that Mr. Jones is not a predator or pedophile. See *Exhibit F* (Confidential Report of Psychological Evaluation). Furthermore, Dr. Coles noted the direct correlation between the onset of Mr. Jones's involvement with child pornography and his being prescribed and using Ritalin to ameliorate the effects of Attention Deficit Disorder and improve his attention and ability to concentrate (which had been impaired and was affecting his work output). *Id.* at p. 15. Ultimately, Dr. Coles found that Mr. Jones's use of the pornographic contraband was both aberrant and situational in nature and not indicative of any deep underlying personality disorder or innate deviancy. *Id.* at p. 14. He also concluded that Mr. Jones is not a danger to the community and that his risk of re-offense is "very low." *Id.* at p. 15. In light of Dr. Coles's extensive experience and expertise as an evaluator for the State of California's Sexual Violent Predator Evaluation Panel, his opinion in this area can be relied upon with confidence. *Id.*

Mr. Jones has not used Ritalin since the day of his arrest, has no active prescription, and has no desire to use it again. *Id.* Mr. Jones does not present this chronology and correlation as an

22

excuse for his behavior, but it clearly appears to be a factor to consider when looking at how and why Mr. Jones's offense conduct came to pass and whether a variance below the Guidelines range is appropriate.[11]

Many courts have supported a downward variance based on addiction and mental health concerns. See, e.g., *United States v. Garcia*, 497 F.3d 964, 971-72 (9th Cir. 2007) (where defendant convicted of drug conspiracy, sentence of 100 years vacated in part because district judge erred in holding it had no power to consider to defendant's drug addiction and resulting mental impairment as a mitigating factor under 18 U.S.C. § 3553(a): "Just because a consideration was improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime. ... We agree with our sister circuits and hold that district courts are not prohibited in all circumstances from considering a defendant's drug addiction in choosing a reasonable sentence."); *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) (where defendant pled guilty to embezzling $650,000 from non-profit organization over course of three years, and where Guidelines range was 30-37 months, sentence of one day in jail and supervised release for three years on condition defendant spend one year in community treatment center to go to work and obtain counseling was not unreasonable in part because defendant "would clearly benefit from continued mental health treatment" for his gambling addiction); *United States v. Vieke,* 348 F.3d 811 (9th Cir. 2003) (crime committed because of "pathological nature of the [gambling] addiction" and was "totally out of suit with the rest of her life and the behaviors" even though fraud went on for years); *United States v. Thompson*, 315 F.3d 1071 (9th Cir. 2002) (Berzon, J. concurring) (district court should consider departure for diminished capacity because defendant could not control his addiction to pornography).

---

[11] Mr. Jones was also diagnosed with anxiety and depression in the 1990s and has experienced various associated addictive or obsessive-compulsive patterns over the years including workaholism, relationship/love addiction, and compulsiveness around general internet use and pornography in particular. *PSR*, ¶ 90. He has seen various counselors and therapists periodically going back to 1999 but only recently began attending the appropriate recovery program for his particular addictions (Sex Addicts Anonymous or "SAA"). *PSR*, ¶¶ 92-93. He currently takes the antidepressant Wellbutrin. *PSR*, ¶ 91.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Thus, Mr. Jones submits that the court should impose a downward variance in light of the documented use of Ritalin, its powerful effects on Mr. Jones's personality, conduct and mental health which in turn coincided with his addictive use of pornography and commission of the offense conduct in this case.

**D.    SUPPORT OF FAMILY AND COMMUNITY**

Mr. Jones is incredibly fortunate to have a deeply supportive family and surrounding community of friends and colleagues as well as profound support from his church and 12-step recovery communities. He has uncompromising support from his wife, Jennie, with whom he lives and who serves as his court-appointed custodian. She has worked as a registered OB-GYN nurse at UCSF and San Francisco General Hospital for 37 years. She is highly invested in his remaining sober and crime-free and reports that their relationship is stronger than ever and that Mr. Jones has continued to be entirely honest with her. See *Exhibit G-69*; *PSR*, ¶¶ 4, 80, 83, 87 (describing her husband as a "changed person"), 90. He also enjoys a very positive relationship with his 25-year old son, whom he financially supports. See *Exhibit G-70; PSR*, ¶ 83. This strong family support will undoubtedly aid his rehabilitation. See *United States v. Sayad*, 589 F.3d 1110, 1113 (10th Cir. 2009) (variance from 57 months to probation based in part on strong family support); Shirley R. Klein *et al., Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, *Gender, Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sent'g Rep. 148 (1995) ("[T]he better family ties are maintained[,] the lower the recidivism rate."); see also *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (downward variance in child porn case from 78-97 months to 42 months affirmed in part because defendant "is a good parent," which is a "valid consideration under § 3553(a)").

Mr. Jones is also a valued and active member in his church community. The clergy at St. Gregory of Nyssa Episcopal Church, all of whom are aware of the instant case, emphatically support him and value his contributions to the church community. See *Exhibit G-1* (letter from

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Reverend Dr. Paul D. Fromberg, Rector); see also *PSR*, ¶ 82. Mr. Jones helps with Sunday services and is also a key volunteer and leader at the weekly Food Pantry charity, where he volunteers from 8 a.m. to 4 p.m. every Friday, and where both of his supervisors and some of his fellow volunteers know of his charges. According to Reverend Fromberg, Mr. Jones "is reliable, sensible, courteous and kindhearted. His contributions to our Food Pantry are very helpful to our work." *Exhibit G-1;* see also *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*) (variance from 12-18 months to probation not unreasonable in part because of defendant's charitable activities and good deeds).

Lastly, Mr. Jones has unlimited support from his 12-step recovery community. Many members of his fellowship have supported him over the past 18 months when he entered into the Sex Addicts Anonymous ("SAA") program and some even accompanied him to court to support him at the time he entered his guilty plea.

As referenced above, Mr. Jones has an impeccable reputation with family members, friends, clergy, and colleagues, all of whom were surprised by the instant charges. He is submitting to the Court **70 letters of support** from his wife and son, longtime friends, clergy members, fellow recovery program members (including five sponsees and a sponsor), victims of childhood sexual abuse, and colleagues, most of whom have known Mr. Jones for decades. These heartfelt letters espouse a man with genuine integrity, a man who often puts others' needs before his own, and a man who works tirelessly and gives without question. All are fully aware of the nature of the charges. See *Exhibits G-1 to G-70* (summarized below); see also *United States v. Garcia*, 182 F.3d 1165, 1176 (10th Cir. 1999) (citing letters written on behalf of defendant attested to his good character and reputation for honesty).

It is a testament to Mr. Jones's recovery and character that he has been so public and forthcoming about his offense. He reports that he has not lost a single friend or family member because of this offense and plans to nurture every relationship. *PSR*, ¶ 84. He also plans to continue his writing, now incorporating his offense, prior experience, addiction, recovery, and spiritual journey into it. He knows he cannot be one of those offenders who tries to disappear and understands the importance of "stepping up" to continue his SAA involvement and other treatment

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

for the rest of his life. *Id.*; see also *United States v. Wachowiak*, 412 F.Supp.2d 958, 964 (E.D.Wisc. 2006), *aff'd* 496 F.3d 744 (7th Cir. 2007) (significant variance in child pornography case imposed in part because "the guidelines failed to account for the strong family support defendant enjoyed, which would aid in his rehabilitation and re-integration into the community. Because defendant's family and friends have not shunned him despite learning of his crime, he will likely not feel compelled to remain secretive if tempted to re-offend. Rather, he will seek help and support.")

<u>Friends, Clergy, and Community Members</u>

- Exhibit G-1, Letter from Dale Walker, friend and member of St. John's Presbyterian Church: "I have always known Mr. Jones to be an individual of the highest integrity and personal responsibility. When he has fallen short of his own standards, I have seen him apply himself fully to working on his issues both spiritually and psychologically. From our recent conversations, I know that he is facing his past actions squarely and doing all he can to improve himself and make amends. … I have only seen him go out of his way to be of service to others through his recovery program, his work as a writer and teacher, his church and his family. I am proud to number him among my friends and believe he is a true asset to our society."

- Exhibit G-2, Letter from Reverend John L. Kirkley, Rector at St. James Episcopal Church: "In my judgment, Gerry is absolutely committed to working a program of recovery and amending his life. He is actively searching for a Christian community to support his spiritual growth, as well actively participating in the fellowship of a 12-step program focused on sexual addiction. He is a person of good character and I do not believe him to be a danger to others."

- Exhibit G-3, Letter from Joseph Filice, longtime friend and collaborator: "I know that Gerard is facing child pornography charges. He's talked to me about it since right after his arrest. I know he's had addictive issues, and I know he got lost online for a while. But I also know that he's the same good man I've grown up with, that he's deeply remorseful for his errors, and that he's applying himself every day in every way to being the man he wants to be. And I know for certain that he would never cause harm to anyone. … I have no doubt that the Gerard Jones who emerges from all this will be the wisest, most honest, most decent, and most valuable version of him yet."

- Exhibit G-4, Letter from Reverend Dr. Paul D. Fromberg, Rector at St. Gregory of Nyssa Episcopal Church: "Since coming to St. Gregory's, [Gerry] has been faithful in attendance and eager to participate in some of the many different ministries we sponsor. Gerry is a valued member of our congregation. I know him to be conscientious in attendance, and eager to participate in our ministries of service to the community."

- Exhibit G-5, Letter from Arielle Rosen, friend: "I find Gerry to be endlessly introspective, humble and wise, and I appreciate his goal and ability to continuously strive towards being a better human and partner."

- Exhibit G-6, Letter from Sara Miles, Executive Director of the Food Pantry nonprofit: "Gerard Jones has been volunteering steadily at The Food Pantry every week since February of 2017. He is hardworking, generous, and able to relate well to very diverse communities. I appreciate his calming influence on the volunteers, his willingness to take responsibility for getting the harder physical tasks done, and especially his kindness toward our elderly clients."

- Exhibit G-7, Letter from Susan Stapczynski, longtime friend: "I have been friends with. Gerard Jones since 1981. … [F]or the past 36 years our families have been very close. … I've seen him interacting with my children from babyhood to adulthood and watched him raise his own son. … Gerry has always been a very kind and patient person and was very instrumental in my husband developing his writing skills and eventually getting published. He has been a steady and loyal friend to us and others over the years. [¶] Everything I've learned about Gerry over 36 years has shown me that he is an asset to everyone around him."

- Exhibit G-8, Letter from Sarah Sparks, family friend: "The Gerry Jones I know is a person who clearly cares about his wife, their family, his community, and behaving in accordance with the law. I also know he would welcome the opportunity to continue to be of service and support to others who may be tempted in engaging in similar behaviors that led to his arrest and are seeking their own therapeutic support and behavior changes."

- Exhibit G-9, Letter from Helene Manheim, fellow parent and learning specialist for K-4 students: "I have known Gerry Jones for over 15 years. We were part of the parent community at Live Oak School, where our children attended K - 8th grade. My daughter and Gerry's son were very good friends throughout most of their early school years. Gerry participated heavily in the school community and was a valuable support for teachers, parents and the children. [¶] I am aware of the pending charges against Gerard Jones. I have seen him around kids and I never saw inappropriate behavior nor heard of inappropriate behavior with children on his part."

Fellow Recovery Program Members

- Exhibit G-10, Letter from Kevin D., SAA sponsee: "For most recovering pornography addicts in our program, the consequences and wreckage we have created did not involve the legal or criminal justice system. By sharing his cautionary story humbly and honestly, Gerry is saving lives, preventing others from making the same mistake and contributing to the spiritual health of our community. [¶] If I could choose any outcome from Gerry's involvement in the legal system, it is that that system could see how much more useful and redeeming recovery is to society, as opposed to incarceration. Gerry's candidness about his wrongdoing, his demonstration of redemption, and his expression of remorse in every

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

meeting he attends is of profound value to every recovering pornography addict who hears him."

- Sealed Exhibit G-11, Letters from unnamed[12] SAA sponsee: "I have been fortunate to have had Gerard Jones as my sponsor in Sex Addicts Anonymous since June of last year. He has always worked a hard, dedicated program and has been a model to me in my own recovery. I see him attacking his addiction head-on, really owning his past behaviors, and working to become a better person. He is a valued member of our community for his honesty about his addictions and his offenses against the law, for his optimism in recovery, and for his generosity to others. [¶] Gerard advises me in many areas of life, including parenting. He is a devoted father and feels an obvious guilt and remorse for having engaged in behaviors harmful to young people. By being of service not only to members of our recovery program but to fathers like myself, he is clearly making amends for his actions."

- Exhibit G-12, Letter from Bill S., SAA sponsee: "Gerard Jones has been my sponsor in Sex Addicts Anonymous since late October, 2017. I was drawn to him because he speaks very honestly about his actions and the criminal charges that resulted, but is also obviously very interested in the welfare and recovery of others. He has talked about his strong remorse for the things he did in his addiction and the importance of not merely maintaining his own sobriety but of making amends to society by helping other addicts. From what I see in his work with me and his service to the SAA fellowship, it's clear to me that that's a conviction for him, not just lip service. … My sobriety has been stronger since I have been working with him."

- Exhibit G-13, Letter from Dallas Dean, SAA sponsee: "Gerard has been working with me for some months helping me develop a similar sincerity toward sexual sobriety. … I am aware of the serious criminal charges which Gerard is facing, and I trust that justice will be done. I am grateful for our well functioning law enforcement and legal systems which work to protect each of us. I am also grateful for the guidance, dedication, service, genuine concern, and evident sobriety which Gerard consistently brings to our interactions. I am especially grateful for the hope I feel as I aspire to, and work with Gerard toward, a similar serenity and sobriety."

- Exhibit G-14, Letter from John Schroder, SAA sponsee: "Gerry has been a steady, committed sponsor, talking honestly about his own struggles and past mistakes as well as the tools supporting his current sobriety. It's clear to me that he takes full responsibility for his mistakes and is working very hard to make restitution by being of service to others, both in the program and the community. Not only has he been enormously helpful to me in early recovery, but he is a strong presence in the meetings. [¶] I have only known Gerry for a few months, but I've spent hours talking to him and being supported by him. Gerry is both proactive, following up with me when I've had challenges in my recovery, and nurturing, listening deeply to get to know me as a person, and providing a safe and supportive environment for me to deal with what may be the most difficult challenge I've

---

[12] This letter along with nine others are being submitted under seal to protect the anonymity of the authors.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

had to face in my life so far. I know Gerry to be an intelligent and caring human being. I have experience in another 12-step program, and I know how challenging it can be to be a sponsor. Gerry makes it look easy, and I cannot imagine finding a better sponsor. I feel truly fortunate that our paths crossed in a meeting this past summer."

- Exhibit G-15, Letters from Mark McMillan, SAA sponsor: "Gerard has … been a valued speaker at SAA meetings throughout the Bay Area in recent months. The honesty with which he tells his own story is a powerful warning to other addicts who may be in danger of breaking the law, as well as an inspiration for all of us in recovery. … Gerard bas been attending at least five SAA meetings per weeks since the beginning of 2017 and holds important service positions at three weekly meetings. Over the past year he has become a valuable member of our recovery community."

- Exhibit G-16, Letter from Zachary Singh, friend and fellow recovery program member, who also suffered a felony child pornography conviction: "Having had dozens of in-person conversations, as well as phone calls, with Gerard in which we share our experience, strength, and hope with each other, I have no doubts that Gerard will continue to work his program for the betterment of himself and others. I have seen and heard Gerard share his story through a formal 1st Step presentation. He communicated the progressive nature of his sex addiction, as well as the fallout and sincere remorse he and others have had to endure as a result of his actions. In short, I very truly believe that Gerard is upstanding, dependable, and honest, as well as strives for growth, forgiveness, and lasting change. He does the work - works the steps, attends meetings, makes program calls, and shares his story to help others. [¶] His presence in our community has helped me tremendously, as his positive outlook, faith in lasting change and desire to be sober and present to the service of others is evident and highly beneficial to the group."

- Sealed Exhibit G-17, Letter from unnamed friend and fellow recovery program member: "It is an enormous service for people in recovery to hear about addicts who have been arrested for their behavior. This is because, generally speaking, addicts in recovery are tempted to relapse and one of the most effective ways to prevent relapse is to realize that a relapse could easily result in arrest, prosecution, and incarceration. I have heard many participants in the Program talk about how Gerry's experience has helped them to stay sober, because they do not want to face incarceration. I know at least one individual who has made the choice to avoid harmful behavior in large part due to hearing Gerry's story."

- Exhibit G-18, Letter from Tim Pauly, friend and fellow recovery program member: "Gerard is someone I tum to for support and to whom I offer support. We met in an addiction recovery group: a group where high value is placed on honesty and vulnerability. During my time being friends with Gerard, I've been impressed at the degree to which he embodies these values and the concept of 'recovery.' Over time, I've experienced his growth as a person: in friendship, in his marriage, and in his support for others who are doing the same work. He's a valuable member of the recovery community and a true friend."

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

- Exhibit G-19, Letter from Tom Leugers, friend and fellow recovery program member: "I've seen Gerry's efforts to improve not only his relationship but his overall well being. He has really shown up to put in hard work on his personal development. I've been impressed with the growth I've seen and he has taught me quite a bit during that time as well. I've definitely taken things he's suggested worked for him and applied them to myself in my desire for self improvement. He consistently helps new people that attend the meetings through his experience. He's an integral piece of the group and it would be lacking without his participation."

- Exhibit G-20, Letter from Erik Pierson, friend and fellow recovery program member: "It's clear to me he takes h1s recovery seriously and thoughtfully. He volunteers to speak and share with the group at every meeting and often discloses the fact that he is facing criminal charges as a result of his addiction before his recovery and speaks openly about the challenges that are a part of his daily life. [¶] As long as I've known Gerry he has been authentic and truthful about his commitment to abstaining from his addiction to pornography and I have unwavering faith in his success. Through Gerry's ongoing service to SAA and the fellowship, in addition to who he is as a person, he has been a powerful and essential contribution to my sobriety and spirituality."

- Exhibit G-21, Letter from Ramiro Castro, friend and fellow recovery program member: "I see Gerard often at our recovery meetings and I always feel new ho[p]e and I am always, indeed, invigorated when I hear him share his feelings, his experience, his hopes and dreams about his own recovery. He has also spoken about the book he is writing about sex addiction, which I believe will be very valuable to people seeking to overcome their addictions. I have no doubt that his highest priorities are to make amends for his past and become the most productive person he can be. I am very fortunate to know Gerard because he is a role model for many of us seeking recovery from addictive sexual behaviors."

- Exhibit G-22, Letter from Scott Grinthal, friend and fellow recovery program member: "I've been close friends with Gerard Jones since 2011, when we met through our weekly Healthy Intimate Relationships meeting. As we've talked often and openly about our lives during the past six years, I've come to know him as a man of great integrity and concern for others. … I've watched him doing the hard work of addiction recovery through both psychotherapy and Sex Addicts Anonymous."

- Exhibit G-23, Letter from Brian T., friend and fellow recovery program member: "I have seen Gerry consistently attend 12 step meetings, take service commitments, sponsor and guide other men on their own journey of recovery. And I have heard him share honestly about his past, his remorse for wrongs done while suffering from this disease, and his hard earned freedom from addiction that he now lives with thanks to his work with the 12 steps."

- Exhibits G-24 to G-48 and Sealed Exhibits G-49 to G-56: Thirty-three additional letters from fellow recovery program members.

30

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Victims of Childhood Sexual Abuse

- Exhibit G-57, Letter from Cynthia Putnam, victim of childhood sexual abuse: "I am not one to excuse or minimize crimes like this. I myself was the victim of frequent, long-term sexual abuse as a child. I've spent much of my life healing from that trauma. I know how destructive sexual exploitation of every kind is to children. … But I also know how addiction works. … I've been listening to Gerry share his story in SAA rooms, and often talking with him personally, for well over a year now. I know that he is a good man who fell to the progressive nature of addiction until he found himself violating his own values. … I can't tell you how powerful it is for me to see someone like Gerry taking responsibility for the crimes he committed and talking about how he got there. Seeing him making amends to the world helps with my own healing. I've heard other people in the recovery rooms, other victims, say the same about him. For other addicts who've become perpetrators, it's important to hear Gerry talk about his guilt and what he's doing to change his life. For addicts who have the potential to become perpetrators, it's crucial to hear stories like Gerry's so they can start changing direction now."

- Exhibit G-58, Letter from John Blair, victim of childhood sexual abuse: "I … fully grasp the need to enforce laws that protect people, especially defenseless children, from exploitation and sexual violation. I have been one of those children. … [Gerry] has been a cornerstone to me in my recovery. [¶] I've watched him in the legal process of pleading guilty to felony charges, and I attended his federal court hearing. Concurrently, I've also watched him draw closer to God in true sincerity, and his honesty and contrition have spoken volumes to the many of us in recovery. [¶] From my perspective, Gerry has shown true repentance. It is my hope and prayer that the judgement of the court will be respected, but will also factor in the remarkable witness Gerry provides to his fellowship of recovering addicts and their close associates."

- Exhibit G-59, Letter from Robin Mackey, victim of childhood sexual abuse: "I'm a woman who was a victim of childhood sexual abuse and trauma. I'm writing to you because Gerard Jones has helped me heal from that trauma. I've known Gerry and his wife the past four years that my fiancé and I have been attending a Healthy Intimate Relationships meeting in San Francisco. … I've seen a lot of growth and transformation in Gerry over the past years and I can see that he sincerely regrets his offenses. Seeing Gerry's sincere remorse and the pain of regret has also helped me heal. It's given me hope and faith in a person's ability to be honest about his transgressions and heal and grow and use the insights gained to help others."

Colleagues

- Exhibit G-60, Letters from Will Jacobs, author and owner of Avalon Books bookstore and Atomic Drop Press: "I have been a close friend and professional partner of Gerard Jones since 1978. We have written four published books together, two screenplays, a graphic novel series that ran for six years, and worked closely together on the aforementioned Atomic Drop Press. We've gotten to know each other's families, gone on camping trips together, and stayed overnight at each other's homes too many times to count. In the nearly

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

40 years of our friendship I've never known him to be anything but a person of integrity and decency. He's quick to own up to his mistakes and strive to be a better person. He's the most even-tempered person I've ever known. He's intelligent, funny, and the best of company."

- Exhibit G-61, Letter from Caroline Paul, author, colleague at the San Francisco Writers' Grotto, and former San Francisco firefighter: "I know Gerry to be a guy who always has a good word to say to people around him. He and I were part of a writing group within the Grotto, where we regularly hashed out our writing challenges, our personal roadblocks, and our hopes and dreams. Gerry was a good listener and a generous participant. While I am a successful writer, I shed my tears, as artists do, during setbacks, and more than once Gerry stopped me in the hall to inquire how things were going. He made me feel comfortable and accepted, and never embarrassed. I'm well aware of the charges against Gerry and I have never seen any inappropriate behavior toward children. I think of Gerry fondly and with respect to this day."

- Exhibit G-62, Letter from Chris Colin, author and colleague at the San Francisco Writers' Grotto: "As long as I've known [Gerry] he's been a supportive and friendly presence, gracious with newcomers and humble about whatever writing challenge he was currently facing. Over the years I heard him speak with great devotion about his son. I always appreciated how conscientiously he spoke about parenting."

- Exhibit G-63, Letter from Chris Cook, author and colleague at the San Francisco Writers' Grotto: "[A]s a fellow author and writer and member of the San Francisco writing community, I have long known Gerry as a person of significant integrity, social grace and generosity, and kindness …."

- Exhibit G-64, Letter from Elizabeth Bernstein, author and colleague at the San Francisco Writers' Grotto: "In all our time together, I have known Gerry to be a kind, generous, loyal, trustworthy and non-judgmental friend. He was always available to lend an ear when I had a problem or concern. He was genuinely interested and never too busy to try to help. … I have also had many conversations with Gerry about his son and I know how much he cherishes and takes seriously his parental responsibility. I am aware that he is before you now facing very serious charges. There are few people I would stand behind without hesitation, through any hardship in life. Gerard Jones is one of them. Today, as always, I'm proud to call Gerard Jones my friend."

- Exhibit G-65, Letter from Ethan Watters, author and co-founder of the San Francisco Writers' Grotto: "For several years Gerry Jones was a valued and cherished member of our community. He participated and added to group events and was a respected and sought-after teacher. We have never had a complaint from any of his students as to the appropriateness of his behavior. I know him personally as a friend and fine community member. I know him also as an excellent teacher and as a father deeply concerned with the educational difficulties of his son. His reputation as a friend and a colleague among the over 100 members of the Grotto was excellent."

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

- Exhibit G-66, Letter from James Hudnall, comics author and colleague of 30 years: "In all the time I have known Gerry, I have never seen any behavior or attitude that was the least bit salacious or strange. He's never indicated anything, through his humor or his personal interactions with myself or others, that was in any way out of the ordinary or remotely questionable. So these charges against him are very surprising in the least. I can only say that in my experience he has always been a good guy."

- Exhibit G-67, Letter from Mark Badger, comics author, activist, friend, and colleague of 30 years: "I have watched as Gerard helped younger artists and writers succeed in the field and become part of the comics community. We've discussed the challenges of teaching as he volunteered at Dave Eggers' 826 Valencia in mentoring and workshops. As we both had young boys, parenting and Thomas the Tank Engine began to dominate our talk. Slowly the problems of negotiating public and private school, kids with challenges of their own became the main topic for many years. Reflecting on all the changes we have been through from medical conditions, parenthood to creating comics I don't think there is any topic we haven't brushed up against. I've seen Gerard's deep love for his son and family, concern for other children and certainly trust him with my own son easily with no fears at all."

- Exhibit G-68, Letter from Mike Barr, comics author and colleague of 30 years: "I have always enjoyed my time spent with Gerry, both on a personal and professional basis. I have been impressed by his integrity, and have enjoyed our seemingly-endless discussions on the history of comics and popular literature. These have led to another mutual interest -- campaigning for benefits for older comic book creators. Many of these early comic book creators have no pensions of any kind, so this service is not only generous, it is necessary. The creators who have finally received additional income in the form of reprint or merchandising payments are very grateful for this service."

Family

- Exhibit G-69, Letter from Jennie Kajiko: "… So he blew our lives up again. He did things that he himself found wrong and horrifying. He subjected us-and our son-to terrible shame and pain. And he's earned himself a prison sentence. [¶] But God acts in mysterious ways. This awful event has turned out to be what he needed to break free of all his secrets. Everyone knows everything now. Every day of his life he talks to other people about what he did. His computer is being monitored, which he says makes him feel safe and accountable. He's broken through the shame that used to paralyze him and learned that the way to make amends for his wrongs is to be of service to other people. He's turning his career toward writing about the disease that led him there. I've watched him change with his arrest and the publicity of his crimes, the first truly honest therapy of his life and his amazing work with Sex Addicts Anonymous. I've watched him as he's realized how much he needs to feel useful to others, be part of a community and work on his spirituality. I was at his side when he was baptized into a loving church community, a moment that changed both our lives for the better. [¶] With all these terrible events swirling around us, Gerry has been more loving, responsible and grounded than I've ever seen him. It's like he's finally become the Gerry he was always meant to be but that his secrets wouldn't let him be. As we say in recovery, 'You're only as sick as your secrets.' [¶] In the midst of all this

33

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

awfulness there have been gifts for me too. I'd already learned a lot about codependency, addiction and recovery before this happened, but I've learned a lot more now. I have a compassion for addicts that I've never known before and I see how addicts in recovery are of such value to others. I'm able to be of service in my own recovery programs, especially to other partners of sex addicts who've had their own lives turned upside down by their partners' compulsive behavior. [¶] It breaks my heart that Gerry and I will have to be apart for years. But I know we'll be okay. He'll show up for what he has to show up for. He'll do his best to make amends to society and be of service to his fellow inmates. Then he'll come back and get to work helping other addicts and helping the world understand this horrible disease. And I'll be here with him."

- Exhibit G-70, Letter from Nicholas Jones, son: "In the last few years, since I've been an adult, my dad has been very honest and up front with me about his struggles with sex and internet addiction. I've known that he has difficulty controlling certain urges which go against his own morals and values, and I've been acutely aware of the strides he's made in correcting his behavior. I've seen first hand his dedication to bettering himself, his uphill but successful battle to regain his self control, and also the deep regret for his actions that he carries with him. He is a dedicated husband and partner to my mother and the last thing he would ever want to do is betray or hurt her. I see his renewed commitment to my mom every time we're together, and I can feel the strength and faithfulness of their bond."

It is clear that Mr. Jones has incredible community support and is fortunate to have such a dedicated and loving wife, family, friends, and community. This support indicates a very low likelihood of recidivism and underscores the fact that the offense conduct was clearly aberrant and entirely out of character for Mr. Jones. Thus, as set forth above, a substantial downward variance is appropriate in light of Mr. Jones's compelling support from family, friends, colleagues, and church and 12-step recovery communities. *Sayad,* 589 F.3d at 1113; *Wachowiak,* 412 F.Supp.2d at 964; *Garcia,* 182 F.3d at 1176.

**E.    POST-OFFENSE REHABILITATION AND CONTINUATION OF COUNSELING, TWELVE-STEP, AND OTHER REHABILITATIVE PROGRAMS**

1.    **Post-Offense Rehabilitation**

The Supreme Court has recognized that post-offense rehabilitation "may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." *Pepper v. United States*, 131 S.Ct. 1229, 1236 (2011) (considering post-sentencing rehabilitation). The *Pepper* court recognized that

34

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

evidence of ... rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing. For example, evidence of ... rehabilitation may plainly be relevant to "the history and characteristics of the defendant." § 3553(a)(1). Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2) — in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training ... or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)- (D); [citation] .... [R]ehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2).

*Id.* at 1242.

In *Pepper*, the evidence proffered in support of a downward variance included the fact that the defendant had been addicted to drugs but no longer used them, was enrolled in college and achieving good grades, had a part-time job, was in compliance with the terms of his supervised release, and had reestablished his relationship with his previously estranged father. *Id.* at 1236-1237; see also *Gall v. United States,* 552 U.S. 38, 59 (2007) (where defendant withdrew from drug conspiracy after seven months, stopped using drugs, went to college, became a businessman, and rehabilitated himself, variance from 30-37 months to probation was reasonable in part because of defendant's self-rehabilitation, which showed that "imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts"); *United States v. Green*, 152 F.3d 1202, 1206 (9th Cir. 1998); *United State v. McFarlin,* 535 F.3d 808 (8th Cir. 2008) ("A defendant's post-arrest rehabilitation "is relevant in evaluating the § 3553(a) factors."); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 2008) ("The court believed that it saw a changed man, who would return to the bosom of a committed and loving family after his release."); *United States v. Ngatia*, 477 F.3d 496, 502 (7th Cir. 2007); *United States v. Newlon*, 212 F.3d 423 (8th Cir. 2000).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Similarly, in *United States v. Kapitzke*, 130 F.3d 820 (8th Cir. 1997), the court held that a lower sentence was warranted based on defendant's "extraordinary post-offense rehabilitation efforts." *Id.* at 823. The court stated that it was "heartened to learn that [defendant] has received excellent progress reports from both programs. His counselors report that he has accepted his addictions and is determined to regain control of his life and keep his family intact." *Id.* In *United States v. Thompson*, 315 F.3d 1071 (9th Cir. 2002), the defendant received high praise from the expert who conducted his post-offense rehabilitation, stating that he had taken treatment "very seriously. He's participating well in group and in individual [settings]…." *Id.* at 1078. Likewise, in *United States v. Sally*, 116 F.3d 76 (3d Cir. 1997), the court held that "rehabilitation efforts should be 'remarkable and indicate real, positive behavioral change.'" *Id.* at 81; see also *United States v. Cherry*, 487 F.3d 366 (6th Cir. 2007) (because child porn defendant's "efforts at rehabilitation were more extensive than those the district court usually [saw] in offenders," variance from guidelines range of 210 to 262 months to 120 months was proper).

Mr. Jones has been out of custody since the inception of the case in federal court in March 2017, and for more than two months prior to that while the case was first pending in state court. There has not been a single allegation of any violation of Mr. Jones's conditions of pretrial release during this period. *PSR*, ¶ 4. Not only has he been totally law abiding during his pretrial release, but he has also been an exceptional, contributing member of society during that time as detailed above. See Section E, *infra.*

More specifically, Mr. Jones has been attending weekly individual psychotherapy appointments since his arrest in January 2017. He has missed only three appointments during that time due to illness, moving, and travel. See *Exhibit D* (letter from Cynthia V. Rinker, MFT); *PSR*, ¶ 93. He has also been attending weekly group sessions with Ms. Rinker since April 2017. *Exhibit E* (second letter from Ms. Rinker); *PSR*, ¶ 97. Ms. Rinker states, "In these venues, I have observed him participating effectively, openly, and in a way that demonstrates both intellectual and emotional understanding of his own behavior and the harm he has caused. Other members of the group find him to be a leader and a support showing that he has both made significant changes and demonstrates empathy." *Id.*

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

In addition, Mr. Jones has been attending an average of <u>six</u> Sex Addicts Anonymous (SAA) group meetings per week since January 2017 and holds service positions at three weekly meetings. *Exhibit E*; *PSR*, ¶¶ 33, 82, 84, 85, 93. He has taken his duty to assist other offenders very seriously (to make sure they do not relapse or reoffend) and is a valuable member of the SAA community. *Id.* He has five SAA sponsees (he has taken on an additional sponsee since he wrote his statement of acceptance), all of whom affirm that he is helping them stay sober. See *Exhibits G-10 to G-14* (letters from SAA sponsees). Mr. Jones is also a valued speaker at SAA meetings throughout the Bay Area and recently spoke at the SAA national convention in Oakland where he told his story to hundreds of addicts. *PSR*, ¶ 82. As his sponsor, sponsees, and Ms. Rinker can attest, Mr. Jones's story is incredibly valuable to other addicts who may be on a path to breaking the law. *Exhibits G-10 through G-56.*

In fact, Mr. Jones has begun co-writing a book, *Bonds of Shame*, advised by Robert Weiss and other prominent sex-addiction experts, on addiction to internet pornography. The book will include the story of Mr. Jones's own addiction and downfall, which he believes will help others in avoiding the same path. *PSR*, ¶ 85. This may be the first book ever published where the author is facing charges such as these and yet allows their true name to be revealed. See *Exhibit H-1* (letter from Will Jacobs: "his goal with this book is to make amends for his past actions by helping others.")

Lastly, Mr. Jones is also very active and a valued member in his church community. PSR, ¶¶ 82, 85; *Exhibits G-1, G-2, and G-4.*

Based on these efforts, Mr. Jones has clearly engaged in <u>and</u> <u>accomplished</u> extraordinary post-offense rehabilitation. As in *Kapitzke,* Mr. Jones is determined to rehabilitate himself. He has received praise from his therapists in similar fashion to the defendant in *Thompson.* Like the defendant in *Sally, h*e has also shown a definitive effort to make real, positive behavioral changes. Mr. Jones has also since exhibited a strong character and a willingness to make things right. *Exhibits G-1 to G-70.*

Additionally, Mr. Jones has performed exceedingly well since being released on an unsecured bond over 16 months ago. Courts have found that exemplary behavior on pretrial

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

supervision can also form the basis for a variance. See, e.g., *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (variance from 47-56 months to one year and a day in drug case reasonable in part because of defendant's "behavior while on a year-and-a-half pretrial release, which the district court found to be exemplary" and shows defendant unlikely to reoffend); *United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) (variance from 27-33 months to one year house arrest proper in part because he behaved "exceedingly well" under pretrial supervision).

In light of the aforementioned extraordinary post-offense rehabilitation efforts made by Mr. Jones, which in turn portend an extremely low likelihood of re-offense, a sentence substantially below the Guideline range is justified.

2.    **Continuation of Counseling, 12-Step, and Other Rehabilitative Programs.**

One of the purposes of sentencing is "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C.§ 3553(a)(2)(D). Thus, where a defendant cannot effectively receive necessary rehabilitative or correctional treatment while incarcerated, or cannot receive such treatment in the most effective manner while incarcerated, a downward variance permitting the imposition of a non-custodial sentence may be appropriate to effectuate this sentencing purpose. See *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (variance from 57-65 months to one day in jail and one year house arrest in child pornography case based in part on expert testimony that imprisonment would interrupt course of treatment); *United States v. Olhovsky*, 562 F.3d 530 (3d Cir. 2009) (below-guidelines sentence of 72 months in child pornography case was unreasonably high in part because the record did not reflect the reasons for the court's "believing that treatment in prison would 'provide ... correctional treatment in the most effective manner' despite [treating psychologist's] opinion to the contrary" and that in prison defendant "would just regress terribly"); *Autery*, 555 F.3d at 874 (variance from 41-51 months to probation in child pornography case because incarceration "would undermine" defendant's rehabilitation and because "probation with psychiatric treatment was a more appropriate sentence" than incarceration).

It is well-documented that rehabilitative treatment programs are lacking in federal prison. The United States Department of Justice published a report entitled *Mental Health Problems of*

38

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

*Prison and Jail Inmates*.[13]  This report reveals that 43.6 percent of male inmates in federal prison have a mental health problem. *Id*. at 1. However, only 24 percent of prisoners in the federal system "received treatment after admission" and only 15.1 percent had "professional mental health therapy." "[T]reatment other than therapy" consisted of only medication and an overnight hospital stay. *Id*. at 9. The report goes on to say that "taking a prescribed medication for a mental health problem was the most common type of treatment inmates who had a mental health problem had received since admission to prison or jail" *Id*.

As discussed above, Mr. Jones has benefited greatly from his participation in individual and group therapy, as well as in the 12-step program for pornography addiction (SAA) for the last 18 months while out of custody. Given his positive response to treatment with his current therapists and recovery group, a sentence of imprisonment would likely dampen these efforts at rehabilitation and exacerbate any outstanding mental health issues. As noted in the afore-referenced DOJ report *Mental Health Problems of Prison and Jail Inmates,* medication is likely the only "treatment" he would receive in prison.

Given the above-referenced considerations concerning the importance of maintaining continuity in therapy and his other rehabilitative programs, a mitigated sentence of no more than 60 months is appropriate in order to permit Mr. Jones to resume his psychotherapy, 12-step programs and other rehabilitative treatment as soon as practicable.

## F.    EXCELLENT EMPLOYMENT HISTORY

A defendant's strong employment history may be a basis for a downward variance. In *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008), defendant's Guidelines range was 30 to 37 months for embezzling $650,000 from a nonprofit organization over the course of three years. The district court varied downward and sentenced him to one day in jail and supervised release for

---

[13] Lauren E. Glaze, Doris J. James, *Mental Health Problems of Prison and Jail Inmates*, NCJ 213600 (2006), available at http://bjs.gov/index.cfm?ty=pbdetail&iid=789; see also GAO, *Bureau of Prisons Health Care: Inmates' Access to Health Care is Limited By Lack of Clinical Staff*, cf. Bur.Just.Stat. (1994).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

three years on condition that defendant spend one year in a community treatment center so he could continue to go to work and obtain counseling. The Ninth Circuit found this sentence was reasonable in part because of the defendant's "history of strong employment." *Ruff* at 1001; *see also United States v. Alba*, 933 F. 2d 1117 (2d Cir. 1991) (departure based on long-standing employment at two jobs); *United States v. Jagmohan*, 909 F.2d 61 (2d Cir. 1990) (exceptional employment history); *United States v. Big Crow*, 898 F.2d 1326, 1331-32 (8th Cir. 1990) (excellent employment record).

As evidenced by the many letters of support from colleagues described above, Mr. Jones has been a highly-regarded and successful author for 40 years—writing everything from comics to screenplays to novels—and has also been a central member of the Bay Area literary community, teaching classes and serving as a writing coach. See *Exhibits G-60 to G-68* (letters from colleagues); *PSR*, ¶¶ 102-109. He is currently finishing a book entitled, *Nation of Faith and Fire*, a 150,000-word, heavily researched academic book about the birth of the American social reform movement out of Christian activism in the early 19th Century. The book is scheduled to be published by FSG/Macmillan after it is completed. See *Exhibit H-2* (letter from UC Graduate Theological Union board member and social justice advocate Dale Walker: "I believe this will be an important work of popular history, helping Americans to understand the origins of many of the current struggles to improve our society."); *Exhibit H-3* (letter from Reverend John L. Kirkley, Rector at St. James Episcopal Church: "By weaving realistic but sympathetic—at times even heroic—portraits of the religious leaders who fought to free the slaves and uplift the poor, Gerard gives a human face to both the importance and the difficulties of bringing a spiritual commitment to the improvement of society."); *Exhibit H-4* (letter from journalist Frank Lovece: "Especially revealing of the role of churches and religious leaders in promoting universal education, urban reform, and racial equality.").

Mr. Jones is currently working on a book of short political satire stories, *The Mystery of the Changing Times*, with co-writer Will Jacobs. See *Exhibit H-1* (letters from Will Jacobs). He also just published a novel, *Million Dollar Ideas*, released by Avalon Books in March 2018 (again with co-writer Will Jacobs), and edited a book of another writer's short stories, *Solitary Pursuits* by

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Joseph Filice. *Id.;* see also *Exhibit G-3* (letter from Joseph Filice). As noted above, he has also begun co-writing a book about his own personal story of pornography addiction, *Bonds of Shame*, in an effort to help others avoid a similar fate.

In light of Mr. Jones's extraordinary and exemplary professional history, as well as his critical importance to his colleagues and co-authors, there is good cause for the Court to grant a downward variance.

## G.    NEGLECT AND EMOTIONAL ABUSE AS A CHILD

The Ninth Circuit has held that "[w]here a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse." *Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006); *United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) (departure based on defendant's abandonment by his parents and lack of guidance as a youth).

Here, Mr. Jones's youth was marked by significant neglect and instability. His mother was an alcoholic, "moody and unpredictable," with long depressive "funks" followed by angry outbursts and then later upbeat periods. As a child, Mr. Jones would find her passed out on the floor. She once pulled him out of school and kept him isolated at home for a few months in the sixth grade during one her depressions. She was verbally abusive and emotionally unavailable. She was never formally diagnosed, but it is now believed that she suffered from Bipolar Disorder and Borderline Personality Disorder. *PSR*, ¶ 76. Mr. Jones's father passively endured his mother's behavior, which the defendant experienced as a kind of abandonment. *PSR*, ¶ 77.

The internalized suppression of negative emotions often lead to addictive behaviors, and so in light of the substantial emotional abuse and neglect that Mr. Jones suffered it is not a surprise that he turned to destructive behaviors related to internet pornography. In light of these factors, the Court may properly grant a downward variance. *Ibid.*

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

## H.    EXTREME REMORSE

Even where a defendant receives an adjustment for acceptance of responsibility, the court may further mitigate a defendant's sentence where he shows great remorse "to an exceptional degree." *United States v. Fagan,* 162 F.3d 1280, 1284-1285 (10th Cir. 1998); see also *United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008); *United States v. Jaroszenko*, 92 F.3d 486 (7th Cir. 1996); *United States v. Gardellini,* 545 F.3d 1089 (D.C. Cir. 2008) (variance from 10-16 months to probation affirmed in part because defendant "cooperated with authorities and accepted responsibility … to an extraordinary degree.")

Here, even more than his statement of acceptance of responsibility (which clearly exhibits remorse for his actions), Mr. Jones's actions following his arrest demonstrate his sincere remorse and exceptional desire to make amends. Mr. Jones fully cooperated with agents at the time of his arrest and provided a detailed and extensive confession of his involvement with child pornography and pornography in general. *PSR*, ¶¶ 12-20; see also *Ruff,* 535 F.3d at 1001 (variance from 30-37 months to one day in jail not unreasonable based in part on cooperation with agents as to how crime accomplished).

Also, as stated above, Mr. Jones immediately sought professional help by actively participating in treatment with 12-step programs and by engaging in treatment with an individual psychotherapist specializing in sex and pornography addictions. *PSR*, ¶¶ 33, 82, 84, 85, 93, 97. He has been incredibly public about taking responsibility for his offense and trying to help others avoid a similar fate. *Id.*

Given that Mr. Jones has shown great remorse to an exceptional degree, a sentence below the Guideline range is warranted.

## I.    COLLATERAL CONSEQUENCES IN ADDITION TO INCARCERATION

Mr. Jones's offense conduct has resulted not only in his arrest and prosecution in this case, but also in serious collateral consequences that he (and his family) will have to live with for the rest of his life. Just some of these include lifetime sex offender registration, all the limitations that

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

come with being a convicted felon, carrying the stigma of a child pornography offender, loss of income, and suffering permanent damage to his professional and social reputation.

Such collateral consequences can form the basis for a variance. See, e.g., *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (variance upheld where defendant "already suffered substantially due to the criminal investigation"); *United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) (variance upheld where district court "specifically addressed other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system."); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ("The district court also found that Pauley warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his [child pornography] conduct."); *United States v. Crook*, 9 F.3d 1422, n.7 (9th Cir. 1993) (civil forfeiture of property, in combination with other specific offender characteristics, might form basis for mitigated sentence).

Indeed, lifetime sex offender registration has been recognized as a significant collateral consequence of a conviction. See *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (noting it was appropriate for the district court to consider, under § 3553(a), the "lasting effects of being required to register as a sex offender").

Additionally, Mr. Jones will now have a federal felony conviction on his record that can never be expunged or sealed. The magnitude of the impact that this will have on his life, for the rest of his life, cannot be overstated. He will struggle professionally to explain the conviction. He will be disqualified from most forms of public assistance. Courts have recognized that these far-reaching collateral consequences of incurring a felony conviction should be considered by judges when determining an appropriate sentence. See, e.g., *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016) (variance to probation for drug crime based on collateral consequences); *United States v. Adelson,* 441 F.Supp.2d 506 (S.D.N.Y. 2006) (variance from life to 42 months based in part on fact that "[w]ith his reputation ruined by his

43

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); see also Ernest Drucker, *A Plague of Prisons* (The New Press 2011), at p. 130 ("Having served their formal sentences, ex-prisoners will endure new forms of punishment capable of generating more anger, more shame, and the scars of permanent social stigma.")

It is also worth noting that Mr. Jones has suffered an additional collateral consequence in that he has been on location monitored home detention throughout the duration of his pretrial release. See *United States v. Miller,* 991 F.2d 552, 554 (9th Cir. 1993) (departure based on fact that defendant had "already been punished to some extent" by pretrial home detention).

In light of the numerous above-referenced collateral consequences, there are good grounds to grant a downward variance below the Guidelines range.

## J.    VULNERABILITY TO ABUSE AND VICTIMIZATION IN PRISON

Defendant will be especially vulnerable to abuse and victimization in prison as a result of being a child pornography offender, especially in light of the fact that he is 61 years old and this will be the first time he will be incarcerated in a prison or jail.

In *United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002), the Ninth Circuit upheld an eight-level departure in a child pornography case in part because defendant would have "high susceptibility to abuse in prison" because of "his demeanor, his naiveté, and the nature of the offense." See also *United States v. Rausch*, 570 F.Supp.2d 1295 (D.Colo. 2008) (in child porn case with guidelines of 120 months, court sentenced defendant to one day in jail in part because "client's vulnerability to victimization in prison as an unnecessary and unacceptably high risk … [I]t is clear that violence against inmates, especially sex offenders, does occur and that vulnerable inmates are at greater risk of violence than typical inmate populations.") (emphasis added); *United States v. Wilke*, 995 F.Supp. 828 (N.D.Ill. 1998) (testimony by prisoner-turned-professor persuaded court that defendant's appearance and conviction of sex offense involving juveniles (child porn) subjected him to physical abuse in prison and warranted four-level departure); *United v. Shasky*, 939 F.Supp. 695 (D.Neb. 1996) (downward departure for receiving material via computer involving pornographic images of minors was granted because based on defendant's

unusual susceptibility to abuse in prison and extraordinary post offense efforts at rehabilitation; defendant was a homosexual state trooper of diminutive stature and weight, and extraordinary participation in internationally-renowned sex offender treatment program).

The National Prison Rape Elimination Commission, in a study released on June 24, 2009, reports "an estimated that 60,500 State and Federal prisoners were sexually abused during [2006]." See Executive Summary at http://nprec.us/publication/report/executive_summary.php; Jeannie Suk, *Redistributing Rape*, 48 American Criminal Law Review at 111 (Winter, 2011) ("Prison is hell. If there is anything in today's United States that may approximate Hobbes' state of nature, where men live in continual fear and danger of violent death by other men, and security is whatever man's own strength and invention enables, it must be the modern prison. There, the war of all against all is not merely chaos, but, rather, reveals consistent patterns as the stronger inevitably subordinate the weaker. One such undeniable pattern is the central and routine place of rape and its threat in the social system of the prison.").

In light of Mr. Jones's vulnerability to abuse and victimization in prison, the Court should grant a downward variance under 18 U.S.C. § 3553(a) or a departure under the Guidelines' "catch-all" provision. See USSG § 5K2.0(b).


## K.    EFFECT ON INNOCENT FAMILY MEMBERS AND COLLEAGUES

In *United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000), the Ninth Circuit departed downward four levels based on the court's acknowledgement of extraordinary family circumstances. The court relied on the fact that there was an eight-year old son who had lost a father and who would be losing a mother for a substantial period of time. See also *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) ("The district court clearly believed that, in this case, the potential harm to the close relationship between this single parent and her child outweighed the benefits of a prolonged period of incarceration to achieve deterrence, protection of the public, and punishment."); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (incarceration might have resulted in destruction of otherwise strong family unit).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Here, Mr. Jones's wife of 32 years, Jennie, is a registered nurse at UCSF. She is financially dependent on defendant's income as they have always lived on a shared income. She is also 60 years old. See *PSR*, ¶ 80. Mr. Jones's 25-year old son is also dependent on his income. *Id.* at ¶ 79. He lives with his girlfriend in Davis, California, and is completing a degree in music production through the Berklee College of Music (online). Mr. Jones and his wife support him financially. *Id*.

In addition, Mr. Jones's co-authors and publishers with whom he is working on several uncompleted projects are depending on his finishing the writing to publish the works. Courts have found that negative effects on innocent third parties can also justify a downward variance. See *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*) (variance to probation reasonable in part because incarceration could threaten employment of others).

Mr. Jones's time in custody will significantly impact family members as well as several colleagues and co-authors. Thus, it is respectfully requested that the Court consider the impact of incarceration on his family and colleagues and vary downward accordingly.

## L.    DEFENDANT DID NOT INTEND TO DISTRIBUTE CHILD PORNOGRAPHY.

Regarding distribution, it is undisputed that there was only one attempted—and ultimately unsuccessful—video upload to YouTube in June 2016. In response to the government's subpoena and the agent's follow-up questions, Google confirmed the following with respect to this video:

> The upload of the video was initially rejected due to the length of the video.
> The user took a step to delete the video after attempting to upload it.
> The video was rejected and then reviewed by Google and therefore not public.

(See ROI 015, attached hereto as *Exhibit J*.) Thus, according to Google/YouTube, the video was never made publicly available on the website. Indeed, there is no evidence that the government actually accessed this video from YouTube or accessed other images or videos that Mr. Jones uploaded or otherwise made publicly available on any platform, and there is no evidence that other individuals actually did so either.

Mr. Jones's statements corroborate this evidence. He told the SFPD investigator that while uploading other legal images to his YouTube account, he accidentally attempted to upload a video

46

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

containing child pornography. When he realized what the video depicted, he "immediately" deleted it and closed the account. (See SFPD Interview at 56:10-1:00:45, attached hereto as *Exhibit K*.) In fact, the evidence reflects that this entire account was deleted within <u>nine minutes</u> of the time Mr. Jones attempted to upload the illegal video. While there is some dispute as to whether it was Mr. Jones or Google that deleted or closed the account (compare ROI 015 with SFPD Interview), even assuming *arguendo* it was Google, the account was closed before the video ever went live. Thus, the video was never actually "distributed." See also *PSR*, ¶ 26 (recognizing the video never went "live" on YouTube).

These facts show that (1) the video was never actually uploaded to YouTube; instead, it was rejected and then reviewed by Google, and never became public; and (2) Mr. Jones did not intend to distribute the video given that he immediately took a step to delete the video after attempting to upload it and realizing what it was, and then closed his account.

This lack of intent with regard to the distribution charge is further support for a downward variance.

## M.    AVOIDING DISPARITY WITH OTHERS SIMILARLY SITUATED

A sentence of 60 months, followed by a lengthy period of five years of supervised release, is soundly in line with the mean and median sentences for all 2016 sentences in the NDCA under USSG § 2G2.2.[14]

In addition, it is worth noting that countless child pornography defendants over the years have been sentenced to terms of imprisonment significantly lower than those suggested by the overly harsh advisory Guidelines. In fiscal year 2013, 1,105 of the 1,626 cases sentenced pursuant to § 2G2.2 (more than two-thirds) resulted in sentences below the recommended guideline range. In only 22 of those cases did courts impose a sentence above the recommended guideline range.

---

[14] The median sentence for the child pornography guideline (§ 2G2.2) in the NDCA for 2016 was 63 months; the mean was 67 months. *Exhibit B* (Statistics from Sentencing Commission). The median sentence for all child pornography offenses in the NDCA in 2016 was 89 months (the mean was 93 months). *Exhibit C* (Statistics from Sentencing Commission).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

See United States Sentencing Commission, *Sourcebook of Federal Sentencing Statistics*, Table 28 (2013).[15] In fiscal year 2015, 442 of the 1,557 cases sentenced pursuant to § 2G2.2 resulted in sentences within the recommended range, i.e., less than a third. In only 18 of those cases did courts impose a sentence above the recommended range. See United States Sentencing Commission, *Sourcebook of Federal Sentencing Statistics*, Table 28 (2015).[16]

This trend exists nationwide. As thoroughly documented by Senior Judge Weinstein, there is a strong "judge-initiated trend" of varying below the advisory Guidelines for non-production child pornography offenses. *United States v. R.V.,* 157 F.Supp.3d 207, 210 (E.D.N.Y. 2016). In varying from the Guidelines, "district judges nationwide have spoken out against the harsh Guidelines sentences for child pornography offenders." *Id*. (listing myriad cases throughout the country between 2008 and 2012 in which district courts have imposed substantial variances). Senior Judge Weinstein also noted that for possession cases, many courts have elected to impose minimal or non-custodial sentences. *Id.* at 211 (compiling long list of published cases between 2007 and 2015 in which minimal or non-prison sentence have been imposed). At the end of his treatise-like sentencing order, Senior Judge Weinstein imposed a non-custodial sentence for his defendant on a sentencing range of 78 to 97 months. *Id.* at 212. For other examples of courts across the country declining to impose sentences within the range recommended by § 2G2.2, see e.g., *United States v. Apodaca*, 641 F.3d 1077 (9th Cir. 2011) (sentencing range of 78 to 97 months; the court imposed a 24-month sentence); *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010) (sentencing range of 235 to 293 months; the court imposed a mandatory minimum sentence of 60 months); *United States v. Abraham*, 2013 WL 2099795 (D.Neb. May 15, 2013) (sentencing range of 210 to 240 months; the court imposed a sentence of 72 months); *United States v. D.M.,* 2013

---

[15] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annualreports-and-sourcebooks/2013/Table28.pdf.

[16] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annualreports-and-sourcebooks/2015/Table28.pdf.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

WL 1846543 (E.D.N.Y. May 3, 2013) (sentencing range of 78 to 97 months; the court imposed a sentence of five years probation).[17]

This trend exists in the Northern District of California as well. A number of district court judges have imposed variances below the advisory ranges in child pornography cases:[18]

- *United States v. Young,* 13-CR-782-LK: The defendant was convicted of possessing child pornography, and the evidence showed that he participated in chatrooms soliciting images of individuals having sex with their children. His guideline range was 135 to 168 months. The Court sentenced him to 48 months of incarceration in October 2015.

- *United States v. Michael Slyter*, 13-CR-227-SI: The defendant was convicted of possession of child pornography, and the evidence showed that the defendant expressed an interest in sexual material containing young boys, had arranged for a 14-year-old boy to stay with him at his home, and had applied for a position at a local elementary school. Under the plea agreement, his agreed-upon guideline range was 51 to 63 months. The Court sentenced him to 36 months of incarceration in 2014.

- *United States v. Christopher Schuette*, 15-CR-00316-EJD: The defendant created a Facebook account in the name of a police officer and distributed child pornography from it. The advisory Guideline range was 235 to 293 months; the court varied to 90 months.

- *United States v. Tri Minh Dao*, 13-CR-00580-RMW: The defendant's Guidelines range was 97 to 121 months for the possession of child pornography. The court sentenced the defendant to five years of probation.

- *United States v. Paul Vella*, 13-CR-00349-EJD: The defendant possessed over 86,000 images and over 2000 videos and faced a Guideline range was 78 to 97 months. The court sentenced the defendant to 59 months in custody and to seven years of supervised release.

- *United States v. Roberto Carlos Hernandez-Ponce*, 13-CR-00128-JSW: The defendant used peer-to-peer file sharing software to exchange child pornography. Although the defendant distributed images through file-sharing, the government permitted a plea agreement to the possession of child pornography. His sentencing range was 97 to 108 months; the court varied to 68 months.

---

[17] See also *United States v. Kelly*, 868 F.Supp.2d 1202 (D.N.M. 2012); *United States v. Tews*, 2010 WL 1608951 (E.D.Wis. Apr. 20, 2010); *United States v. Raby*, 2009 WL 5173964 (S.D.W.Va. Dec. 30, 2009); *United States v. McElheney*, 630 F.Supp.2d 886 (E.D.Tenn. 2009); *United States v. Phinney*, 599 F. Supp. 2d 1037 (E.D.Wis. 2009); *United States v. Doktor*, 2008 WL 5334121 (M.D.Fla. Dec. 19, 2008); *United States v. Johnson*, 588 F.Supp.2d 997 (S.D.Iowa 2008); *United States v. Noxon*, 2008 WL 4758583 (D.Kan. Oct. 28, 2008); *United States v. Shipley*, 560 F.Supp.2d 739 (S.D.Iowa 2008); *United States v. Baird*, 580 F.Supp.2d 889 (D.Neb. 2008).

[18] The information from this list was obtained from the Northern District of California U.S. Attorney Press Releases and from publicly filed court documents available on ECF.

49

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

- *United States v. Luis Fernando Ramos*, 13-CR-00106-JSW: The defendant was charged with the distribution and possession of child pornography. He pleaded guilty to possession and faced a range of 97 to 121 months. The court sentenced the defendant to 50 months in custody.

- *United States v. Kyle Robert James*, 12-CR-00048-CW: The defendant possessed tens of thousands of images of child pornography, and he had numerous chats with other traders of child pornography. His sentencing range was 151 to 188 months; the court varied and sentenced the defendant to 96 months in custody.

- *United States v. Ronald Wayne Powers, Jr.,* 12-CR-00102-PJH: The defendant was charged with possession and distribution of child pornography. He pleaded guilty to simple possession and his sentencing range, according to the PSR, was 70 to 87 months. The Court imposed a sentence of 48 months in custody.

- *United States v. Brian Lalor*, 10-CR-00797-WHA: The defendant sent payments to distributors of child pornography in exchange for images and was charged with the receipt and possession of child pornography. He pleaded guilty to the possession charge and his sentencing range was 78 to 97 months. The Court imposed a sentence of 58 months in custody and five years of supervision.

- *United States v. Alex Eye Bursch,* 11-CR-00644-PJH: The defendant used peer-to-peer file-sharing software to exchange child pornography images via the internet. After a bench trial, the defendant's Guidelines range was 87 to 108 months. The court varied from the range and imposed a sentence of 57 months custody.

- *United States v. Edmund Lee*, 14-CR-00314-EMC: The defendant pleaded guilty to possession of child pornography but had distributed pornography. For the possession offense, he faced a Guidelines sentencing range of 78 to 97 months, which would have been higher had he been convicted of distribution. The court sentenced the defendant to 78 months in custody because that was the lowest sentence the defendant could request pursuant to his plea agreement with the government.

- *United States v. Donald Thomas Tosti*, 09-CR-00973-JSW: The defendant had a large collection of child pornography at home and at his office. After a bench trial conviction, his Guidelines range was 108 to 135 months. In February 2012, the court imposed a sentence of 96 months in custody.

- *United States v. Aaron Carlon*, 12-CR-00765-EJD: The defendant was convicted of the distribution of child pornography, and his offense also included peer-to-peer file sharing. His sentencing range was 108 to 135 months; the court imposed a 66-month sentence.

- *United States v. Robert Edgar Weagle*, 11-CR-00279-SBA: A search warrant revealed that the defendant possessed tens of thousands of images and videos of child pornography. The defendant had a prior conviction for lewd and lascivious acts with children under the age of 14, and his sentencing range was 168 to 210 months; the Court imposed a sentence of 120 months.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

- *United States v. Jonathan Mitchell*, 12-CR-00265-JSW: The defendant was convicted of possessing a collection of child pornography. His sentencing range was 78 to 97 months; the Court imposed a sentence of 64 months.

- *United States v. Brenton Pharr*, 10-CR-00610-LHK: The defendant's sentencing range was 57 to 71 months; the court imposed a sentence of 30 months custody.

- *United States v. Stewart John Burch*, 10-CR-00035-MHP: The defendant was charged with the receipt of child pornography. He paid distributors monthly subscriptions for child pornography and had accessed the Internet after his arrest, a violation of his pretrial release terms. The defendant's sentencing range was 97 to 121 months; the court imposed a 72-month prison sentence.

- *United States v. Zachary Snead*, 09-CR-01180-JF: The defendant distributed child pornography and made statements about having molested children. The defendant's sentencing range was 210 to 262 months, the court imposed a sentence of 84 months in custody.

- *United States v. Mark Freiburghaus*, 09-CR-00019-CW: The defendant distributed child pornography to an undercover agent. The defendant's sentencing range was 121 to 151 according to the Presentence Investigation Report's calculation, the court imposed a 66-month sentence.

- *United States v. Randall Thayer*, 07-CR-00812-DLJ: The defendant distributed and possessed child pornography and engaged in sexually inappropriate internet chat sessions about the young daughter of his girlfriend. The defendant's sentencing range was 188 to 235 months, the court imposed a 70-month custodial sentence.

Finally, the Court should compare sentences imposed in this judicial district involving more serious allegations to the Guidelines range in this case. For example, in *United States v. Robert Edgar Weagle*, 11-CR-00279-SBA, a search warrant revealed that the defendant possessed tens of thousands of images and videos of child pornography. The defendant had a prior conviction for lewd and lascivious acts with children under the age of 14, and his sentencing range was 168 to 210 months. The Court imposed a sentence of 120 months. Similarly, in *United States v. Ashley Smith*, 15-CR-00194-JST, Judge Tigar sentenced Mr. Smith to the minimum sentence of 120 months and to five years of supervised release. Mr. Smith had a prior child pornography case and a prior conviction for lewd and lascivious acts with a minor under the age of 14. The low end of the Guidelines here is 15 months higher than the sentence imposed on defendants Weagle and Smith, both of whom had a prior conviction for contact with a minor.

51

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

In *United States v. Craig Burt*, 15-CR-00137-TEH, the defendant ran a charity in the Philippines and corresponded with a woman to set up sex with prepubescent girls and solicited pornographic images of young girls. Over an 18-month period, the defendant paid for and received numerous images of young Filipino girls engaged in sexually explicit conduct. He was arrested after he traveled to the Philippines to enact his plan to have sex with prepubescent minors. The Court imposed a sentence of 127 months in custody and five years of supervised release. In *United States v. Patrick Young*, 13-CR-00782-LHK, the defendant distributed child pornography to an undercover officer and chatted on-line about watching the undercover officer have sex with his daughter, and he discussed traveling to Mexico to have sex with minors. The government allowed Mr. Young to enter a plea to the possession of child pornography charge and dismissed a distribution count. The Court sentenced Mr. Young to 48 months in custody and five years of supervised release.

As the concurrence in *Henderson* makes clear, the sentence imposed in this case should leave room for more serious offenses on the spectrum of child pornography-related crimes. *Henderson*, 649 F.3d at 964-65 (Berzon, J., concurring); see also *R.V.,* 157 F.Supp.3d at 210. The sentencing recommendation of the probation department in this case—and the range prescribed by the advisory Guidelines—utterly fails to "distinguish among the varying degrees of culpability" for child pornography offenders. Failure to take these degrees of culpability into account "is particularly grave in the field of child pornography offenses." *R.V.,* 157 F.Supp.3d at 210.

In light of the above-referenced downward variances imposed by this Court in other cases and by other courts throughout the United States, there is substantial evidence to support the imposition of a 60-month sentence of imprisonment in Mr. Jones's case.

**N.    AVOIDING DISPARITY WITH STATE SENTENCES FOR SIMILAR CONDUCT**

A federal district court also has discretion under 18 U.S.C. § 3553 to consider that the state penalty for the same conduct is less serious. *United States v. Ringgold*, 571 F.3d 948 (9th Cir. 2009).

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Here, the greatest prison sentence Mr. Jones would face if he were to be prosecuted in state court for this offense conduct is six years and eight months. Cal. Pen. Code §§ 311.1, 311.2. Moreover, in undersigned counsel's experience, the standard sentence for a first-time offender in most any state court in northern California for these offenses is three years of probation and a county jail sentence of less than one year which can usually be satisfied through an electronic home monitoring program. Chazin Decl., ¶ 14.

This, too, provides grounds for a downward variance.

## O.     DEFENSE COUNSEL MIS-ADVISED MR. JONES ON THE APPLICABLE GUIDELINES RANGE.

Undersigned counsel made a mistake in calculating the applicable Guidelines range when advising Mr. Jones on whether to accept the government's proposed plea agreement to Count Two (possession) or plead open to both charges (distribution and possession), as he ultimately did. The draft plea agreement provided a Base Offense Level of 18 for Count Two and a disputed two-level enhancement for distribution, resulting in a Total Offense Level of 30 with an advisory range of 97 to 121 months. Undersigned counsel incorrectly assumed the same Base Offense Level of 18 applied to Count One, and thus advised Mr. Jones that pleading open and arguing the distribution enhancement to the Court might be beneficial and could result in a Total Offense Level of 28 with a lower advisory range of 78 to 97 months. After the plea was entered, however, counsel realized the Base Offense Level for Count One is actually 22 resulting in an Adjusted Offense Level of 32 (assuming the three-point reduction for acceptance of responsibility), with a corresponding advisory range of 121 to 151 months. Chazin Decl., ¶ 15.

Mr. Jones relied on this advice in rejecting the government's plea offer and pleading open to the Court. Mr. Jones has advised the undersigned that he does not wish to try to withdraw his plea and attempt to enforce the government's original offer and stands prepared to accept whatever punishment the Court sees fit. *Id.* But counsel is compelled to inform the Court of these facts as this may be deemed by the Court as a basis for a downward variance from the advisory Guidelines range.

## P.    MERCY WARRANTS A BELOW GUIDELINE SENTENCE.

As Justice Anthony Kennedy famously testified before the Senate Judiciary Committee on Valentine's Day 2007: "Our sentences are too long, our sentences are too severe, our sentences are too harsh ... [and because there are so few pardons] there is no compassion in the system. There's no mercy in the system.") (video link available at http://sentencing.typepad.com/sentencing_law_and_policy/2007/02/justice_kennedy.html); Speech of Justice Kennedy at the Ninth Circuit Judicial Conference, July 9, 2006 ("I think the guidelines are far too severe .... The fact that the prison guards' association lobbies for higher penalties is sick.") (http://talkleft.com/new_archives/015288.html); Speech of Justice Kennedy at the ABA Annual Meeting, August 9, 2003 ("Our resources are misspent, our punishments too severe, our sentences too long. ... The sentencing guidelines are responsible in part for the increased terms ... [and they] should be revised downward.") (http://www.abanews.org/ kencomm/amkspeech03.html); see also *United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) (citing Justice Kennedy's August 9, 2003 comments and noting that the "increased prison population is due in large part to longer sentences. For the same crimes, American prisoners receive sentences twice as long as English prisoners, three times as long as Canadian prisoners, four times as long as Dutch prisoners, five to 10 times as long as French prisoners, and five times as long as Swedish prisoners. Yet these countries' rates of violent crime are lower than ours, and their rates of property crime are comparable.")

"American punishment is comparatively harsh, comparatively degrading, comparatively slow to show mercy. … [T]he makers of sentencing guidelines succeeded only in contributing to the making of a law of punishment that shows obstinately little concern for the personhood of offenders ... a law that tends to treat offenders as something closer to animals than humans, and that has correspondingly sought, more and more frequently, simply to lock them away." James Q. Whitman, *Harsh Justice* (Oxford Press 2003) paperback ed. at 19; 223 n.72.

"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) (variance from life to 42 months in securities fraud case).

Mr. Jones's case is deserving of this balancing of his better angels against his demons, and a measure of mercy is wholly appropriate here where he has otherwise engaged in a life of productivity and helping others. See *Exhibits G-1 to G-70.*

## Q.    THE COMBINATION OF ALL FACTORS CONSTITUTES A MITIGATING CIRCUMSTANCE JUSTIFYING A DOWNWARD VARIANCE.

Courts have long held that a combination of factors can together constitute a mitigating circumstance justifying a downward variance. See *United States v. Cook,* 938 F.2d 149, 153 (9th Cir. 1991); *United States v. Decora,* 177 F.3d 676 (8th Cir. 1999); USSG § 5K2.0.

Mr. Jones respectfully requests that, when determining an appropriate punishment, the Court consider the substantial mitigating circumstances identified herein, including the fact that the behavior that led to the offense conduct was aberrant in that it was a marked deviation from a lifetime as a law-abiding person and was fueled by addiction and the negative effects of a prescribed medication, Ritalin; the continued support of family, friends, church, and 12-step recovery program communities and colleagues; his exceptional post-offense rehabilitation; his cooperation with law enforcement; his excellent professional history; the many collateral consequences he has suffered and will continue to suffer for the rest of his life as a result of his conviction; and the negative impact that a lengthy incarceration will have on Mr. Jones's wife, son, colleagues, and sponsees.

Mr. Jones also asks that the court consider the substantial history of downward variances in child pornography cases in this court and in courts throughout the United States, as noted in sections III.N. and III.O., *infra.,* when fashioning a sentence that is appropriate but not greater than necessary.

It is submitted that when considering the combination of all mitigating factors under 18 U.S.C. § 3553(a) as set forth above, there is a substantial basis to support a downward variance from the Guidelines range and impose a sentence of 60 months.

## IV.

### OBJECTIONS TO PRESENTENCE REPORT

Defendant respectfully notes the following outstanding objection to the PSR:

**A.    THE COURT SHOULD NOT CONSIDER THE ALLEGED CONDUCT INVOLVING "R.B." IN 2011.**

"Relevant conduct" is defined under the Guidelines as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant … that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG §1B1.3(a)(1)(A). It also includes "all acts and omissions … that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG §1B1.3(a)(2).

Here, the allegations regarding R.B. are clearly not related to the offense of conviction. Therefore, they can be considered only if they were "part of the same course of conduct or common scheme or plan as the offense of conviction." USSG §1B1.3(a)(2).

The Second Circuit has distinguished between "same course of conduct" and "common scheme or plan." It interpreted "same course of conduct" as requiring "the sentencing court ... to consider such factors as the nature of the defendant's acts, his role, and the number and frequency of repetitions of those acts." *United States v. Santiago*, 906 F.2d 867, 871–73 (2d Cir. 1990) (drug sales 8-14 months before sale of conviction properly considered—all sales were similar and to same individual). A "'common scheme,' in contrast, requires a connection among participants and occasions." *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993) (citing earlier cases). The Ninth Circuit later cited *Santiago* in holding that the "essential components of the section 1B1.3(a)(2) analysis are similarity, regularity, and temporal proximity." *United States v. Hahn*,

56

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

960 F.2d 903, 910 (9th Cir. 1992). "When one component is absent, however, courts must look for a stronger presence of at least one of the other components. In cases ... where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of the third component." *Id.* Application Note 9(B) of §1B1.3, effective Nov. 1, 1994, adopted this analysis for "same course of conduct." *United States v. Sykes*, 7 F.3d 1331, 1336–38 (7th Cir. 1993) (following test for "similarity, regularity, and temporal proximity," it was error to include fourth fraud count that was dismissed—it bore only "general similarity" to other three frauds, and regularity and proximity were insufficient).

The *Hahn* court also stated, "When regularity is to provide most of the foundation for temporally remote, relevant conduct, specific repeated events outside the offense of conviction must be identified. Regularity is wanting in the case of a solitary, temporally remote event, and therefore such an event cannot constitute relevant conduct without a strong showing of substantial similarity." *Hahn*, 960 F.2d at 911; see also *United States v. Jones*, 948 F.2d 732, 737–78 (D.C. Cir. 1991) (although current offense and prior criminal conduct both involved fraud, they were not related under §1B1.3 because they occurred more than a year apart, were different in nature, and involved different individuals).

Here, while Mr. Jones's uploading of images of R.B. in April and May 2014 may be considered as part of his offense conduct, the underlying relationship between Mr. Jones and R.B. cannot be considered as relevant conduct. That conduct was not similar in nature to the charged offense of possessing and distributing child pornography (other than the general allegation that both involved minors), and there is no evidence that any such conduct was committed with regularity or with temporal proximity as the alleged relationship ended in 2011.

Indeed, the presentence report specifically titles these paragraphs as "Offense Behavior Not Part of Relevant Conduct," thus recognizing that they cannot be considered as such. The report does not provide any alternative basis for why the Court should consider this unrelated, uncharged, and unproven conduct. Thus, it should be disregarded in its entirety, especially given its highly inflammatory nature.

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

Even arrests that do not lead to conviction are not normally considered by the Court at sentencing. It is generally agreed that arrests and other uncharged conduct do not have sufficient indicia of reliability to be considered in sentencing. The Sentencing Commission recognizes that, because of the impact discrete factual determinations have on the Guidelines range, "[r]eliable fact-finding is essential to procedural due process and to the accuracy and uniformity of sentencing." USSG Ch. 6, Part A (intro. comment). While neither the Guidelines nor the Sentencing Reform Act place a limit on the kinds of information to be used in resolving sentencing disputes (see 18 U.S.C. § 3661), and the rules of evidence do not apply (FRE 1101(d)(3)), the Court may consider only information that "has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). Unreliable allegations may not be considered, and out-of-court declarations by an unidentified informant may be considered only when there is good cause for anonymity, and the declarations are sufficiently corroborated. USSG § 6A1.3, cmt. ¶ 2. The Commission suggests that the standard of proof for sentencing factors is a preponderance of the evidence. USSG § 6A1.3, cmt. ¶ 3.

In accordance with the Sentencing Guidelines, the Ninth Circuit has held that a court may not consider a "prior arrest record itself" in departing from the applicable Guideline range because it does not constitute "reliable information" under USSG § 4A1.3. *United States v. Durham*, 995 F.2d 936, 938 (9th Cir. 1993). In that case, the court concluded that the sentencing judge properly relied on police records that covered "all aspects of a prosecuted offense" and "detailed [defendant's] underlying conduct during each offense," in contrast to an arrest record, which "simply records an arrest." *Id.* at 938 and n.1. Importantly, in *Durham*, the police reports were related to arrests that were "processed and became convictions." *Id.*; see also *United States v. Cota-Guerrero*, 907 F.2d 87, 90 (9th Cir. 1990) (prior arrests should not have been considered where information relating to the incidents in the presentence report was based entirely on police records of arrest); *United States v. Thomas*, 361 F.3d 653 (D.C. Cir. 2004) (because arrests prove nothing, court erred in considering long arrest record to justify denial of downward departure for over-represented criminal history); *United States v. Williams*, 910 F.2d 1574, 1580 (7th Cir. 1990) (stating that "the determination that the arrests indicated similar criminal conduct must be based on

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

facts apart from the arrest record itself" and holding that the district court had not adequately explained the factual basis for its use of defendant's prior arrests as a ground for departure), *vacated on other grounds*, 503 U.S. 193 (1992); cf, *United States v. G.L.,* 143 F.3d 1249, 1255 (9th Cir. 1998) (prior arrests considered where data came from a detailed file from the Tribal Court and defendant was ultimately convicted but not sentenced pending disposition of federal charges). As recently held by Judge Kavanaugh,

> Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial. If you have a right to have a jury find beyond a reasonable doubt the facts that make you guilty, and if you otherwise would receive, for example, a five-year sentence, why don't you have a right to have a jury find beyond a reasonable doubt the facts that increase that five-year sentence to, say, a 20-year sentence? ...

> Importantly,...federal district judges have power in individual cases to disclaim reliance on acquitted or uncharged conduct. ... [D]istrict judges may then vary the sentence downward to avoid basing any part of the ultimate sentence on acquitted or uncharged conduct. ... In my view, district judges would do well to heed [this advice] appropriate cases.

*United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc) (citation omitted).

Here, Mr. Jones was not arrested let alone convicted for this conduct. As such, it should be disregarded in its entirety.

Finally, the Probation Officer cites to Publication 107, *The Presentence Investigation Report*, by the Administrative Office of the United States Court ("Publication 107"), for the proposition that "there may be instances in which related offense behavior that is not part of relevant conduct has not been included in the criminal charges." *PSR*, Addendum p.1. However, the relevant section of that report refers primarily to *offense* behavior underlying other charges to be dismissed pursuant to Rule 11(c)(1)(A), not to unrelated, uncharged, prior conduct that is clearly not considered relevant conduct under the Guidelines. The section entitled "Offense Behavior Not Part of Relevant Conduct" in Publication 107 provides in full:

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

In some cases, the offense behavior of the count(s) to be dismissed per Rule 11(c)(1)(A) is not considered part of relevant conduct. In those cases, the criminal conduct is included in this section rather than in the Offense Conduct. Discussion of the facts in this section makes it clear to the court that the conduct is not captured within the guideline application. Presentation of the information in this manner will assist the court in evaluating a plea agreement. If, however, the offense behavior of the dismissed counts constitutes relevant conduct, such information should be included in the Offense Conduct section of the report and used to calculate the guidelines.

For example, a defendant pled guilty to one count of bank robbery with two counts of bank robbery to be dismissed. The conduct in the two bank robberies to be dismissed would not be considered relevant conduct to the count of conviction and would be presented in this section. In essence, the Offense Level Computation operates as a bright line between counts included in the calculation and those that may not be included. In addition to crimes of robbery, other offenses that may be pertinent to this section when charged in a count to be dismissed are assault, burglary, certain immigration crimes, and threatening communications.

There may also be instances in which related offense behavior that is not part of relevant conduct has not been included in the criminal charges. If sufficient reliable information is present to establish that the conduct took place, it may be included in this section. An assessment of the impact on any victim(s) of the conduct described in this section is included.

Publication 107, pp. 16-17.

Here, the alleged behavior is not related, not relevant conduct, and has never been charged. It should therefore not be considered.

**V.**

**THE COURT SHOULD ORDER MR. JONES TO PAY RESTITUTION IN THE AMOUNT OF $500.**

The PSR notes that restitution requests were received from the following series in the following amounts: Vicky ($10,000), Sweet Sugar ($5,000 each for "Pia," "Mya," and "Ava"), Lighthouse (Maureen) ($10,000), and Tara ($18,136.40 for unreimbursed expenses). *PSR,* ¶ 30.

60

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

The Presentence Report takes no position on these requests.

In *Paroline v. United States*, 134 S. Ct. 1710, 1716 (2014), the Supreme Court considered "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in [the] pornographic materials possessed." The court held that restitution is "proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Id.* at 1722 (emphasis added). Proximate cause is a "flexible concept" that "generally refers to the basic requirement that ... there must be some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 1719 (internal citations omitted).

*Paroline* further noted:

> [W]here it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id.* at 1727. *Paroline* further noted that restitution should be neither "severe" nor "nominal." *Id.*[19]

The Supreme Court did not adopt a formula for determining restitution in this type of case, noting "[t]his cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." *Id.* at 1728. Instead, *Paroline* suggested two additional stages of inquiry after a court had (1) established proximate cause: a court should (2) determine "the amount of the victim's losses caused by the continuing traffic in the victim's images," *id.* at 1728, then (3) weigh several factors in determining the relative causal significance of the defendant's conduct in relation to the victim's total losses. These factors include:

- The number of past criminal defendants found to have contributed to the victim's general losses;

---

[19] An award that is neither severe nor nominal "serve[s] the twin goals of helping the victim achieve eventual restitution for all her [or his] child-pornography losses and impressing upon offenders the fact that child-pornography crimes, even simple possession, affect real victims." *Id.*

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

- Reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;
- Any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);
- Whether the defendant reproduced or distributed images of the victim;
- Whether the defendant had any connection to the initial production of the images;
- How many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.

*Id.* at 1728.

Following the *Paroline* analysis, this Court must address the restitution requests from Mr. Jones in three parts: (1) an analysis of proximate cause; (2) the outstanding amount of loss caused by the continuing traffic in the victims' images; and (3) other *Paroline* factors appropriate for consideration.

Mr. Jones recognizes children featured in child pornography continue to be harmed by the possession and distribution of those images, see *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012), and thus there may be some support for a finding of proximate cause in this case. However, the other factors warrant a careful analysis. For example, the government has not produced evidence regarding the total monetary harm to each victim and the number of past criminal defendants found to have contributed to each victim's general losses, including the amount of restitution each victim has already collected. There is also no precise calculation as to the actual number of images on Mr. Jones's devices of each of these victims.

Regarding the other *Paroline* factors, the government has failed to produce sufficient evidence to satisfy virtually all of these additional factors, including the fact that it is undisputed that Mr. Jones did not reproduce or distribute images of any of these victims and had no connection to any initial productions.

Finally, ordering a large restitution award would create further hardship for Mr. Jones's wife and son while he is in custody, and would impact them more than Mr. Jones himself. Mr. Jones's family has already suffered significant emotional, economic, and reputational damage as a result of Mr. Jones's conduct. In light of the *Paroline* analysis discussed above, the defense

62

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

submits that these innocent family members should not be further harmed in order to compensate victims to whom Mr. Jones had little to no connection.

Considering all of the factors relevant to restitution, an award of $500 or less in this case is appropriate. See, e.g., *United States v. Miltier*, 2016 WL 6821087, at *6 (E.D.Va. Nov. 17, 2016) (awarding restitution of $407.05 to one victim for 75 images, finding the amount is "neither trivial or severe, and comports with Defendant's relative role in the causal process").

Mr. Jones respectfully requests an evidentiary hearing if the Court is inclined to award restitution over $500.

### CONCLUSION

Gerard Jones is a 61-year old nonviolent offender with no prior criminal history whatsoever. He has taken his arrest and prosecution very seriously and made every effort to turn his life around and give back to his community, in ways both related and unrelated to his offense. Since his arrest (and even prior to that) he has been an extremely productive and contributing member of the literary community, his family, his church, his 12-step recovery community, and his community at large. He has been assessed by a highly qualified forensic psychologist who has conducted over 1,000 sexual violent predator evaluations for the State of California, and by his psychotherapist who specializes in treating sex offenders, as posing no risk to the community at large and very little risk of reoffending. He has exhibited extreme remorse, has excellent family and community support, has an excellent history of professional achievement, and has responded appropriately to this prosecution.

One of the main questions for the Court is how much credence should be given to the applicable Guidelines, which have been soundly criticized as too harsh for many years by courts throughout the United States and repeatedly in the Northern District of California. If you will, where should the conversation begin? Should it begin with the astronomical and unreasonable applicable Guidelines range? By all accounts from the aforementioned sentencing studies, recidivist statistics, and disparate sentence analyses, it is respectfully submitted that the answer to

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

this question should be an emphatic "no." When adding the fact that state courts in this region will normally limit sentences for first-time offenders for these offenses to a period of probation and a term of county jail (rather than prison) for less than one year, and where the sentence can usually be satisfied on an electronic home detention program, this question should seemingly involve little debate. We submit that the applicable Guidelines range here should in no way be considered a reasonable starting point.

Additionally, child pornography convictions require lifetime sex offender registration and thus lifetime punishment, "being marked as a pariah with severe restrictions on residence, movements, activities and associations." *R.V.,* 157 F.Supp.3d at 210. Adding "unnecessary" and "unduly long" periods of incarceration to such a sanction is "inappropriate and it should be avoided." *Id.*

Some degree of mercy is warranted here. As Justice Kennedy states: "A country which is secure in its institutions, confident in its laws should not be ashamed of the concept of mercy. As the greatest of poets has said 'mercy is the mightiest in the mightiest. It becomes the throned monarch better than his crown.'" Justice Kennedy's 2003 ABA speech, available at http://www.iprt.ie/contents/348.

Therefore, Mr. Jones respectfully requests that the Court consider all of the information set forth above to impose no more than the mandatory-minimum sentence of 60 months in custody followed by five years of supervised release, which will provide a combination of punishment through incarceration, treatment once released, and intensive monitoring of Mr. Jones until he is nearly 70 years of age. This sentence is sufficient but not greater than necessary to achieve the goals of sentencing and is fair and just in this particular case.

Defendant further submits that the recommended sentence of 60 months comports with the purposes of Section 3553(a). Because the offense constituted such a marked deviation from an otherwise law-abiding life and because Mr. Jones presents such a low risk for reoffending, there is no need to incarcerate him any more than the mandatory minimum requires to protect the public from further crimes under 18 U.S.C. § 3553(a)(2)(C). Likewise, because he will be able to continue with his so-far successful rehabilitation, recovery, and counseling efforts both in custody

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM

and after being released, the requested sentence provides Mr. Jones with the needed medical care and correctional treatment in the most effective manner in accordance with 18 U.S.C. § 3553(a)(2)(D). Finally, based on all of the mitigating factors discussed above—including his otherwise exemplary life and reputation, tremendous community support, excellent professional history, cooperation with law enforcement, and the other collateral consequences of his felony conviction—the proposed sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and affords adequate deterrence as required by 18 U.S.C. § 3553(a)(2)(A) and (B).

It is submitted that, in light of all of these factors and the authority referenced above, including those set forth in 18 U.S.C. § 3553(a), a sentence of 60 months is both sufficient and just for Mr. Jones.

**Dated: August 7, 2018**                         **Respectfully submitted,**

                                    **_____/s/_____**
                                    **SETH P. CHAZIN**
                                    **Attorney for Defendant GERARD JONES**

65

DEFENDANT GERARD JONES'S SENTENCING MEMORANDUM