**SETH P. CHAZIN (CA SBN 133777)**
**Attorney at Law**
**LAW OFFICES OF SETH P. CHAZIN**
**1164 Solano Ave**
**Albany, CA 94706**
**Telephone: (510) 507-8100**
**Facsimile: (510) 525-0087**

**Attorney for Defendant**
**GERARD JONES**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) No.  **3:17-cr-00070-VC** |
| **Plaintiff,** | ) |
| | ) **DECLARATION OF COUNSEL IN** |
| | ) **SUPPORT OF DEFENDANT GERARD** |
| **vs.** | ) **JONES'S SENTENCING** |
| | ) **MEMORANDUM** |
| **GERARD JONES,** | ) |
| | ) **Date: August 14, 2018** |
| **Defendant.** | ) **Time: 10:30 a.m.** |
| | ) **Judge: Hon. Vince Chhabria** |
| | ) **Courtroom: Courtroom 4, 17th Floor** |

**I, SETH P. CHAZIN, hereby declare as follows:**

1.    I am an attorney at law duly admitted to practice in the State of California and admitted to the bar of this Court. I represent the defendant in the above-captioned matter.

2.    Unless otherwise noted, I make this declaration based on my own personal knowledge. With respect to those matters not personally known to me, I make this declaration upon information and belief.

3.    Attached hereto as Exhibit A is a true and correct copy of *The History of Child Pornography Guidelines*, dated October 2009, by the United States Sentencing Commission.

4.    Attached hereto as Exhibit B is a true and correct copy of the mean sentence for the child pornography guideline for the Northern District of California in 2016.

DECLARATION OF COUNSEL IN SUPPORT OF SENTENCING MEMORANDUM

5.    Attached hereto as Exhibit C is a true and correct copy of the median sentence for all child pornography offenses in the Northern District of California for 2016.

6.    Attached hereto as Exhibit D is a true and correct copy of a letter from Cynthia V. Rinker, MFT and Certified Sex Addiction Therapist (CSAT) at the San Francisco Forensic Institute (SFFI), dated March 8, 2017, along with her CV.

7.    Attached hereto as Exhibit E is a true and correct copy of a second letter from Ms. Rinker dated June 25, 2018.

8.    Attached hereto as Exhibit F is a true and correct copy of the Confidential Report of Psychological Evaluation by Dr. Jeremy Coles, Ph.D., Clinical and Forensic Psychologist, dated November 3, 2017, along with his CV.

9.    Attached hereto as Exhibits G-1 to G-10, G-12 to G-16, G-18 to G-48, and G-57 to G-70 are true and correct copies of letters of support submitted on behalf of Mr. Jones. (Exhibits G-11, G-17, and G-49 to G-56 are being submitted separately under seal.)

10.    Attached hereto as Exhibits H-1 to H-4 are true and correct copies of letters of support submitted on behalf of Mr. Jones related to his current book projects.

11.    Attached hereto as Exhibit I is a true and correct copy of my email correspondence with Assistant United States Attorney Meredith Osborn in February and March 2018.

12.    Attached hereto as Exhibit J is a true and correct copy of the Department of Homeland Security's Report of Investigation No. SF07QD14SF0019-015 dated February 26, 2018.

13.    Attached hereto as Exhibit K is a true and correct copy of part of the transcript of Mr. Jones's post-arrest interview by the San Francisco Police Department.

14.    I have represented many defendants in San Francisco County and many other counties throughout Northern California who have been charged with possession and/or distribution of child pornography. In my experience, the standard disposition for a first-time offender is three years of probation and a county jail sentence of less than one year, which is usually satisfied through an electronic home detention program rather than through actual confinement in a jail or prison.

DECLARATION OF COUNSEL IN SUPPORT OF SENTENCING MEMORANDUM

15.     I made a mistake in calculating the applicable Guidelines range when advising Mr. Jones on whether to accept the government's proposed plea agreement to Count Two (possession) or plead open to both charges (distribution and possession), as he ultimately did. The draft plea agreement provided a Base Offense Level of 18 for Count Two and a disputed two-level enhancement for distribution, resulting in a Total Offense Level of 30 with an advisory range of 97 to 121 months. I incorrectly assumed the same Base Offense Level of 18 applied to Count One, and thus advised Mr. Jones that pleading open and arguing the distribution enhancement to the Court might be beneficial and could result in a Total Offense Level of 28 with a lower advisory range of 78 to 97 months. After the plea was entered, however, I realized the Base Offense Level for Count One is actually 22 resulting in an Adjusted Offense Level of 32 (assuming the three-point reduction for acceptance of responsibility), with a corresponding advisory range of 121 to 151 months. I am informed and believe that Mr. Jones relied on this advice in rejecting the government's plea offer and pleading open to the Court. Mr. Jones has advised me that he does not wish to try to withdraw his plea and attempt to enforce the government's original offer and stands prepared to accept whatever punishment the Court sees fit. But I am compelled to inform the Court of these facts as this may be deemed by the Court as a basis for a downward variance from the advisory Guidelines range.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on August 7, 2018, in Albany, California.

**Dated: August 7, 2018**                    **Respectfully submitted,**

                                       **_____/s/_ Seth Chazin_____**
                                       **SETH P. CHAZIN**
                                       **Attorney for Defendant GERARD JONES**

3

DECLARATION OF COUNSEL IN SUPPORT OF SENTENCING MEMORANDUM

# EXHIBIT A

# Exhibit A

**UNITED STATES SENTENCING COMMISSION**



# THE HISTORY OF
# THE CHILD PORNOGRAPHY
# GUIDELINES

# THE UNITED STATES SENTENCING COMMISSION



**William K. Sessions III**
*Chair*

**Ruben Castillo**
*Vice Chair*

**William B. Carr, Jr.**
*Vice Chair*

**Ricardo H. Hinojosa**
*Commissioner*

**Beryl A. Howell**
*Commissioner*

**Dabney L. Friedrich**
*Commissioner*

**Jonathan J. Wroblewski**
*Ex Officio*

**Isaac Fulwood, Jr.**
*Ex Officio*

---

United States Sentencing Commission
One Columbus Circle, N.E.
Suite 2-500
Washington, DC  20002
*www.ussc.gov*

October 2009

**Table of Contents**

I.  **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Sentencing Reform Act Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Congressional Review and Directives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.  Child Pornography. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  **The Child Pornography Sentencing Guidelines**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  Federal Statutes and Sentencing Guidelines Related to Child
Pornography Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  History of Child Pornography Legislation and the Child Pornography
Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.  <u>Child Pornography Statutes in the Pre-Guidelines Era</u>. . . . . . . . . . . . . . . . 8

        2.  <u>Child Pornography Guidelines at Promulgation</u>. . . . . . . . . . . . . . . . . . . . . 10

        3.  <u>1988 Guideline Changes</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.  <u>1990 Guideline Changes</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        5.  <u>1991 Guideline Changes:  Part I</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        6.  <u>1991 Guideline Changes:  Part II</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        7.  <u>1996 Guideline Changes</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        8.  <u>2000 Guideline Changes</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        9.  <u>2003 Guideline Changes</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        10.  <u>2004 Guideline Changes</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        11.  <u>2009 Guideline Changes</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

III.  **Summary**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

> *This report  provides a history of the child pornography guidelines.  The child pornography guidelines have existed since their initial promulgation in 1987, and they have been substantively amended nine times.  These revisions were prompted by, among other things, statutory changes, the United States Sentencing Commission's independent analysis, and public comment.  This report is the first step in an ongoing examination of the child pornography guidelines.*

## I.     Introduction

The United States Sentencing Commission ("Commission") was created by Congress to "establish sentencing policies and practices for the Federal criminal justice system" that implement the Sentencing Reform Act of 1984 ("SRA"),[1] including the purposes of sentencing enumerated at 18 U.S.C. § 3553(a)(2).[2]  In establishing such policies and practices, principally through the promulgation of federal sentencing guidelines and policy statements, the Commission's efforts are guided by the substantive and procedural requirements of the SRA and other congressional sentencing legislation.  The SRA directs that the Commission "periodically shall review and revise, in consideration of comments and data coming to its attention, the guidelines."[3]  To this end, the Commission has established a review of the child pornography guidelines as a policy priority for the guidelines amendment cycle ending May 1, 2010.[4]  This report is the first step in the Commission's work on this priority.

Congress has been particularly active over the last decade creating new offenses, increasing penalties, and issuing directives to the Commission regarding child pornography offenses.  Indeed, in 2008, the 110th Congress passed three new laws amending child pornography statutes and creating a new offense for creating child pornography through

---

[1]  Sentencing Reform Act of 1984, Pub. L. No. 98–473, Chapter II, § 212(a), 98 Stat. 1837 (1984) ("SRA").

[2]  18 U.S.C. § 3553(a)(2) provides that the purposes of sentencing are—

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)  to afford adequate deterrence to criminal conduct;
    (C)  to protect the public from further crimes of the defendant; and
    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

18 U.S.C. § 3553(a).

[3]  28 U.S.C.  § 994(o).

[4]  The Commission will conduct a "[r]eview of child pornography offenses, and possible promulgation of guideline amendments and/or a report to Congress as a result of such review.  It is anticipated that any such report would include (A) a review of the incidence of, and reasons for, departures and variances from the guideline sentence; (B) a compilation of studies on, and analysis of, recidivism by child pornography offenders; and (C) recommendations to Congress on any statutory changes that may be appropriate."  Notice of Final Priorities, 74 Fed. Reg 46,478-03 (Sept. 9, 2009).

adapting or modifying a depiction of a child.[5]  Prompted by congressional action, and on its own initiative, the Commission has reviewed and substantively revised the child pornography guidelines nine times.  This report describes the nine revisions made to the possession and trafficking in child pornography guidelines and the guidelines' relation to the requirements imposed on the Commission by related legislation and the SRA.[6]

## A.    Sentencing Reform Act Requirements

The SRA was motivated by a desire on the part of Congress to establish a rational sentencing system to provide for certainty, uniformity, and proportionality in criminal sentencing.  The intent of Congress was to eliminate an "unjustifiably wide range of sentences [imposed on] offenders with similar histories, convicted of similar crimes, committed under similar circumstances,"[7] and to recognize differences between offenses.[8]  In the SRA, Congress also stated that "in many cases, current sentences do not accurately reflect the seriousness of the offense."[9]

The SRA sets forth several substantive requirements that have guided the Commission's actions in the area of child pornography offenses, as with all federal offenses.  In prefatory language to statutory provisions outlining the Commission's duties, Congress directs the Commission to act "consistent with all pertinent provisions of any Federal statute."[10]  Under the SRA, the Commission is required to consider the same factors that a sentencing court is required to consider under 18 U.S.C. § 3553(a).[11]  For example, the guidelines are to

---

[5]  Providing Resources, Officers, and Technology to Eradicate Cyber Threats to Our Children Act of 2008, Pub. L. No. 110–401, 122 Stat. 4229 (2008) ("PROTECT Our Children Act"); Keeping the Internet Devoid of Sexual Predators Act of 2008, Pub. L. No. 110–400, 122 Stat. 4224 (2008) ("KIDS Act"); Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110–358, 122 Stat. 4001 (2008) ("Effective Child Pornography Prosecution Act").

[6]  This paper does not discuss two technical, non-substantive amendments to §2G2.2.  *See* USSG App. C, amendment 575 (Nov. 1, 1997), amendment 617 (Nov. 1, 2001).

[7]  S. Rep. No. 98–225, at 38 (1983).

[8]  *Id.* at 45-46.  One goal was to ensure that sentences available for different crimes reflected the seriousness of these crimes because "[s]entences that are disproportionate to the seriousness of the offense create a disrespect for the law. Sentences that are too severe create unnecessary tensions among inmates and add to disciplinary problems in the prisons."  *Id.*

[9]  28 U.S.C. § 994(m).

[10]  28 U.S.C. § 994(a) (as amended by § 401 of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act, Pub. L. No. 108–21, 117 Stat. 650 (2003) ("PROTECT Act")).

[11]  18 U.S.C. § 3553(a) provides that in imposing a sentence the court shall consider —

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  the need for the sentence imposed—
    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just

take into account, to the degree relevant, certain characteristics of the offense, including "the nature and degree of the harm caused by the offense," "the community view of the gravity of the offense," "the public concern generated by the offense," "the deterrent effect a particular sentence may have on the commission of the offense by others," and "the current incidence of the offense in the community and in the Nation as a whole."[12]  Such characteristics are used by the Commission to establish the relative seriousness of the offense as compared to other offenses and to maintain proportionality throughout the guidelines.

The SRA further instructed the Commission to use past sentencing practices "as a starting point"[13] for creating the guidelines, and the Commission continues to use them in its proportionality analyses.  However, the Commission is not bound by past practices.  The SRA states that "[t]he Commission *shall not be bound by such average sentences*, and shall independently develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of title 18, United States Code."[14]

---

punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
(i) issued by the Sentencing Commission pursuant to section 994 (a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and
(ii) that, except as provided in section 3742 (g), are in effect on the date the defendant is sentenced; or
(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994 (a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28);
(5) any pertinent policy statement—
(A) issued by the Sentencing Commission pursuant to section 994 (a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and
(B) that, except as provided in section 3742 (g), is in effect on the date the defendant is sentenced.
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

[12]  28 U.S.C. § 994(c).

[13]  *Id.* § 994(m).

[14]  *Id.* (emphasis added).

The SRA also instructs the Commission to take into account, to the degree relevant, certain characteristics of the offender, including criminal history, while assuring that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders.[15]  Furthermore, "in recommending a term of imprisonment or length of a term of imprisonment," the SRA requires the guidelines and policy statements to reflect the "general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant."[16]

In addition to these substantive directions, the SRA establishes the process by which the Commission promulgates federal sentencing guidelines and policy statements.  The SRA requires the Commission to comply with the notice and comment provisions of the Administrative Procedure Act at section 553 of title 5, United States Code, when promulgating guidelines.[17]  The SRA further requires that the Commission "periodically . . . review and revise, in consideration of comments and data coming to its attention, the guidelines . . . ."[18]  In so doing, the Commission is directed to "consult with authorities on, and individuals and institutional representatives of, various aspects of the Federal criminal justice system," and in particular, the United States Probation System, the Bureau of Prisons, the Judicial Conference of the United States, the Criminal Division of the United States Department of Justice ("DOJ"), and a representative of the Federal Public Defenders.[19]

Consistent with the procedural requirements of the SRA,[20] the Commission has established administrative Rules of Practice and Procedure that adhere to these statutory procedural requirements and guide its guideline amendment cycle.[21]  Pursuant to these rules

---

[15]  *Id.* § 994(d).

[16]  *Id.* § 994(e); *see also id.* § 994(k) (requiring "that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment.")

[17]  *Id.* § 994(x).

[18]  *Id.* § 994(o).

[19]  *Id*.

[20]  *Id.* § 995(a)(1) ("The Commission . . . shall have the power to — establish general policies and promulgate such rules and regulations for the Commission as are necessary to carry out the purposes of this chapter.").

[21]  *See, e.g.*, USSC Rules of Practice and Procedure (2007) ("USSC Rules"), Rule 2.2 - Voting Rules for Action by the Commission (requiring the affirmative vote of at least four members at a public meeting to promulgate guidelines, policy statements, official commentary, and amendments thereto); Rule 3.2 - Public Meetings (stating that, to the extent practicable, the Commission shall issue a public notice of any public meeting); Rule 3.4 - Public Hearings (allowing for public hearings "on any matter involving the promulgation of sentencing guidelines or any other matter affecting the Commission's business"); Rule 4.1 - Promulgation of Amendments (setting forth the amendment process pursuant to 28 U.S.C. § 994(p)); Rule 4.4 - *Federal Register* Notice of Proposed Amendments (stating that "[a]

and consistent with the procedural requirements of the SRA, before promulgating a guideline amendment, the Commission holds public meetings and public hearings, and solicits input from its standing and ad hoc advisory groups.  The Commission also reviews formal public comment and informal input submitted by other parties, including the parties identified in the SRA and outside groups representing the federal judiciary, prosecutors, defense attorneys, crime victims, and other interested groups.  The Commission studies relevant data, reports, and other information compiled by the Commission staff, which may include sentencing data, case-law analyses, literature reviews, surveys of state laws, and other relevant information.

Typically in December or January, the Commission formally requests comment by publishing proposed amendments in the *Federal Register*, typically providing a 60-day comment period.  The Commission conducts at least one public hearing per year regarding the proposed amendments, usually in March.  After the close of the public comment period, the Commission refines the proposed amendments in light of comments and testimony it receives.  Then, the Commission holds its final vote on the promulgation of the amendments.  Promulgation of guidelines, policy statements, official commentary, and amendments thereto require the affirmative vote of at least four members of the Commission at a public meeting.[22]  Through this administrative process, the Commission considers the various substantive factors set forth throughout the SRA.

## B.    Congressional Review and Directives

Notwithstanding the delegation of authority provided to the Commission in the SRA, Congress retained ultimate authority over the federal sentencing guidelines.  The guideline amendment cycle described above by statute culminates with the submission of promulgated amendments to Congress for its review.  The SRA authorizes the Commission, not later than the first day of May of each year, to submit to Congress amendments to the guidelines, which must include a "statement of reasons therefor."[23]  Amendments to the guidelines become effective on a date specified by the Commission, which may not be earlier than 180 days after submission to Congress or later than the first day of November in the year in which the amendments were submitted.[24]  During the pendency of the amendments, Congress may

---

vote to publish a proposed amendment to a guideline, policy statement, or official commentary in the *Federal Register* shall be deemed to be a request for public comment"); Rule 5.2 - Notice of Priorities (requiring the Commission to "publish annually in the *Federal Register*, and make available to the public, a notice of the tentative priorities for future Commission inquiry and possible action, including areas for possible amendments to guidelines, policy statements, and commentary").

[22]  28 U.S.C. § 994(a).

[23]  *Id*. § 994(p).  Amendments to policy statements and commentary may be promulgated and put into effect at any time.  However, to the extent practicable, the Commission endeavors to include amendments to policy statements and commentary in any submission of guideline amendments to Congress.  USSC Rules, Rule 4.1 – Promulgation of Amendments.

[24]  28 U.S.C. § 994(p).

modify or reject submitted amendments.[25]  If Congress does not act, the amendments take effect as submitted.[26]

In addition to its power to disapprove guideline amendments, Congress retains the ability to influence federal sentencing policy by enacting directives to the Commission.  These directives may be general or specific.  When Congress enacts such a provision, the Commission is obliged to implement the directive in a manner consistent with the legislation.[27]  As the Supreme Court stated in *United States v. LaBonte*, "Congress has delegated to the Commission significant discretion in formulating guidelines . . . . Broad as that discretion may be, however, it must bow to the specific directives of Congress."[28]  In responding to directives, the Commission follows the same procedure outlined above for other amendments, unless the directive provides for an alternative procedure (*i.e.*, "emergency amendment authority").

## C.    Child Pornography

For more than 30 years, and particularly in recent years, Congress has focused attention on the scope of child pornography offenses and the severity of penalties for child pornography offenders.  Through creating new offenses, enacting new mandatory minimums, increasing statutory maximums, and providing directives to the Commission, Congress has repeatedly expressed its will regarding appropriate penalties for child pornography offenders.  Congress has specifically expressed an intent to raise penalties associated with certain child pornography offenses several times through directives to the Commission and statutory changes aimed at increasing the guideline penalties and reducing the incidence of downward departures for such offenses.[29]

---

[25]  *Id.*

[26]  *Id.*

[27]  *Id.* § 994(a).  Section 994(a) requires the Commission to promulgate guidelines that are "consistent with all pertinent provisions of any Federal statute."  *Id.*

[28]  *United States v. LaBonte,* 520 U.S. 751, 757 (1997) (quotation omitted).

[29]  For example, 18 U.S.C. § 3553(b)(2)(A), enacted by § 401 of the PROTECT Act, sought to reduce below-guideline sentences for "child crimes and sexual offenses," including child pornography offenses. It permitted courts to depart below guideline ranges in very limited circumstances and to consider "only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission together with any amendments thereto by act of Congress."  18 U.S.C. § 3353(b)(2)(A).  The status of this provision was in question after the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220 (2005).  In that case, the Court held that mandatory application of the guidelines violated the Sixth Amendment and excised § 3553(b)(1) which limited district courts' ability to impose a sentence outside the guideline range in all cases not covered by § 3553(b)(2)(A).  543 U.S. at 259.  Although the *Booker* court did not directly address the status of § 3553(b)(2)(A), every court of appeals to address the issue has concluded that *Booker* likewise requires the excision of that provision.  *United States v. Hecht*, 470 F.3d 177, 181 (4th Cir. 2006); *United States v. Shepherd*, 453 F.3d 702, 705 (6th Cir. 2006); *United States v. Grigg*, 442 F.3d 560, 564 (7th Cir. 2006); *United States v. Jones*, 444 F.3d 430, 441 n. 54 (5th Cir. 2006); *United States v. Selioutsky*, 409 F.3d 114, 117 (2d Cir. 2005); *United States v. Yazzie*, 407 F.3d 1139, 1145 (10th Cir. 2005).

The Commission has sought to implement congressional intent in the area of child pornography offenses in a manner consistent with the SRA and subsequent legislation. As discussed in this paper, in amending the child pornography guidelines over the years, the Commission has reviewed sentencing data, considered public comment on proposed amendments, conducted public hearings on proposed amendments, studied relevant literature, and considered pertinent legislative history.

## II.    The Child Pornography Sentencing Guidelines

### A.    Federal Statutes and Sentencing Guidelines Related to Child Pornography Offenses

The crimes of possession, receipt, and trafficking of child pornography are described in chapters 71 and 110 of title 18 of the U.S. Code, primarily at 18 U.S.C. §§ 2252, 2252A, 2260(b). Child pornography is defined as—

> any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where –
>
> (A)  the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
> (B)  such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or
> (C)  such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.[30]

---

[30]  18 U.S.C. § 2256(8). Section 1466A of title 18 of the U.S. Code (Obscene visual representations of the sexual abuse of children) also describes conduct that is referenced to §2G2.2, but for the purposes of this paper, the definition of child pornography at section 2256(8) is adopted generally.

Sentencing guidelines for child pornography offenses are found within Chapter Two, Part G, Subpart 2 (Sexual Exploitation of a Minor), of the federal sentencing guidelines.[31]  In fiscal years 2007 and 2008, the guideline for trafficking, receipt, and possession of child pornography (§2G2.2) was the child pornography guideline applied most often, followed by the guideline for production of child pornography (§2G2.1).[32]

This paper focuses primarily on the offenses sentenced under §2G2.2, trafficking, receipt, and possession of child pornography.  For the past several years, §2G2.2 has had a high and increasing rate of downward departures and below-guideline variances.[33]

### B.    History of Child Pornography Legislation and the Child Pornography Guidelines

#### 1.    Child Pornography Statutes in the Pre-Guidelines Era

Distribution and receipt of child pornography has been an area of congressional concern since the passage of the Protection of Children Against Sexual Exploitation Act of

---

[31]  Relevant guidelines include §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production); §2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor); §2G2.3 (Selling or Buying Children for Use in Production of Pornography); §2G2.4 ([Deleted]); §2G2.5 (Recordkeeping Offenses Involving the Production of Sexually Explicit Materials; Failure to Provide Required Marks in Commercial Electronic Email); and §2G2.6 (Child Exploitation Enterprises).  This paper focuses on §2G2.2 (and §2G2.4) and the history of the trafficking, receipt, distribution, and possession offenses under the guidelines.  Other guidelines are discussed herein only insofar as they relate to §2G2.2 (or §2G2.4).

[32]  USSC, 2008 Sourcebook of Federal Sentencing Statistics, Table 17 ("2008 Sourcebook"); USSC, 2007 Sourcebook of Federal Sentencing Statistics, Table 17 ("2007 Sourcebook").  Prior to 2007, §2G2.4 was more commonly referenced than §2G2.1.  Guideline 2G2.4 was the previously existing guideline for offenders convicted of possession of child pornography offenses.  In 2004, §§2G2.2 and 2G2.4 were consolidated as part of a review of the child pornography guidelines after congressional legislation in 2003.  *See infra*, Part II.B.10., *2004 Guidelines Changes*.  Some defendants who committed their offenses before 2004 continue to sentenced under the deleted §2G2.4 in order to avoid *ex post facto* concerns.  *See* §1B1.11 (Use of Guidelines Manual in Effect on Date of Sentencing (p.s.)).

[33]  In fiscal year 2008, for offenders sentenced under §2G2.2, the non-government sponsored below-guideline rate was 35.7 percent, the government sponsored below-guideline rate was 8.5 percent, and the above-guideline rate was 2.0 percent.  2008 Sourcebook, Table 28.  By comparison, for all offenders, the non-government sponsored below-guideline rate was 13.4 percent, the government sponsored below-guideline rate was 25.6 percent, and the above-guideline rate was 1.5 percent.  2008 Sourcebook, Table N.  In fiscal year 2007, for offenders sentenced under §2G2.2, the non-government sponsored below-guideline rate was 27.2 percent, the government sponsored below-guideline rate was 7.0 percent, and the above-guideline rate was 2.4 percent.  2007 Sourcebook, Table 28.  By comparison, for all offenders, the non-government sponsored below-guideline rate was 12.0 percent, the government sponsored below-guideline rate was 25.6 percent, and the above-guideline rate was 1.5 percent.  2007 Sourcebook, Table N.

1977.[34]  This Act, among other things, prohibited the use of children to produce child pornography and established a ten-year statutory maximum for first-time trafficking offenders and a 15-year statutory maximum and a two-year mandatory minimum for subsequent offenders.[35]  Lawmakers stated at the time that prosecutions of child pornography crimes should not merely focus on large-scale distributors, but should also ferret out individual traffickers.[36]

In 1984, Congress further clarified its intent to punish all traffickers by passing the Child Protection Act of 1984, which extended penalties to producers and traffickers of child pornography who commit such offenses for non-pecuniary purposes.[37]

In 1986, the *Final Report of the Attorney General's Commission on Pornography* was presented to Congress ("Meese Report").[38]  The Meese Report found that the production and sharing of child pornography images causes serious harm and noted that "[i]f the sale or distribution of such pictures is stringently enforced, and if those sanctions are equally stringently enforced, the market may decrease and this may in turn decrease the incentive to produce those pictures."[39]

In response, Congress enacted the Child Sexual Abuse and Pornography Act of 1986 and the Child Abuse Victims' Rights Act of 1986.[40]  The Child Abuse Victims' Rights Act expressed the sense of Congress that it had "recognized the physiological, psychological, and emotional harm caused by the production, distribution, and display of child pornography by strengthening laws [proscribing] such activity."[41]  Among other things, the Act provided civil remedies for victims and increased the mandatory minimum penalty for repeat child pornography offenders from two to five years of imprisonment.[42]

---

[34]  Protection of Children Against Sexual Exploitation Act, Pub. L. No. 95–225, 92 Stat. 7 § 2 (1978) (codified at 18 U.S.C. §§ 2251-2253).

[35]  *Id.*

[36]  S. Rep. No. 95–438, at 6 ( 1977).

[37]  Child Protection Act of 1984, Pub. L. No. 98–292, 98 Stat. 204 (1984).

[38]  The Final Report of the Attorney General's Commission is often referred to as the Meese Report as it was prepared under U.S. Attorney General Edwin Meese ("*Meese Report*").

[39]  *Meese Report*, at 413.

[40]  Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99–628, 100 Stat. 3510 (1986) ("Child Sexual Abuse and Pornography Act of 1986"); Child Abuse Victims' Rights Act, Pub. L. No. 99–500, 100 Stat. 1783, Title I, § 101(b) [Title VII, §§ 701-05 (1986)] and amended by Pub. L. No. 99–591, 100 Stat. 3341-75, Title I, §101(b) [Title VII, §§ 701-705] (1986) ("Child Abuse Victims' Rights Act").

[41]  Child Abuse Victims' Rights Act § 702(2).

[42]  *Id.* §§ 703-04.

## 2.    Child Pornography Guidelines at Promulgation

When the Commission promulgated the first set of guidelines in 1987, it provided sentence ranges for those defendants convicted of crimes under 18 U.S.C. § 2251 (production of child pornography) and 18 U.S.C. § 2252 (transport, distribution, and receipt of child pornography).  Individuals convicted under these statutes were sentenced under §2G2.1 or §2G2.2, respectively.[43]  There was no guideline for simple possession of child pornography because possession was not a federal crime at the time of promulgation of the initial set of guidelines.

In establishing base offense levels for child pornography, as was the case with other offenses, the original Commission examined existing sentencing practices.  The Commission did this, in part, by translating the Parole Commission's offense categorization into an estimated guideline offense level.[44]  For the offenses included under §2G2.2, the Parole Commission categorization would be translated as base offense level 18 to 20.  The Commission set the base offense level for §2G2.2 at level 13, which was substantially lower than the Parole Commission's categorization based on the expectation that the specific offense characteristics included in the new guideline would apply in many cases to increase the guidelines calculation from base offense level 13 to as high as level 20.  Two specific offense characteristics were provided in §2G2.2:  a 2-level increase when an image depicted a child under twelve years of age; and no less than a 5-level increase for distribution with additional increases keyed to the retail value of the material distributed, rather than the number of images or reason for distribution.[45]

---

[43]  USSG §§2G2.1, 2G2.2 (Nov. 1, 1987).

[44]  The Commission performed this translation by identifying the Parole Commission's offense category, determining the likely sentence served for that offense category, finding the closest guidelines range that fit the sentence served, and adding one additional offense level to account for a 15 percent adjustment for good time available under the parole system.  For more information on the manner in which the Commission established the initial guidelines, *see generally* USSC, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements, at 16-26 (1987).

[45]  The Commission received proposed revisions to §2G2.2 prior to promulgation from the Department of Justice ("DOJ").  While the DOJ agreed with a base offense level of 13 for §2G2.2, it recommended several other specific offense characteristics including +2 for trafficking; +2 for involvement of a child aged 7-12; +4 for involvement of a child under age 7; +10 for sadistic or masochistic images; +2 for abuse of trust; +6 for each prior conviction for this offense; and graduated increases for distribution for value.  Letter from DOJ, James Knapp, Deputy Associate Attorney General, to the U.S. Sentencing Commission (Mar. 16, 1987).

Guideline 2G2.2, effective Nov. 1, 1987, read as follows:

| | |
|---|---|
| §2G2.2 | **Transporting, Receiving, or Trafficking in Material Involving the Sexual Exploitation of a Minor** |
| | (a)    Base Offense Level:  **13** |
| | (b)    Specific Offense Characteristics |
| | (1)    If the material involved a minor under the age of twelve years, increase by **2** levels. |
| | (2)    If the offense involved distribution, increase by the number of levels . . . corresponding to the retail value of the material, but in no event less than **5** levels. |

3.    1988 Guideline Changes

On November 20, 1987, shortly after the initial guidelines went into effect, the Commission republished the guidelines, including §2G2.2, and indicated that "[s]uggestions for improving the sentencing guidelines, commentary and policy statements are [ ] solicited on a continuing basis, to assist the Commission in carrying out its responsibilities under the Sentencing Reform Act."[46]  In addition to soliciting written comments, the Commission held a public hearing on March 22, 1988, to receive testimony from practitioners about the implementation and the application of the guidelines.  The only witness to address §2G2.2 was Bruce A. Taylor, general counsel, Citizens for Decency Through Law, Inc.  Mr. Taylor encouraged the Commission to expand the existing §2G2.2 specific offense characteristic enhancement based on the young age of the victim.[47]  He stated that it is "difficult, especially in the commercial cases, to identify the actual children or their ages.  The guidelines should guide the courts in better identifying the exploitation of younger victims and provide that larger scale, organized or commercial suppliers be more seriously punished."[48]  Mr. Taylor suggested revising the specific offense characteristic to apply where the material involved "a prepubescent minor or a minor under the age of twelve years."[49]

---

[46]  Notice of Revisions to Commentary to the Sentencing Guidelines and Policy Statements for the United States Courts, 52 Fed. Reg. 44,674 (Nov. 20, 1987).

[47]  Testimony of Bruce A. Taylor, General Counsel, Citizens for Decency Through Law, Inc., to the U.S. Sentencing Commission Regarding Sentencing for Obscenity Offenses (Mar. 22, 1988) ("1988 Citizens for Decency Through Law Testimony").  Mr. Taylor's testimony also suggested increasing the specific offense characteristic enhancement for young children from two to four levels, but this suggestion was not adopted.  *Id.* at 8.

[48]  *Id.* at 8.

[49]  *Id*.

11

On April 29, 1988, the Commission promulgated amendments, effective June 15, 1988, including a revision to §2G2.2, to expand the specific offense characteristic to refer to a prepubescent minor or a minor under the age of twelve years.[50]  The purpose of this change was to provide "an alternative measure to be used in determining whether the material involved an extremely young minor for cases in which the actual age of the minor is unknown."[51]

Guideline 2G2.2, as amended by amendment 31, effective June 15, 1988, read as follows:

| | |
|---|---|
| §2G2.2 | **Transporting, Receiving, or Trafficking in Material Involving the Sexual Exploitation of a Minor** |
| | (a)   Base Offense Level:  **13** |
| | (b)   Specific Offense Characteristics |
| |   (1)   If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels. |
| |   (2)   If the offense involved distribution, increase by the number of levels . . . corresponding to the retail value of the material, but in no event less than **5** levels. |

---

[50]  *See* Notice of Submission of Regular Amendments to the Sentencing Guidelines and Commentary to the Congress for Review, 53 Fed. Reg. 15,530 (Apr. 29, 1988).

[51]  *Id* at 15,533; USSG App. C, amendment 31 (June 15, 1988).  The Commission notified guidelines manual users of the temporary amendments by memorandum and noted that the amendments were based on "monitoring of implementation of the guidelines and comments from judges, attorneys and probation officers."  USSC, Memorandum to Guideline Manual Recipients from the U.S. Sentencing Commission (May 3, 1988) (explaining amendments).

### 4.     1990 Guideline Changes

In 1990, the Commission directed a staff working group to compile a report on the status of child pornography prosecutions in the federal system ("1990 Staff Report").[52]  The 1990 Staff Report reviewed the legislative history of the existing child pornography statutes and noted the following findings by Congress:  (1) both commercial and non-commercial distribution and receipt of child pornography contribute to the molestation and abuse of children;[53] (2) child pornography had become a highly organized, multi-million dollar industry that operates on nationwide scale, but federal law enforcement efforts should not be limited to large scale distributors of child pornography;[54] (3) child pornography causes substantial harm to both the child victim and to society as a whole since abused children tend to grow up "in an adult life of drugs and prostitution [and] become child molesters themselves, thus continuing the vicious cycle."[55]

The 1990 Staff Report also included a statistical analysis of all prosecutions of child pornography offenses sentenced under the guidelines and made recommendations based on this review and the mandates of 28 U.S.C. § 994.[56]  The report identified only 31 cases involving child pornography convictions, half of which involved defendants who had engaged in sexual abuse of children and none of which involved trafficking or production of child pornography for pecuniary gain.[57]  Rather, the trafficking cases involved defendants who traded images for pleasure.[58]  Thirty-four percent of child pornography offenders convicted under 18 U.S.C. § 2252 received a departure from the guidelines and the departures were almost evenly split between sentences above and below the guideline range.[59]  Through review of the guidelines and the related convictions, the 1990 Staff Report identified the "failure of the guidelines to specifically account for past or present abuse of children" as "troublesome" and included

---

[52]  USSC, Revised Report of the Working Group on Child Pornography and Obscenity Offenses and Hate Crime (1990) ("*1990 Staff Report*") (available from the Commission).

[53]  *1990 Staff Report*, at 8, 14.

[54]  *Id.* at 7, 9.

[55]  *Id.* at 8 (quoting from S. Rep. No. 438, 95th Cong., 2d Sess., at 5 (1977)).  The *1990 Staff Report* also mentioned the *Meese Report's* recognition of the more recently acknowledged fact that child pornography carries a unique ongoing harm to the abused child, independent of the abuse, through the creation of a permanent record.  *See id.* at 14.

[56]  Section 994 provides in pertinent part:  "[i]n establishing categories of offenses for use in the guidelines and policy statements governing the imposition of sentences . . . ," the Commission is instructed to consider, *inter alia*, "the grade of the offense," "the nature and degree of the harm caused by the offense," "the community view of the gravity of the offense," "the deterrent effect a particular sentence may have on the commission of the offense by others," and "the current incidence of the offense in the community and in the Nation as a whole."  28 U.S.C. § 994(c).

[57]  *1990 Staff Report*, at 17.

[58]  *Id.*

[59]  *Id.* at 17-18.

suggestions for enhancements that would address this issue, other practitioner-identified issues, and inconsistent case law.[60]

The 1990 Staff Report concluded that the penalty structure for §2G2.2 was not in accord with congressional intent with respect to repeat child pornography trafficking offenders, who, under 18 U.S.C. § 2252, were subject to a mandatory minimum term of five years of imprisonment.[61] The 1990 Staff Report found the statutory mandatory minimum penalty for repeat trafficking offenders to be virtually unreachable in most guideline cases and noted "[a]s a result the statutory minimum becomes the guideline maximum sentence."[62]

The report found the mandatory minimum sentence to be "evidence of the severity of the offense as viewed by Congress."[63] A guideline calculation far below that minimum failed to give sufficient credence to congressional intent and undercut the validity of a statute-based guidelines system.[64] The 1990 Staff Report suggested that the base offense level for §2G2.2 be increased from level 13 to 15 to "better insure that the severity of the offense as indicated by the statutory penalty structure was reflected for all offenders under the guideline."[65] Alternatively, the 1990 Staff Report discussed creation of a "separate, substantially higher base offense level for repeat offenders" but did not recommend this option as it would have had a more significant structural impact on the guidelines.[66]

On February 16, 1990, the Commission published proposed amendments to §2G2.2 for notice and comment.[67] The proposed amendments responded to several issues raised in the 1990 Staff Report by retaining the base offense level of 13 for offenders engaging in simple receipt, establishing a base offense level of 15 for all other offenders, and adding the following:

---

[60] *1990 Staff Report*, at 19-21, 23. Note that the past or present sexual abuse of children is often referred to as a "pattern of activity" because in such cases, the offender has demonstrated that his or her abuse of children forms a pattern.

[61] 18 U.S.C. § 2252 (1990).

[62] *Id.* at 24-25. When the base offense level for this crime was set at level 13, the guideline range usually fell short of the mandatory minimum even with enhancements. Applying the version of §2G2.2 that was in effect in 1989, a recidivist offender receiving both aggravating specific offense characteristics would have an offense level of 20. Unless the offender was in Criminal History Category V or higher (for base offense level 20 the guideline range is 63-78 months), the lower range of the guideline calculation would not even reach the statutory minimum. *See* USSG Ch. 5, Pt. A (Nov. 1, 1989).

[63] *1990 Staff Report*, at 25.

[64] *Id.* at 24-25.

[65] *Id.* at 25-26.

[66] *Id.* at 26.

[67] Notice of Proposed Amendments and Additions to Sentencing Guidelines, Policy Statements and Commentary, 55 Fed. Reg. 5,718 (Feb, 16, 1990).

- A 4-level increase if the offense portrayed "sadistic or masochistic conduct or other depictions of violence";[68]

- A minimum base offense level 21 if "the defendant sexually abused a minor at any time prior to the commission of the offense";[69] and

- A 4-level increase for involvement of "a minor under the age of twelve years," and a 2-level increase for involvement of "a minor under the age of 16 years."[70]

In response to the proposed amendments, the Commission received comments from numerous parties. Morality in Media, Inc., Citizens for Decency Through Law, the Children's Legal Foundation, in addition to dozens of concerned citizens, provided comment that generally favored the proposal and increasing sentence severity for child and adult pornography offenders.[71]

By contrast, the Commission received negative comment from, among others, the Committee on Criminal Law and Probation Administration of the Judicial Conference of the United States Courts ("CLC"), which disfavored any enhancement related to prior criminal conduct of the offender.[72] The CLC's letter stated that "[i]n order to retain the integrity of the structure of the guidelines, it would appear that such prior criminal conduct considerations would be more properly addressed in Chapter Four."[73] The American Bar Association's Committee on the U.S. Sentencing Commission also submitted comment noting that the proposed amendment would "result in dramatically increased punishment for the crime of

---

[68] 55 Fed. Reg. at 5,729-30. The enhancement for sadistic and masochistic content was included because it mirrored the specific offense characteristic already available under the distribution of adult obscenity guideline and thereby accorded consistent treatment of such material under both guidelines. Notably, at promulgation of the guidelines in 1987, the DOJ had recommended a 10-level increase to a base offense level of 13 for sadistic and masochistic images. *See supra* n.45.

[69] 55 Fed. Reg. at 5,729-30.

[70] *Id.* at 5730.

[71] *See, e.g.,* Letter from Paul J. McGeady, General Counsel, Morality in Media, Inc. to the U.S. Sentencing Commission (Mar. 29, 1990); Letter from Benjamin W. Bull, General Counsel, Citizens for Decency Through Law, to the U.S. Sentencing Commission (Apr. 6, 1990); Letter from James P. Mueller, Legal Counsel, Children's Legal Foundation, to the U.S. Sentencing Commission (Mar. 22, 1990).

[72] Letter from the Hon. Edward R. Becker, U.S. Circuit Judge for the Third Circuit Court of Appeals, Chairman, Committee on Criminal Law and Probation Administration of the Judicial Conference of the United States Courts, to the U.S. Sentencing Commission (Apr. 2, 1990) ("1990 CLC Letter").

[73] *Id.*

selling obscenity."[74]  The Federal Defenders similarly "object[ed] to the increased penalties for this non-violent conduct wherein selling certain obscene materials [child pornography] would result in more severe punishment than the commission of some robberies . . . ."[75]

The Commission also received informal input from individual judges explaining downward departures in §2G2.2 sentencings.  The correspondence generally indicated the view that §2G2.2 offenses involving individuals with no significant criminal history or future likelihood of acting out should receive straight probationary periods.

Prior to voting on the proposed amendments, the Commission considered including a pattern of abuse enhancement directly in §2G2.2, as opposed to using it as a basis for departure, on the grounds that the Commission's own research revealed that prior incidents of sexually abusing children seemed to establish a "heartland" characteristic in child pornography cases.  The Commission examined two options for the guideline amendment. Both options included an increase for sadistic and masochistic conduct, but Option 1 included the pattern of activity enhancement as a specific offense characteristic, while Option 2 included a pattern of activity as a basis for an upward departure.

The Commission voted at the April 11, 1990, meeting to promulgate §2G2.2 with a specific offense characteristic for sadistic and masochistic conduct and a departure provision for a pattern of activity.[76]  Specifically, the Commission amended §2G2.2 to add a 4-level enhancement where the image portrayed sadistic, masochistic, or violent conduct, and it amended the commentary to recommend consideration of an upward departure where the defendant had sexually abused a minor at any time in the past.[77]  The Commission also amended §2G2.1 to (1) create new enhancements related to victim age, (2) provide additional enhancements for defendants who abuse a position of trust, and (3) clarify guideline calculations when there are multiple victims.[78]

---

[74]  Letter from Samuel J. Buffone, Chairperson of the American Bar Association's Committee on the U.S. Sentencing Commission, to the U.S. Sentencing Commission (undated).

[75]  Statement of Paul D. Borman, Chief Federal Defender, Legal Aid and Defender Ass'n of Detroit, on Behalf of the Federal Defenders, to the U.S. Sentencing Commission (Mar. 15, 1990).

[76]  USSC, Public Meeting Minutes, at 5 (Apr. 11, 1990).

[77]  USSG App. C, amendment 325 (Nov. 1, 1990).

[78]  *Id.*, amendment 324 (Nov. 1, 1990).

Guideline 2G2.2, as amended, effective November 1, 1990, read as follows:[79]

---

§2G2.2      **Transporting, Receiving, or Trafficking in Material Involving the Sexual Exploitation of a Minor**

(a)      Base Offense Level: **13**

(b)      Specific Offense Characteristics

    (1)      If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels.

    (2)      If the offense involved distribution, increase by the number of levels . . . corresponding to the retail value of the material, but in no event less than **5** levels.

    (3)      If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

---

5.      1991 Guideline Changes:  Part I

On November 29, 1990, after the amendments to the child pornography guidelines went into effect on November 1, 1990, Congress passed, as part of the Crime Control Act of 1990, the Child Protection Restoration and Penalties Enhancement Act of 1990, which criminalized possession of child pornography.[80]  The Crime Control Act also contained a general directive regarding child sex abuse crimes that instructed the Commission to "amend existing guidelines for sentences involving sexual crimes against children . . . so that more substantial penalties may be imposed if the Commission determines current penalties are inadequate."[81]

---

[79]  Guidelines 2G2.2 and 2G2.4 are excerpted throughout this document without applicable cross references.  For information on cross references, please check the relevant Guidelines Manual.

[80]  Crime Control Act of 1990, Pub. L. No. 101–647, 104 Stat. 4789, Title III, § 323(a), (b) (1990) ("Crime Control Act of 1990").  The Crime Control Act of 1990 also clarified that the sentence for those child pornography offenders with a prior conviction required imposition of a minimum five-year term of imprisonment, *in addition to* a fine, as opposed to *either* a five-year term of imprisonment *or* a fine.  *Id.*  The Act did not otherwise the change penalties for transporting, receiving, or trafficking in child pornography.

[81]  Crime Control Act of 1990 § 321.  The Crime Control Act of 1990 also contained several specific directives to the Commission relating largely to other guidelines.  For example, the Act directed the Commission to add a specific offense characteristic for kidnapping that would add an increase of two levels or four levels, depending on the particular characteristics of the crime.  *Id.* § 401.

On January 17, 1991, the Commission published for notice and comment a proposed guideline for the offense of possession of child pornography.[82] The Commission proposed to create a new guideline for possession with a base offense level between 6 and 10, and it also proposed to move the offense of receipt to the new possession guideline.[83] The Commission received public comment only from the DOJ, which recommended a base offense level of 9 and opposed removing simple receipt from §2G2.2.[84]

In addition to seeking comment, and in response to the congressional directive to amend existing guidelines, the Commission directed staff to prepare another child sex offense report in early 1991 ("1991 Staff Report").[85] The Commission identified and reviewed 135 cases that were sentenced under the relevant guidelines in 1990.[86] Where there were sufficient cases to draw conclusions, the 1991 Staff Report provided case analysis, including the incidence of departure, and the report included issues for consideration in amending the guidelines. In addition to its quantitative data review, the Commission collected qualitative data at 12 district court sites where it conducted interviews with judges, assistant U.S. attorneys, and probation officers about their opinions of, and experiences working with, the child sex offense guidelines.[87] The Commission also reviewed relevant calls for technical support and case law regarding these types of offenses.

Drawing in part on work produced for the 1991 Staff Report, on May 1, 1991, the Commission submitted to Congress amendment 372, which revised the child pornography guidelines.[88] Amendment 372 "insert[ed] an additional guideline at §2G2.4 to address offenses involving receipt or possession of materials depicting a minor engaged in sexually explicit conduct, as distinguished from offenses involving trafficking in such material, which continue

---

[82] Notice of Proposed Amendments to Sentencing Guidelines, Policy Statements, and Commentary, 56 Fed. Reg. 1,846 (Jan. 17, 1991).

[83] *Id.* at 1863-64.

[84] Letter from DOJ, Paul L. Maloney, Deputy Attorney General, Criminal Division, to the U.S. Sentencing Commission, at 8-10 (Mar. 19, 1991).

[85] USSC, Child Sex Offense Working Group Report (1991) ("*1991 Staff Report*") (available from the Commission). The guidelines examined in the *1991 Staff Report* included child pornography guidelines, §§2G2.2-2.5; and §2A3.1 (Criminal Sexual Abuse); §2A3.2 (Criminal Sexual Abuse of a Minor (Statutory Rape)); §2A3.3 (Criminal Sexual Abuse of a Ward); §2A3.4 (Abusive Sexual Contact); §2A4.1 (Kidnapping, Abduction, Unlawful Restraint); §2G1.2 (Promoting a Commercial Sex Act or Prohibited Sexual Conduct with an Individual Other than a Minor); and §2G3.1(Importing, Mailing, or Transporting Obscene Matter; Transferring Obscene Matter to a Minor; Misleading Domain Names). *See 1991 Staff Report*, at 1-2.

[86] The *1991 Staff Report* examined cases sentenced under §§2A3.1-4, 2A4.1, 2G1.2, 2G2.1-5, and 2G3.1.

[87] The Commission conducted 190 interviews overall (49 judges, 75 assistant U.S. attorneys, and 66 probation officers). *See 1991 Staff Report*, at 16.

[88] Notice of Submission of Amendments to the Sentencing Guidelines to Congress, 56 Fed. Reg. 22,762 (May 16, 1991).

to be covered under §2G2.2."[89]  The Commission decided to treat receipt, as distinguished from receipt with intent to traffic,[90] as analogous to possession (rather than to trafficking) because the Commission determined "that receipt is a logical predicate to possession, [and] concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct."[91]

Guideline 2G2.2, as amended by amendment 372 and the new §2G2.4 (both submitted May 1, 1991, effective November 1, 1991) are excerpted here.  Nevertheless, as discussed in more detail below, these amendments were effective for less than a month before they were amended in response to superseding congressional legislation:

| | |
|---|---|
| §2G2.2 | **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Advertising, or Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic** |
| | (a)      Base Offense Level:  **13** |
| | (b)      Specific Offense Characteristics |
| | (1)      If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels. |
| | (2)      If the offense involved distribution, increase by the number of levels . . . corresponding to the retail value of the material, but in no event less than **5** levels. |
| | (3)      If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels. |

| | |
|---|---|
| §2G2.4 | **[NEW GUIDELINE] Receipt or Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct** |
| | (a)      Base Offense Level:  **10** |
| | (b)      Specific Offense Characteristic |
| | (1)      If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels. |

Shortly after the submission of amendment 372, lawmakers expressed dissatisfaction with the Commission's efforts in establishing sentencing guidelines for child pornography

---

[89]  USSG App. C, amendment 372 (Nov. 1, 1991) (creating §2G2.4).

[90]  This is a distinction the Commission made in the guidelines even though the statute only addressed one who "knowingly receives" child pornography.  *See* 18 U.S.C. § 2252(a)(2) (1991).

[91]  Letter from the U.S. Sentencing Commission to Hon. Edward R. Roybal, Chairman, Subcommittee on Treasury, Postal Service and General Government, Committee on Appropriations, United States House of Representatives, dated Aug. 7, 1991, at n.1, included in the *Congressional Record* at 137 Cong. Rec. H6736-02 (Sept. 24, 1991) ("August 7, 1991 Commission Letter").

offenders convicted of possession.  On July 18, 1991, Senator Jesse Helms addressed the changes made to the child pornography guidelines.  Senator Helms, along with co-sponsor Senator Strom Thurmond, proposed an amendment to the 1991 appropriations bill (the "Helms-Thurmond Amendment") that directed the Commission to raise base offense levels for all child pornography offenses and return the offense of receipt of child pornography to the trafficking guideline at §2G2.2.[92]  In support of this amendment, Senator Helms stated,

> [I]n effect, . . . the Sentencing Commission has undermined Congress['s] attempt to assure severe punishment for dealing in child pornography.  I want to turn that around.  I want to say to the Sentencing Commission, "You made a mistake; now you correct it."   The Helms-Thurmond amendment ensures that criminals will receive serious punishment for child pornography offenses, not a mere slap on the wrist.[93]

The only other floor statements regarding the Helms-Thurmond Amendment were offered in support and the amendment passed the Senate by a vote of 99-0.[94]

In the House of Representatives, Representative Frank R. Wolf proposed a similar amendment that would direct the Commission to revise the child pornography sentencing guidelines.  Representative Wolf indicated that such an amendment was necessary to "reiterate that Congress wants to put teeth into the criminal laws governing child pornography."[95]

Representative Edward R. Roybal offered two letters into the record, one from the Sentencing Commission opposing the Helms-Thurmond Amendment language and suggesting modified language ("August 7, 1991 Commission Letter")[96] and another from the Archbishop of Los Angeles supporting the amendment.[97]

The August 7, 1991 Commission Letter stated that "the debate in the Senate mischaracterized the Commission's recent actions as having reduced the guideline penalties for

---

[92]  137 Cong. Rec. S10322-04 (July 18, 1991).  This amendment is often referred to as the "Helms-Thurmond Amendment" as it was appended to what was signed into law as the Treasury, Postal Services and General Government Appropriations Act, 1992, Pub. L. No. 102–141, 105 Stat. 834, § 632 (1991) ("General Government Appropriations Act").

[93]  *Id.* at S10323 (statement of Senator Helms).

[94]  137 Cong. Rec. S10356-01, S10363 (July 18, 1991).  Senator Thurmond briefly spoke in favor of the amendment stating in part that "[t]his important amendment . . . instructs the Sentencing Commission to increase the penalties for individuals who receive or transport child pornography." 137 Cong. Rec. S10322-04, S10331 (July 18, 1991). Senator Orrin Hatch also spoke in favor of the amendment.  137 Cong. Rec. S10331-01, S10333 (July 18, 1991).

[95]  137 Cong. Rec. H6736-02 (Sept. 24, 1991) (statement of Representative Wolf).

[96]  *Id.* at H6737 (statement of Representative Roybal introducing the August 7, 1991 Commission Letter).

[97]  *Id.* at H6738.

trafficking in child pornography" and offered support for why the Commission had chosen to categorize receipt and possession of child pornography as it did.[98]  The Commission noted that proposed child pornography amendments "continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice," and explained that a high rate of downward departures and low likelihood of government appeal from these departures suggested that judges and prosecutors thought "that the offense level for the least serious forms of conduct under §2G2.2 was too severe."[99]  The Commission suggested a substitute, more general, directive for the Helms-Thurmond Amendment directing the Commission to "review and amend as necessary" the child pornography guidelines.[100]

Representative Roybal urged his colleagues to "to review both letters, but particularly that of the chairman of the Sentencing Commission, prior to making any final decision on the language to be included in the bill."[101]  Representative Thomas J. Bliley, Jr., spoke in support of Representative Wolf's amendment, stating that "Congress has spoken to the issue of child pornography and the sexual exploitation of children repeatedly over the last 15 years.  Each time, our legislative effort has emphasized the seriousness of those offenses."[102]

Representative Wolf then introduced a response by the House staff to the August 7, 1991 Commission Letter ("Response to Sentencing Commission Letter") which sought to rebut the Commission's letter point by point.[103]  The Response to Sentencing Commission Letter argued that "Congress toughened federal pornography laws by creating a new federal offense of possessing child pornography and the Commission used that new law as a pretext for

---

[98]  *Id.* at H6737.

[99]  *Id.* (internal transcription errors corrected).

[100]  The August 7, 1991 Commission Letter suggested the following substitute language, below in its entirety, for the Helms-Thurmond Amendment:

> Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall review and amend as necessary the sentencing guidelines pertaining to child pornography offenses to ensure a substantial term of imprisonment for any dependant [*sic*] convicted of an offense involving:  (1) the sale, distribution, or possession with intent to sell or distribute any visual depiction involving the sexual exploitation of a minor, or (2) the receipt, transportation, or possession of such material if the defendant received, transported or possessed a substantial quantity of such material.

137 Cong. Rec. H6736-02, H6737-38 (Sept. 24, 1991).

[101]  *Id.*

[102]  *Id.* at H6739 (statement of Representative Bliley).

[103]  *Id.* at H6739-40.

reducing penalties."[104]  It continued by stating that the Commission's decision to reference simple receipt to the possession guideline was unexpected as "[s]urely no member of Congress understood that by voting to create a new federal offense he would also be voting to reduce penalties for existing offenses."[105]  The Response to Sentencing Commission Letter explained that most child pornography offenders, including trafficking offenders, were caught in the act of receiving the material through sting operations and suggested that the Commission's attempt to differentiate offenders was misguided.[106]  The Response to Sentencing Commission Letter closed by specifically arguing against the substitute amendment language provided by the Commission stating that:

> The Commission-proposed substitute is objectionable for several reasons.  First, it requires only that the Commission "review and amend as necessary the sentencing guidelines pertaining to child pornography."  Under the substitute, the Commission is free to determine for itself whether any further amendment to those guidelines is necessary.  Second, it requires the Commission to "ensure a substantial term of imprisonment" under the guidelines for individuals convicted of child pornography offenses without stating what constitutes "substantial."  Further, and perhaps most objectionable, the Commission substitute perpetuates the distinction between distribution on the one hand and receipt, transportation, and advertising on the other.[107]

There were no additional floor statements and Representative Wolf's amendment passed the House by a vote of 414-0.[108]

---

[104]  *Id.* at H6740.

[105]  *Id.*

[106]  *Id.*

[107]  *Id.*

[108]  *Id.*

The Commission's 1991 Staff Report was finalized and presented at the October 23, 1991 Commission meeting just months after the Senate, and less than a month after the House, had passed directives to raise the base offense levels in the child pornography guidelines.[109]

With respect to §2G2.2, the 1991 Staff Report noted ongoing congressional initiatives to amend that guideline and did not include recommendations.  The 1991 Staff Report acknowledged that, for the newly promulgated §2G2.4, Congress "has indicated that the new guidelines should be amended to raise the base offense level and to put 'receipt' offenses with trafficking offenses."[110]

### 6.    1991 Guideline Changes:  Part II

On October 28, 1991, the President signed the legislation that had served as a vehicle for the Helms-Thurmond Amendment containing directives to the Commission.[111]  The Commission was directed to increase base offense levels for child pornography offenses, reorganize receipt offenses under §2G2.2, and add a new specific offense characteristic for child pornography offenders.[112]  While this legislation did not directly "disapprove" the 1991 amendments as provided by 28 U.S.C. § 994(p), it contained specific instructions from Congress to the Commission that expressed Congress's clear disagreement with the Commission's decision in amendment 372 to treat receipt and possession as similar offenses.  In particular, the legislation indicated Congress's belief that receipt cases should be treated similarly to trafficking—not possession—and set forth specific directives to effectuate this result.  Congress stated—

> (1) . . . [T]he Sentencing Commission shall promulgate guidelines, or amend existing or proposed guidelines as follows:
>
> (A) Guideline 2G2.2 to provide a base offense level of not less than 15 and to provide at least a 5 level increase for offenders who have engaged in a pattern of activity involving the sexual abuse or exploitation of a minor.

---

[109]  The Commission reviewed working iterations of the *1991 Staff Report* throughout the 1991 amendment cycle, but the report was not finalized until after Congress directed the Commission to raise offense levels for child pornography offenses.  *See* USSC, Public Meeting Minutes, at 3 (Oct. 23, 1991).

[110]  *1991 Staff Report*, at 14.

[111]  General Government Appropriations Act § 632.

[112]  *Id.*

(B) Guideline 2G2.4 to provide that such guideline shall apply only to offense conduct that involves the simple possession of materials . . . and guideline 2G2.2 to provide that such guideline shall apply to offense conduct that involves receipt or trafficking . . . . (C) Guideline 2G2.4 to provide a base offense level of not less than 13, and to provide at least a 2 level increase for possessing 10 or more . . . [child pornography] items . . . .

(2)(A) Notwithstanding any other provision of law, the Sentencing Commission shall promulgate the amendments mandated in subsection (1) by November 1, 1991, or within 30 days after enactment, whichever is later.  The amendments to the guidelines promulgated under subsection (1) shall take effect November 1, 1991, or 30 days after enactment . . . .[113]

With the new superceding directives expressing congressional will on how to best penalize child pornography offenders, the Commission relied upon its analysis of child pornography cases from the 1990 and 1991 Staff Reports to determine how to implement those statutory changes and directives.[114]  The Commission formally adopted amendments with necessary conforming changes on November 13, 1991.[115]  The promulgated amendments (amendments 435-436) became effective on November 27, 1991.[116]

In response to the directive, the Commission amended §2G2.2 by directing that receipt offenses were to be sentenced under §2G2.2, raising the base offense level from 13 to 15 and adding a 5-level pattern of activity enhancement and explanatory commentary.[117]  The Commission also amended §2G2.4 by limiting the guideline to those who possess child pornography, raising the base offense level from 10 to 13 and adding a specific offense characteristic regarding the number of items.[118]

Although amendments 435 and 436 were made pursuant to a directive, they were consistent with two recommendations in the Commission's earlier 1990 Staff Report:

---

[113]  *Id.*

[114]  *See generally, 1990 Staff Report; 1991 Staff Report.*

[115]  USSC, Public Meeting Minutes, at 1 (Nov. 13, 1991).

[116]  USSG App. C, amendments 435, 436 (Nov. 27, 1991).

[117]  *Id.*, amendment 435.

[118]  *Id.*, amendment 436.

increasing the base offense level for §2G2.2 from 13 to 15, and including a specific offense characteristic at §2G2.2 for pattern of abuse.[119]

Guidelines §§2G2.2 and 2G2.4, as amended, effective November 27, 1991, read as follows:

| | |
|---|---|
| §2G2.2 | **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic** |

(a)    Base Offense Level: **15**

(b)    Specific Offense Characteristics

    (1)    If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels.

    (2)    If the offense involved distribution, increase by the number of levels . . . corresponding to the retail value of the material, but in no event less than **5** levels.

    (3)    If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

    (4)    If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

| | |
|---|---|
| §2G2.4 | **Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct** |

(a)    Base Offense Level: **13**

(b)    Specific Offense Characteristics

    (1)    If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels.

    (2)    If the offense involved possessing ten or more books, magazines, periodicals, films, video tapes, or other items, containing a visual depiction involving sexual exploitation of a minor, increase by **2** levels.

---

[119] *Id.*, amendment 435; *see also 1990 Staff Report,* at 21-26 (discussing proposed enhancements).

### 7.    1996 Guideline Changes

In December 1995, Congress passed the Sex Crimes Against Children Prevention Act of 1995 ("SCACPA"),[120] which contained specific directives to the Commission to increase penalties under the guidelines covering child pornography offenses.  The directives stated that the Commission was to—

> amend the sentencing guidelines to. . . increase the base offense level for [child pornography offenses] by at least 2 levels . . . [and] to increase the base offense level by at least 2 levels . . . if a computer was used to transmit the notice or advertisement to the intended recipient or to transport or ship the visual depiction.[121]

Congress also generally directed the Commission—

> to submit a report to Congress concerning offenses involving child pornography and other sex offenses against children [and to] include in the report . . . an analysis of the sentences imposed for offenses, . . . an analysis of the type of substantial assistance that courts have recognized as warranting a downward departure from the sentencing guidelines, . . . a survey of the recidivism rate for offenders convicted of committing sex crimes against children, [and] such other recommendations with respect to [child sex] offenses . . . .[122]

On February 23, 1996, the Commission published proposed amendments conforming to the SCACPA directives, providing notice and seeking comment.[123]  The proposed amendments to §§2G2.2 and 2G2.4 provided alternative base offense levels that would increase the child pornography base offense levels by two, three, or four levels.  The proposed amendment included a specific offense characteristic for use of a computer with a 2- to 4-level enhancement.  The Commission also published an issue for comment asking "whether §2G2.1 [production of child pornography] should be amended to add an enhancement to the offense level for the use of a computer comparable to the enhancement for the use of a computer directed to be added to §§2G2.2 and 2G2.4."[124]

---

[120]  Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104–71, 109 Stat. 774 (Dec. 23, 1995) ("SCACPA").

[121]  SCACPA §§ 2, 3.

[122]  *Id.* § 6.

[123]  Notice of Proposed Amendments to Sentencing Guidelines and Commentary, 61 Fed. Reg. 7,037 (Feb. 23, 1996).

[124]  *Id.* at 7,037-38.

The Commission received comment from several parties and held a hearing on March 11, 1996, about all pending 1996 amendments. One witness addressed the child pornography guidelines. Mary Lou Soller of the American Bar Association ("ABA") testified with respect to the child pornography proposed base offense levels that "we cannot, based on our mandate, take a position about any specific numerical offense. However we would note that we do understand that the Commission's prior determinations were based on well-considered study and believe that those were comported as well as possible with the position that is in the ABA Standards, which is that the punishment should be sufficient but not greater than necessary to fit any crime."[125]

At the April 1996 Commission meeting, written public comment was presented to the Commission. In addition to the ABA testimony, the DOJ generally agreed that the proposed amendments adequately responded to the directive and supported adding the use of computer enhancement to the production guideline at §2G2.1.[126] The Federal Public and Community Defenders proposed that the Commission wait until the Commission's report to Congress was complete before finalizing any amendments.[127]

During consideration of the proposed 1996 guideline amendments, the Commission reviewed public comment in addition to analytical work underway for its report to Congress.[128] The Commission implemented some of the SCACPA directives through amendment 537. With respect to §2G2.2, as required by the directive, the Commission increased the base offense level from 15 to 17 and added a 2-level enhancement if a computer was used to solicit participation.[129] The Commission also amended the definitions of "distribution," "pattern of activity," and "sexual abuse or exploitation," and provided new guidance in the commentary.[130] Guideline 2G2.4 was similarly amended, as required by the directive, by increasing the base offense level for possession of child pornography from 13 to 15 and adding a 2-level enhancement for use of a computer.[131]

---

[125] Transcript, Public Hearing on Proposed Guidelines Amendments, at 11 (Mar. 11, 1996).

[126] Letter from Mary Harkenrider, Counsel to the Assistant Attorney General, to the U.S. Sentencing Commission, at 7 (Mar. 6, 1996).

[127] Statement from Thomas W. Hillier, II, Federal Public Defender, W.D. Wash., on Behalf of the Federal and Community Defenders, to the U.S. Sentencing Commission, at *3* (Apr. 9, 1996).

[128] The report, presented to Congress in June 1996, pursuant to section 6 of SCACPA, USSC, Sex Offenses Against Children: Findings and Recommendations Regarding Federal Penalties (1996) ("*1996 Report to Congress*").

[129] USSG App. C, amendment 537 (Nov. 1, 1996).

[130] *Id.*

[131] *Id.*

*United States Sentencing Commission*

In June 1996, pursuant to section 6 of SCACPA, the Commission delivered the final report to Congress entitled *Sex Offenses Against Children:  Findings and Recommendations Regarding Federal Penalties* ("1996 Report to Congress") which analyzed sentences for all 423 convictions for a child sex offense in fiscal years 1994 and 1995,[132] and reviewed scientific literature regarding studies of sexual offenders.[133]

The 1996 Report to Congress provided information on several topics.  First, it reviewed the statutes and application of the child pornography and child sex abuse guidelines.[134] Second, it examined the burgeoning use of computers in the commission of child pornography crimes.[135]  Third, it discussed methods of identifying the most dangerous offenders and those most likely to recidivate.[136]  Finally, it made recommendations to Congress based on its review

---

[132] *1996 Report to Congress,* at i (Executive Summary).  The 423 cases represented convictions in fiscal years 1994 and 1995 under §§2A3.1, 2A3.2, 2A3.4, 2G1.2, 2G2.1, 2G2.2, and 2G2.4 for which information was received by the Commission.  *Id.* at Table 1 (Executive Summary).  For more about the methodology utilized in the *1996 Report to Congress*, *see id.*, at 3.

[133] *See generally id.*, at 31-34 (reviewing, *inter alia*, J.A. Bushnell, J.E. Wells & M.A. Oakley-Brown, *Long-term Effects of Intrafamilial Sexual Abuse in Childhood*, 85 Acta Psychiatr. Scand. 136-42 (1992) (children who have been sexually abused often have higher rates of later childhood and adult mental health symptomatology); David Finkelhor, *The International Epidemiology of Child Sexual Abuse*, 18 Child Abuse & Neglect 409-17 (1994) (most child sexual abuse is committed by men and by persons known to the child); Lita Furby, *et al.*, *Sex Offender Recidivism:  A Review*, 105 Psychol. Bull. 3-30 (1989) (stating, with respect to recidivism, that a longer follow-up period will identify more recidivism; there is no evidence that clinical treatment reduces rates of sex reoffenses, and there is evidence that recidivism rates differ across types of offenders); Gordon C. Nagayama Hall, *Sexual Offender Recidivism Revisited:  A Meta-Analysis of Recent Treatment Studies*, 63 J. Consulting & Clinical Psychol. 802-09 (finding the range of recidivism among sex offenders varied from 4 to 75%, depending upon the specific study); R. Karl Hanson, *et al.*, *Long-Term Recidivism of Child Molesters*, 61 J. Consulting & Clinical Psychol. 646-52 (1993) (criminal history, especially a history of sexual offenses, is the most accurate predictor of the risk of future sexual offending); Miles D. Harer, Recidivism Among Federal Prison Releasees in 1987:  A Preliminary Report (Federal Bureau of Prisons, Office of Research and Evaluation, 1994) (finding recidivism across the federal population to be 41% within three years and 50% for the few federal sex offenders included the sample); S. Harter, P.C. Alexander & R.A. Neimeyer, *Long-Term Effects of Incestuous Child Abuse in College Women: Social Adjustment, Social Cognition, and Family Characteristics*, 56 J. Consulting and Clinical Psychol. 5-8 (1988) (children who have been sexually abused often have higher rates of later childhood and adult mental health symptomatology); Ronald M. Holmes, Sex Crimes (1991) (same); W.L. Marshall & H.E. Barbaree, *The Long Term Evaluation of a Behavioral Treatment Program for Child Molesters*, 26 Behav. Res. Ther. 499-511 (1988) (a sexual child molester remains at risk of recidivism for a long period of time); Robert J. McGrath, *Sex-Offender Risk Assessment and Disposition Planning:  A Review of Empirical and Clinical Findings*, 35 Int'l J. Offender Ther. & Comp. Criminology 329-350 (1991) (same); B. Watkins & A. Bentovim, *The Sexual Abuse of Male Children and Adolescents:  A Review of Current Research*, 33 J. Child Psychol. & Psychiatry & Allied Disciplines 197-248 (1992) (noting that at least 20% of American women and 5 to 10% of American men have been the victims of sexual child abuse)).

[134] *Id.* at 5-24.

[135] *Id.* at 25-30.

[136] *Id.* at 31-36.

of data, analysis of scientific literature, and statutory mandates,[137] noting that "[t]he amount of prison time that is appropriate for these offenses is a policy judgment to be made by Congress and the Sentencing Commission.  This judgment can be informed, however, by data on how the range of punishments available under the present guidelines are being used."[138]

The 1996 Report to Congress examined the application of the child pornography guidelines for fiscal years 1994 and 1995.  Of a total of 66 §2G2.2 cases reviewed, the average sentence length was 28.5 months,[139] 54 percent were sentenced within the guidelines range, 7.6 percent received upward departures, and 23 percent received a downward departure for reasons other than substantial assistance.[140]  Of the 24 §2G2.4 cases reviewed, the average sentence length was 15.4 months,[141] 75 percent were sentenced within the guidelines range, no offenders received upward departures, and 13 percent received a downward departure for reasons other than substantial assistance.[142]  The Commission also conducted a prison impact analysis that predicted which cases would be affected and the degree to which sentences would likely increase if the base offense levels for §§2G2.2 and 2G2.4 were raised by two, three, or four levels, respectively, in conjunction with a 2-, 3-, or 4-level enhancement for use of a computer.[143]

The 1996 Report to Congress also analyzed child pornography cases and described application issues.  The Commission informed Congress that some receipt cases were being sentenced as possession cases.  This was attributed, in part, to the fact that courts appeared to identify little difference in offense seriousness between typical receipt cases and typical possession cases.  These findings suggested that the cross reference from the possession guideline to the trafficking guideline was not being applied as intended, and that some courts cross referenced to the possession guideline from the trafficking guideline to avoid sentencing simple receipt offenders as traffickers even though no such cross reference existed.[144]  The

---

[137] *Id.* at 37-42.

[138] *Id.* at 6 (referring to §2G2.1 specifically and other child pornography guidelines generally).

[139] *Id.* at 9.

[140] *Id.*

[141] *Id.* at 12.

[142] *Id.*

[143] *See 1996 Report to Congress,* at 8 (discussing prison impact analysis).

[144] *Id.* at 11.  For example, of the 19 cases identified in the *1996 Report to Congress* as eligible to apply the cross reference from the possession of child pornography guideline at §2G2.4 to the more severe receipt/trafficking guideline at §2G2.2, only one offender was so cross referenced.  By contrast, the report identified two cases in which

report noted that "it appears that there may still be unwarranted disparity in sentences received for similar conduct and that judges have sought to avoid that disparity in some cases."[145]  In addition, with respect to §2G2.2, the report found that the pattern of activity enhancement was not being applied consistently, with some courts requiring the abusive conduct to have occurred in the instant case.[146]

With respect to the use of computer enhancement, the 1996 Report to Congress described changes to the guidelines made pursuant to the directive and explained that the Commission's analysis supported an enhancement for use of a computer to solicit participation.[147]  The 1996 Report to Congress, recommended increasing the base offense levels for §§2G2.2 and 2G2.4 by only two levels, the minimum increase permitted by the directive, explaining that the data were insufficient to support an increase in the base offense level more than that minimally required by the Act.

The Commission noted that the prevalence of computer use in these crimes increased between 1994 and 1995 and stated its intention to "closely monitor the variety of computer uses in pornography distribution and amend the guidelines as appropriate."[148]  The 1996 Report to Congress also focused on "identifying those offenders who show the greatest risk of victimizing children in the future, so that they can be provided appropriate treatment or incapacitated through extended imprisonment."[149]

The Commission's research demonstrated that those offenders who had a prior history of abusing children should receive lengthier sentences due to a propensity to recidivate.[150]  The 1996 Report to Congress found that "[o]f the 138 cases indexed to the pornography and

---

the sentencing court sentenced a receipt/trafficking offender as a possession offender under the more lenient §2G2.4 even though no cross reference existed.  *Id.*

[145] *Id.*

[146] *Id.* at 34.

[147] *Id.* at 37-38, *see also* USSG App. C, amendment 537 (Nov. 1, 1996) (implementing the directive in SCACPA requiring a 2-level increase in the child pornography guidelines for use of a computer).

[148] *1996 Report to Congress*, at 30.  While computer use at promulgation of the "use of computer" specific offense characteristic was small (approximately 28% of federal child pornography offenders in 1995 used a computer), such use has continued to rise and the use of a computer occurred in 96.5 percent of these cases in fiscal year 2008 and 84.5 percent of these cases in fiscal year 2007.  USSC, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2008 (2008); USSC, Use of Guidelines and Specific Offense Characteristics:  Fiscal Year 2007 (2007).

[149] *1996 Report to Congress*, at 31.

[150] *Id.* at 36-37.

transportation guidelines, about 20 percent had a prior sex-related conviction . . . [and] 13 percent of pornography defendants had a history of sexual misconduct . . . . It appears that *some* defendants sentenced under *each* of the guidelines exhibit a pattern of recidivism."[151] As such, and given application issues with the existing enhancement, the Commission promulgated an amendment that clarified the application note for the pattern of activity enhancement[152] and notified Congress that it would continue to examine options to best account for this behavior under the guidelines.[153]

The 1996 Report to Congress further informed Congress about guideline amendments under review and made several recommendations. The Commission noted that it was considering an expansion of the pattern of activity enhancement to production and possession cases because "[t]he incidence of sexual abuse or exploitation of a minor is prevalent in child pornography production and possession cases as well as distribution and receipt cases."[154] The Commission also informed Congress that it was working to clarify whether the distribution enhancement should apply to non-pecuniary distribution as well as distribution for financial gain.[155] Finally, the Commission stated that it was considering consolidating §§2G2.2 and 2G2.4 in order to better account for the analogous crimes of receipt and possession and to remedy confusion and "disparity in the sentencing of substantially similar crimes."[156] The Commission suggested that one possible way to manage simple receipt cases was to include "a two-level downward adjustment."[157]

Guidelines 2G2.2 and 2G2.4, as amended by amendment 537, effective November 1, 1996, read as follows:

---

[151] *Id.* at 33 (emphasis in original).

[152] The Commission revised the application note for the "pattern of activity" enhancement to clarify that, among other things, the referenced pattern of activity need not have been related to the instant offense. USSG App. C, amendment 537 (Nov. 1, 1996); *1996 Report to Congress* at 38.

[153] *Id.* at 39-40.

[154] *Id.* at 40.

[155] *Id.* at 40-41.

[156] *Id.* at 41.

[157] *Id.*

*United States Sentencing Commission*

---

§2G2.2    **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic**

(a)    Base Offense Level: **17**

(b)    Specific Offense Characteristics

(1)    If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels.

(2)    If the offense involved distribution, increase by the number of levels . . . corresponding to the retail value of the material, but in no event less than **5** levels.

(3)    If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

(4)    If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

(5)    If a computer was used for the transmission of the material or a notice or advertisement of the material, increase by **2** levels.

---

§2G2.4    **Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct**

(a)    Base Offense Level: **15**

(b)    Specific Offense Characteristics

(1)    If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels.

(2)    If the offense involved possessing ten or more books, magazines, periodicals, films, video tapes, or other items, containing a visual depiction involving the sexual exploitation of a minor, increase by **2** levels.

(3)    If the defendant's possession of the material resulted from the defendant's use of a computer, increase by **2** levels.

---

8.    2000 Guideline Changes

In October 1998, the Protection of Children from Sexual Predators Act of 1998 ("Sexual Predators Act") again addressed the penalties for child pornography offenses. The Sexual Predators Act provided both general and specific directives to the Commission. A primary general directive instructed the Commission to "ensure that the sentences, guidelines, and policy statements for offenders convicted of [child pornography offenses] are appropriately severe and reasonably consistent with other relevant directives and with other Federal

Sentencing Guidelines."[158]  The Act also directed the Commission to promulgate amendments—

- "to provide appropriate enhancement if the defendant used a computer with the intent to persuade, induce, entice, coerce, or facilitate the transport of a child";[159]
- "to increase penalties applicable to the offenses . . . in any case in which the defendant engaged in a pattern of activity";[160]
- "as are necessary to clarify that the term 'distribution of pornography' applies to the distribution of pornography – (A) for monetary remuneration; or (B) for a nonpecuniary interest";[161]
- "[to] ensure reasonable consistency with other guidelines of the Federal Sentencing Guidelines; and . . . avoid duplicative punishment under the Federal Sentencing Guidelines for substantially the same offense."[162]

On December 8, 1999, the Commission published its proposed priorities for notice and comment.[163]  The proposed priorities stated that the Commission intended to respond to the directive regarding distribution for non-pecuniary interests by expanding the existing specific offense enhancement for distribution.[164]  On February 11, 2000, the Commission published

---

[158]  Protection of Children From Sexual Predators Act of 1998, Pub. L. No. 105–314, 112 Stat. 2974, § 502 (1998) ("Sexual Predators Act").

[159]  Sexual Predators Act § 503(2).

[160]  *Id.* § 505(2).  This directive was consistent with the Commission's ongoing efforts to better account for pattern of activity as discussed in the 1996 Report to Congress.  *1996 Report to Congress*, at 40-41; *see also supra*, Part II.B.7, *1996 Guideline Changes*.

[161]  Sexual Predators Act § 506 (indentations omitted).  This directive was consistent with the Commission's intent to revise the distribution enhancement to clarify whether it covered distribution for non-pecuniary gain as discussed in the 1996 Report to Congress.  *1996 Report to Congress*, at 41; *see also supra*, Part II.B.7, *1996 Guideline Changes*.

[162]  Sexual Predators Act § 507.

[163]  Notice of Proposed Priorities; Request for Public Comment, 64 Fed. Reg. 68,715 (Dec. 8, 1999).

[164]  The Commission was not fully constituted through most of 1999.  The proposed priorities noted that "the Commission has only recently been reconstituted and, due to the constraints of an abbreviated amendment cycle, the Commission proposes to place on its agenda only those items the Commission hopes it may be able to conclude by its statutory deadline of May 1."  64 Fed. Reg. at 68,715.  The Commission thus "limited its . . . policy development priorities principally to the following areas:  (1) implementation of legislative directives and other high priority crime legislation enacted by the 105th Congress for which guideline amendments were not developed or finalized by the previous Commission; and (2) resolution of a limited number of high priority 'circuit conflicts'. . . .  The Commission plans to address any unfinished policy development work from this agenda during the next amendment cycle."  *Id.* at 68,716.

proposed amendments that, among other things, implemented the Sexual Predators Act directive regarding distribution of child pornography for non-pecuniary interests.[165]

The proposed distribution enhancement at §2G2.2 included five circumstances in which at least a 5-level enhancement would apply.[166]  The proposal included issues for comment asking whether the enhancement—

> should include distribution between or among adults that does not involve the receipt, or expectation of receipt, of anything of value . . . whether to delete the current enhancement's reference to the loss table in the fraud guideline, whether to maintain the minimum 5-level increase for distribution for pecuniary gain, and whether to provide for an upward departure for especially large-scale commercial enterprises.[167]

The Commission received substantive public comment only from the Federal Defenders.  The Federal Defenders did "not oppose the addition of an enhancement for the distribution of child pornography for . . . the receipt of a thing of value," recognizing that "child pornographic material is a 'thing of value' and if received in a bartered exchange for other child pornographic material, an enhancement should apply," but generally suggested that any applicable enhancement be lower than that proposed by the Commission.[168]

On March 23, 2000, the Commission held a public hearing for which it received a written statement from James K. Robinson, Assistant Attorney General, Criminal Division, DOJ, about various topics, including the implementation of the distribution directive contained in the Sexual Predators Act.[169]  Mr. Robinson addressed the Sexual Predators Act at length and specifically suggested that the distribution enhancement "apply to any distribution of child pornography, whether or not there was an expectation of receiving something in return."[170]

---

[165]  Notice of (1) Intent to Promulgate a Permanent Amendment to Implement the No Electronic Theft (NET) Act of 1997 After Any Temporary, Emergency Guideline Amendment is Promulgated to Implement That Act; and (2) Additional Proposed Permanent Amendments to the Sentencing Guidelines, Policy Statements, and Commentary, 65 Fed. Reg. 7,080, 7,081-82 (Feb. 11, 2000).

[166]  *Id.* at 7,082-83.

[167]  *Id.*

[168]  Statement from the Federal Public and Community Defenders to the U.S. Sentencing Commission, submitted by Jon Sands, at 30-31 (Mar. 10, 2000).

[169]  Information about the March 23, 2000, public hearing, including agenda, transcript, and written testimony are *available at* http://www.ussc.gov/AGENDAS/3_23_00/test03_00.htm.

[170]  Statement of James K. Robinson, Assistant Attorney General, Criminal Division, to the U.S. Sentencing Commission Concerning Proposed Guideline Amendments, at 7 (Mar. 23, 2000).

The Commission also heard testimony from Charles R. Tetzlaff, U.S. Attorney, District of Vermont.  Mr. Tetzlaff briefly addressed the Sexual Predators Act to stress the DOJ's concern about properly penalizing offenders who were convicted of transporting a minor with the intent to engage in sexual activity or traveling with the intent to engage in sexual activity with a minor.[171]

On April 4, 2000, the Commission passed a multi-part amendment promulgating guidelines consistent with the Sexual Predators Act.  Among other things, the amendment revised the distribution enhancement at §2G2.2 that detailed varying levels of punishment, ranging from a general 2-level distribution enhancement to a 7-level enhancement for those who distributed child pornography for pecuniary gain or to a minor to persuade the minor to engage in sexual conduct.[172]

Guidelines §§2G2.2 and 2G2.4, as amended, effective November 1, 2000, read as follows:

---

[171]  Testimony of Charles R. Tetzlaff, U.S. Attorney, District of Vermont, Transcript, Public Hearing on Proposed Guidelines Amendments, at 107-08 (Mar. 23, 2000).

[172]  USSG App. C, amendment 592 (Nov. 1, 2000).

*United States Sentencing Commission*

| | |
|---|---|
| §2G2.2 | **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic** |

(a)    Base Offense Level:  **17**

(b)    Specific Offense Characteristics

    (1)    If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels.

    (2)    (Apply the Greatest) If the offense involved:

        (A)    Distribution for pecuniary gain, increase by the number of levels from the table in §2F1.1 (Fraud and Deceit) corresponding to the retail value of the material, but by not less than **5** levels.

        (B)    Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, increase by **5** levels.

        (C)    Distribution to a minor, increase by **5** levels.

        (D)    Distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by **7** levels.

        (E)    Distribution other than distribution described [above], increase by **2** levels.

    (3)    If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

    (4)    If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

    (5)    If a computer was used for the transmission of the material or a notice or advertisement of the material, increase by **2** levels.

---

| | |
|---|---|
| §2G2.4 | **Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct**<br>[NO CHANGES TO GUIDELINE] |

The Commission noted in its accompanying reason for amendment that "[b]ecause of the limited time available in this amendment cycle, the Commission was not able fully to respond to all of the directives of the [Sexual Predators Act].  In the next amendment cycle, the

Commission intends to continue consideration of the directive requiring that the Commission 'provide for an appropriate enhancement in any case in which the defendant engaged in a pattern of activity of sexual abuse and exploitation of a minor.'"[173]

The Commission continued its efforts to implement the sentencing provisions of the Sexual Predators Act in the next amendment cycle, with particular attention given to the mandate in the Act to ensure the guidelines for child pornography offenders were "reasonabl[y] consisten[t] with other guidelines of the Federal Sentencing Guidelines" and related proportionality concerns.[174] Another area of Commission study was the pattern of abuse enhancement. The Commission was interested in how best to identify those offenders at the greatest risk of recidivism. In order to identify possible tools to identify likely child sex offender recidivists, the Commission reviewed risk assessment tools used by state courts in child sex offense sentencings.

The Commission also received comment from the Probation Officers Advisory Group ("POAG"). POAG cited circuit splits regarding grouping of the multiple-count convictions. POAG also raised concerns that the definitions of "pattern of activity" and "sexually explicit conduct" were unclear and that it was challenging to differentiate between receipt and possession offenses where both involved use of a computer.[175]

The Commission had sought since 1991 to create appropriate pattern of activity enhancements for child pornography offenders with a history of abusing children and had noted in the 1996 Report to Congress that it had continued such efforts.[176] The Commission responded in 2001 to concerns about the existing pattern of activity enhancement and the pattern of activity directive in the Sexual Predators Act[177] by adding a new guideline at §4B1.5 (Repeat and Dangerous Sex Offender Against Minors).[178] Guideline 4B1.5(a) provides an alternate offense level (if higher than the calculated offense level) where the "instant offense of

---

[173] Notice of: (1) Promulgation of Temporary, Emergency Amendment to the Sentencing Guideline for Copyright and Trademark Infringement, Effective May 1, 2000; (2) Submission to Congress of Amendments to the Sentencing Guidelines; and (3) Request for Comment, 65 Fed. Reg. 26,880, 26,902 (May 9, 2000).

[174] Sexual Predators Act § 507. One area of concern was that the guidelines sometimes resulted in higher penalties for §2G2.2 child pornography offenses than offenses where a defendant traveled to engage in a sexual act with a minor, an arguably more serious crime. This was an area addressed by the Commission following a proportionality analysis. *See* USSG App. C. amendment 616 (Nov. 1, 2001).

[175] Letter from Ellen S. Moore, Chairperson, POAG, to the U.S. Sentencing Commission, at 2-3 (July 7, 2000).

[176] *1996 Report to Congress*, at 40.

[177] Sexual Predators Act § 505(2).

[178] USSG App. C, amendment 615 (Nov. 1, 2001).

conviction is a covered sex crime . . . and the defendant committed the instant offense of conviction subsequent to sustaining at least one sex offense conviction."[179]  Guideline 4B1.5(b) provides an increase of up to five levels with a floor of base offense level 22 "[i]n any case in which the defendant's instant offense of conviction is a covered sex crime . . . and the defendant engaged in a pattern of activity involving prohibited sexual conduct . . . ."[180]

While there were significant changes to the commentary and application notes of §§2G2.2 and 2G2.4, the Commission made no further amendments to the child pornography guidelines pursuant to the Sexual Predators Act directives.

### 9.    2003 Guideline Changes

In 2003, pursuant to the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act ("PROTECT Act"), the Commission again revised the guidelines covering child pornography offenses.[181]  The PROTECT Act made several changes with respect to the child pornography guidelines and contained provisions by which Congress, for the first and only time to date, directly amended the guidelines.[182]  The PROTECT Act also provided general directives, created a five-year mandatory minimum for trafficking and receipt,[183] raised the statutory maximum for trafficking and receipt from 15 to 20 years and for possession from five to ten years,[184] and amended the prefatory language of 28 U.S.C. § 994(a)(1), which enumerates the duties of the Commission, to require that guidelines be "consistent with all pertinent provisions of any Federal statute."[185]

---

[179]  USSG §4B1.5(a).

[180]  *Id.* at §4B1.5(b).  As envisioned by the 1996 Report to Congress, this made those involved in production of child pornography vulnerable to a significant pattern of activity enhancement.  *See 1996 Report to Congress*, at 40-41.

[181]  Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act, Pub. L. No. 108–21, 117 Stat. 650 (2003) ("PROTECT Act").  The PROTECT Act passed the Senate by a vote of 98-0. 149 Cong. Rec. S5156, S5157 (Apr. 10, 2003 ).  The PROTECT Act passed the House by a vote of 400-25.  149 Cong. Rec. H3075, H3076 (Apr. 10, 2003).

[182]  PROTECT Act § 401.

[183]  *Id.* § 103.

[184]  *Id.*

[185]  *Id.* § 401.

Section 401 of the PROTECT Act directly amended §§2G2.2 and 2G2.4 by adding the following  specific offense characteristics relating to the number and type of child pornographic images (the "image table") to the text of both guidelines:[186]

> (6)    If the offense involved–
> (A)    at least 10 images, but fewer than 150, increase by 2 levels;
> (B)    at least 150 images, but fewer than 300, increase by 3 levels;
> (C)    at least 300 images, but fewer than 600, increase by 4 levels; and
> (D)    600 or more images, increase by 5 levels.[187]

In addition to inserting the image table, the Act added a specific offense characteristic to §2G2.4 which increased the offense level for the presence of sadistic or masochistic conduct. The language added by the PROTECT Act stated, "If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by 4 levels."[188]

The addition of the image table and other direct amendments to the guidelines became effective April 30, 2003, the date of enactment of the PROTECT Act.[189]  The Commission published these changes as a final action in the *Federal Register* on May 16, 2003.[190]

---

[186]  *Id.* § 401(i).

[187]  *Id.*

[188]  *Id*.  The sadistic and masochistic conduct enhancement already existed at §2G2.2.  *See supra,* Pt. II.B.4, *1990 Guideline Changes*.

[189]  USSG App. C, amendment 649 (Apr. 30, 2003).  *See also* PROTECT Act  § 401(j) (requiring the Commission to distribute the amendments made by the PROTECT Act and specifying that they take effect on the date of enactment).

[190] Notice of (1)(A)(i) Congressional Amendments to the Sentencing Guidelines Made Directly by the PROTECT Act, Pub. L. No. 108–21, and Effective April 30, 2003, 68 Fed. Reg. 26,960 (May 16, 2003).  The Commission noted that these amendments were not subject to the standard notice and public comment period because they were enacted by Congress and effective on April 30, 2003, making "it impracticable to publish the conforming amendments in the *Federal Register* to provide an opportunity for public comment before the congressional amendments became effective."  *Id.*

*United States Sentencing Commission*

Guidelines 2G2.2 and 2G2.4, as amended, effective April 30, 2003, read as follows:[191]

| | |
|---|---|
| §2G2.2 | **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic** |

(a)    Base Offense Level:  **17**

(b)    Specific Offense Characteristics

    (1)    If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels.

    (2)    (Apply the Greatest) If the offense involved:

        (A)    Distribution for pecuniary gain, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but by not less than **5** levels.

        (B)    Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, increase by **5** levels.

        (C)    Distribution to a minor, increase by **5** levels.

        (D)    Distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by **7** levels.

        (E)    Distribution other than distribution described [above], increase by **2** levels.

    (3)    If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

    (4)    If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

    (5)    If a computer was used for the transmission of the material or a notice or advertisement of the material, increase by **2** levels.

    (6)    If the offense involved—

        (A)    at least 10 images, but fewer than 150, increase by **2** levels;

        (B)    at least 150 images, but fewer than 300, increase by **3** levels;

        (C)    at least 300 images, but fewer than 600, increase by **4** levels; and

        (D)    600 or more images, increase by **5** levels.

---

[191]  The 2003 Guidelines Manual that was effective November 1, 2003, slightly changed the language of the use of a computer enhancement in §2G2.2 to "If a computer was used for the transmission, receipt, or distribution of the material or a notice or advertisement of the material, increase by 2 levels."  USSG §2G2.2 (Nov. 1, 2003).  The use of a computer enhancement was further refined in the 2004 Guidelines Manual.  *See infra* II.B.10.

| §2G2.4 | **Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct** | | |
|---|---|---|---|
| | (a) | Base Offense Level: **15** | |
| | (b) | Specific Offense Characteristics | |
| | | (1) | If the material involved a prepubescent minor or a minor under the age of twelve years, increase by **2** levels. |
| | | (2) | If the offense involved possessing ten or more books, magazines, periodicals, films, video tapes, or other items, containing a visual depiction involving the sexual exploitation of a minor, increase by **2** levels. |
| | | (3) | If the defendant's possession of the material resulted from the defendant's use of a computer, increase by **2** levels. |
| | | (4) | If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels. |
| | | (5) | If the offense involved— |
| | | | (A) at least 10 images, but fewer than 150, increase by **2** levels; |
| | | | (B) at least 150 images, but fewer than 300, increase by **3** levels; |
| | | | (C) at least 300 images, but fewer than 600, increase by **4** levels; and |
| | | | (D) 600 or more images, increase by **5** levels. |

10.    2004 Guideline Changes

In addition to amending the guidelines directly, the PROTECT Act also provided general directives to the Commission. For example, it directed the Commission to "review and, as appropriate, amend . . . to ensure that the guidelines are adequate to deter and punish conduct that involves [18 U.S.C. §§ 2252A(a)(3)(B) and 2252A(a)(6)] . . . . With respect to . . . section 2252A(a)(3)(B), the Commission shall consider the relative culpability of promoting . . . or distributing material . . . as compared with solicitation of such material."[192]  For the non-emergency directives and general statutory changes, the Commission relied on its standard rulemaking process.

In responding to the PROTECT Act, the Commission engaged in a variety of studies regarding changes to the child pornography guidelines. These efforts included—

---

[192]  PROTECT Act § 513(c); *see also* USSG App. C, amendment 664 (Nov. 1, 2004).

- A prison impact analysis that used 2002 data to report how the 2004 amendments to §§2G2.2 and 2G2.4 directly mandated by Congress would likely impact sentences. This analysis revealed that average sentences for §2G2.2 would likely more than double from 42.8 months to 88.8 months. Those previously sentenced under §2G2.4 were predicted to see a similarly large average increase in sentence from 28 months to 54 months.

- An examination of state sentencing practices for child pornography offenses in Florida, Oklahoma, Massachusetts, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee, Virginia, and Washington. The results were ultimately ambiguous due to differing data collection models in each state, but such information was considered during the policy development process.

- A project examining offenders sentenced under §§2G2.2 and 2G2.4 to determine the statute of conviction; the offender's most serious behavior; any inappropriate contact with a minor by offender; travel by victim or offender; arrest due to a sting operation; age of victim; number of victims; use of a computer by offender; pattern of activity by offender; offender's criminal history (particularly, the existence of prior offenses against persons); existence of plea agreement; history of substance abuse by offender; psychological evaluation of offender; and offender's marital status. The project also examined departure rates in child pornography cases. The results informed the drafting of proposed amendments and identified issues for comment. It also permitted the Commission to understand the likely rates at which new enhancements would apply.

On December 30, 2003, and January 14, 2004, the Commission published for notice and comment its proposed amendments to revise the child pornography guidelines and comply with the remaining directives of the PROTECT Act.[193] Among other things, the notice sought comment on the application of the image table, the appropriate base offense levels for the offenses in light of new statutory penalties, and the consolidation of §§2G2.2 and 2G2.4.[194] The Commission received public comment on the child pornography guidelines from the DOJ, POAG, and the Federal Defenders.

The Commission had considered revising the child pornography guidelines to consolidate §§2G2.2 and 2G2.4 since at least 1996 (as discussed in the 1996 Report to

---

[193] Notice of Proposed Amendments to Sentencing Guidelines, Policy Statements, and Commentary, 69 Fed. Reg. 2,169 (Jan. 14, 2004); Notice of Proposed Amendments to Sentencing Guidelines, Policy Statements, and Commentary, and Request for Public Comment, 68 Fed. Reg. 75,340 (Dec. 30, 2003).

[194] 68 Fed. Reg. 75,343.

Congress).[195]  Such a consolidation was based in part on the Commission's belief that receipt and possession were similar offenses and on practitioner concerns about confusion in application and disparate resulting sentences.  For example, POAG stated that "the current cross references create a tremendous amount of confusion and disparity in application, often resulting in lengthy sentencing hearings."[196]  The DOJ agreed, stating that "[t]he existing scheme . . . has created confusion, and, we believe, has been applied inconsistently."[197]  Public comment was largely in favor of consolidation.[198]

Other Commission analysis centered on application of the image table inserted directly by Congress into §§2G2.2 and 2G2.4.  For example, the Commission had to define the term "images," quantify video images, and implement the directive.[199]  The Federal Defenders suggested that an "'image' should be defined in terms of a single item such as one photograph or video rather than by reference to each frame in a video or each person depicted."[200]  By contrast, the DOJ took the position that "a definition that treated a video/movie and a still image as both being one image . . . would be arbitrary" and instead suggested each moving image be subject to a 2- or 3-level enhancement.[201]  The Commission ultimately determined that because each video contained multiple images it should be counted as more than one image.  Given that the image table enacted by Congress assigned a 2-level increase for between ten images and 150 images, and a 3-level increase for 150 to 300 images, the Commission adopted a definition of video that considered each video to contain 75 images, squarely in the middle of

---

[195]  *1996 Report to Congress* at 41.

[196]  Letter from Cathy A. Battistelli, Chair, POAG, to the U.S. Sentencing Commission, at 1 (Mar. 5, 2004) ("2004 POAG Letter").

[197]  Letter from DOJ, Deborah J. Rhodes, Counselor to the Assistant Attorney General, to the U.S. Sentencing Commission, at 2 (Mar. 1, 2004) ("2004 DOJ Letter").

[198]  POAG, the DOJ, and the CLC all supported consolidation of §§2G2.2 and 2G2.4, citing practitioner confusion.  *See generally* 2004 POAG Letter; 2004 DOJ Letter; Letter from the Hon. Sim Lake, United States District Judge for the Southern District of  Texas, Chairman of the CLC, to the U.S. Sentencing Commission (Mar. 8, 2004).  The Federal Defenders opposed consolidation.  Federal Public and Community Defenders, Written Testimony of Jon Sands, at 8 (Mar. 17, 2004) ("2004 Federal Defenders Testimony").

[199]  USSG App. C, amendment 649 (Apr. 30, 2003); USSG App. C, amendment 664 (Nov. 1, 2004).

[200]  2004 Federal Defenders Testimony at 8.

[201]  2004 DOJ Letter at 5.  The 2004 DOJ Letter explained that the Motion Picture Association of America categorized a video as containing 24 frames per second and explained that if each frame were counted as a single image this would be 1440 frames/image per minute of video.  *Id.*  The DOJ did not suggest that such a calculation would be appropriate but proposed rather a more modest enhancement as described above.  *Id.*

the 2-level increase range.[202]  The Commission also expressly authorized an upward departure if the video was substantially longer than five minutes.[203]  Additionally, effective implementation of the image table required the Commission to delete the previously promulgated specific offense characteristic relating to the number of *items* of child pornography, formerly §2G2.4(b)(3).  The Commission made this adjustment to prevent instances of "double counting."[204]

With respect to implementation of the five-year mandatory minimum sentence for trafficking and receipt of child pornography and the increased statutory maximum for child pornography offenses, the Commission sought to implement congressional intent to punish offenders[205] and comply with the proportionality and other requirements of the SRA, including the congressional mandate that guidelines be "consistent with all pertinent provisions of any Federal statute."[206]  In order to select the appropriate base offense levels, the Commission examined several approaches.

When Congress establishes a mandatory minimum penalty, the Commission generally has four approaches available for selecting the appropriate base offense level.  First, the Commission may set the base offense level for the offense so that the base offense level for a Criminal History Category I offender corresponds to the first guideline range on the sentencing table with a minimum guideline range *in excess of the mandatory minimum*.  For example, the

---

[202]  §2G2.2, comment. (n. 4(B)).  In practice, this means that a defendant with a single, relatively short, video will likely receive a 2-level increase from the application of the image table for that video.  *See* §2G2.2(b)(7)(A).

[203]  §2G2.2, comment. (n. 4(B)(ii)).

[204]  USSG App. C, amendment 664 (Nov. 1, 2004).

[205]  *See, e.g.,* 149 Cong. Rec. S2573-02, S2584 (Feb. 24, 2003) (statement of Senator Orrin Hatch in support of the PROTECT Act):

> Congress has long recognized that child pornography produces . . . distinct and lasting harms to our children . . . .  It goes without saying that we have a compelling interest in protecting our children from harm . . . .  The end result of all our hard work is a bill of which we can be proud, one that is tough on pedophiles and child pornographers in a measured and constitutional way.

[206]  28 U.S.C. § 994(a) (as amended by § 401(k) of the PROTECT Act).  Prior to the PROTECT Act amendment, section 994(a) required that the guidelines be "consistent with all pertinent provisions of [title 28] and title 18."  The PROTECT Act language explicitly clarifying the Commission's duty to enact guidelines consistent with all statutes was introduced as section 417 "Technical Correction to Ensure Compliance of Sentencing Guidelines With Provisions of All Federal Statutes" of the Anti-Gang and Youth Violence Control Act of 1996 by U.S. Senator Joseph Biden, in the 104th Congress, S. 1991, 104th Cong. § 417 (1996).  Similar or identical language was introduced in every subsequent Congress until its ultimate passage in the 108th Congress as part of the PROTECT Act.  *See* S. 3, 105th Cong. § 827 (1997); S. 9, 106th Cong. § 3911 (1999); S. 16, 107th Cong. § 2310 (2001).  Similar prefatory language in § 994(b) was not amended and continues to state that "[t]he Commission, in the guidelines promulgated pursuant to subsection (a)(1), shall . . . establish a sentencing range that is consistent with all pertinent provisions of title 18, United States Code."  28 U.S.C. § 994(b)(1).

five-year mandatory minimum (60 months) quantity for most drug-trafficking offenses is assigned base offense level 26, which corresponds to a guideline range of 63-78 months.[207]

Second, the Commission may set the base offense level to the guideline range that is the first one on the table to *include the mandatory minimum* at any point within the range. For example, the five-year mandatory minimum quantity associated with crack cocaine offenses is assigned level 24,[208] which corresponds to a range of 51-63 months, the first range on the sentencing table to include the five-year mandatory minimum.[209]

Third, the Commission may set the base offense level below the mandatory minimum and rely on specific offense characteristics and Chapter Three adjustments to reach the statutory mandatory minimum. If, after all adjustments have been made, the guideline range still fails to reach the mandatory minimum, the application of §5G1.1(b) accommodates the mandatory minimum penalty by trumping the otherwise applicable guideline range. Guideline 5G1.1(b) states that "[w]here a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."[210]

Finally, the Commission may also adopt a fourth approach, not typically utilized by the Commission, based on the application of §5G1.1(b). In the fourth approach, the Commission

---

[207] *See* USSG §2D1.1. In permitting the mandatory minimum to fall above the lowest end of the guidelines range for drug cases, the Commission acknowledged that "while it theoretically could design a structure that would equate the lowest guideline sentence with the mandatory minimum, adherence to that approach would produce in typical cases sentences that would reach or exceed the statutory maximum and, thus, there would be little if any opportunity for consideration of aggravating factors." USSC, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, at 27 (1991) ("*1991 Mandatory Minimum Report to Congress*").

[208] §2D1.1 as amended by amendment 706. *See* USSG App. C, amendment 706 (Nov. 1, 2007); amendment 711 (Nov. 1, 2007).

[209] As explained in greater detail in the following paragraph, although the guideline range would be 51-63, through application of §5G1.1(b), the range after application of the mandatory minimum would be 60-63 months.

[210] USSG §5G1.1(b). Guideline 5G1.1 states:

> (a) Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.
> (b) Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.
> (c) In any other case, the sentence may be imposed at any point within the applicable guideline range, provided that the sentence —
> > (1) is not greater than the statutorily authorized maximum sentence, and
> > (2) is not less than any statutorily required minimum sentence.

would select a new (or maintain an existing) base offense level without regard to a newly adopted (or increased) mandatory minimum and, in a case in which the guideline calculation fails to reach the mandatory minimum, the mandatory minimum sentence would be applied through application of §5G1.1(b).  However, this approach would promote unwarranted sentencing disparity by creating sentencing "cliffs," would arguably fail to meet the Commission's statutory mandates under the SRA to make sure its guidelines are "consistent with all pertinent provisions of any Federal statute," and would not reflect that mandatory minimum penalties represent, at least partly, "the community view of the gravity of the offense," and "the public concern generated by the offense" as interpreted by Congress.[211]

After engaging in extensive analysis of its data, including a review of typical trafficking and receipt offenders, offense characteristics, and rates of below guideline sentences for these offenses, the Commission adopted the third, most lenient option of those typically used by the Commission, and selected base offense level 18 for possession offenders and base offense level 22 for trafficking and distribution offenders.[212]

The Commission's analysis revealed that a majority of offenders sentenced under §2G2.2 were subject to specific offense characteristics that increased their offense level. Specifically, the overwhelming majority of these offenders received a 2-level enhancement for use of a computer (89.4%) and a 2-level enhancement for material involving a child under 12 (91.4%).[213]

This analysis was supplemented by public comment from the DOJ and the Federal Defenders.[214]  Both the DOJ and the Federal Defenders made recommendations to the Commission during the 2004 amendment cycle regarding proposed base offense levels for these crimes.  The Federal Defenders concurred with the Commission's assessment that

---

[211]  28 U.S.C. §§ 994(a), (c)(4)-(5).

[212]  Had the Commission adopted the first option, the Commission would have selected base offense level 26 for the five-year mandatory minimum for trafficking and receipt of child pornography, which corresponds to a range of 63-78 months.  Had the Commission adopted the second option, it would have resulted in a base offense level of 24 and a guideline range of 51-63 months.

[213]  USSG App. C, amendment 664 (Nov. 1, 2004).  The enhancement for material involving a child under 12 has existed under §2G2.2 since the initial promulgation of the guidelines in 1987, while the use of a computer enhancement was added pursuant to a directive in 1996.  SCACPA § 3; USSG App. C, amendment 537 (Nov. 1, 1996); *see supra*, Pt. II.B.7, *1996 Guideline Changes*.

[214]  *See generally* 2004 Federal Defenders Testimony; 2004 DOJ Letter.

setting the base offense level lower than the mandatory minimum would be appropriate given the likelihood that certain enhancements would frequently apply.[215]  The Federal Defenders argued against any increase to the base offense levels, despite the increase in statutory maximum or the new mandatory minimum, but, in the alternative, proposed retaining base offense level 15 for possession and a 1-level increase to 18 for trafficking and distribution.[216]  By contrast, while the DOJ agreed that "unlike drug or other cases subject to a mandatory minimum statute, several special [*sic*] offense characteristics will likely apply to the 'typical' case," it recommended selecting a base offense level of 24, stating that "a base offense lower than 24, however, will not give full effect to the special [*sic*] offense characteristics . . . ."[217]

The Commission's research and review of comment indicated that if it placed the base offense level at 26, or even 24, after applying the typical enhancements, most first-time offenders' guidelines calculations would be far in excess of the mandatory minimum.[218]  However, setting the base offense level at level 22 would permit the guidelines and enhancements to operate in conjunction with the statutory mandatory minimum.

In addition to the concerns about guideline ranges that exceed the mandatory minimum penalty, the Commission was also concerned that setting the base offense level any higher than 22 for trafficking and receipt offenses would affect the proportionality of other guidelines.  To comply with 28 U.S.C. § 994(a)(1), the Commission studied the proportionality of the guidelines.  In the instant case, the Commission undertook a proportionality analysis of the §2G2.2 guideline in comparison with sentences for other types of offenses.[219]  This review demonstrated that if the base offense level were set any higher than 22, the typical offender sentenced under §2G2.2 for receipt of child pornography would face a higher guideline than a

---

[215]  2004 Federal Defenders Testimony at 8.

[216]  *Id.* at 10-11.

[217]  2004 DOJ Letter at n.3.

[218]  USSG App. C, amendment 664 (Nov. 1, 2004).  The Commission examined cases from 2002 to determine which specific offense characteristics were applied most frequently and determined that enhancements for use of a computer, material involving children under 12 years of age, and number of images each would apply in at least 60 percent of cases.  For purposes of this analysis, the "typical offender" was then defined as an offender for which all of those most common specific offense characteristics applied.

[219]  For example, the Commission considered the base offense levels for, among other offenses, first degree murder, second degree murder, assault with intent to murder, conspiracy to commit murder, rape, production of pornography, voluntary manslaughter, kidnapping, and travel to engage in a sex act, with the proposed offense levels for child pornography offenses of trafficking, receipt and possession under §2G2.2.

typical offender convicted of conspiracy to commit murder and kidnapping.[220]  Thus by setting the base offense level at 22 for trafficking, the Commission sought to preserve proportionality, avoid double counting, and provide a wider sentencing range for defendants than would be otherwise available.[221]

The Commission added a 2-level decrease for offenders sentenced under §2G2.2(b)(1) whose offense was limited to receipt or solicitation of child pornography materials.[222]  The reduction was supported by Commission findings that, in many instances, "simple receipt" of child pornography is very similar to "simple possession" of child pornography despite the different statutory penalties that impose a five-year mandatory minimum penalty to receipt offenses.[223]  The Commission also sought to preserve proportionality and give meaning to the increased statutory maximum penalty from five to ten years by setting the base offense level for possession to 18.[224]

The Commission implemented the remaining guidelines changes made pursuant to the PROTECT Act through amendment 664 to the guidelines, effective November 1, 2004.[225]  Guideline 2G2.2 (now consolidated with §2G2.4) as amended, read as follows:

---

[220]  Such a result does not support a coherent guidelines system as envisioned by Congress.  One of the major aims of the SRA was to provide for proportionality in punishment.  *See, e.g.*, S. Rep. No. 98–225, at 45-46 (1983); USSG Ch.1, Pt. A (Nov. 1, 2008).

[221]  This chart briefly summarizes the base offense levels proposed by the DOJ and the Federal Defenders as contrasted with the base offense levels ultimately adopted.

|  | POSSESSION | TRAFFICKING/DIST. |
|---|---|---|
| DOJ *proposed* BOL | 20 | 24/26 |
| Federal Defenders  *proposed* BOL | 15 | 18 |
| §2G2.2 as adopted | 18 | 22 |

[222]  *See* USSG App. C, amendment 664 (Nov. 1, 2004).  The Commission noted in the 1996 Report to Congress that it was considering a 2-level reduction for some receipt offenders to better account for the conduct involved in a simple receipt case.  *See 1996 Report to Congress*, at 41.

[223]  USSG App. C, amendment 664.

[224]  The efforts expended to ensure proportionality have resulted in a median sentence in fiscal year 2008 of 78 months for offenders sentenced at §2G2.2; 108 months for offenders who traveled to engage in a prohibited sexual conduct with a minor sentenced at §2G1.3(a); 139 months for criminal sexual abuse offenders sentenced at §2A3.1(a); and 240 months for production of child pornography offenders sentenced at §2G2.1.

[225]  USSG App. C, amendment 664.

§2G2.2    **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor**

(a)    Base Offense Level:

    (1)    **18**, if the defendant is convicted of 18 U.S.C. § 1466A(b), § 2252(a)(4), or § 2252A(a)(5).

    (2)    **22**, otherwise.

(b)    Specific Offense Characteristics

    (1)    If (A) subsection (a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material, decrease by **2** levels.

    (2)    If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by **2** levels.

    (3)    (Apply the Greatest) If the offense involved:

        (A)    Distribution for pecuniary gain, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but by not less than **5** levels.

        (B)    Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, increase by **5** levels.

        (C)    Distribution to a minor, increase by **5** levels.

        (D)    Distribution to a minor that was intended to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than illegal activity covered under subdivision (E), increase by **6** levels.

        (E)    Distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by **7** levels.

        (F)    Distribution other than distribution described [above], increase by **2** levels.

    (4)    If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

    (5)    If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

    (6)    If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, increase by **2** levels.

    (7)    If the offense involved—

        (A)    at least 10 images, but fewer than 150, increase by **2** levels;

        (B)    at least 150 images, but fewer than 300, increase by **3** levels;

        (C)    at least 300 images, but fewer than 600, increase by **4** levels; and

        (D)    600 or more images, increase by **5** levels.

11.      2009 Guideline Changes

In the fall of 2008, Congress again passed legislation relating to child pornography offenders.  The PROTECT Our Children Act created a new offense at 18 U.S.C. § 2252A(a)(7) with a statutory maximum of 15 years, which made it unlawful to knowingly produce with intent to distribute, or to knowingly distribute, "child pornography that is an adapted or modified depiction of an identifiable minor" ("morphed image").[226]  The PROTECT Our Children Act did not contain a directive to the Commission.  Nevertheless, as with any new criminal offense, the Commission considered whether a guideline amendment would be appropriate.

On January 27, 2009, the Commission published for notice and comment proposed amendments to revise the child pornography guidelines in response to the PROTECT Our Children Act.[227]  The proposed amendments noted that the new offense created by the PROTECT Our Children Act at 18 U.S.C. § 2252A(a)(7) (production of a morphed image with intent to distribute or distribution of a morphed image) would be automatically referenced, without Commission action, to the trafficking, distribution, and receipt of child pornography guideline at §2G2.2.[228]  The Commission included an issue for comment asking whether §2G2.2 was the appropriate guideline for the morphed images offense or whether it should be referenced to the production of child pornography guideline at §2G2.1.  Further, the Commission asked whether that offense should be sentenced via cross reference or should be eligible for specific aggravating or mitigating offense characteristics.

The Commission received public comment from the DOJ and the Federal Defenders; the Federal Defenders also addressed this topic at a public hearing on March 19, 2009.[229]  The DOJ

---

[226] Pub. L. No. 110–401, § 304 (2008).  These adapted images are referred to as "morphed images" because they morph a non-sexual image of an identifiable child with sexually explicit images.  In 2008, Congress also passed the Effective Child Pornography Prosecution Act.  This Act, among other things, clarified that receipt or distribution of a live visual depiction of child pornography via the Internet or other electronic method is a child pornography offense and that one who "knowingly accesses with intent to view" a live visual depiction of child pornography has possessed child pornography.  Pub. L. No. 110–358, §§ 103, 203 (2008).

[227] Notice of Proposed Amendments to Sentencing Guidelines, Policy Statements, and Commentary, 74 Fed. Reg. 4,802 (Jan. 27, 2009).

[228] Appendix A references all offenses under 18 U.S.C. § 2252A to §2G2.2.  *See* USSG App. A.  The amendments also clarified the definition of child pornography to include the production, transmission, or access of a live visual depiction of child pornography pursuant to the Effective Prosecution Act.  74 Fed. Reg. 4,818-19.

[229] Letter from DOJ, Jonathan J. Wroblewski, Director, Office of Policy and Legislation, to the U.S. Sentencing Commission (Mar. 27, 2009) ("2009 DOJ Letter"); Letter from Federal Defenders on Miscellaneous Amendments, Jon M. Sands, Federal Public Defender, to the U.S. Sentencing Commission (Mar. 27, 2009) ("2009 Federal Defenders

stated that the production of a morphed image of child pornography is not as serious a crime as the production of genuine child pornography, but asserted that "the defendants who create these [morphed] images should not be treated on par with those who distribute, receive and possess them."[230]  The DOJ suggested that the offense could be referenced to §2G2.1 or to a new stand-alone guideline.[231]  It further stated that, if the offense were referenced to §2G2.2, producers of morphed images should be subject to a base offense level greater than that applied to distributors.[232]  By contrast, the Federal Defenders stated that "[o]ffenses involving 'morphed images' are actually less serious than any other child pornography offense that depicts actual sexual abuse of a minor."[233]  They suggested that morphed images offenses be referenced to §2G2.2(a)(1) with a base offense level of 18.[234]

After reviewing public comment, legislative history, and existing guideline structure, the Commission determined that the distribution guideline at §2G2.2, as opposed to the production guideline at §2G2.1, is the appropriate guideline for this offense because distribution is a required element of the offense, as the offender must either distribute the material or produce it with intent to distribute.[235]  Simply possessing a morphed image (or producing a morphed image without intent to distribute) is not a federal crime.  The Commission further determined that §2G2.2 is the appropriate guideline reference because it has provisions to account for aggravating and mitigating circumstances that may be involved in these offenses.

The Commission selected a base offense level of 18 for the offense, four levels lower than the base offense level for other child pornography distribution offenses referenced to §2G2.2.  The Commission determined that the lower base offense level was appropriate because, unlike for other child pornography distribution offenses:  (1) the process of creating the image does not involve the sexual abuse of a child; and (2) Congress provided a lower penalty structure for this offense compared to other child pornography distribution offenses.

---

Letter"); Federal Public and Community Defenders, Written Testimony on Miscellaneous Amendments of Jon M. Sands (Mar. 17-18, 2009) ("2009 Defenders Written Testimony on Miscellaneous Amendments").

[230]  2009 DOJ Letter at 51.

[231]  *Id.* at 52.

[232]  *Id.*

[233]  2009 Defenders Written Testimony on Miscellaneous Amendments at 9 (emphasis in original).

[234]  *Id.*

[235]  *See* 18 U.S.C. § 2252A(a)(7) (stating that violation of this offense occurs when one "knowingly produces with intent to **distribute**, or **distributes**, . . . child pornography that is an adapted or modified depiction of an identifiable minor") (emphasis added).

*United States Sentencing Commission*

Specifically, the new offense carries a maximum term of imprisonment of 15 years and no mandatory minimum term of imprisonment, while other child pornography distribution offenses typically carry a maximum term of imprisonment of 20 years and a mandatory minimum of five years. The lower base offense level also accounts for the fact that the enhancements at subsections (b)(3) (for distribution) and (b)(6) (for use of a computer) will likely apply in these cases.

On May 1, 2009, the Commission submitted the amendments to Congress.[236] Guideline 2G2.2 as amended will read as follows:

---

[236] Notice of Submission to Congress of Amendments to the Sentencing Guidelines Effective November 1, 2009, 74 Fed. Reg. 21,750 (May 8, 2009). As discussed *supra* Part I.B, amendments to the guidelines become effective 180 days after submission if Congress does not act to modify or disapprove the amendments. 28 U.S.C. § 994(p).

| | |
|---|---|
| §2G2.2 | **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor** |

(a)     Base Offense Level:

    (1)    18, if the defendant is convicted of 18 U.S.C. § 1466A(b), § 2252(a)(4), § 2252A(a)(5), or § 2252A(a)(7).

    (2)    **22**, otherwise.

(b)     Specific Offense Characteristics

    (1)    If (A) subsection (a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material, decrease by **2** levels.

    (2)    If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by **2** levels.

    (3)    (Apply the Greatest) If the offense involved:

        (A)    Distribution for pecuniary gain, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but by not less than **5** levels.

        (B)    Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, increase by **5** levels.

        (C)    Distribution to a minor, increase by **5** levels.

        (D)    Distribution to a minor that was intended to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than illegal activity covered under subdivision (E), increase by **6** levels.

        (E)    Distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by **7** levels.

        (F)    Distribution other than distribution described [above], increase by **2** levels.

    (4)    If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

    (5)    If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

    (6)    If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by **2** levels.

    (7)    If the offense involved—

        (A)    at least 10 images, but fewer than 150, increase by **2** levels;

        (B)    at least 150 images, but fewer than 300, increase by **3** levels;

        (C)    at least 300 images, but fewer than 600, increase by **4** levels; and

        (D)    600 or more images, increase by **5** levels.

### III.    Summary

This report provides a history of the child pornography guidelines, which were initially promulgated in 1987 and substantively revised nine times in the following 22 years.  The most recent guideline revision is pending before Congress and, absent congressional action, will become effective on November 1, 2009.  Congress has demonstrated its continued interest in deterring and punishing child pornography offenses, prompting the Commission to respond to multiple public laws that created new child pornography offenses, increased criminal penalties, directly (and uniquely) amended the child pornography guidelines, and required the Commission to consider offender and offense characteristics for the child pornography guidelines.

Sentencing courts have also expressed comment on the perceived severity of the child pornography guidelines through increased below-guidelines variance and downward departure rates.  Consistent with the Commission's duties to review and revise the guidelines,[237] and the Supreme Court's direction,[238] the Commission has established a review of the child pornography guidelines as a priority for the amendment cycle ending May 1, 2010.  This report is the first step in the Commission's work on this priority.

---

[237] 28 U.S.C. § 994(o).

[238] *Rita v. United States*,  551 U.S. 338, 350, 127 S. Ct. 2456, 2464 (2007) ("The sentencing courts, applying the Guidelines in individual cases may depart . . . . The judges will set forth their reasons.  The Courts of Appeals will determine the reasonableness of the resulting sentence.  The Commission will collect and examine the results.").

# EXHIBIT B

[Home](#)

## SENTENCE LENGTH IN SELECTED PRIMARY SENTENCING GUIDELINES[1]

Districts: **California North**      Fiscal Years: **2016**



| PRIMARY SENTENCING GUIDELINE | Mean Months | Median Months | N |
|---|---|---|---|
| TOTAL | **50** | **30** | **438** |
| §2A1.1 | 364 | 403 | 4 |
| §2A2.2 | -- | -- | 1 |
| §2A3.1 | -- | -- | 0 |
| §2A3.5 | -- | -- | 0 |
| §2A4.1 | -- | -- | 0 |
| §2A6.1 | -- | -- | 0 |
| §2B1.1 | 20 | 12 | 83 |
| §2B3.1 | 182 | 74 | 14 |
| §2B5.1 | 22 | 17 | 3 |
| §2B5.3 | 4 | 3 | 4 |
| §2C1.1 | 47 | 56 | 6 |
| §2D1.1 | 60 | 53 | 102 |
| §2D1.2 | 18 | 12 | 3 |
| §2D1.11 | -- | -- | 0 |
| §2D2.1 | -- | -- | 1 |
| §2G1.3 | 139 | 96 | 5 |
| §2G2.1 | 144 | 120 | 6 |
| §2G2.2 | 67 | 63 | 14 |
| §2J1.2 | -- | -- | 0 |
| §2K2.1 | 47 | 37 | 68 |
| §2L1.1 | -- | -- | 0 |
| §2L1.2 | 29 | 28 | 26 |
| §2L2.1 | -- | -- | 2 |
| §2L2.2 | 1 | 0 | 9 |
| §2P1.1 | 8 | 9 | 8 |
| §2Q2.1 | 0 | 0 | 3 |
| §2S1.1 | 29 | 26 | 12 |
| §2S1.3 | 34 | 46 | 3 |
| §2T1.1 | 12 | 12 | 9 |
| §2T1.4 | -- | -- | 2 |
| §2X4.1 | -- | -- | 0 |
| §2X5.2 | -- | -- | 2 |
| **Other Primary Sentencing Guidelines** | 50 | 15 | 48 |

---

[1]  Of the 464 cases, 26 were excluded due to missing guideline applied. Sentences of probation only are included in this table as zero months of imprisonment. In addition, the information presented in this table includes time of confinement as described in USSG §5C1.1. Descriptions of variables used in this table are provided in [Appendix A.](#)

SOURCE: This was produced using the U.S. Sentencing Commission's Interactive Sourcebook ([isb.ussc.gov](#)) using the Commission's fiscal year 2016 Datafile, USSCFY2016.

# EXHIBIT C

Home

**LENGTH OF IMPRISONMENT IN EACH PRIMARY OFFENSE CATEGORY**[1]

Districts: **California North**    Fiscal Years: **2016**



| PRIMARY OFFENSE | Mean Months | Median Months | N |
|---|---|---|---|
| **TOTAL** | **59** | **36** | **372** |
| Murder | -- | -- | 0 |
| Manslaughter | -- | -- | 0 |
| Kidnapping/Hostage Taking | -- | -- | 0 |
| Sexual Abuse | 136 | 108 | 6 |
| Assault | -- | -- | 2 |
| Robbery | 69 | 63 | 7 |
| Arson | -- | -- | 1 |
| Drugs - Trafficking | 65 | 60 | 85 |
| Drugs - Communication Facility | -- | -- | 0 |
| Drugs - Simple Possession | -- | -- | 1 |
| Firearms | 92 | 49 | 88 |
| Burglary/B&E | -- | -- | 0 |
| Auto Theft | -- | -- | 0 |
| Larceny | 7 | 8 | 4 |
| Fraud | 25 | 22 | 51 |
| Embezzlement | -- | -- | 1 |
| Forgery/Counterfeiting | 22 | 17 | 3 |
| Bribery | 29 | 22 | 5 |
| Tax | 17 | 12 | 5 |
| Money Laundering | 39 | 37 | 8 |
| Racketeering/Extortion | 126 | 87 | 12 |
| Gambling/Lottery | 15 | 8 | 7 |
| Civil Rights | -- | -- | 0 |
| Immigration | 24 | 24 | 44 |
| Child Pornography | 93 | 89 | 18 |
| Prison Offenses | 12 | 11 | 6 |
| Administration of Justice Offenses | 73 | 57 | 5 |
| Environmental/Wildlife | -- | -- | 0 |
| National Defense | -- | -- | 2 |
| Antitrust | -- | -- | 2 |
| Food & Drug | 6 | 3 | 3 |
| Other Miscellaneous Offenses | 14 | 12 | 6 |

---

[1]  Of the 464 cases, 91 with zero months of prison ordered were excluded. In addition, one case was excluded due to or missing or indeterminable sentencing information. The information in this table does not include any time of confinement as described in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: This was produced using the U.S. Sentencing Commission's Interactive Sourcebook (isb.ussc.gov) using the Commission's fiscal year 2016 Datafile, USSCFY2016.

# EXHIBIT D



# S A N   F R A N C I S C O

# F O R E N S I C   I N S T I T U T E

*At the Interface of Psychology & Law*

CHARLES A. FLINTON, PH.D.   |   CYNTHIA V. RINKER, MFT
TEL  415  391  7171     FAX  844  506  3322     WWW.SFFI.US

March 8, 2017

Seth Chazin
Law Offices of Seth P. Chazin
1164 Solano Avenue
Albany, CA 94706

RE: Gerard Jones

Dear Mr. Chazin,

Per your request, I am writing a letter outlining Mr. Jones's participation and progress in Sexual Offender Specific treatment. The San Francisco Forensic Institute (SFFI) provides state-of-the-art psychological evaluation, consultation, and expert testimony in criminal and civil cases. Additionally, SFFI offers focused psychotherapy to individuals in the legal system and is a Certified Sex Offender Treatment Program according to the standards set by the California Sex Offender Management Board (CASOMB). Furthermore, I am a Certified Sex Addiction Therapist (CSAT) and have additional training and experience to assess and treat people exhibiting addictive like behaviors that involve sex or sexual material. Since his arrest, Mr. Jones began participating in weekly individual therapy with me on January 17, 2017 and has not missed any sessions since that time. He was also attending supportive, 12 step type groups in the community (Sex Addicts Anonymous or SAA).

In terms of future offenses involving child pornography, the reader should note that in a meta-analysis completed by Seto, Hanson, and Babchishin (2014) involving 2,630 child pornography offenders, 2 percent later committed a hands on offense while 3.4 percent recidivated with child pornography.[1] In another study, completed by Faust, Bickert, Renaud, and Camp (2014), based on a sample of 493 child pornography offenders, 1.6% reoffended with child pornography while those with a targeted (or identifiable victim) reoffended at a rate of 3%[2]. This indicates that child pornography offenders typically re-offend at a very low rate. Still, current research suggests several factors that should be considered regarding recidivism risk. These are 1) the offender is young, 2) the offender has never been married, 3) the offender has a low level of education, 4) the offender has a prior criminal history (especially violent or sexual offense), 5) the offender has a history of conditional release failure, 6) the offender has substance use problems, and 7) the offender possesses non-internet child pornography.[3]

---

[1] Babchishin, K.M., Hanson, H.K., VanZuylen, H. (2014). Online Child Pornography Offenders are Different: A Meta-analysis of the Characteristics of Online and Offline Sex Offenders Against Children. Arch Sex Behav DOI 10.1007/s10508-014-0270-x
[2] Faust E, Bickart W, Renaud C, Camp S. (2014) Child pornography possessors and child contact sex offenders: A multilevel comparison of demographic characteristics and rates of recidivism. Sex Abuse 2014; 27(5): 460-478.
[3] Seto, M. (2012), Prepared for the United States Sentencing Commission Draft dated February 6, 2012//AND// Seto, M. C., & Eke, A. W. (2005). The criminal histories and later offending of child pornography offenders. Sexual Abuse: A Journal of Research and Treatment, 17, 201-210.//and// Wakeling, H. C., Howard, P. D., & Barnett, G. D. (in press). An examination of the predictive validity of the Risk Matrix 2000 with internet offenders. Sexual Abuse: A Journal of Research and

2

In Mr. Jones's case, in terms of factor 1, he is of sufficient age for this factor to mitigate his risk. In terms of factor 2, he has maintained at least one long-term, marital relationship and continues to be in this relationship. In terms of factor 3, he has an advanced degree. This factor may separate him from typical recidivists. In terms of factor 4, Mr. Jones has no known prior criminal history. In terms of factor 5, Mr. Jones has never been on probation. This does not aggravate or mitigate risk. In terms of factor 6, Mr. Jones denies a substance abuse problem. In terms of factor 7, Mr. Jones was not found to possess non-internet child pornography. Factors above except #5 support a lower risk than the average recidivist.

While Mr. Jones appears to be at a relatively low risk for re-offense, the reader might note that offenders who successfully complete treatment recidivate at a rate 50% less than those who participate, but do not complete treatment (Marques et al., 2005)[4]. A 2003 study by McGrath, Cumming, Livingston, and Hoke found that over a six-year follow-up, offenders who had "completed" a cognitive behavioral program recidivated less (5.4% overall) than offenders who had "some" treatment, but did not complete the program (30.6% overall)[5].

Mr. Jones was involved in compulsive, almost addictive-like behavior albeit with harmful material. He demonstrated anxious and depressive symptoms such as diminished interest or pleasure in activities that he normally found pleasure in, loss of energy, and excessive work to the detriment of himself. This behavior was likely a way for him to escape into a fantasy world that he would not likely act out in the real world. He denies a sexual interest in children and has demonstrated long-term relationships with women.

Mr. Jones presents as an exceptional candidate to successfully complete treatment. In short, I believe that with proper treatment, Mr. Jones will further lower his risk of re-offense. Addressing maladaptive behavior as soon as it is discovered provides the best potential for remission. Continuing with treatment would be in his benefit.

Thank you,

*Cynthi V. Rink, LMFT*

Cynthia Rinker, Administrative Director
Licensed MFT (37,017)

---

Treatment.//And// Faust, E., Renaud, C., & Bickart, W. (2009, October). Predictors of re-offense among a sample of federally convicted child pornography offenders. Paper presented at the 28th Annual Conference of the Association of the Treatment of Sexual Abusers, Dallas, TX.

[4] Hanson, R. F., Resnick, H. S., Saunders, B. E., Kilpatrick, D. G., & Best, C. (1999). Factors related to the reporting of childhood rape. Child Abuse & Neglect, 23, 559–569. Finkelhor, D., Hammer, H., and Sedlak, A.J. (2008). Sexually Assaulted Children: National Estimates and Characteristics. (NCJ 214383) August 2008. OJJDP NISMART Series.

[5] McGrath, R. J., Cumming, G., Livingston, J. A., Hoke, S. E. (2003). Outcome of a treatment program for adult sex offenders: From prison to community. Journal of Interpersonal Violence, 18, 3-17.

**Cynthia Rinker, MFT**

## Education and Qualifications:
*Licensed Marriage and Family Therapist, MFC 37,017 (issue date June 3, 2000)*
*Master's of Clinical Psychology*
> Antioch University of Santa Barbara, CA, 1995

*Bachelor of Arts in Psychology*
> University of California, Davis, 1992
> (Lower division work completed at the University of Arkansas, Fayetteville)

*Certified Sexual Offender Treatment Provider, Independent Practitioner (July 2012-present)*
*Certified Sex Addiction Therapist- (CSAT)*

## Work Experience:
*Administrative Director, President, and CEO*          Duration:          04/13- present
*Marriage and Family Therapist, private practice, and forensic clinician*
> **Blue Rock Institute, A Psychological Corporation**
> **Duties:**
>> Individual and group therapy sessions specializing in sex addiction/sexual compulsivity treatment with a focus on prevention of harmful sexual behavior.
>> Individual therapy sessions for general therapeutic need
>> Documentation for billing and contract requirements
>> Clinical Supervision for pre-licensed interns and administrative supervision of licensed staff
>> Administrative oversight of clinical programs

*Administrative Director*          Duration:          05/12-03/13
*Marriage and Family Therapist, private practice, and forensic clinician*
> **San Francisco Forensic Institute, San Francisco, CA          Duration:          11/09-present**
> **Duties:**
>> Individual and group therapy sex offender specific treatment for pre- and post- conviction clients.
>> Individual therapy sessions focusing on drug, alcohol and/or mental health needs for those on probation and parole.
>> Documentation for billing and contract requirements
>> Clinical Supervision for pre-licensed interns

*Program Manager, Family Reunification, Family Preservation, Services to Enhance Early Development (SEED) and Parent Engagement (5/05-12/09)*
> Alameda County Social Services Agency, Oakland, CA          *Duration:          5/05-12/10*
> **Duties:**
>> Plan, coordinate and direct the operation of social service programs consisting of multiple units.
>> Monitor and ensure conformance to policies and procedures established by higher level management, Federal and State law and County ordinances;
>> Recommends and plans for program policies and procedures and develops the methods necessary for achieving program objectives;
>> Makes budget recommendations and monitors expenditures;
>> Makes recommendations of staff allocations needed to accomplish goals and objectives; evaluates quality and results of services provided;
>> Coordinates program activities with other service providers both in and out of the County service.
>> Reviews and approves actions or decides upon course of action in the most sensitive case problems that could not be solved at a lower level;
>> Interprets laws and regulations for staff, clients, public and outside organizations;
>> Addresses community groups and conducts training sessions as required;

*870 Market Street, Suite 875, San Francisco, CA 94102    415-391-7171 x14*
*1 Kaiser Plaza, Suite 1480, Oakland, CA 94612*

**Cynthia Rinker, MFT**

*Child Welfare Supervisor, Family Reunification and Permanent Youth Connections, Kinship Unit*
Alameda County Social Services Agency, Hayward and Oakland, CA*Duration:*        *6/01-5/05*

**Duties:**

Supervise casework methods and techniques particularly related to child abuse and neglect.

Monitor compliance and timely completion of court reports, relative approvals, and CWS/CMS full utilization.

Provide clinic supervision in relation to return of children to parents, changes of placement, new child abuse allegations, and services needed to stabilize children and families.

Provide supervision related to Agency and Juvenile Court policies and procedures. Testify as needed.

Assess and Evaluate staff in my unit, provide coaching and development, and identify training needs.

Assign and transfer cases between sections based on transfer guidelines.

Participate in program planning and other work groups to improve service delivery and develop new procedures to initiate new programs and initiatives.

Other duties as needed depending on the needs of clients, child welfare workers, agency, or Courts.

*Child Welfare Worker II, Dependency Investigations,*   *Duration:*       *1/98-6/01*
*Child Welfare Worker II (in-training),*                 *Duration:*       *11/97-1/98*
Alameda County Social Services Agency, Oakland, CA

**Duties:**

Investigate and interview clients and collateral persons to determine type and extent of child abuse brought to the attention of Children's Protective Services.

File petitions, write detention reports, jurisdictional reports, and other court related documents on behalf of clients. Testifying in court as needed.

Help clients by creating Case Plan Objectives and referring the clients to appropriate services depending on their individual strengths and needs.

Intervene in crises involving biological families and foster families as they arise.

Attempt to develop concurrent plans for children by placing them with family members willing and able to provide long term care for them, including adoption.

Other duties depending on the individual needs of clients, agency, or Courts.

*Assistant Program Director,*                *Duration:*   *9/96 to 9/97*
*Counselor and MFCC Intern,*                 *Duration:*   *7/95 to 9/96 full-time*
*Sanctuary Psychiatric Centers, Santa Barbara, CA*       *3/94 to 6/95 part-time*

**Administrative Duties**:

Consult and advise Program Director on all aspects of facility management.

Perform the duties of Program Director in his/her absence or in emergencies.

Help screen, hire, and train clinical staff.

Assist in evaluating clinical staff.

Schedule staff shifts and vacations on a monthly basis.

Supervise and organize undergraduate volunteers.

Develop and maintain procedures for monitoring content of logs and charts.

Review charts on the computer.

Provide training and assistance with staffs' computer questions.

Organize and facilitate weekly staff and monthly community meetings.

Assist in meeting standards for several licensing and accrediting agencies.

Maintain a client caseload and perform all of the regular functions of a counselor when census exceeds 10. (see clinical duties)

Oversee facility maintenance.

*870 Market Street, Suite 875, San Francisco, CA 94102    415-391-7171 x14*
*1 Kaiser Plaza, Suite 1480, Oakland, CA 94612*

**Cynthia Rinker, MFT**

**Clinical Duties**:

Direct supervision of seriously mentally ill adults in a residential treatment facility.
Treatment planning, implementation of treatment plans, and crisis intervention.
Interface with treatment team and outside professionals to maximize client's treatment.
Presentation of cases in weekly staff meetings.
Assist and instruct clients on independent living skills, socialization, and rehabilitation.
Supervision of medication compliance.
Daily, weekly, and monthly charting on clients' activities and behavior.
Periodic detailed evaluations in conjunction with clinical consultants.
Discharge planning.

***MFCC Intern,*** *Duration:  6/95 to 8/96   (6-8 hours per week)*

Shelter Services for Women, Santa Barbara, CA

Counseled women and their children impacted by domestic violence.
Documented sessions.
Facilitated Group Therapy with children ages 8 to 12 years old.
Reported to Child Protective Services as needed.
Facilitated family sessions as needed.
Completed the 40 hour Domestic Violence Advocate Training

***MFCC Trainee, Duration****:  2/95 to 7/95  (6 hours per week)*

Girls, Inc., Santa Barbara, CA

Individual counseling sessions, including documentation, with girls 5 to 12 years of age.
Facilitated family sessions as needed.

***Child Care Worker,*** *Duration:  6/92 to 6/93 Fulltime*

Progress Ranch, Inc., Davis, CA

Directly supervised emotionally disturbed boys, 6 to 10 years old, in a residential group home.
Crisis intervention.
Creation and implementation of treatment program.
Documentation of children's activities and behavior daily.
Completed quarterly reports for county agencies.
Participated in weekly staff meetings and ongoing training sessions.
Organized household maintenance and menu development.

***Co-facilitator for Eagle Group,*** *(10/92 to 6/93)*

Progress Ranch, Inc., Davis, CA

Co-Facilitated a child abuse survivor's group for young boys, 6 to 8 years old.
Prepared activities with the goal of facilitating the children's ability to tell their abuse stories and express their feelings associated with their abuse.
Participated in role plays and limit setting.
Assisted with creating a group structure that was more effective for younger boys.
Participated in ongoing training and organizing sessions.

## Memberships

- California Coalition on Sexual Offending (CCOSO)
- Association for the Treatment of Sexual Abusers (ATSA)
- Member, Society for the Advancement of Sexual Health (SASH)

*870 Market Street, Suite 875, San Francisco, CA 94102    415-391-7171 x14*
*1 Kaiser Plaza, Suite 1480, Oakland, CA 94612*

# EXHIBIT E



# S A N   F R A N C I S C O
# F O R E N S I C   I N S T I T U T E
## *At the Interface of Psychology & Law*

CHARLES A. FLINTON, PH.D.  |  CYNTHIA V. RINKER, MFT
TEL  415  391  7171     FAX  844  506  3322     WWW.SFFI.US

June 25, 2018

Seth Chazin
Law Offices of Seth P. Chazin
1164 Solano Avenue
Albany, CA 94706

RE: Gerard Jones

Dear Mr. Chazin,

Per your request, I am writing a letter outlining Mr. Jones's participation and progress in Sexual Offender Specific treatment. The San Francisco Forensic Institute (SFFI) provides state-of-the-art psychological evaluation, consultation, and expert testimony in criminal and civil cases. Additionally, SFFI offers focused psychotherapy to individuals in the legal system and is a Certified Sex Offender Treatment Program according to the standards set by the California Sex Offender Management Board (CASOMB). SFFI regularly provides pre-trial services to individuals who have been arrested by local and federal jurisdictions and have provided post-conviction treatment for same. Furthermore, I am a Certified Sex Addiction Therapist (CSAT) and have additional training and experience to assess and treat people exhibiting addictive like behaviors that involve sex or sexual material.

Since his arrest, Mr. Jones began participating in weekly individual therapy with me on January 17, 2017 and has only missed sessions due to illness, moving, and travel. He began attending weekly group therapy on April 5, 2017 and has continued to attend this group. In these venues, I have observed him participating effectively, openly, and in a way that demonstrates both intellectual and emotional understanding of his own behavior and the harm he has caused. Other members of the group find him to be a leader and a support showing that he has both made significant changes and demonstrates empathy.

Mr. Jones has also been an active member of supportive, 12 step type groups in the community (Sex Addicts Anonymous or SAA). In addition to his participation, he also provides "service" in his fellowship activities in church and SAA meetings. Being qualified/eligible to fulfill these roles requires rigorous participation, sobriety, and working the program through the steps. This too demonstrates that Mr. Jones has taken his recovery seriously and is helping others as part of restorative justice and healing.

As stated before, Mr. Jones was involved in compulsive, almost addictive-like behavior albeit with harmful material. He demonstrated anxiety and depressive symptoms such as diminished interest or pleasure in activities that he normally found pleasure in, loss of energy, and excessive work to the detriment of himself. This behavior was likely a way for him to escape into a fantasy world that he would not likely act out in the real world. He denies a sexual interest in children and has demonstrated a long-term relationship with his wife. Although Mr. Jones has had one questionable relationship with a 17 year-old named Rachel, this occurred around 8 years ago and in the United Kingdom where the age of consent is 16years old. Despite the victim letter that was received by

870   MARKET STREET    |    SUITE 875    |    SAN FRANCISCO CA    |    94102

the court, that relationship seemed to Mr. Jones at the time, by all other measures, consensual. I believe this letter says more about why we have consent laws rather than teenagers being allowed to make this judgment at an age when they feel like an adult but their pre-frontal cortex is not fully developed. Once developed, typically between the ages of 22-26 years of age, the individual has better insight, judgment, and ability to anticipate consequences of their own behavior. Now that Rachel has reached full maturity, she can see in retrospect that the relationship was at a minimum weird and at worst, manipulative. Mr. Jones has questioned his interest and behavior in this regard as part of the therapeutic process. It should be noted that being attracted to post-pubescent teenagers is normative but acting on it when the age of consent is not reached is illegal. In other words, this relationship should not necessarily aggravate his risk.

As my previous documents have shown, as has his evaluation, Mr. Jones is at a low risk given factors we know about recidivists. A long prison sentence in this case is a waste of resources and should be limited to those at high risk. Mr. Jones can be a productive member of society and easy to supervise given that his offense was computer based if given the opportunity.

Mr. Jones presents as an exceptional candidate to successfully complete treatment and has a good prognosis given his work thus far. In short, I believe that with proper treatment, Mr. Jones will further lower his risk of re-offense. He is clearly doing solid work in the name of himself, victims, and others that may end up in similar situations. Continuing with this path of treatment and service to others uninterrupted would benefit him as long as possible prior to entering custody and returning to the community as soon as he is able.

Thank you,

Cynthia V. Rinker, LMFT

Cynthia Rinker, Administrative Director
Licensed MFT (MFC 37,017)
Certified Sex Offender Treatment Provider
Certified Sex Addiction Therapist (CSAT)

# EXHIBIT F

**JEREMY COLES, PH.D.**
**CLINICAL & FORENSIC PSYCHOLOGIST**
**6114 LaSalle Ave # 587**
**OAKLAND, CA 94611**
**510-339-6733**
CA LICENSE # 15992

**11/03/2017**

**CONFIDENTIAL REPORT OF PSYCHOLOGICAL EVALUATION**

**Name:**                          **Gerard Jones**
**Date of Birth:**                 **07/10/1957**
**Age:**                           **60 years old**
**Case #:**                        **Case # 17 CR-0070**
**Date of Evaluation:**            **10/30/2017**

**IDENTIFYING INFORMATION AND REFERRAL QUESTIONS**
Mr. Gerard Jones is a 60 year-old male who was referred for psychological evaluation by Seth Chazin, the attorney who is representing him on the charges of U.S.C. § 2252(a)(4)(B)-possession of child pornography, and U.S.C. § 2252(a)(2)- distribution of child pornography.  The purpose of the current evaluation was to assess Mr. Jones's general psychological and cognitive functioning, to provide a risk assessment, to determine whether he is afflicted with a Pedophilic Disorder, and to provide treatment recommendations. I evaluated Mr. Jones on 10/30/2017 for approximately two and a half hours in my outpatient office at 3873 Howe St. in Oakland, CA. He was explained the purpose of the evaluation as well as the limits of confidentiality. He was cooperative with all aspects of the evaluation process.

**ASSESMENT PROCEDURES**
**Tests Administered:**

1.  **Millon Multiaxial Clinical Inventory- III (MCMI-III)**
2.  **Cognistat**

**Documents Reviewed:**

*   **United States District Court for the Northern District of California/Case #17 CR-0070- Indictment: filed 02/07/2017**

- **Letter to defense attorney Seth Chazin from Ability Systems Corporation, President Robert D Young:  10/03/2017**
- **San Francisco Police Department Chronicle of Investigation/Case # 160729643: 09/13/2016**
- **San Francisco Police Department Crime Report/Case # 160-729-643: 12/29/2016**
- **San Francisco County Return to Search Warrant/Case # 160729643: 11/22/2016**
- **San Francisco County Search Warrant and Affidavit/Case # 160729643: 10/3/2016**
- **Cyber Tip Line Report-12640482:  06/22/2016**

## MENTAL STATUS AND TEST SESSION BEHAVIOR

Mr. Jones presented as a well dressed, likable man who arrived to his appointment on time. He was alert and oriented. His gait was unremarkable. His grooming skills were adequate.  He wore glasses. He put forth adequate energy and motivation throughout the interview. He was quite articulate and clearly of above average intelligence. His speech was coherent and goal directed. It was of normal tone, pace, and volume. He offered information freely and appeared to be a reliable historian. He demonstrated a broad range of affect. He became sullen when speaking of the controlling offense and mentioned on multiple occasions that he has been overwhelmed with shame, and that having to talk about the offenses brought about significant sadness.

Mr. Jones's attention was intact. He was able to follow the flow of our conversation and respond to my questions with relevant responses. His memory, both recent and remote, was intact. There was no evidence of delusions, hallucinations, or other psychotic symptoms in his mental functioning. He denied current suicidal ideation. His insight was moderate.

## CURRENT SITUATION AND PERTINENT BACKGROUND
**The following information was obtained from Mr. Jones unless otherwise noted.**

**Current Situation.**  Mr. Jones lives with his wife, Jenny, in a rented apartment in San Francisco. He spends most of his days attempting to reconstruct a book that was near completion when his computers were taken away from him during his arrest for the controlling offense. Apparently, he has not been allowed to access the book files that were on these computers. He noted that he is currently being supervised by U.S. Pretrial Services. This involves wearing an ankle bracelet, a 6 p.m. curfew, and monthly visits from a pretrial service officer who comes to his home to check his computers. Additionally, he is required to report to the officer once a month. He has been fully compliant with all of the conditions of supervision. He also attends weekly individual psychotherapy and a weekly therapy group specifically for individuals dealing with sexual problems. Finally, he attends Sex and Love Addicts Anonymous several times a week.

Mr. Jones noted that his arrest for the controlling offense has caused him to lose many job contracts that he had in place and he is experiencing financial hardship. He also indicated that while his wife has stayed with him after his arrest for the controlling offenses, the circumstances surrounding his arrest have devastated her and their relationship is distant at this point in time.

**Psychosocial History.** Mr. Jones was born in Cut Bank, Montana. He was raised in Los Gatos until age 16 and then moved to Gilroy. He has a brother, Ray, who is 10 years older than him and lives in San Jose, California. He is close with Ray and has been able to talk to him about his recent offenses. Mr. Jones was raised by both parents who remained married until his mother passed away in 2001. His father died in 2011. His father worked as a high school teacher and guidance counselor. His mother worked as a high school teacher.

Mr. Jones described his childhood as, "Steady. There were some rough stretches. My Mom went into a depression when I was in the 14 to 15 year old range. She started drinking a lot. Prior to that, I remember that there was steadiness." He described his father as, "Sweet and congenial. He didn't show a lot of affection but he was very good to me." His described his mother as, "Moody. She was impatient and could get angry although she was never abusive. She had depressive spells and was hard to reach but then she would get really affectionate. I didn't get a lot of training in expressing emotions but it was a loving and supportive home."

As a child, Mr. Jones spent most of his time with friends playing various games that were popular at the time. He noted that he was imaginative and wrote stories from a young age. He also liked to draw. He collected various items such as coins and matchbox cars. He recalled that he spent a lot of time with his parents and older brother, camping most of the summer each year. He recalled loving animals and birds and would spend hours viewing birds with binoculars, keeping lists of the birds that he saw.

Mr. Jones was never in legal trouble as a juvenile. He was generally well behaved. He did not engage in any behavior commonly associated with conduct-disordered youth such as stealing, truancy, and fighting.

Mr. Jones recalled being depressed and anxious beginning in the 6th grade: "I was unhappy and I would trump up that I was sick so I could stay home. I was anxious and depressed and was somewhat scared. I was a sensitive kid. I wanted to please grown ups. By the end of the 7th grade, my parents took me out of the public school and placed me in a small private school and there I just felt lonely and I felt like I let my parents down. I didn't connect well with kids and I had a hard time staying in contact with my prior friends. I felt like there was something wrong with me for being sent to this school. I made some friendships but they weren't satisfying. More and more I didn't do much after school and I watched a lot of television." Ultimately, he was homeschooled in the 9th and

10th grade. During these years, he was lonely as he lost touch with the kids that he knew: "That was a very depressive year. I slept all the time."

Mr. Jones's family moved to Gilroy when he was in the 11th grade and this helped lift him out of his depression. He attributed this to being placed back in a public school where he was able to reintegrate with kids his age. Simultaneously, his mother's depression lifted, in large part due to the fact that she taught in the Gilroy school system and she no longer had to commute two hours a day.

After graduating high school, Mr. Jones remained in his parent's home for two years and attended community college. At age 20, he moved out and worked at a bookstore and began writing: "I wanted to be a novelist so I didn't really want to keep with college at that point." Soon thereafter, Mr. Jones published a humor book with a coauthor that sold fairly well.  This allowed him to begin writing full- time.

**Educational History.** Mr. Jones did well in school, generally achieving A's. He was never in special education classes and was not a behavior problem. As noted, in addition to being home schooled, he attended a mixture of public and private schools. He attended two years of community college.

**Employment History.** Mr. Jones's first job occurred at age 20 when he worked in a bookstore. Since that time, he has supported himself writing, teaching, and editing. He has had, by and large, a successful career, having published his works for major publishing presses. His writing has varied from comic books to non-fiction.

**Substance Abuse History.** Mr. Jones has no substance abuse history. He described himself as a casual drinker and said that, at most, he consumes a couple of drinks a week. He experimented with marijuana in his early 20s but did not like it. He has never used harder, mind-altering substances.

**Legal History.** Mr. Jones has no prior legal history.

**Psychological History.** Mr. Jones's first contact with mental health professionals occurred in 1991 when he sought therapy after he had an affair. He attended weekly psychotherapy for about two years. Since that time, he has been in therapy on five different occasions typically for about two to three years at a time. He indicated that he generally sought out therapy for depressive symptoms.

Mr. Jones was first prescribed psychiatric medication in 2004. Then, in 2006,  he saw a psychiatrist who prescribed him Wellbutrin in an effort to quell his depressive symptoms: "It was a vague malaise, I felt scattered. There were many days that I felt unmotivated. I had tried Paxil and Lexapro a few years earlier but I didn't notice much. Wellbutrin gave

me a little more of a foundation." Currently, Mr. Jones is prescribed Wellbutrin, 300 mg. once a day.

As noted, Mr. Jones is currently attending individual and group therapy as a condition of his pretrial release. This therapy is provided by Cynthia Rinker at the San Francisco Forensic Institute.  He noted that the group that he attends is comprised of people who identify as sex addicts.   He noted that both therapeutic modalities are helpful and allow him to process his pornography addiction and his decision to view child pornography.

**Medical History.** Mr. Jones is afflicted with GERD and asthma. He experiences occasional migraine headaches.

**Relationship and Sexual History.** Mr. Jones described being inhibited and shy as an adolescent. By his senior year, he learned how to talk to girls and, eventually, by the end of his senior year, he dated for the first time. Notably, his first girlfriend and first sexual partner was his current wife, Jenny. He said that they were together for about four years. Then, at age 23, he took a trip to Europe for six months. Jenny began dating another man during this time. From the age of 23 to 26, they remained in a relationship although they saw each other less and saw other people: "We had an arrangement so that we didn't have to tell each other everything." At 26, the relationship became more monogamous and they began living together: "It seemed like a good idea. We wound up getting a condominium." Ultimately, they married at the age of 29. They have been together continuously since this time other than one year that they separated after he had an affair.

Mr. Jones and Jenny had one child, Nicholas, who is 24 years old. He is finishing his BA in musical production and engineering. He lives in Davis with his girlfriend. He said that he has a good relationship with Nicholas and they speak and visit often.

Mr. Jones noted that his marriage has never been marked by significant conflict but "There have been rough spots. It's had periods when we were distant and walled off." He noted that Jenny experienced a post partum depression that was exacerbated by an affair that he had:

> We worked on it and it got better until I cheated on her again. It got a lot better in 2010 after we both went into 12-step program. I went into Sex and Love Anonymous which deals with people who have addictions to romantic attractions…People who leak from relationship to relationship, falling in love repeatedly… She went into the Alanon portion of that which is called COSA. At first I went to five meetings a week and then over time, I scaled back to one or two meetings a week after about one or two years. Since then, things had gotten a lot better. We also did couples therapy. It has been wonderful for the past seven years even through this awfulness she has been steady and supportive. She tells me that my behavior has been scary for her. She hasn't completely promised to be

there after my prison time but she probably will be. It took a lot of work but we are both so grateful that we hung on. Along the way we had second thoughts.

Mr. Jones indicated that his sex life with his wife was minimal during the last few years of their marriage: "Maybe once every couple of months. She was going through menopause and was not feeling sexual, this was for the past three years." He noted that his own sex drive was rather low as well so he did not feel particularly frustrated due to the lack of sex in their relationship. However, when he began taking Ritalin, his sex drive increased.

Mr. Jones has had sex with roughly five women; his wife and four women with whom he had affairs. He has never experienced any sexual attraction towards men and considers himself heterosexual.  Notably, none of the child pornography that he downloaded contained images of boys.

Mr. Jones denied all sexual dysfunctions, including difficulty getting an erection, premature ejaculation, and inability to ejaculate.

Mr. Jones reported that he had never engaged in exhibitionism, masturbating in public, mooning, streaking, voyeurism, bestiality, bondage, sadomasochism, obtaining sexual excitement by controlling another person, dressing in women's clothing or masturbating using women's or children's clothing.

**CONTROLLING OFFENSE AND PRECURSORS**
Mr. Jones is currently charged with one count of U.S.C. § 2252(a)(4)-possession of child pornography, and one count of U.S.C. § 2252(1)(2)- receipt of child pornography.

According to San Francisco Police Department crime reports related to these offenses, Mr. Jones was interviewed on December 29, 2016.  He admitted to downloading and possessing graphic child pornography from several different online sources.  He admitted uploading and sharing child pornography to YouTube. He also admitted to looking at child pornography that involved children between the age 9 and 12. The youngest child depicted in the pornography he possessed was 3 years old.

Crime reports related to these offenses indicate that law enforcement was contacted by Google who informed them that child pornography had been uploaded to their YouTube site.  A review of the uploaded file revealed a child approximately 12 years old being sexually abused by an adult male and female.

Police reports indicate that prior to the current investigation, Homeland Security had been conducting an investigation related to Mr. Jones traveling to the United Kingdom to meet an underage female for sexual contact.  When asked about this by authorities, he admitted that he had been online several years prior when the alleged victim was 15.  They chatted

online and the chats became sexual.   He sent her graphic images when she was underage. He traveled to meet her when she was 17 years old and, ultimately, when she turned 18 they had sexual intercourse.

San Francisco Police Department crime reports further indicate that Mr. Jones told investigating officer he attended Sex Addicts Anonymous.  He noted that after an affair, he felt the compulsion for pornography as a substitute for being with other people.  He found pornography exciting because of the sense of taboo. He indicated he was not sexually attracted to children and reiterated that the taboo nature of the child pornography was what was most compelling. He was asked about meeting up with a minor named Rachel in the United Kingdom.  He indicated he met her in a Facebook group called "Facebook Writers."  They flirted online.  He noted he was unhappy at that point.

**Mr. Jones's understanding of the controlling offense and precursors.** Mr. Jones said that he had periodic pornography obsessions, beginning in 2000: "This was when we (he and his wife) were separated and I used a lot of pornography. It was straight ahead male-female pornography. Some had some dominance themes. Mostly, it was women that I found attractive performing fellatio." He said that nearly all of the pornography that he viewed was in the context of Internet pornography. When asked if he had any insight into his pornography addiction, he stated,  "I felt like I was withdrawing from the affair. I felt like if I wasn't actually with someone else it was better. I was seeing a psychologist but I was pretty guarded." When Mr. Jones moved back with his wife, roughly one year later, his pornography use ended. Then, in 2004, he recalled getting into a flirtation with a woman and, in turn, he felt shame and disappointment that he was again edging towards an affair: "I had sworn I wouldn't do it again. I was starting to think there was something addictive or compulsive about the flirting. I went to some S and L meetings but at the same time that I was cutting off the relationship. I wanted to see pornography which I thought would be ok because it was a safer place to channel my sexuality and wasn't going to hurt people like my wife and this woman." For about six months, Mr. Jones again viewed pornography on a daily basis, almost entirely women performing fellatio on men: "I did notice some drifting. Wondering what kind of things were out there. I was still mostly interested in male-female fellatio but that was the first time that I became aware of jailbait sites, pictures of teenage girls with their clothes on. Girls 14 to 18 looking like sexual objects. I didn't look a lot but I looked to see what was there." Mr. Jones said that he did this for about six months and then, in early 2005, got disgusted with himself and stopped. He ran this same cycle four or five times prior to his introduction to child pornography many years later: " I had seen advertisements for it so I knew it was there but it wasn't until November 2015 when I decided to cross the line… in January 2016  I swore that I wouldn't look at it again but I drifted back to it that summer."

In further describing this time period, Mr. Jones recalled that he was writing a book on social reform movements and was very pressured. He had received his editor's rewrites

requests which were many and were overwhelming. He was supposed to finish this book in a couple of months and he worried that he wouldn't make the deadline. In turn, his physician prescribed extended release Ritalin in late 2015. Ritalin is an attention deficit medication that helps one concentrate and work for longer stretches of time. After Mr. Jones began taking Ritalin, he began obsessively viewing pornography in order to relieve his stress. He recalled feeling agitated from the Ritalin: "I was panicky about the book deadline and I would take the extended release to help with that and I was getting agitated. It also seemed like the obsessive compulsiveness was up." During this month, he downloaded collections of child pornography from Russian web addresses: "I wasn't so much hunting but grabbing these massive chunks. I never knew specifically what was in the folders and I would view them and delete the stuff I didn't like."

Mr. Jones indicated that he made an Internet account named "Eight is the New 18" in December 2015: "My rationalization was just to see what happened but I was obsessively curious about what I would see. When I put that up, I get a lot of messages from people sending links. It was free access to these huge collections. I think that I rationalized it I just talked myself into believing that it was ok. None of it makes sense, it was like what I did with my affairs; I would find ways to rationalize things when I am in the obsessive state."

Mr. Jones said that he viewed child pornography for about a month starting in November 2015. Then, he stopped viewing all pornography due to his feelings of shame and disgust with himself. Additionally, he was worried about his addiction to pornography taking over his life. Ultimately, about six months later, he became overwhelmed with stress and in June 2016, he began viewing pornography again, much of which was child pornography:

> When I went into it again in June the main thing that I was fixated on… was these Russian Ukrainian sites were these girls who wore clothes but they were presented as objects of desire. Typically they were 13 or 14, the beginning of sexuality. Sometimes there would be model sets of earlier pictures of the same girls at like 9 or 10. The early ones didn't sexually excite me. I didn't masturbate to them but I had some thrill looking at them. The 13, 14-year-old ones I would masturbate to, the early post puberty.

Mr. Jones said that eventually he went to Sex Addicts Anonymous in late November 2016 and this helped him understand his pornography addiction: "I was realizing that I wanted to be free from all of it, even looking at the teenage models. I was still tentative but I was fighting with myself." He indicated that he stopped viewing pornography again at the end of November 2016. He was arrested the next month.

I asked Mr. Jones about the younger children that were in the child pornography that he downloaded, and specifically if he felt a sexual excitement while viewing the images. He

told me the following: "I wanted to see everything… I looked at a couple but felt very uncomfortable and deleted them… When I crossed the line it took me over- this desire to just see everything. It made me feel kind of queasy." He indicated that his sexual arousal was to pubescent age females and used those images for masturbatory stimulation. When he looked at the younger children, he felt flushes of shame: "I was still experiencing it as this scary forbidden stuff. I was not conscious of sexual excitement of the younger ones."

I asked Mr. Jones about the distribution charge he is facing concerning the videos that were uploaded to Youtube. Essentially, he confirmed the information that was documented in the police reports.

I asked Mr. Jones about the 17 year-old girl that he met with in England. Again, confirmed the information that was documented in the police reports.

**COGNITIVE FUNCTIONING**
Mr. Jones was administered the Cognistat, a neurobehavioral cognitive status examination, in an effort to assess his basic cognitive capacities in all of the major cognitive domains.  The results are listed below:

### COGNISTAT COGNITIVE STATUS PROFILE

| | |
|---|---|
| **LEVEL OF CONSCIOUSNESS:** | **Alert** |
| **ORIENTATION:** | **Within Average Range** |
| **ATTENTION:** | **Within Average Range** |
| **LANGUAGE:  Comprehension:** | **Within Average Range** |
| **Repetition:** | **Within Average Range** |
| **Naming:** | **Within Average Range** |
| **CONSTRUCTIONAL ABILITY:** | **Within Average Range** |
| **MEMORY:** | **Within Average Range** |
| **CALCULATIONS:** | **Within Average Range** |
| **REASONING:      Similarities:** | **Within Average Range** |
| **Judgment:** | **Within Average Range** |

Mr. Jones's performance on the Cognistat indicates that his cognitive capacities are intact and are not likely to be interfering with his ability to carry out tasks of daily living.

**BEHAVIORAL AND EMOTIONAL FUNCTIONING**
The current evaluation reveals Mr. Jones to be a moderately anxious and depressed man who, despite being an accomplished author, has a significantly ill-formed sense of himself marked by feelings of low-self worth. He has spent a significant portion of his life seeking other's approval and, at times, this has led to his becoming involved in a vicious cycle in which he seeks out affairs for validation only to feel shame and more depression. At other times, he exhibits compulsive behaviors in an effort to bind his

anxiety. This was the case at the time of the controlling offense when he compulsively viewed and downloaded pornography, a significant portion of which was child pornography.

On the positive side, all of the available data indicates that Mr. Jones is not afflicted with anti-social traits in his character structure, and that his behavior during the controlling offense was anomalous. Overall, he is a man who conforms to social norms, does not break the law, and empathizes with others.  Notably, when viewing the child pornography he felt significant shame and, in the aftermath, he continues to feel great embarrassment and shame related to his behavior. Beyond the behavior documented in the police reports above, there are no other examples of behaviors in Mr. Jones' life that indicate he is a person prone to behave in a manner that is harmful to others.

Given the fact that Mr. Jones is currently charged with possession of child pornography, I considered the possibility that he may be afflicted with a Pedophilic Disorder.

Regarding the diagnosis of Pedophilic Disorder, it should be noted that the *Diagnostic and Statistical Manual of Mental Disorders - Fifth Edition* ("DSM-5") describes the diagnostic criteria for this disorder as follows:

> A. Over a period of at least 6 months, recurrent, intense sexually-arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

> B. The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

> C. The individual is at least age 16 years and at least 5 years older than the child or children in Criterion A.

It is my opinion that Mr. Jones does not meet the diagnostic criteria for Pedophilic Disorder. His self-stated attraction for minors is related to pubescent and post pubescent females. To be sure, there were images of prepubescent females in the pornography that was confiscated and Mr. Jones acknowledged that he downloaded some of those images. However, he also noted that they came in "massive" folders and that when he viewed them, he deleted them shortly thereafter. He indicated that he was not sexually aroused by them and did not use them for masturbatory purposes. Based upon this information, he does not meet the diagnostic criteria for Pedophilic Disorder.

---

**CONFIDENTIAL REPORT OF PSYCHOLOGICAL EVALUATION**
**Gerard Jones**
**Case # 17 CR-0070**
**11/03/2017**

**RISK ASSESSMENT**

Research addressing recidivism amongst child pornography offenders suggests that most individuals who are caught in possession of child pornography are not likely to commit further child pornography crimes and are even less likely to commit a future hands on sex offense. In a recent, comprehensive meta-analysis of child pornography offenders (N = 2,630),[1] it was found that in follow up periods ranging from 1.5 to 6 years, only 3.4 % of child pornography offenders committed another child pornography offense. It was also found that 2% committed a contact sexual offense. In another study from 2012, the United States Sentencing Commission found that, in an average follow up time of 8 ½ years, only, 3.6 % of individuals who had been convicted and sanctioned for a federal, child pornography crime were rearrested or convicted for a hands on sex offense, and 2.3 % were convicted of a subsequent child pornography offense.[2]

In addition to the low recidivism rates found in individuals who have been charged and/or convicted of child pornography crimes and not other sex crimes, research suggests that these individuals differ fundamentally from hands on sex offenders and mixed (both child pornography and hands on sex offenses) offenders. Not only are their recidivism rates significantly lower than the later two groups, but their psychological profiles differ significantly. In a recent meta-analysis comparing psychological characteristic of on-line versus offline sex offender, it was found that child pornography only offenders possessed greater victim empathy, less cognitive distortions, and more psychological barriers to sex offending than their hands-on sex offender counterparts[3]. Not surprisingly, the hands on sex- offenders were found to possess more antisocial traits.

Given these findings, it is my job as a risk evaluator to try to determine whether the individual I am assessing is likely to be one of the very few, 2 to 3 % of individuals that go on to commit another sex offense, and whether or not that offense is likely to be a hands on sex offense.

Given the relatively recent escalation of child pornography crimes, actuarial measures designed to specifically assess recidivism in child pornography offenders are very new and, to date, none have been cross-validated. Therefore, my current risk assessment approach utilizes the Static 99-R[4], a measure that was designed for hands on sex offenders, as well as an analysis of the individual items that constitute the Child Pornography Offender Risk Tool ("CPORT").[5] All of the items on this scale have been

---

[1] **Contact Sexual Offending by Men With Online Sexual Offenses**
**Michael C. Seto, R. Karl Hanson and Kelly M. Babchishin** *Sex Abuse* **2011 23: 124**
[2] **United States Sentencing Commission Special Report to Congress, 2012, Chapter 11 p. 293-310**
[3] **Online Child Pornography Offenders are Different: A Meta-analysis of the Characteristics of Online and Offline Sex Offenders Against Children**
**Kelly Babchishin, R.K. Hanson, Heather VanZuylen** *Archives of Sexual Behavior* **March 2014**
[4] **What Sexual Recidivism Rates Are Associated with Static-99R and Static-2000R Scores?**
**R. Karl Hanson, David Thornton, Leslie-Maaike Helmus & Kelly M. Babchishin**
**Sexual Abuse: A Journal of Research and Treatment, 15-JAN-2015**
[5] **Predicting Recidivism Among Adult Male Child Pornography Offenders: Development of the Child Pornography Offender Risk Tool (CPORT)**

---

**CONFIDENTIAL REPORT OF PSYCHOLOGICAL EVALUATION**
**Gerard Jones**
**Case # 17 CR-0070**
**11/03/2017**

found to be significantly correlated to sexual recidivism in child pornography offenders. Finally, I examine multiple dynamic risk factors that have been found to be significantly correlated to sexual recidivism in all types of sex offenders.[6]

Mr. Jones was scored on the Static-99-R, a more recent version of the Static-99 that has attempted to account for age related differences with respect to sexual recidivism in a more comprehensive manner than the Static-99.

On the Static-99R, Mr. Jones received a score of "-2". Specifically, he received the following scores:

| | | |
|---|---|---|
| Age at Release | (60 and above) | -3 |
| Ever Lived with Lover for 2+ Years | | 0 |
| Index Non-Sexual Violence Convictions | | 0 |
| Prior Non-Sexual Violence Convictions | | 0 |
| Prior Sex Offenses | | 0 |
| Prior Sentencing Dates (3 or Less) | | 0 |
| Non-Contact Sex Offense Convictions | | 1 |
| Unrelated Victim | | 0 |
| Stranger Victim | | 0 |
| Male Victim | | 0 |

Notably, I am scoring a "1" on the non-contact sex offense conviction item in anticipation of his upcoming conviction even though, technically, he has not been convicted of this crime yet.

On the Static-99-R, individuals with scores of "-2" reoffended at a rate of 1.3% after five years.

In addition to the Static-99-R, the following empirically derived dynamic risk factors were also considered. A dynamic risk factor is a risk factor that can change over time, particularly with treatment. These risk factors have been found to be related to sexual recidivism in empirical research in this field. A brief summary of the role of risk factors in Mr. Jones's case will be provided after the list of the specific risk factors.

## *Stable Dynamic Risk Factors*

---

Michael C. Seto, Angela W. Elke *Law and Human Behavior* 2015, Vol. 39. No. 4 416-429

[6] Hanson, R. K., Morton-Bourgon, K., & Canada. (2004). Predictors of sexual recidivism: An updated meta-analysis. Ottawa: Public Safety and Emergency Preparedness Canada.

- Intimacy Deficits
  -Lovers/intimate partners- **(ABSENT)**
  -Emotional identification with children- **(ABSENT)**
  -Lack of concern for others- **(ABSENT)**
  -Hostility towards women- **(ABSENT)**
  -Social rejection loneliness- **(ABSENT)**

Intimacy deficits are evaluated by examining the above five components that represent potential problem areas for sex offenders. In assessing intimacy capabilities, the crucial factor to be considered in terms of someone's previous relationships has to do with whether a person is disposed to becoming involved in an intimate relationship that is nurturing, both sexually and emotionally; one that would provide them with some sort of containment that might inhibit their paraphilic impulses.

- Sexual Self-Regulation
  -Sex as coping- **(ABSENT)**
  -Deviant sexual interests- **(MILDLY PRESENT (pubescent females)**
  -Sexual preoccupation- **(PRESENT)**

Individuals whose sexual impulses are poorly controlled are at greater risk for sexual reoffense. Sexual self-regulation is divided into three components: a) sex drive/preoccupation, b) deviant sexual interests, and c) sex as coping. Sexual preoccupation focuses on the recurrent sexual thoughts and behaviors that are not directed at a current romantic partner.

- Lack of Cooperation with supervision- **(ABSENT)**

An offender's lack of cooperation with supervision is related to an increased risk for sexual reoffense.

- General self-regulation
  -Impulsive acts- **(ABSENT)**
  -Negative emotionality and hostility- **(ABSENT)**

The component of general self-regulation is assessed by examining the individual's impulsivity, poor cognitive problem solving, and negative emotionality and hostility.

**Summary of Dynamic Risk Factors.** Overall, Mr. Jones's behavioral and psychological profile does not reveal significantly aggravating factors related to sexual reoffense. He has been involved in one, long-term relationship throughout

---

**CONFIDENTIAL REPORT OF PSYCHOLOGICAL EVALUATION**
**Gerard Jones**
**Case # 17 CR-0070**
**11/03/2017**

his adult life and while this relationship has had ups and downs and he has had affairs in the relationship, his overall ability to develop and maintain a satisfying and meaningful intimate relationship with adult partners is very good. Additionally, his self-regulatory capacities are intact and he has proven during his recent pretrial supervision that he is able to comply with community supervision. The two dynamic risk factors present are Mr. Jones' self-stated attraction to pubescent females and his proclivity to become sexually preoccupied when he is under stress. Notably, research demonstrates that sexual attraction to pubescent adolescents is not uncommon. Obviously acting upon this attraction does represent deviant behavior. These factors, in and of themselves, are not significantly aggravating with respect to his risk for sexual reoffense.

**The Child Pornography Offender Risk Tool ("CPORT").** The following items comprise the CPORT and have been linked to sexual reoffense in child pornography offenders.

1. Age less than 35 at time of index offense  (No)
2. Any prior criminal history (No)
3. Indication of sexual interests in child pornography or prepubescent children (Yes)
4. Any contact sexual offense history (No)
5. Any conditional release failure (No)
6. Boy greater than girl content in child pornography seized (No)
7. Boy greater than girl content in other child depictions (No)

A review of Mr. Jones' CPORT score reveals only one variable associated with sexual reoffense. His score of "1" is considered low and indicative of a person that is not at high risk for reoffense.

**OPINION**
Mr. Jones is a 60 year-old man who is at extremely low risk for committing another child pornography crime, and at even lower risk for committing a hands on sex crime. As discussed above, a comprehensive risk assessment reveals very little that might otherwise suggest he will commit another sex offense of any kind. Beyond his behavior during the controlling offense, he is a prosocial man who has been gainfully employed and has been in one marriage throughout all of his adult life. He has no criminal history and there is no indication that he has engaged in unlawful behavior beyond the controlling offense.

Mr. Jones's behavior at the time of the controlling offense was aberrant and not indicative of any deep underlying trend in his sexual make-up. His foray into child pornography was situationally driven and not part and parcel of a pedophilic disorder. While this is no way excuses what he did, it is important to contextualize the behavior in an effort to understand it as well as to develop an appropriate treatment response. In this regard, Mr. Jones hit a very stressful time in his occupational life and was sexually

estranged from his wife. He turned to Ritalin to help with his work product which, in turn, heightened his sexual impulsivity. Notably, Ritalin is an amphetamine and the relationship between amphetamines and hyper-sexuality has been well established in the research. [78] Ultimately, he began viewing pornography and masturbating compulsively in an effort to bind the anxiety caused in other parts of his life. Some of this pornography was child pornography and during a period of months, this pornography became his primary preoccupation. It is unlikely that he would have lacked the self-restraint to not engage in this behavior had he not been taking stimulants and facing the aforementioned life pressures.

As discussed above, Mr. Jones is currently involved in both group therapy and individual therapy, both of which are designed to help him understand his behavior at the time of the controlling offense with the ultimate goal of making sure that he does not repeat this behavior. It is my opinion that he should continue this treatment for a minimum of one more year. It is also my opinion that he can be safely and effectively treated in a community setting. In this regard, his risk for future offending is very low and it will be lowered by continued sex offender treatment. In this regard, research demonstrates reduced risk for sexual reoffense for those individuals who complete sex offender treatment. Finally, there is little to no chance that he would not comply with the conditions of a community release plan. He does not, in turn, represent a danger to the community.

Respectfully Submitted.

*Jeremy Coles Ph.D*

Jeremy Coles, Ph.D.

---

[7] **Bilgic, Ayhan & Gurkan, Kagan & Türkoğlu, Serhat. (2007). Excessive masturbation and hypersexual behavior associated with methylphenidate (Ritalin). Journal of the American Academy of Child and Adolescent Psychiatry. 2007: 789-90.**
[8] **Blum K, Badgaiyan RD, Gold MS. Hypersexuality Addiction and Withdrawal: Phenomenology, Neurogenetics and Epigenetics. Muacevic A, Adler JR, eds. . 2015;7(10)**

**CONFIDENTIAL REPORT OF PSYCHOLOGICAL EVALUATION**
**Gerard Jones**
**Case # 17 CR-0070**
**11/03/2017**

6114 LaSalle Drive #587
Oakland, CA  94611
Phone: 510-339-6733
Fax: 866-384-3537
jeremycolesphd@yahoo.com

# Jeremy Coles, Ph.D. – Licensed Clinical & Forensic Psychologist

**Education**

September 1998
**Licensed Clinical Psychologist**

1992–1996             The Wright Institute             Berkeley, CA

- Ph.D- Doctorate of Philosophy in Clinical Psychology
- Dissertation Topic: Personality Correlates of Coronary Prone Behavior in a High Risk Population.
- APA accredited Institution

1982–1987             Rutgers University             New Brunswick, NJ

- Bachelor of Arts in Political Science; Minor, Psychology.

**Clinical Work Experience**

**09/1996- present**
**Private Practice**
- Psychodiagnostic testing of children and adults. Conducted over 700 evaluations including risk assessments, diagnostic assessments, and competency evaluations in hospital and forensic settings.

**02/2005- present**
**Qualified Medical Examiner**                                      **CA**
- Psychological Evaluations of individuals filing Worker's Compensation Claims in the State of California. Evaluations include full psychological work ups, extensive psychological testing, and comprehensive record reviews.

**07/2012- Present        California Department of State Hospitals**
Sexually Violent Predator Evaluator
- Psychological Evaluations of individuals who are determined to potentially meet the criteria as a sexually violent predator. These evaluations consist of an extensive record review, a clinical interview and written reports. This work also includes testifying in cases that go to trial.

**2004-present**

**Alameda County Alienist Panel**

- Psychological Evaluations ordered to assess matters related to PC1026, PC1368, and PC288.1 Evaluations include interviews with the inmate, lawyers and other relevant individuals. Evaluations also include a document review and testing as needed for malingering, psychopathology, cognitive functioning and competency.

**10/2014-present**

**Contra Costa County Alienist Panel**

- Psychological Evaluations ordered to assess matters related to PC1026, PC1368, and PC288.1 Evaluations include interviews with the inmate, lawyers and other relevant individuals. Evaluations also include a document review and testing as needed for malingering, psychopathology, cognitive functioning and competency.

**09/2001-2010**

**California Forensic Assessment Project                    CA**

- Conditional Release Program- Full Psychological Evaluations of individuals who are currently involved in the California Conditional Release Program. These evaluations involve risk assessment, diagnostic assessment and treatment planning issues.

**05/2002- present**

**US Pretrial Services                    CA**

- Psychological Evaluations of individuals facing criminal charges. These evaluations include competency evaluations, drug treatment amenability evaluations and comprehensive psychological evaluations.

**09/2004- 07/2012**

**Mentally Disordered Offenders Panel                    CA**

- Psychological Evaluations of incarcerated individuals who are being considered for Mentally Disordered Offender Status. These evaluations include cognitive screening, historical record review, a clinical interview and written reports.

**02/2002- 07/2013**

**Sexually Violent Predator Panel                    CA**

- Psychological Evaluations of individuals who are determined to potentially meet the criteria as a sexually violent predator. These evaluations consist of an extensive record review, administration of the Hare Psychopathy Checklist, a clinical interview and written reports. This work also includes testifying in cases that go to trial.

**05/2000- 09/2008**

**602 Alienist Panel, S.F. Juvenile Court                    SF, CA**

- Court ordered psychodiagnostic testing and evaluations of juveniles in the custody of the court. Evaluations involved disposition questions as

well as competency determinations.

**09/1996-01/2009**
**Private Practice**                                        **Oakland, CA**
- Individual, couples and family therapy with clients with a broad range of diagnoses. Ages 13-70.

**05/1997- 03/2000    Alta Bates Hospital                    Berkeley, CA**
Treatment Coordinator- Dual Diagnosis/Chemical Dependency Unit
- Crisis intervention with chemically dependent, mentally ill patients.
- Family interventions with patients, including education around dual diagnoses issues as well as discharge planning.
- Leader of chemical dependency education groups.

**09/1994- 05/1997    Alta Bates Hospital                    Berkeley, CA**
Mental Health Specialist- Dual Diagnosis/Chemical Dependency Unit
- Contribute to and implement treatment plans, direct patient care and interventions for dually diagnosed adults.
- Leader of group therapy, community meetings, and chemical dependency education groups.
- Crisis intervention leader.
- Supervision of Mental Health Workers.

**08/1989- 08/1994    CPC Belmont Hills                    Belmont, CA**
Mental Health Worker- Adult and Adolescent Unit
- Contribute to and implement treatment plans, direct patient care and interventions for adult and adolescent inpatient populations in crisis.
- Leader of group therapy, community meetings and family groups.
- Crisis intervention leader.

**08/1988- 08/1989    New Hope Foundation                    Marlboro, NJ**
Substance Abuse Counselor- Adolescent Drug Rehabilitation Center
- Leader of group therapy, chemical education groups and family therapy groups.
- Individual counseling for adolescents with substance abuse issues.

**07/1997-07/1998        Psychological Assistantship    Oakland, CA**
Psychotherapist
- Provide individual psychodynamic therapy to adults and children with personality, adjustment and affective disorders.
- Psychodiagnostic testing of adults.

**07/1995 – 07/1997    UCSF/Mt. Zion Dept. of Psychiatry        S.F, CA**
Psychology Intern

- Provide individual psychodynamic therapy to adults with a broad range of psychiatric diagnoses.
- Psychodiagnostic testing.
- Participation in a broad range of educational and training conferences.

**01/1994- 01/1995      Rubicon Programs                Richmond, CA**
Assessment Trainee

- Psychological assessment of adult patients in an outpatient day program for chronically disturbed individuals.  Full battery write-ups and case conference presentations for each client tested.

**09/1993- 08/1994      Wright Institute                Berkeley, CA**
Practicum Trainee

- Provided individual therapy to adults with personality and affective disorders.
- Intakes of prospective clients including full clinical interview, mental status examination and intake reports.
- Participation in case conferences and individual supervision.

**Continuing Education**

**Sept 1999   Family Violence and Sexual Assault Institute      CA**
Domestic Violence Training Program: Practical Applications for Custody Evaluations. (14 hours)

**Sept 1999   California School for Professional Psychology      CA**
Forensic Neuropsychology- Evaluation of Criminals (8 hours)

**June 2000    Specialized Training Services                OR**
Testifying in Court (14 hours)

**Nov 2000    UC Extension                                CA**
Advances in Human Brain Sciences for Clinicians (7 hours)

**March 2001     UC Extension                            CA**
Introduction to Neuropsychological Assessment (7 hours)

**November 2001   Rorschach Workshops                    CA**
Integrating the MMPI-2 and the Rorschach (21 hours)

**April 2002   Sex Offender Commitment Program          CA**
The Impact of Recent Court Decisions on Sex Offender Assessment (4 hrs)

**February 2002- Sex Offender Commitment Program**
Assessing Sexually Violent Predators – 16 hours

**February 2003- Sex Offender Commitment Program**

Dynamic Risk Factors as they Relate to Sexual Recidivism (16 hours)

Taught by Andrew Harris, Ph.D.

**September 2003- Sex Offender Commitment Program**

Conducting Recommitment Evaluations (8 hours)

**November 2004- Sex Offender Commitment Program**

Sexual Offender Commitment Program Update and Application of Recent Research Findings related to Age, Plethsmography and Antiandrogens to Sexual Violent Predator Risk Assessment (3.5 hrs)

**January 2005-  Sex Offender Commitment Program**

 Comprehensive Training in the use of the SORAG and the MsSOST-R (21.5 hrs)- Taught by Marnie Rice, Ph.D.,  and Doug Epperson, Ph.D.

**February 2006- Sex Offender Commitment Program**

Comprehensive Training in the role of age and sexual recidivism- (16 hours)- Taught by Howard Barbaree Ph.D. and David Thornton, Ph.D.

**September 2008- California Society of Industrial Medicine  & Surgery**

The Doctor's Report-Making it Substantial Evidence (4 hours)- Taught by Claude Monday, Ph.D.

**June 2009- Sex Offender Commitment Program**

Statistical Topics in Sexual Recidivism (5 hours) Taught by Gary Laver, Ph.D.

**November 2009- Mentally Disordered Offender Program**

MDO Evaluations Six Years After People V. Starr (3 hours)- Taught by Ronald Mihordin, M.D., J.D.

**December 2009- Sex Offender Commitment Program**

Static Risk Assessment: Understanding and Applying the 2009 Norms (7 hours) Taught by David Thornton, Ph.D. and Leslie Helmus, Ph.D.

**February 2010- QME Seminar**

Comprehensive Training in the new legal standard for psychological QMEs (7 hours) Taught by Shaun King, Esq.

**March 2010- Sex Offender Commitment Program**

The Effects of Aging on Sex Offender Recidivism (Taught by Howard Barbaree, Ph.D.)

Rapists: Classification, Diagnosis and Etiology (Taught by Robert A. Prentky, Ph.D.) (7 hours)

**February 2011- Alliant International University**

Assessment and Diagnosis of Rape-Related Sexual Arousal Patterns: Implications for Current and Future Practice (7 hours) Taught by David Thornton, Ph.D. and Raymond Knight, Ph.D

**September 2011- California Department of Mental Health**

SVP Evaluations: An Introduction, a reintroduction (12 hours) Taught by Ronald Mihordin, M.D., J.D.

**January 2012- Behavioral HealthCE.Com**

Chronic Pain Management, Treatment and Evaluation (4 hours)
Chronic Pain Managemtn  Concepts (3 hours)
Special Issues with Chronic Pain Treatment (5 hours)

(All of the above taught by William Deardorff, Ph.D.)

**April 2012- Behavioral HealthCE.Com**

Chronic Pain Management III: Special Issues (5 hours)-taught by William Deardorff, Ph.D.

**August 2013- Spirit Rock Meditation Center**

Training in Buddhist Psychology (6 hours) –taught by Jack Kornfield, Ph.D.

**September-2013- BehavioralHealthCE.Com**

Psychiatric Impairment: A Comprehensive Review of the GAF (3 hours)
The MMPI-2 and Chronic Pain (3 hours)
The DSM-V: An Overview of Changes, Controversies, and Implications (4 hours)
Ethical Challenges, Risk Management, and the Emerging Technology of Telehealth for Mental Health (3 hours)

**Professional Affiliations**

Association for the Treatment of Sexual Abusers

Forensic Mental Health Association of California

# EXHIBIT G-1

**Dale R. Walker**
**199 N Harvard St., N411**
**Allston, MA 02134**
**dale@dalewalker.com**
**415-663-6060**

Mr. Seth Chazin
1604 Solano Ave.
Albany, CA 94707

Dear Mr. Chazin,

I am a long time resident of the Bay Area, and since 2002 a San Francisco city resident. I'm a retired financial services executive, having worked at Citibank, Wells Fargo and a number of other large financial services institutions. I have been President of five companies across the years, last serving as President of Digital Insight Corp, a publicly traded company. I am currently retired, serving on the Boards of Pacific Vision Foundation, the Graduate Theological Union, and Beneficial State Bank. All of these can be considered social impact ventures, as they are all devoted to social, environmental, and economic justice, in different areas of work. I am a member of St. John's Presbyterian Church in San Francisco, and I am currently temporarily residing in the Cambridge area as a Fellow in the 2017 Harvard Advanced Leadership Institute. I have two lovely daughters and five grandchildren, all living in the Bay Area.

I am writing on behalf of Mr. Gerard Jones. I am aware of the criminal charges he is facing. I have known Mr. Jones since 2004, when we were members of the same spiritual program. For years he was an anchor of our Men's Meetings, which were of service to many men. We have continued to be close friends ever since, speaking often and honestly about our lives. I have always known Mr. Jones to be an individual of the highest integrity and personal responsibility. When he has fallen short of his own standards, I have seen him apply himself fully to working on his issues both spiritually and psychologically. From our recent conversations, I know that he is facing his past actions squarely and doing all he can to improve himself and make amends.

Mr. Jones has always shown a great consideration for others. I have never seen anything to make me feel that he might ever cause harm to anyone, adult or child. On the contrary, I have only seen him go out of his way to be of service to others through his recovery program, his work as a writer and teacher, his church and his family. I am proud to number him among my friends and believe he is a true asset to our society.

Sincerely,

Dale R. Walker

# EXHIBIT G-2



## ST. JAMES EPISCOPAL CHURCH
*A joyful, inclusive community*

May 17, 2018

The Honorable Vince Chhabria
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Your Honor,

I am writing this letter in support of Gerard Jones, who is facing sentencing on felony charges.  As an Episcopal priest and spiritual director, I have been meeting and speaking regularly with Gerard Jones since January 2017, soon after his initial arrest. Gerry is very conscious of the harm done by child pornography, and has been honest about the nature and severity of his crimes. He is working a rigorous program in Sex Addicts Anonymous and has maintained steady sobriety.

Gerry participates in community service through the Food Pantry at St. Gregory of Nyssa Episcopal Church and at St. Martin de Porres Catholic Worker House. He also provides peer support to recovering sex addicts, understanding that service to others is essential both to recovery and to making amends for past wrongs.  As a gifted writer, Gerry is determined to learn from his experience and help others by writing a book about pornography addiction and recovery.

Gerry had a genuine conversion experience. This is evidenced by his dedicated addiction recovery work, and by his participation in the life of St. Gregory of Nyssa Episcopal Church, and his baptism on November 5, 2017. This milestone marks a spiritual awakening that began long before his arrest, manifest by the profound healing he is experiencing and by his willingness to accept responsibility for his actions.

Gerry is a devoted husband, father and friend. He is deeply concerned with the welfare of others and committed to the process of restitution. I do not believe him to be a threat to others, adults or children. To the contrary, he has many gifts to share with others. I look forward to accompanying him on his spiritual journey.

I believe this information is relevant, and urge consideration of the above in relationship to

**ST. JAMES EPISCOPAL CHURCH**
4620 California St.  San Francisco, CA 94118
(415) 751-1198   stjames@stjamessf.org
www.stjamessf.org

Gerry's case.   I will continue to support Gerry as he takes responsibility for his life and recovery with God's help and that of others.


Sincerely,


The Rev. John L. Kirkley
Rector

**ST. JAMES EPISCOPAL CHURCH**
4620 California St.  San Francisco, CA 94118
(415) 751-1198   stjames@stjamessf.org
www.stjamessf.org

# EXHIBIT G-3

Joseph Filice
9985 Pacific Heights Boulevard #20
San Diego, CA 92121
June 2, 2017

To whom it may concern,

I've known Gerard Jones since 1971, when we were teenagers. Our interests diverged over the years: while Gerard was becoming a writer, I studied physics at Dartmouth, then received my Ph.D. in Applied Physics from the University of California San Diego. In 1985 I began working as a Senior Scientist at Photon Research Associates, a subsidiary of Raytheon, where I'm still employed today, having become Director of the San Diego Division Phenomenology Group. I'm widely published in my field and hold a US Patent for a tunable multi-band spectropolarimeter.

Our personal lives, however, never diverged. He and his fiancée came to my wedding, I and my wife went to his. His son grew up as a friend of my son and daughter. Our families have stayed together and traveled together countless times. I've spent 46 years coming to know Gerard Jones as a good friend, a good father, a good citizen, and a good man. We've only grown closer in recent years.

I know that Gerard is facing child pornography charges. He's talked to me about it since right after his arrest. I know he's had addictive issues, and I know he got lost online for a while. But I also know that he's the same good man I've grown up with, that he's deeply remorseful for his errors, and that he's applying himself every day in every way to being the man he wants to be. And I know for certain that he would never cause harm to anyone.

For 34 straight years, Gerard and I have made a ritual out of attending the San Diego Comic Con together. For a while he was well-known in that field and I saw him interacting often with children and teenagers. He was always the model of professionalism with them: courteous and respectful but never over-interested, certainly never inappropriate. We talked a great deal while he was working on his book *Killing Monsters*, about children and the media, and I know he was motivated by a genuine concern for young people. He talked about a follow-up book more recently on children and the internet, always with good intentions. Obviously, he took a very wrong turn. But I truly believe that was a brief digression from a long life of decency.

I know Gerard also made some terrible relationship decisions in the past, but I saw how quickly he started work on the issues underlying them. I've been inspired by the work he and Jennie have put into rebuilding their lives from that. Now I see him putting the same kind of work into his internet issues. He's talked to me about his 12-step and therapy programs, and I can feel the commitment. I have no doubt that the Gerard Jones who emerges from all this will be the wisest, most honest, most decent, and most valuable version of him yet.

Very sincerely,

Joseph Filice

Joseph Filice

# EXHIBIT G-4



# St. Gregory of Nyssa Episcopal Church

**500 De Haro Street San Francisco, California 94107**

**Paul Fromberg**
Rector

**Kerri Meyer**
Associate Lay
Minister

**Devin Rogers**
Curate

**Sanford Dole**
Music Director

**Sherri Lynn Wood**
Parish Administrator

**Kelsey Menehan &**
**Susan Sutton**
Co-convenors

**Gregory Curatolo**
Membership
Commissioner

**Joseph Bolling**
Secretary

**Amy Baker**
Finance
Commissioner

**Burton Edwards**
Sacred Space
Commissioner

**Randy Bowman**
Learning
Commissioner

**Leesy Taggart**
Treasurer

(415) 255-8100
office@saintgregorys.org
www.saintgregorys.org

March 16, 2018

Dear Mr. Chazin:

I understand that Gerard Jones is pleading guilty to child pornography charges. Nonetheless, I write in support of his desire to remain in the community.

I have known Gerry for more than a year. Since coming to St. Gregory's, he has been faithful in attendance and eager to participate in some of the many different ministries we sponsor. Gerry is a valued member of our congregation. I know him to be conscientious in attendance, and eager to participate in our ministries of service to the community. Gerry volunteers every Friday, from 8:00 AM – 4:00 PM, at our Food Pantry, helping to give groceries to over 400 people who come through our doors. He has good relationships with the other volunteers who come and help. He is reliable, sensible, courteous and kind-hearted. His contributions to our Food Pantry are very helpful to our work. In addition, we have asked Gerry to serve as a volunteer in our upcoming Holy Week and Easter services.

I look forward to many more years of Gerry being a member of our church, and a productive contributor to our services and ministries in the City of San Francisco. If I can be of any further assistance, do not hesitate to contact me by mail, or call me at 415-794-4499 or send email to paul@paulfromberg.com.

With my kind regards,

The Rev. Dr. Paul D. Fromberg
Rector

# EXHIBIT G-5

February 9, 2017

To Whom It May Concern:

It is my distinct pleasure to write a character reference letter for Gerard (Gerry) Jones. I have known Gerry for more than 5 years and am incredibly proud to call Gerry a beloved friend.

I have worked in program management for more than 15 years, mainly with programs that provide support to young children, parents and families. My focus and success have been to provide quality direct services, facilitate community building, acquire grant funding, and develop and implement efficiency systems that assist in streamlining program capacity. I am currently the Bay Area Program Director for Sunny Days, an early intervention agency that provides home-based therapy to children birth to three who have a developmental delay and/or disability.

I have lived in the Bay Area for six years, having met Gerry shortly after I relocated from Southern California. Gerry has become a dear friend who has provided me with a strong sense of personal grounding and loads of generous support during the tenure of our friendship. Our friendship has journeyed through quite a few life changes, including a life-altering break-up I experienced back in 2011, Gerry and his wife selling their house of more than 20 years, my wedding, and much more. My friendship with Gerry has mostly focused on supporting each other through maintaining healthy relationships, both friendships and romantic relationships. I find Gerry to be endlessly introspective, humble and wise, and I appreciate his goal and ability to continuously strive towards being a better human and partner.

It is without question that I would recommend Gerry as one of my most cherished friends, someone with impeccable integrity and an unwavering moral compass. Please feel free to contact me if you have any questions.

Sincerely,

Arielle Rosen
5223 Market Street, Unit B
Oakland, CA 94608
818-384-9146
ariellerosen@gmail.com

# EXHIBIT G-6

# The Food Pantry

## Peace on Earth & Food for All

500 De Haro Street
San Francisco, CA 94107
Phone: 415-255-8100
www.thefoodpantry.org

May 14. 2018

Law Offices of Seth P. Chazin
1604 Solano Avenue
Albany, CA 94707

Dear Mr. Chazin,

I am writing with regard to Gerard Jones, who is facing sentencing in Federal Court.

I'm the director of The Food Pantry, a community-based nonprofit founded in 2000 to increase hungry people's access to food and empower them to feed others. Currently, we provide free, fresh groceries to nearly 400 hungry families every week at St. Gregory of Nyssa Episcopal Church in Potrero Hill. We depend entirely on volunteers—many of them people who came to get groceries and stayed to help out—to run the pantry. Together, the volunteers give away almost four tons of food every week, serving people from all over San Francisco who come from every conceivable background, nationality, language and age,

Gerard Jones has been volunteering steadily at The Food Pantry every week since February of 2017. He is hardworking, generous, and able to relate well to very diverse communities. I appreciate his calming influnece on the volunteers, his willingness to take responsibilty for getting the harder physical tasks done, and especially his kindness toward our elderly clients.

Gerard clearly wants to make restitution for his offenses, and we are grateful for his participation in The Food Pantry. I hope we will be able to continue to count on him as a volunteer.

Please contact me with any questions.
Many thanks,

Sara Miles
Executive Director
sara@thefoodpantry.org

The Food Pantry is a California nonprofit,
and a 501(c)3 nonprofit organization.

# EXHIBIT G-7

Susan Stapczynski
11346 Red Cedar Lane
San Diego, CA 92131
November 3, 2017

Dear Mr. Chazin,

My name is Susan Stapczynski, and I am a long-time friend of Gerard Jones. I'm completely aware of the criminal charges he is facing.

I am the mother of two children, a daughter and a son. I am also a former public classroom and Sunday school teacher, drama director, and parent volunteer. I taught Drama, Speech Arts, and English in the Sweetwater Union High School District, south of San Diego, CA, for 10 years. Besides producing drama productions while teaching, I was also the Children's Christmas play director for many years at my Lutheran Church, and once my children entered school, I applied my skills in their classroom, besides the usual parent volunteer duties. I've been a resident of San Diego since childhood and married since 1983.

I have been friends with Gerard Jones since 1981. I met him through my then-fiancé, and for the past 36 years our families have been very close. We get together at least once a year and often more. I've seen him interacting with my children from babyhood to adulthood and watched him raise his own son. I've never seen anything to make me think he has inappropriate thoughts or feelings for minors or could ever be a threat to them. On the contrary, my children have grown up liking and trusting him completely and as adults are still in communication with him. My children are also in communication with Gerry's son, who has always exhibited great love and comfort around his Dad.

Gerry has always been a very kind and patient person and was very instrumental in my husband developing his writing skills and eventually getting published. He has been a steady and loyal friend to us and others over the years.

Everything I've learned about Gerry over 36 years has shown me that he is an asset to everyone around him.

Sincerely,

Susan Stapczynski

# EXHIBIT G-8

Seth Chazin
1604 Solano Ave
Berkeley, CA 94706

Dear Mr. Chazin,

I am writing to provide a character reference for Gerard "Gerry" Jones. I understand the charges he is facing and the seriousness of these charges and their consequences.

I have lived in the Bay Area for the last 11 years and I work as a Proposal Writer and Project Manager.

I have had a personal acquaintance with Gerry Jones. I met him initially through his wife, Jennie Kajiko, approximately 8 years ago. In that time I have known him to be a kind and compassionate person who I believe genuinely loves and cares for his wife, their son, friends, family, other acquaintances and community members.

I met Jennie Kajiko through a 12 Step Recovery support group for people who have been affected by others' compulsive sexual behavior. Because of my close relationship with his wife, I have met Mr. Jones on numerous social occasions.

I know he has been regularly attending meetings of Sex Addicts Anonymous in seeking sobriety from past behaviors as I have personally seen him walk into and attend meeting rooms where I have been attending another meeting nearby. I also know he has been continuing to communicate his deep regret to his wife and to other mutual friends. He is deeply distressed by his past behavior and I believe he understands the impact of this behavior on others and on the community and sincerely wishes to no longer engage in this behavior and to change. He has continued to seek mental health and spiritual support to do so.

I know very little about sentencing laws or how cases should be sentenced. I do know it would be a shame if Mr. Jones is not given the opportunity to share more of his experiences and mistakes with others to perhaps prevent such situations from happening with others in the future. I do believe his best support to the community and restitution could be by continuing to share this experience in the community and my hope is his willingness and desire to caution others will be taken into account in his sentencing.

The Gerry Jones I know is a person who clearly cares about his wife, their family, his community, and behaving in accordance with the law. I also know he would welcome the opportunity to continue to be of service and support to others who may be tempted in engaging in similar behaviors that led to his arrest and are seeking their own therapeutic support and behavior changes.

Best regards,

Sarah Sparks
Alameda, CA

# EXHIBIT G-9

220 Surrey Street
San Francisco, CA
3/8/16


Regarding Gerard Jones


To whom it may concern:


My name is Helene Manheim and I am a Learning Specialist for K- 4 students
at one of the private K -8 schools in San Francisco.

I have known Gerry Jones for over 15 years.  We were part of the parent community
at Live Oak School, where our children attended K - 8th grade.  My daughter and
Gerry's son were very good friends throughout most of their early school years. Gerry
participated heavily in the school community and was a valuable support for teachers,
parents and the children.

I am aware of the pending charges against Gerard Jones.  I have seen him around kids
and I never saw inappropriate behavior nor heard of inappropriate behavior with children
on his part.


Thank you for your attention.
Helene Manheim

# EXHIBIT G-10

June 26, 2018

Dear Mr. Chazin,

I am writing on behalf of Gerard Jones, whom I know is facing sentencing on child pornography charges. I did not know Gerry in his sickness, the kind of insanity every member of our 12 Step group has experienced. I know Gerry only as a sober, respected, valued member of the fellowship of Sex Addicts Anonymous.

For most recovering pornography addicts in our program, the consequences and wreckage we have created did not involve the legal or criminal justice system. By sharing his cautionary story humbly and honestly, Gerry is saving lives, preventing others from making the same mistake and contributing to the spiritual health of our community.

If I could choose any outcome from Gerry's involvement in the legal system, it is that that system could see how much more useful and redeeming recovery is to society, as opposed to incarceration. Gerry's candidness about his wrongdoing, his demonstration of redemption, and his expression of remorse in every meeting he attends is of profound value to every recovering pornography addict who hears him.

I admire Gerry's willingness to attend meetings daily and gratefully do service at every level of our fellowship. He leads a meeting for sex addicts and their spouses. He works every day to make amends and repair the damage to his relationships with his wife and son.

Gerry has helped to sustain my recovery. I chose Gerry as my sponsor through the 12 steps during these first four months of my sobriety because I admire his freedom from pornography addiction.

With his support and feedback and my own commitment, I am proud to say that I have not viewed pornography, drunk alcohol, or used drugs in four months. I am a responsible member of my community and a valued member of the legal firm I work for. Through his service, example, feedback and suggestions, I am making right decisions one day at a time and I will not go down a path toward illegality.

Gerry's absence would be a loss for the community of recovering sex addicts in San Francisco. Seeing a man with so much grace, gratitude and dignity every day is an asset to every recovering sex addict in this city.

Sincerely,

Kevin D.

Kevin D.

# EXHIBIT G-11

## (filed separately under seal)

# EXHIBIT G-12

March 30, 2018

Seth Chazin
1604 Solano Ave.
Albany, CA 94706

Dear Mr. Chazin,

Gerard Jones has been my sponsor in Sex Addicts Anonymous since late October, 2017. I was drawn to him because he speaks very honestly about his actions and the criminal charges that resulted, but is also obviously very interested in the welfare and recovery of others. He has talked about his strong remorse for the things he did in his addiction and the importance of not merely maintaining his own sobriety but of making amends to society by helping other addicts. From what I see in his work with me and his service to the SAA fellowship, it's clear to me that that's a conviction for him, not just lip service.

I myself have been in SAA for seven years, and so I have been working the program for several more years than my sponsor. Although he has only been working our program for the past 15 months, his recovery and dedication are beyond what I see from many others who have been in the rooms much longer. I believe that's largely due to his determination to change his life and dedication to others. My sobriety has been stronger since I have been working with him.

Thank you,

Bill S

# EXHIBIT G-13

Seth Chazin Law Offices
1604 Solano Avenue
Albany, CA 94706

Dear Mr. Chazin,

My name is Dallas Dean. I have lived in San Francisco for the last five years. I am an active member of the California State Bar and San Mateo County Bar Association. I am also an active member of the Church of Jesus Christ of Latter-Day Saints.

I have known Gerard Jones since October, 2017. I first met him at a meeting of Sex Addicts Anonymous, and later saw and heard him speak in multiple meetings at various locations. I was consistently impressed by his sincerity and demeanor in spite of his pending serious legal issues. For these reasons I asked him to work with me as a "sponsor" to help guide me in recovering from my own sexually compulsive behaviors and avoid serious transgressions.

Gerard has been working with me for some months helping me develop a similar sincerity toward sexual sobriety. Specifically, he has been instrumental in helping me prepare for my "First Step" presentation which is scheduled for April 3, 2018. This presentation is a significant part of my recovery, and I sincerely hope he will be there to support me on that day.

I am aware of the serious criminal charges which Gerard is facing, and I trust that justice will be done. I am grateful for our well functioning law enforcement and legal systems which work to protect each of us. I am also grateful for the guidance, dedication, service, genuine concern, and evident sobriety which Gerard consistently brings to our interactions. I am especially grateful for the hope I feel as I aspire to, and work with Gerard toward, a similar serenity and sobriety.

Sincerely,

Dallas E. Dean

1843 9th Avenue, Apt A
San Francisco, CA 94122

# EXHIBIT G-14

John Schroeder
1262 12th Ave #3
San Francisco, CA 94122

October 23, 2017

Seth Chazin
1604 Solano Ave
Albany, CA 94707

Dear Mr. Chazin,

I am writing on behalf of Gerard Jones (or Gerry, as I know him), who has been my sponsor in Sex Addicts Anonymous since July.  I am aware of the criminal charges he is facing.

Gerry has been a steady, committed sponsor, talking honestly about his own struggles and past mistakes as well as the tools supporting his current sobriety.  It's clear to me that he takes full responsibility for his mistakes and is working very hard to make restitution by being of service to others, both in the program and the community.  Not only has he been enormously helpful to me in early recovery, but he is a strong presence in the meetings.

I have only known Gerry for a few months, but I've spent hours talking to him and being supported by him.  Gerry is both proactive, following up with me when I've had challenges in my recovery, and nurturing, listening deeply to get to know me as a person, and providing a safe and supportive environment for me to deal with what may be the most difficult challenge I've had to face in my life so far.  I know Gerry to be an intelligent and caring human being.  I have experience in another 12-step program, and I know how challenging it can be to be a sponsor. Gerry makes it look easy, and I cannot imagine finding a better sponsor.  I feel truly fortunate that our paths crossed in a meeting this past summer.

I've been a San Francisco resident for 14 years, have a Bachelor of Science in Environmental Engineering from Cornell University, and have worked in the software industry as a project manager and data analyst.  I am also an Eagle Scout.  I have no criminal record.

Sincerely,

John Schroeder

# EXHIBIT G-15

**Mark McMillan**

510 Simonds Loop Unit A
San Francisco, CA 94129
415-309-8494
mark_d_mcmillan@me.com

March 27, 2018

Law Offices of Seth P. Chazin
1604 Solano Ave.
Albany, CA 94707

Dear Mr. Chazin,

I have been Gerard Jones' sponsor in Sex Addicts Anonymous for over a year. I am writing to encourage that Gerard be allowed to remain in the community for as long as possible, even though he is pleading guilty to child pornography charges.

Gerard sponsors four other members of SAA, all of whom have attested to the importance of his help in maintaining their sobriety. One of those sponsees will be presenting his First Step at group level, a significant moment for anyone in recovery, on the evening of Monday, April 3. Gerard has been leading him through this step and it is important that he be there to support him.

Gerard has also been a valued speaker at SAA meetings throughout the Bay Area in recent months. The honesty with which he tells his own story is a powerful warning to other addicts who may be in danger of breaking the law, as well as an inspiration for all of us in recovery. He has been asked to speak at the upcoming SAA International Convention, being held in Oakland on May 25-28, where he will be able to tell his story to hundreds of people who need to hear it.

Gerard has been attending at least five SAA meetings per weeks since the beginning of 2017 and holds important service positions at three weekly meetings. Over the past year he has become a valuable member of our recovery community.

As for me, I am 49 years old and hold a masters degree from the University of Virginia. My professional career includes Oracle, Kenexa, and Arthur Andersen, and I have founded and sold my own professional services business. I was formerly a licensed CPA in the State of California and currently hold a Director position at a leading Bay Area retailer. I have been active in Sex Addicts Anonymous for 15 years. Please contact me if you have any questions.

Yours sincerely,

Mark McMillan

## Mark McMillan

510 Simonds Loop Unit A
San Francisco, CA 94129
415-309-8494
mark_d_mcmillan@me.com

August 1, 2018

Law Offices of Seth P. Chazin
1604 Solano Ave.
Albany, CA 94707

Dear Mr. Chazin,

It has been nearly six months since I last wrote to you concerning Gerard Jones, whom I sponsor in Sex Addicts Anonymous, and I'd like to report on his continuing recovery and service.

I believe Gerard's actions demonstrate that he will be of far more value to other addicts—and to society in general—the less time he spends in incarceration and the more he spends doing service in the community. His sharp remorse and desire to make amends for his wrongs, and his energetic application of his experiences and skills to helping others, give him a unique value to us all. In his case, I'm certain that a more lenient sentence would not amount to letting him get away with wrongdoing but to enabling him to make fuller restitution.

Two months ago Gerard spoke on a panel at our annual SAA International Convention in Oakland, where hundreds of addicts heard both his story of addiction and transgression as a cautionary tale and his experience with sobriety as an inspiration. He is an ever-more valued speaker at SAA meetings throughout the Bay Area. Recently he was also encouraged by his Pretrial Services Officer, Kenneth Gibson, to speak to a therapy group facilitated for the Court by the San Francisco Forensic Institute so that those men might benefit from his recovery.

Gerard now sponsors five other men in SAA, all of whom attest to his importance in their own sobriety. Significantly, one of those men now has two "sponsees" of his own. The fact that this man was able to complete the number of steps and maintain the length of sobriety necessary to become a sponsor in his own right in such a relatively short period is a testament, at least in part, to Gerard's own hard work. This is the essence of 12-step recovery and evidence that Gerard's good influence will continue to spread beyond those in direct contact with him.

I have also been discussing with Gerard the book he is currently writing about pornography addiction, which I believe will be a valuable contribution to the understanding of the issue and the recovery of others. We've talked about the necessity to avoid anything self-serving in the writing and to stay true to what will be beneficial. Those who've read portions of it, including myself, agree that he is accomplishing that. Gerard has said many times in SAA meetings that he is strangely grateful for having his crimes and addiction exposed because it forces him to make something truly good of his writing career.

Gerard has been attending at least five SAA meetings per week since the end of 2016 and holds important service positions at three weekly meetings. I am convinced of his complete sobriety from addictive and inappropriate behavior and have no doubt that he will continue to make sobriety his first priority.

As for me, I have been active in Sex Addicts Anonymous for 15 years. I am 49 years old and hold a masters degree from the University of Virginia. My professional career includes Oracle, Kenexa, and Arthur Andersen, and I have founded and sold my own professional services business. I was formerly a licensed CPA in the State of California and currently hold a Director position at a leading Bay Area retailer. Please contact me if you have any questions.

Yours sincerely,

Mark McMillan

# EXHIBIT G-16

Zachary Singh
453 Union St
San Francisco, CA 94133
February 6, 2018

Law Office of Seth P. Chazin
1604 Solano Avenue
Berkeley, California 94706

Dear Mr. Chazin:

I understand that Gerard Jones is appearing before the Court in relation to a charge of Child Pornography and I seek to provide a character reference on his behalf.

I first met Gerard over one year ago at a meeting of Sex Addicts Anonymous, a 12-Step Program that is built off the principles of Alcoholics Anonymous that focuses on creating and nurturing healthy sexuality. I came into this program just over two years ago, after my own arrest (and subsequent conviction) of Possession of Child Pornography. Having completed the steps myself and now having over two years of sobriety in this program from my compulsive and demoralizing sexual behavior – specifically, a pornography addiction – I have a solid understanding of the willingness, remorse, and stern desire to go to any lengths to achieve and maintain lasting sobriety.

I strongly believe Gerard carries these principles, earnestly strives for success, and wants to make amends to anyone he has harmed as a result of his actions. Having had dozens of in-person conversations, as well as phone calls, with Gerard in which we share our experience, strength, and hope with each other, I have no doubts that Gerard will continue to work his program for the betterment of himself and others. I have seen and heard Gerard share his story through a formal 1st Step presentation. He communicated the progressive nature of his sex addiction, as well as the fallout and sincere remorse he and others have had to endure as a result of his actions. In short, I very truly believe that Gerard is upstanding, dependable, and honest, as well as strives for growth, forgiveness, and lasting change. He does the work – works the steps, attends meetings, makes program calls, and shares his story to help others.

His presence in our community has helped me tremendously, as his positive outlook, faith in lasting change, and desire to be sober and present to the service of others is evident and highly beneficial to the group.

For your information, I currently sponsor five different men striving for freedom from their compulsive sexual behaviors, have held multiple service positions in SAA (including leading the longest-running SAA meeting in San Francisco), and work daily to ensure my own sobriety and growth. I feel confident in my assessment and belief that Gerard is actively working his program and has what it takes to succeed in rehabilitating himself, while helping others significantly in the process. Because of Gerard's strong presence and service to our community, as well as his honest desire to benefit himself and others, I humbly ask that leniency be considered in his case.

Thank you very much for your time and consideration.

Sincerely,

Zachary Singh

# EXHIBIT G-17

(filed separately under seal)

# EXHIBIT G-18

Tim Pauly
1175 Alpine Way
Colfax, CA 95713

February 22, 2017

To Whom It May Concern:

My name is Tim Pauly, a good friend of Gerard Jones. I'm a 20 year San Francisco
resident who recently moved to the Sierra foothills. While living in San Francisco, I had
careers in international education, hospice care, and real estate development
(co-working buildings). I'm currently helping a good friend manage his organic vegetable
farm. I'm a college graduate with degrees from both American and French institutions. I
volunteer at the local chapter of PFLAG and also help caretake two young children.

I've known Gerard for about 6 years and consider him a close friend. He and I are in
touch at least once a week, previously in person and, since my move, by phone.
Gerard is someone I turn to for support and to whom I offer support. We met in an
addiction recovery group: a group where high value is placed on honesty and
vulnerability. During my time being friends with Gerard, I've been impressed at the
degree to which he embodies these values and the concept of 'recovery". Over time,
I've experienced his growth as a person: in friendship, in his marriage, and in his
support for others who are doing the same work. He's a valuable member of the
recovery community and a true friend.

Sincerely,

Tim Pauly

# EXHIBIT G-19

November 4, 2017

Tom Leugers
300 Beale St. #303
San Francisco, CA 94105
415-218-8944

Dear Mr. Chazin,

As an introduction, I live in San Francisco with my wife and 3 year old son. I moved here 15 years ago in management with Sun Microsystems. In 2010 I founded and operated a franchise restaurant chain - Five Guys. Currently I manage a technology consulting firm - Bridge Applications. I'm involved in the local community and volunteer my time hoping to improve the lives of others.

I've known Gerard Jones since 2010. We met at a meeting we regularly attend that is focused on developing healthy relationships. Seeing one another pretty much on a weekly basis for that period of time has given me the opportunity to learn quite a bit about him and his character. In the meetings we share our challenges and successes not only in our relationships but our overall life.

I've seen Gerry's efforts to improve his relationships and overall well being. He has really shown up to put in hard work on his personal development. I've been impressed with the growth I've seen and he has taught me quite a bit during that time as well. I've definitely taken things he's suggested worked for him and applied them for myself. He consistently helps new people that attend the meetings through his experience. He's an integral part of the group and it would be lacking without his participation.

Since his arrest in December, he's been completely honest about the criminal charges he's facing. He completely owns his mistakes. I see him working to get his life back on track every way he can.

To be very clear I have never, ever heard Gerry speak or act in an inappropriate manner with or about children. I would feel extremely comfortable having my own young child with him at any time.

Sincerely,

Tom Leugers

# EXHIBIT G-20

10/20/2017

Dear Mr. Chazin,

I'm honored to have the opportunity to speak on Gerard Jones' behalf. I've been in the SAA program for two years now and during that time I've gotten to know and respect Gerry through his rigorous and heartfelt approach to his program.

My lovely wife and I have been married for almost 11 years now and are both proud to be native San Franciscans; my wife is a 2nd generation and I am 3rd generation from my grandmother to my father, to me. We met each other in high school over 30 years ago and now own a house together in Balboa Terrace for over 8 years. I am currently employed as a building science contractor specializing in residential energy retrofitting since 2005.

I see Gerry at the three meetings I attend every week and we usually get a chance to talk and text on the phone during the week as well. I respect and admire Gerry's program greatly. It's clear to me he takes his recovery seriously and thoughtfully. He volunteers to speak and share with the group at every meeting and often discloses the fact that he is facing criminal charges as a result of his addiction before his recovery and speaks openly about the challenges that are a part of his daily life.

As long as I've known Gerry he has been authentic and truthful about his commitment to abstaining from his addiction to pornography and I have unwavering faith in his success. Through Gerry's ongoing service to SAA and the fellowship, in addition to who he is as a person, he has been a powerful and essential contribution to my sobriety and spirituality.

Sincerely,

Erik Pierson

# EXHIBIT G-21

Ramiro Castro
451 Donahue Street #305
San Francisco
May 18, 2018

Dear Mr. Chazin:

My name is Ramiro Castro. I am a 65 year old male, married and have two adult children. I have lived in San Francisco most of my life and was raised in the Mission District. After my marriage in 1985, my wife and I purchased our home in the West Portal area of San Francisco where we raised our two children. My wife is a retired school teacher, and I am self-employed in the legal profession working with immigrants. I graduated from UC Berkeley in 1974 and graduate school in 1997. I have also collaborated with many non-profit legal advocacy groups in the Mission District of San Francisco.

I have come to know Gerard Jones over the past year and a half through participation in our 12 Step recovery program. Gerard has always been very honest about his crimes and the addictive behaviors that brought them about. It is clear to me that he understands how wrong his actions were feels real guilt and remorse for them. He is dedicated to taking responsibility for his life and changing the course of his life. His shares reveal a great deal of self-understanding and sobriety, and he is generous in giving service to the program and other people in recovery from addiction. He volunteers as a sponsor to five men, which is the cornerstone of the 12 Step program.

I see Gerard often at our recovery meetings and I always feel new home and I am always, indeed, invigorated when I hear him share his feelings, his experience, his hopes and dreams about his own recovery. He has also spoken about the book he is writing about sex addiction, which I believe will be very valuable to people seeking to overcome their addictions. I have no doubt that his highest priorities are to make amends for his past and become the most productive person he can be. I am very fortunate to know Gerard because he is a role model for many of us seeking recovery from addictive sexual behaviors.

If you need additional information, please call me at 415.933-7518.

Regards, Ramiro Castro

# EXHIBIT G-22

1 De Anza Court
San Mateo, CA 94402
Nov. 6, 2017

Seth Chazin
1604 Solano Ave.
Albany, CA 94707

Dear Mr. Chazin,

I am a Substance Abuse Counselor working at the Bill Wilson Center in San Jose. I work with homeless youth ages 18-24 in various locations, including our Drop In Center and Interim Housing Department. I have been certified for 10 years as a CATC (Certified Addictions Treatment Counselor). I am also a Cantor at St Agnes Catholic Church in San Francisco. I have been married for 13 years and have two grown stepsons.

I've been close friends with Gerard Jones since 2011, when we met through our weekly Healthy Intimate Relationships meeting. As we've talked often and openly about our lives during the past six years, I've come to know him as a man of great integrity and concern for others. He's always been an asset to everyone who knows him and to the community as a whole.

Gerard is a good person and a talented writer. I am grateful to have him as part of my recovery community. He has worked very diligently in his program and I can see significant changes in his life.

I saw how hard Gerard worked on his love addiction issues beginning in 2011 and how much success he's had in transforming himself and his relationships. Now I see him working just as hard on his internet-pornography addiction. Since his arrest in December, he's been honest about the mistakes he made and the criminal charges he's facing. I've watched him doing the hard work of addiction recovery through both psychotherapy and Sex Addicts Anonymous. I have no doubts about his commitment to his own rehabilitation.

As a father of two, I've often talked with Gerard about children and parenting. I've always known him to be a dedicated parent and a man who is genuinely concerned about all children. I understand the charges he's facing, and I understand what led him there, and I'm certain that he is no threat at all to children or anyone else in the community.

Sincerely,

# EXHIBIT G-23

July 11, 2018

**To Whom It May Concern:**

I'm wiring this letter in support of my fellow, Gerard Jones who is expecting sentencing in the coming weeks.

Over the past two years, I've had the opportunity to get to know Gerry and watch his miraculous growth and recovery in the rooms of Sex Addicts Anonymous. He is as earnestly dedicated to his recovery from this disease and to his spiritual growth as I have ever seen in the rooms of SAA. He has been an inspirational example to countless other men and women who have struggled with similar situations in their lives and families' lives.

I have seen Gerry consistently attend 12 step meetings, take service commitments, sponsor and guide other men on their own journey of recovery. And I have heard him share honestly about his past, his remorse for wrongs done while suffering from this disease, and his hard earned freedom from addiction that he now lives with thanks to his work with the 12 steps.

There is not a more honest, humble, and sober member among us. I urge the powers that be to grant him leniency in sentencing so that he may continue his important role in our community and may help more fellows in their recovery.

Sincerely,

Brian T

# EXHIBIT G-24

# ALEXANDER RENALDO LOZANO

(909) 576-8017 | alozano46@gmail.com

**July 2, 2018**

The Law Offices of Seth P. Chazin
1604 Solano Ave
Berkeley, CA 94706

**Dear Mr. Chazin:**

This email is in regard to my friend Gerard Jones who is facing sentencing on felony charges for crimes related to his sex addiction. I have been friends with Gerard for over 3 months now. I met him at Sex Addicts Anonymous (SAA) meetings and we have grown to become friends after talking at many meetings over the past 3+ months.

A little about myself: I am 27-years-old, and I have been living in San Francisco, California for nearly a decade. I graduated from the University of San Francisco, and I work as a project coordinator for a local joint powers authority that conducts research and provides technical assistance to state level early education agencies. I began attending SAA meetings in March 2018 because I became very aware of my addictive behaviors around pornography and the enormous stress they were causing in my life and in the lives of those I love. At the time of this writing, I am 106 days sober from the sexual behaviors I determined (with my sponsor's help) to be unacceptable in my life.

In my line work, I have grown to appreciate the utmost importance of early childhood education for setting children up for successful lives, and I've made that appreciation a driving force in my career goals. I am also very aware of phenomena that have the opposite effect on children. I believe that sexual crimes against minors have enormous and devastating impacts on the lives of the children involved, and I abhor any behavior that leads to such crimes. As such, meeting Gerard and hearing his story was extremely difficult for me at first. My sex addiction never ever brought me to making such extreme and glaring errors in judgement. Prior to meeting Gerard, I never had much room in my heart for showing mercy to anyone who has perpetrated such crimes. I surely never expected to be writing this letter.

However, over time, Gerard's commitment to SAA's message of promoting spiritual and sexual sobriety has made three things clear. First – Gerard aims to atone for his transgressions; he has no intention of skirting

responsibility for his actions. Second – he has been as honest as possible with us about the remorse he feels for his actions.  Finally – he has done so not merely to make his life better, but to help others understand his mistakes and appreciate the power of his addiction. In doing so, he directly helps us grapple with our own addictions, and he models the positive power of promoting life in recovery. All of us sex addicts have committed acts that have led to feelings of overwhelming demoralization, and we are all aware of the cunning power our disease has to lead us towards terrible, taboo, and, in some addicts' cases, even illegal acts. We strive every day to live sexually healthy and sober lives and to pass the promises of recovery on to other addicts. Gerard's commitment to the program, to his sponsees' sobriety, to his own sobriety, and to sharing his story has been steadfast not just for his own sense of righteousness, but for the good of every sex addict he encounters.

I hope those responsible for sentencing Gerard will clearly see that his character, his potential for providing service to the community, and his willingness to take responsibility and repent for his mistakes – as heinous as they are – are evident in his commitment to the SAA promises and the program as a whole. He has been nothing but a good friend to me, and I wish the best for him, no matter his sentencing.

Sincerely,

Alexander Renaldo Lozano

# EXHIBIT G-25

6/29/2018

Dear Mr. Chazin,

I am writing to offer strong support for Gerry Jones. I understand the criminal charges he faces are serious, and I also understand that he does not deny them. Nevertheless, I believe Gerry to be a man of strong character and sincere remorse. I believe he is making sincere amends for his actions through his everyday behavior, and through the value he brings to our 12-step fellowship. Not only is Gerry committed to his own recovery, he is deeply committed to helping others recover from sex addiction. My hope is that he remains free to continue the good work he has already begun.

I have been in 12-step recovery since 2005, and I have had the opportunity to get to know Gerry well over the last 18 months. I am genuinely impressed with the way that he has taken responsibility for his past behavior, and the grace with which is willing to face the consequences. He is vigorously and sincerely working a strong recovery program, and he is a very visible and positive presence within the fellowship. He presents an example of integrity, honesty, humility, and sincerity which I find to be inspiring. His participation in the program is a benefit to old-timers and newcomers alike.

My wife is also in a 12-step program, and she is close with Gerry's wife, Jenny. My wife and I are impressed with the way in which Gerry and Jenny are facing this together, and although they have had to deal with the consequences of Gerry's behavior, they nevertheless have consistently remained available to help others, and frequently try to give back to their fellowships. We are glad to have had the opportunity to become their friends.

My wife and I are home owners in Oakland and we live with our son and daughter, aged 15 and 12. I graduated from UC Berkeley with a bachelor of arts, and from the Kellogg Graduate School of Management with an MBA. My wife is a graduate of UC Santa Cruz, and she holds a PHD from NYU. I work in finance in San Francisco, and have had a 27-year career (so far), mostly in the healthcare sector. My wife is an academic and also works in marketing. We are both very involved in 12-step recovery, and take recovery very seriously.

Thank you for the opportunity to offer our support. If there is anything more we can do to be of assistance, please let us know.

Sincerely

6.29.18

Brad Spielman & Jennifer Chan
465 65th St.
Oakland, CA   94609
415.713.3223 / 415.553.7349

6.29.18

# EXHIBIT G-26

JULY
~~June~~ 28th, 2018

Dear Mr. Chazin,

I am writing to you regarding your client Gerald Jones, hereafter called Gerry. It is with great support that I write as a witness to Gerry's character, his inspirational sobriety, his honest and true remorse, and his dedication to helping others overcome sex addiction. I have known Gerry for 14 months through Bay Area Sex Addicts Anonymous (SAA). I have lived in San Francisco for 8 years and consider myself a hardworking, blue collar, upright, member of society. I work as an electrician. I attend church with my girlfriend. I bowl at my local bowling league—and I too, have suffered from sex addiction. From the very beginning of my time with the program, Gerry has been a source of wisdom and support.

Gerry's openness and honesty about his story has been inspirational to me and others in SAA. In meetings Gerry is frank about his addiction and his recovery—even his criminal charges. He is warm and welcoming with new members and even makes himself available after meetings to talk to those who need it. For as long as I've known him, Gerry has worked hard to create a strong community of brothers, dedicated to recovery. He has shown his dedication to helping others recover through taking leadership positions July 2017-January 2018 in our local SAA, as secretary.

It is said that you can know a person, by how other people you trust talk about them. With Gerry, members new, old, or visiting always had the same thing to say: that he helped on their path and that he helped give perspective on what sobriety and recovery truly looks like. Gerry gives hope to others: that despite his criminal charges, through recovery no matter how challenging the journey, no matter your past, you can find peace, and you can help others find it along the way. I implore you to continue to allow Gerry to make a difference in the lives of men like myself—not behind bars, but in society.

Sincerely,

Branndon L. Tawney

# EXHIBIT G-27

Aug. 1, 2018

Dear Mr. Chazin,

I am a 63-year old male who has been married for 28 years. My wife has worked as a Japanese-English interpreter for over 30 years. I have worked as a technical writer in the software industry for the past 25 years.

My wife and I have two sons. The older son graduated from CSU Fullerton with a bachelor's degree in Business/Marketing. Our younger son is attending CSU San Francisco and majoring in marine biology. I myself graduated from UCLA with a bachelor's degree in Sociology. During the past 20 years, I have lived in the Bay Area and owned a single-family residence in San Francisco.

Over the past 18 months, I have gotten to know Mr. Gerald Jones at the meetings of Sex Addicts Anonymous (SAA). Mr. Jones has repeatedly shared his remorse about the harm he did to others.  I've also met with him individually to seek advice about how to stay sober from sex addiction. Mr. Jones has helped dozens of SAA members by sharing how he works his daily 12-step program. He also sponsors other fellow addicts to help them avoid making the same mistakes he made. To me, Mr. Jones has been a "Red Badge of Courage" by honesty acknowledging what wrong he has done and working extremely hard to make amends to those he has harmed.

I am fully aware of the seriousness of the pornography charges that Mr. Jones is facing. But having observed his behavior at meetings and our 1-on-1 conversations over coffee, I strongly feel Mr. Jones accepts the harm of what he has done and also accepts the consequences of his actions.

For these reasons, I firmly believe Mr. Jones can contribute more to society by helping out fellow sex addicts than by being in prison.

I would be happy to discuss any questions you may have about Mr. Jones character.

Sincerely yours,

Calvin Yee
SAA Fellow
calvinwyee@gmail.com

# EXHIBIT G-28

July 30[st] 2018

Dear Mr. Chazin,

I am writing this letter to provide my strong support for Gerard Jones. I have known Gerry for nearly two years. I am compelled to write this letter of support based on my relationship with him in Sex Addicts Anonymous recovery meetings.

I have witnessed his valiant efforts in recovery and his service others. His responsibility for his actions and his solution-based intentions have been inspiring to me and others.

After getting to know Gerry and hearing his story, I have more empathy for individuals whose struggles with addiction have led them to these types of activities. He has been inspirational to me as I have watched how he has gone through this experience with honesty and regret for this actions. I am a community worker and I have witnessed recovery and transformation through the same deep work as Gerry have embarked on.

I am a married, San Francisco native and  homeowner and have a graduate degree from San Francisco State University and have work in social services for over 10 years.

I am honored to call Gerard Jones a fellow.

Thank you,

Chris R.

# EXHIBIT G-29

Seth Chazin Law Offices
1164 Solano Ave
Albany CAa 94706
June 21st 2018

Dear Mr. Chazin,

I am writing this letter to provide my strong support for Gerard Jones.  And while I have only known Gerry for the last 15 months, I am compelled to write this letter of support based on my relationship with him in recovery meetings and weekly group therapy sessions.

Of the thousands of people I have met who are in recovery over the previous decade, I hold Gerry in the highest regard. I can think of only a handful of people I have ever met that I would write a letter for, and Gerry is one of them.  His efforts in recovery, his ownership of what he has done and the grace with which he addresses his self-improvement have been inspiring to me and others.

I am aware that Gerry is being sentenced for serious crimes, as he has been candid about his experience. As the father of an 18 year old girl, I take what is he being sentenced for very seriously. After getting to know Gerry, hearing his story, I have more empathy for individuals whose struggles with addiction have led them to these types of activities.

It is clear to me that Gerry has regret for his actions and that he has been honest. He has been inspirational to me as I have watched how he has gone through this experience with honesty, regret for this actions, empathy for those around him and a grace that I have seen very few people exhibit.  He has shown me how to live a more authentic life.

I am the father of two kids and long-time resident of the Bay Area. I have lived in the area since 1982 after graduating in Finance from UC Berkeley.  I am the founder of two financial services firms and am very active nationally in the financial services community.

I am honored to call Gerard Jones my friend. I am available to speak with anyone about this information. Please find my contact information below. Thank you.

Craig Kirkpatrick

Contact Information : (925) 788- 3266


Craig Kirkpatrick                                    303 Tharp Drive Moraga CA 94556

# EXHIBIT G-30

## David Kleinberg/Ex-SF Chronicle Editor/Writer

**david@bacl.com**

Dear Mr. Chazin,

My name is David Kleinberg, and I am in a 12-step recovery program for my sex addiction. Gerry Jones is in this program with me.

I currently have 17 years and 5 months of sobriety from my sexual inner circle activities, or, as I would prefer to put it, by the grace of God and the fellowship, 6,368 one-days-at-a-time.

I am also a native of San Francisco who has lived in the city my entire 75 years. I spent 34 years as an editor and writer at the San Francisco Chronicle, the last 14 of which I served as editor of the paper's Sunday Datebook magazine. I was also a journalist for the U.S. army for one year in the Vietnam war, and was awarded a bronze star for my combat correspondent duties.

I am currently a solo theater performer. My first work – titled "The Voice: One Man's Journey Into Sex Addiction and Recovery" – detailed my recovery journey, and in 2013 was featured for 10 shows at the Stagewerx Theater and 8 shows at the Exit Theater here in San Francisco.

During these theatrical runs, in an effort to try to bring the difficult issue of sex addiction into the public domain, I held post-show panels following several of the performances that featured sex addicts, sex-addiction therapists, former prostitutes and sex-positive spokespeople to interact with the audience.

I have seen Gerry Jones in our rooms since the beginning of his recovery and noted how quickly and totally he committed to the program. In fact, his shares and his service have been extremely valuable in my continued recovery and other fellows' recovery -- especially given the harsh issues and consequences of what he's had to deal with because of the nature of his addiction.

He has been rigorously honest about his story, where it has lead him, and has built upon that through his sobriety and his service. For instance, just the other day I heard him share that he is happy and at peace with the fact his activities were discovered, that he now has the opportunity to be held accountable for them, and deal with them.

This is consistent with one of the foundations of 12-step recovery, that "you will not regret the past nor wish to shut the door on it" and that "no matter how far down the scale we have gone, you will see how our experience can benefit others."

There is a cliché that "a tiger can not change his stripes," but through my almost two decades in the recovery rooms, I have seen countless people make remarkable changes, that indeed, a person can be reincarnated in the same lifetime.

Given what I have observed watching Gerry in our rooms, I believe that Gerry is one of those people, and that he – and all of us -- would be much better off if he were allowed to continue his new journey outside of jail rather than inside.

Thank you for the consideration of the above.

David Kleinberg 7/24/18

# EXHIBIT G-31

July, 24th 2018

Dear Judge Chhabria,

  Gerard Jones became a part of my program in Sex Addicts Anonymous, SAA, about a year and a half ago. From the first time we had the chance to share fellowship I could get a sense that Gerard was a kind and compassionate soul. He patiently heard out my story and shared his experience, strength, and hope. Over the months, we got to know each other. We have touched on a number of meaningful topics regarding father issues, maintaining a strong relationship with my fiancee, and ways to deepen recovery. I'm honored and happy to say that I now see him as a brother and positive role model. This continues to enrich my life so that I can live an independent and meaningful existence.

  Tattooing has been my livelihood for the past thirteen years. The last three have been in the bay area. Some of the world's best artists thrive here ,and it's a dream come true to work next to them. My fiance, Angel, makes me feel like a very lucky man. She is a well-spring of love, support and inspiration. Our wedding date is booked for September 16th and we're blessed to say that we're expecting our first child in February. All of these and other precious gifts in life are contin-gent upon the state of sobriety that I have maintained since May, 27th 2015. Whatever I put ahead of sobriety will be lost and destroyed. It is that simple, and Gerard

understands this on every level. He is an important part of this safety net that is my recovery family.

I have heard Gerard's story as I have the prosecution's and the victim's for which they seek justice. The gravity of his crimes cannot be overstated. The depth of Gerard's remorse and dismay for the actions of his past are now equal to the level at which he diligently maintains his presence in SAA. Please help support each side in their life long journey towards healing and freedom of the soul. Certainly this is essential to us all.

Sincerely,

David Parker

David Parker

Last modified: 3:09 PM

# EXHIBIT G-32

Devon John Kniess
381 Broadway
San Francisco, CA 94133

Law Office of Seth P. Chazin
1164 Solano Ave.
Albany, CA 94706

June 26, 2018

To Whom It May Concern:

I write this letter in support of Gerard Jones, with full knowledge of the felony charges he faces of illegal pornography.

Mr. Jones has shared his story openly, honestly, and bravely with myself and many other men and women who live with sex and porn addiction. The boldness with which he has shared his story has brought hope to those of us who face this illness. It was within the first week of attending program meetings that I learned of Gerard's story. The details of our stories may be different, but I connected with his pain and powerlessness on a deep and spiritual level. At the time of my first meeting, my isolation and despair had become unbearable. I was lost, afraid, and overwhelmed by what I had done and what my addiction might lead me to do. It was desperation that lead me to the fellowship of Sex Addicts Anonymous, and there I found stories of honesty and hope that showed me that I was not alone.

Gerard Jones has given great service to Sex Addicts Anonymous and his fellow sex addicts by sharing his story with us. His kindness and empathy to those of us who still suffer has been immeasurably important to helping myself and others understand and accept the painful consequences of this disease.

From attending meetings together, I can see that Gerard Jones has come to terms with his criminal activity. His dedication to following the steps of this program in spite of what he faces is an inspiration to many of us. He faces the repercussions of his actions with a changed perspective and an open heart. His participation in the program has been instrumental in my own recovery, and I am grateful for his presence in my life and in these rooms.

Sincerely,

Devon Kniess

# EXHIBIT G-33

Dear Mr. Chazin,

I understand the gravity of Gerard Jones' situation and the reason for his potential incarceration. With that said, this letter is to express my sincere support and high regard for Gerry.

I met Gerry in Sex Addicts Anonymous. I have not known Gerry for a long time, perhaps a year, but that does not in any way diminish the impact Gerry has had on me. I've been abstinent in that program for over 7 years and in that time I've seen a lot of members come and go. What has struck me about Gerry is his commitment to recovery and the rigorous honesty in which he shares his story at meetings. His story is not a "pretty" one; a story that many people would be too afraid or timid to share—but not Gerry. He undeniably takes responsibility for his actions, and shows a genuine desire to make amends as necessary. I see Gerry looking inward, at his actions and how he has hurt others. I respect his forthright & unflinching perspective on his addiction and his recovery, plus his willingness to accept the consequences.

I am a seller of antiques and sometimes sell merchandise at the Alameda Flea Market. Just last month I saw Gerry walking down the aisle and got his attention. He came over and introduced me to his wife. It lasted only a couple of minutes, but I just got a really nice feeling for them...their closeness and affection for one another, and I appreciated how gracious they were to me. Their circumstances could easily have torn any number of couples apart, but they were together, which to me spoke of Gerry's commitment to his family and his desire to "make things right" and to heal.

I've lived and worked in San Francisco since 1992. I moved here sober in Alcoholics Anonymous and have remained sober for the past 27 years. I am active and abstinent in SAA for over 7 years, and a member of Debtors Anonymous for the past 7 years. I've met a lot of really great people during my time in recovery, and I include Gerry in that group of great people.

I wish Gerry the best and have no reservations in sending this letter. If you would like to discuss further, I've included my contact information below. Thank you.

Regards,

Eric Campbell
929 Dolores Street
San Francisco, CA 94110
415-425-4299

# EXHIBIT G-34

June 25, 2018

Law Office of Seth P. Chazin
1164 Solano Ave.
Albany, CA 94706

To Whom It May Concern:

I am a member of a men's therapy group that is organized and facilitated by the San Francisco Forensic Institute. It is through this weekly therapy group that I met Gerard Jones. I have known Gerard for fifteen months now. Gerry, as we know him, is an invaluable member of our group, is someone that owns up to his actions, and actively working to improve himself.

All members of this group have made life changing errors due to choices related to sex. We use group therapy to identify these errors and work to ensure we do not do them again. Gerry is a stellar example in our group. His openness about his crimes, his contrition for them, and his willingness to help others as truly beneficial to our group. Gerry listens to us, hears when we give him feedback, and provides insight on each one of our situations. He is really working on becoming a better person.

Gerry is a person who is willing to serve his sentence as he wants to be responsible for his actions. And I know while serving his sentence, he will continue working to improve himself and help others. I hope his sentence is not as harsh that it would keep him away from his wife, family, friends, and community for a long time. I do think Gerry has much to give to the greater community.

Thank you for your time and attention.

Respectfully,

Gene Calderon

# EXHIBIT G-35

June 30, 2018

Dear Mr. Chazin,

I am writing this letter to update you on Gerry Jones, your client, in regards to his participation in Sex Addicts Anonymous (SAA) and the positive affect Gerry's attendance and extensive service in SAA has on my own program of recovery from sexual addiction. I am aware of the criminal charges Gerald is facing. He has continued to speak of his experience with sexual addiction and the consequences that have arisen from it in our meeting groups. He has expressed remorse for what transpired and I feel that he has taken ownership of the negative effects that have impacted others due to his addiction. Being able to speak openly to members of SAA about what has happened and how he uses the SAA program to change his life has made my own recovery more effective. I have heard Gerry speak many times of how he wants to use his experience to affect positive change in others who have similar issues. A big part of Gerry's sharing is describing his struggle and ultimate acceptance of his sentencing without blaming anyone else for his conviction. Hearing him accept responsibility for his actions has helped me to take action in my own recovery which is the opposite of feeling that others are to blame for what I have done and what I will continue to do. I hope my own recovery can be as transformational in my life as it has clearly been in his.

Regards,

Hunter Stern

# EXHIBIT G-36

Dear Mr. Chazin,

I'm writing this letter on behalf of Gerard Jones whom I've gotten to know through SAA 12-step recovery meetings over the past 18 months that he has been attending.

I've personally been in recovery for 8 years now and hold a job as a Sr. Account Executive at a reputable on-line education company here in the Bay Area.

I've watched over the past year and a half Gerry share openly about his upcoming sentencing in federal court for his crimes. His simple willingness to talk openly about this is by itself a tremendous service to our community. He often shares in meetings and in personal moments about his deep remorse for those he hurt while in his addiction. I believe Gerry has a sincere and deep desire to never go back to this behavior. His actions over the past 18 months have demonstrated this seriousness through his helping of others in recovery through sponsorship, sharing openly and speaking in a way that clearly indicates he takes responsibility for his actions.

Best regards,

Jacob Ellison

July 24, 2018

# EXHIBIT G-37

July 2, 2018

Your honor,

I moved to the bay area over two years ago and discovered Sex Addicts Anonymous. I now have two years of sobriety from an addiction to pornography, something I began when I was 14 years old. I am now 27, work as a software engineer, and recently was married.

I have known Gerard Jones since he joined the bay area Sex Addicts Anonymous fellowship over a year and a half ago. I had about nine months of sobriety at that time.

I was impressed by how seriously Gerry took his recovery. He devotedly began attending meetings. He got all the phone numbers he could and began making support calls. He reached out to me and others for help during difficult times at the beginning of his sobriety. We did a series of "bookend" phone calls before and after potentially triggering or difficult situations. He asked if I knew anyone else in the program who had dealt with illegal pornography and called them for help and support. He immediately got a sponsor and began working the 12 steps.

It is obvious to me that Gerry understands the serious damage his addiction has caused.  I attended his "First Step" presentation to a group of about 40 men. He read us the story of his addiction and brought every detail of the wreckage he had caused to others into the light. It was thorough, honest, and difficult to hear.

The Gerry I know today is strikingly different from the one in that story. I regularly make phone calls with him for my own recovery. He has given me inspiration to work my own program just as strong. Each time he shares at a meeting, I listen intently. I always get something from his shares that I needed.

Gerry now has over 18 months of sobriety and is sponsoring other addicts. When I meet newcomers whose addiction has brought them to child pornography, I direct them to Gerry. The journey he has been on puts him in a unique situation to be of service to many people suffering from this destructive addiction to sex and pornography. Gerry's life shows us the dramatic consequences of this behavior if continued, and shows us that no matter far the addiction takes you, there is hope to be free of it.

Today, Gerry's life and service is an enormous benefit to me, to our fellows, and to society.

Sincerely,

James Kerr

# EXHIBIT G-38

June 19, 2018

Law Office of Seth P. Chazin
1164 Solano Ave.
Albany, CA 94706

Dear Mr. Chazin,

I'm writing on behalf of Gerard Jones, who I know is facing sentencing on pornography charges.

Over the last 18 months I've gotten to know Gerard Jones, who has become a big part of my recovery in Sex Addicts Anonymous through attending meetings regularly.  While many of us have struggled with the harms we have done to others, Gerard has been honest, from the first time I met him, about his offenses and the systemic impact his addiction and behavior has had on his family, friends and society. He has worked a thorough program of recovery and has taken not only his sobriety seriously but also impacted countless numbers of others in the fellowship through sponsorship, friendships through the meetings and in helping others like myself.  I see a tremendous amount of remorse for his actions, which has helped me come to terms with my own shortcomings. He has played a large part in my recovery in friendship and providing me guidance along the way. As such, I'm sober and able to pass on what I've learned to others as well to work a strong program of recovery while being of service in the program and society.

While Gerard has been very clear about his past, I do believe that he is and will continue to be a benefit to both the fellowship of SAA recovery and society in staying sober and sharing his experience.

While no one person can control the sobriety of others, Gerard has clearly had a huge impact on my recovery in providing guidance, advice and encouragement.  I'm grateful to be sober and helping others both in and outside of the program, including extensive volunteer work that I'm doing on a weekly basis.  I'm the happiest I've been in my 18 years of living in Northern California through both the service I'm providing others, close friendships, a healthy overall lifestyle and giving back to the community.

Thank you,

Jeff Schwartz

# EXHIBIT G-39

July 1, 2018

Dear Mr. Chazin,

This letter is regarding Gerard Jones, who I'm aware is facing sentencing for illegal pornography. I met Gerard (Gerry) roughly a year and a half ago through the 12-step program of Sex Addicts Anonymous (SAA). We got to know each other through regular attendance at the Monday night SAA meeting in San Francisco.

I have lived in the Bay Area since 1988, have been a homeowner since 2005, and have worked in the tech industry for 19 years. I've also been part of SAA since 2010.

Gerry's willingness to talk openly about his past behavior, the steps he's taken to overcome his addiction, and the ramifications of his conviction models a level of honesty and humility that encourages and challenges me. Practicing those two qualities has helped me and others in SAA successfully battle our addictions.

I would also love to see Gerry able to live freely in society, because his presence will help others develop honesty and humility, which I believe are essential elements of a healthy society, and are sorely lacking currently.

Thank you for taking the time to read my letter. I hope it may be of value to the court.

Sincerely,

Kevin Oshiro

# EXHIBIT G-40

June 28, 2018

Seth P. Chazin, Esq.
The Law Offices of Seth P. Chazin
1604 Solano Avenue
Berkeley, CA 94706

Dear Mr. Chazin,

I am writing on behalf of Gerard Jones. I have known Gerry for well over 8 years
through attending the Healthy Intimate Relationship (HIR) meeting and more
recently from many Sex Addiction Anonymous (SAA) meetings. In that time,
Gerry has taken numerous service positions at meetings, ranging from Secretary
to Literature to Speaker-Seeker. He has demonstrated service and a
commitment to his recovery. I have also seen Gerry at other SAA events ranging
from our annual retreat to our international convention.

He is a powerful presence at these meetings and helps other sex addicts by
sharing his story and volunteering to help others. I regularly see him offering to
help other newcomers in our fellowship and sponsoring other sex addicts. Gerry
provides an important service when he volunteers his help for others. I sincerely
hope that the judge sees the importance of this service to our community and will
consider a sentence that keeps Gerry in prison for the least amount of time. I
pray that the judge can find mercy so that Gerry can continue to help the
community and remain a physical part of it. I have also witnessed the regret,
remorse and honesty that Gerry has shared in these rooms.

I also want to share a little about myself. I have worked in nonprofit marketing for
the organization TechSoup. Before that, I worked at Adobe. I am member of the
Jewish religious community, the Kitchen that combines a serious exploration of
Jewish tradition with an inclusive, progressive social justice commitment. I am
also an active member of the Dolphin Swim and Rowing Club, based in the
Aquatic Park near Fisherman's Wharf.

Sincerely,

Lewis Haidt

# EXHIBIT G-41

August 3rd, 2018

Dear Mr. Chazin,

I am writing this letter in support of my fellow and friend, Gerard Jones, in the sincere hopes that he be given consideration in his sentencing. I have gotten to know Gerry over the last 18 months in meetings of Sex Addicts Anonymous (SAA).

I am a real estate developer in San Francisco and owner of a home in Dogpatch. I graduated from Cornell University and spent much of my early career as a technology entrepreneur. I've been diligently working a program in Sex Addicts Anonymous for the past 8 years, and have been sober in Alcoholics Anonymous for the last 2 years.

It is my understanding that Gerry is currently facing sentencing in federal court for, let's be honest here, some very appalling behavior. It's a testament to how moved and inspired I've been by Gerry and his process that, even with the awareness of his actions, I offer Gerry, without reservation, my unequivocal support.

Over the last 18 months, I've witnessed a man so profoundly humbled, a man with such a deep connection to God, and someone so thankful in the face of the crippling fear that accompanies a federal prison sentence. I've listened to Gerry share consistently at meetings. I've watched him always stay after the meeting to welcome newcomers and ask others how they are doing. In a recent dream I had where I was conflicted as what action to take, Gerry literally showed up as the voice of reason. He's not just of service in the physical world, but subconsciously as well!

The thing that most inspires me to write this letter for Gerry is his gratitude throughout this whole process. What most people don't understand about addicts is, we've been trapped in our own prison for most of our lives. Often times it takes getting caught to set us free. And Gerry is such an inspiration because he is someone who is so clearly in ownership of his addiction, deeply humbled by its depths and consequences.

Gerry is a man of faith, family, and fellowship. The public nature of his arrest has already cost him dearly. He has been ostracized by many in his life, but welcomed with open arms by groups like ours. In SAA we have a saying: Recovery cannot be had by locking yourself in a padded room and isolating from the world. True recovery happens "in relation to".

It is my sincere belief that Gerry and his addiction would be best served by being "in relation to" society, and that society, in turn, would be best served by being "in relation to" Gerry.

I appreciate this opportunity to speak on Gerry's behalf.

Sincerely,

Matthew Kochman

# EXHIBIT G-42

June 30, 2018

Your Honor,

I am friends with Gerard Jones ("Gerry") through the Sex Addicts Anonymous recovery fellowship. We have gotten to know each other throughout his time in our program, which I believe is around a year-and-a-half. I've personally been in SAA for two-and-a-half years. I work for a startup doing user experience and product design here in San Francisco. I also live here. I play in local rec league sports and am involved with City Church where among other things I participate in choir. I have been involved with local non-profits, fundraising for Old Skool Cafe, volunteering with Kiva, City Hope and New Door Ventures, and have been supporting Open Door Legal since the beginning. I also have served at our county jail by creating a church service for the inmates. None of that matters except that I care about this city and its people.

Since the beginning Gerry has been open with our fellowship about his online wrongs and how getting arrested really shook him into getting healthy. I have only ever known Gerry as a man trying to be honest and own his mistakes and issues. He hasn't made excuses but talks about his own past of self-dishonesty that led him to download more extreme videos of porn, even to the point of child pornography. There is no ifs, ands, or buts about that: it's wrong. In my company he's owned that fully.

I cannot tell you who he was. I simply know from my experience in addiction that addiction thrives in dishonest spaces, in hiding, and in trying to bury emotions. I can tell you that Gerry's presence and honesty, his acceptance and his tears, his fears, his apologies, and the hard work he's done to repair trust with his family — those are all actions and ways of being where the addiction can't thrive. The power that was over him in addiction, that buried him, has now moved outward to us, his community, and to me where I have learned from him how to be honest, how to mentor, and how to move toward the world with good redeeming qualities for the good of others.

June 30, 2018

There are two ways in which his outward power was manifested for me. First, he learned to connect with God this year and got baptized into his new church in November. I was so drawn to his sharing and friendship in SAA, and the fact that I share the belief in baptism as super important, that I chose to fly home from a vacation in Japan on a flight that would allow me to attend his baptism. That is, I trust his growth as a person, and have been excited to participate in it.

Secondly, Gerry invited many of us to attend his plea hearing. That was TOUGH for all of us to witness. He chose not to hide the hard parts of his recovery, and chose to invite us to view it. What a service to us it was! And the prosecutor, to her credit, was a fierce advocate for the children who were victims of child porn. The whole experience was a lesson in justice vs mercy. No one claimed anything that happened was right, and Gerry owning his part in the whole matter showed me the power and grace of not hiding.

Your Honor, I truly believe in Gerry's change. I never knew him before, but if his family can stand beside him through this, and because I have seen his consistency in honesty and presence in our community, I trust his change. He's plead guilty because he's guilty. I do not believe that serving prison time more than the minimum would serve anyone. And I genuinely believe that his presence and changed personhood in life outside prison will serve our world (including even these children) better than inside.

Thanks for reading and hearing me out. I hope my experience is helpful to the court.

Nathan Akers

# EXHIBIT G-43

July 1st, 2018

Your Honor,

This is a letter of support and character reference for Gerard Jones. I've had the pleasure of knowing Gerard Jones for approximately 2 years as a fellow member of Sex Addicts Anonymous (SAA). He has been an ongoing source of inspiration and hope for me and other members. His ability to connect his story, legal problems, and his steady recovery have really allowed me and others in our fellowship to see that recovery and facing our addiction is possible for all of us. It allows us to see the truth and the consequences of our actions while moving forward in the world that allows us to recover and repair the hurt we've done to others.

More specifically his courage to openly speak about where his addiction took him has greatly enhanced my day by day lifelong commitment to the program, the quality of my sobriety and my ability to be a better husband, father, and person in the community I live and work in.

Much of us in the fellowship struggle with shame, the lasting effects of growing up in dysfunctional homes and have lost hope in our ability to live life without using sex and pornography to cope. Gerard's honesty and willingness to speak openly about this and personally connect with others who are afflicted with sex addiction is of great service to our program and is helping members like me live a better life.

I can personal say that the healing, clarity, taking of responsibility for my actions and actual change in my life has come from being a member of SAA much more than from therapy and the consequences from others I've faced from my sex addiction.

It is my belief he can do more for victims of sex addiction through his work with SAA and 12th step work in his community than in jail. I encourage you consider this as you make the decision on his sentencing and appreciate the opportunity to share this with you for your consideration.

Sincerely and with respect,

Patrick R.

# EXHIBIT G-44

8/1/18

Dear Mr. Chazin,

My name is Richard Klein and I have been a resident of San Francisco for 35 years, lived in the same apartment for 24 years and worked the same job for 29 years. My wife is a public school 4th grade teacher and my son will begin 6th grade next semester.

I am writing in support of Gerard Jones, who is facing sentencing in Federal Court. I met Gerard in Sex Addicts Anonymous and can attest to the fact that he is taking his recovery extremely seriously and he has been of great service to many other sex addicts. His experience and the honesty and courage he exhibits at meetings and in fellowship has been very helpful to myself and many others. He knows what he did was wrong and feels tremendous remorse and is facing the punishment with acceptance and openness that I find very inspirational. I'm sure that he is a better man than what he was and that when he is out of prison he will continue to be of service.

Richard Klein

# EXHIBIT G-45

July 28, 2018

Dear Mr. Chazin,

I have been a lifelong resident of San Francisco and have worked for Safeway stores in the city for 43 years. My two daughters, now in their twenties, both reside in San Francisco as well.

Gerard Jones has been a friend of mine since 2010 when we met in a men's spirituality group. Gerard has always been kind and supportive to me and others in recovery.

Since witnessing his presence in Sex Addicts Anonymous, I have been inspired by his spirituality, his remorse and ownership of past transgressions and his giving support to newcomers in SAA.

I believe Gerard has much experience, strength and hope to share. He could not continue helping others with a long sentence.

Sincerely,

Richard T. Valentine

Richard T. Valentine

# EXHIBIT G-46

6/26/2018

Dear Mr. Chazin,

I write to you today in regards to Gerard Jones. For the record, I'd like to state that Gerry has become an important part of the SAA community at large, and an important part of my own recovery program. He is a leader by example, on this difficult road that we've chosen to walk.

Gerry has, at every opportunity, been of service to myself and our fellowship as a whole. For every person in our rooms like Gerry, who is able to muster the courage to disclose such difficult information about themselves, there are a great many who are still buried in shame to do so. Taking on specific service positions within single meetings, Gerry exemplifies a commitment to the program and its guiding principles, invaluable to those who witness it. He brings an honesty and candor, about his addiction and its consequences, that is essential to hear for the person who is still sick.

Gerry's hard work and commitment to his recovery, model an integrity not often seen among addicts. He has worked hard to clear away the wreckage of his past. He gives freely of his time, experience, strength and hope. Always conveying an empathy so critical in other's sobriety.

While I understand the need for appropriate consequences, I beg that you consider Gerry's obvious forthrightness in confronting his issues, his rehabilitative service to his fellows in our program, and his personal growth when considering his sentencing.

Thank you so much for your time and consideration.

Steven Moss

6/26/18

"Addiction is a tough illness, and recovery from it is a hard but noble path. Men and women who walk that path deserve our support, encouragement, and admiration." - Sheldon Whitehouse

# EXHIBIT G-47

July 19, 2018

Law Offices of Seth P. Chazin
1604 Solano Ave.
Berkeley, CA 94706

To Any Concerned Party:

I am writing on behalf of Gerard Jones, whom I know is facing sentencing on felony pornography charges.
I met Mr. Jones a year and a half ago when he first came to our Sex Addicts Anonymous meetings; I remember feeling moved and inspired by what he said about his situation, most importantly about his criminal activities which brought him into the legal system as well as to Sex Addicts Anonymous.

He stated very clearly that he had been downloading and viewing pornographic images of underage children and found himself so caught up in the patterns of escapism that stopping, although something he had wanted to do for a long time, became the thing he was completely unable to do on his own.

Over these 18 months or so, Mr. Jones has continued to speak openly about his crimes and the harms he caused to loved ones and those who are victimized by the sex and pornography industry, and by those like himself, who engage in that industry. I have also heard him speak openly in a recent convention workshop where he was a part of a couples' panel (members of SAA and their spouses) discussing life in sexual recovery. He sat through his wife's presentation, which I found to be honest and painful to hear, and responded from an honest and humble place, and was able to share his own story of downfall and the beginning of recovery without any 'glossing over' or defensiveness. All of this indicates to me that Mr. Jones has deeply accepted the wrongs he has done, and that he is willing to face the discomfort associated with his acceptance.

Having been an active and highly involved member of Sex Addicts Anonymous for over twenty years now, I have seen many people come into our meetings after having undergone some great disturbance in their lives, related to their compulsive sexual behavior. I have noticed that it can be very hard for newcomers to stick around and truly face the consequences of their behaviors. My observation regarding Mr. Jones is that he has not flinched from his responsibility to recover and to make the "best good" that he can in terms of amends. I myself find members like Mr. Jones to be a good support for me, as he is modeling humility, honesty, and devotion to SAA. I have fortunately been free from my compulsive sexual behaviors almost since arriving to the SAA program in 1997, buoyed by the faithfulness and integrity of the many who arrived before I did, and I cherish my freedom from those behaviors. Since coming to SAA and becoming sober and working the principles of the program in a dedicated manner, I have ended a lifelong relationship to shame, even as I continue to hold 100% responsibility for my

Page | 1

decisions of the past. I take very seriously my work with others in the program- it is a great gift that I get to give back.

I have successfully completed graduate school (2007) and now have been working in a profession that seems well-suited to my skills and ambitions. I married in 2002 for the first (and only) time, and have flourished in my relationship, which is based upon honesty and service, and I have a large extended family in which I feel like a good contributing member. My life feels highly meaningful, in the greatest part due to the guidance I receive in SAA (including from my sponsor and program peers). I am also deeply involved in another local spiritual community which supports the work I do in SAA. I am a lucky individual.

Regardless of what happens to Mr. Jones in terms of his legal debt, my greatest hope for him is that he will continue to have access to the SAA program, not only for his own continued well-being and taking of responsibility, but so that he may continue to help others who come in after serious downfalls. This is the way in which our program works: we come in, learn honesty and responsibility, follow certain principles, and then offer guidance to others who come in after us.

I feel no pressure to send this letter on Mr. Jones' behalf; rather, I believe in what I have been seeing him do to turn his life toward the good, and would like to offer my hopes for his continued access to this beautiful recovery resource that has turned so many of us around.

Sincerely,

Tim English
1604 Chestnut St.
Berkeley, CA 94702

Page | 2

# EXHIBIT G-48

Seth P. Chazin Law Offices
1164 Solano Ave. #205
Albany, CA 94706


Dear Mr. Chazin and/or the presiding judge:

I am writing on behalf of Gerard Jones, who I met while attending 12-Step Recovery meetings for sex addiction. I understand Mr. Jones is facing serious charges for his past behavior and that he will be sentenced to some form of punishment soon.

I would like to express that Mr. Jones, or Gerry as I know him, has been an extremely valuable member of the recovery community, and has been helpful to me in my own recovery. The honest testimony of another recovering addict is the most powerful medicine we have, and Gerry has been a huge asset to the group. He has shown a level of remorse and humility which is rare, and which greatly affects all who hear him speak.

Every person in recovery faces repercussions from their behavior. Some of us lose wives, families, and homes. Others lose their freedom. I sincerely hope that Gerry does not lose his. I can honestly say that he has helped make me a better man, and a better father, simply by telling his story and contributing to the welfare of the group.

I do not write such letters often. In fact this is the first since I have been in recovery, which will be 10 years in August. I take this step because a good man is facing prison, a man I'd rather see in the rooms where he can mentor young addicts and be a role model for us all.

It is in this spirit that I ask with all due respect that you consider handing Gerry the lightest sentence possible. Let him do his good work where it matters most - in the 12 Step Rooms of the San Francisco Bay Area.

Sincerely,

Vincent Carrella

# EXHIBITS G-49 - G-56

## (filed separately under seal)

# EXHIBIT G-57

Cynthia Putnam
harperputnam377@gmail.com
July 25, 2018

Your Honor:

My name is Cynthia Putnam and I'm writing on behalf of Gerard Jones, who will be soon be sentenced on child pornography charges. I plan to be in the courtroom in support of him.

I am not one to excuse or minimize crimes like this. I myself was the victim of frequent, long-term sexual abuse as a child. I've spent much of my life healing from that trauma. I know how destructive sexual exploitation of every kind is to children.

But I also know how addiction works. I have 33 years of recovery in Alcoholics Anonymous and 12 years in Sex Addicts Anonymous. I've sponsored many people in both programs over the years. I know how good people find themselves doing terrible things in their addictions. When the disease is unchecked it leads progressively to behavior we would never have considered in our right minds. But with recovery we can again become the people we were meant to be and we can start making amends.

I've been listening to Gerry share his story in SAA rooms, and often talking with him personally, for well over a year now. I know that he is a good man who fell to the progressive nature of addiction until he found himself violating his own values. He talks about being a father and how appalling it is for him to wake up to what he did, downloading underage porn and seducing a teenage girl. It's clear to me that he has come back to sobriety now and wants nothing more than to make up for his wrongdoings by being a positive influence for others. He attends meetings nearly every day, speaks at almost every meeting, does service for the group, and sponsors multiple people.

I can't tell you how powerful it is for me to see someone like Gerry taking responsibility for the crimes he committed and talking about how he got there. Seeing him making amends to the world helps with my own healing. I've heard other people in the recovery rooms, other victims, say the same about him. For other addicts who've become perpetrators, it's important to hear Gerry talk about his guilt and what he's doing to change his life. For addicts who have the potential to become perpetrators, it's crucial to hear stories like Gerry's so they can start changing direction now.

People like Gerry shouldn't be locked away and silenced. They should be out here in society so they can tell their stories and make living amends to all of us, including victims.

I also know Gerry's wife through another group we share. I've seen her own recovery during this difficult time, and I know how devoted Gerry and Jennie are to each other and to their healing. Now that she is aware of the full scope of his illness, she is an invaluable support to his sobriety.

I know Gerry will be of service wherever he goes. When he's in prison he'll be an asset to the guys in there by bringing them his recovery and wisdom. But all of us out here would like to get him back with us as soon as we can.

Please feel free to ask me any questions.

Sincerely,

*Cynthia Putnam*

# EXHIBIT G-58

6/28/18

Law Office of Seth P. Chazin
1164 Solano Avenue
Albany, CA 94706

Dear Mr. Chazin,

I am writing on behalf of Gerard Jones, in a letter of support and positive reference for him as he faces sentencing for felony pornography charges.

Both myself and my fiance have known Gerry and his wife Jenny since 2014. We met them through attending the weekly Healthy Intimate Relationships (HIR) meeting in San Francisco, as well as seeing them at related meetings and gatherings around the Bay Area. They have been very encouraging role models for us in the recovery of our own relationship as a couple. We (my fiance and I) recently shared a panel discussion with them at a national COSA convention.

In particular, Gerry is someone I have looked forward to seeing and hearing since his arrest. He has practiced and articulated an example that men in recovery, such as myself, need to experience in person. His example is powerful and of great value to men and women in recovery.

I'm well aware of the gravity of his crime, and his inappropriate relationship with a teenager. I also fully grasp the need to enforce laws that protect people, especially defenseless children, from exploitation and sexual violation. I have been one of those children. One of the reasons I am in recovery is due to trauma I have lived through as a child: At ages six and seven, I was systematically sexually abused by a close and trusted male neighbor. Subsequently, I experienced emotional and physical abuse in an unstable family situation that exposed me (as an adolescent) to the pornography industry and other inappropriate sexual behaviors. Thanks to therapy and HIR and other work, I finally have the abilities to rise above and heal from these experiences.

This is how I connect to Gerry. His leadership and presence at meetings, and his availability, has been a cornerstone to me in my recovery.

I've watched him in the legal process of pleading guilty to felony charges, and I attended his federal court hearing. Concurrently, I've also watched him draw closer to God in true sincerity, and his honesty and contrition have spoken volumes to the many of us in recovery.

From my perspective, Gerry has shown true repentance. It is my hope and prayer that the judgement of the court will be respected, but will also factor in the remarkable witness Gerry provides to his fellowship of recovering addicts and their close associates.

Sincerely,

John J. Blair

# EXHIBIT G-59

June 28, 2018

Law Office of Seth P. Chazin
1164 Solano Avenue
Albany, California 94706

Dear Mr. Chazin,

I'm writing to you on behalf of Gerard Jones. I'm a member of COSA, a recovery program for people whose lives have been affected by the compulsive sexual behavior of others. I'm a woman who was a victim of childhood sexual abuse and trauma. I'm writing to you because Gerard Jones has helped me heal from that trauma. I've known Gerry and his wife the past four years that my fiancé and I have been attending a Healthy Intimate Relationships meeting in San Francisco. Through Gerry's honest and profound insights into his own journey with sexual addiction and the roots of that in his own family history, I've come to understand that though I'm not a sex addict, in my own journey as a victim of childhood sexual abuse and trauma that the roots of our trauma are very similar. The understanding that I've gained from Gerry's thoughtful shares at our meetings of our shared trauma has greatly helped in my healing and increased my compassion towards myself and the person who abused me as a child.

Gerry has been especially valuable to me since his arrest in 2016. He has been honest about his crimes. He has honestly shared that he's being sentenced and has plead guilty to felony pornography charges and has been honest about his inappropriate relationship with someone under the age of 18. I have strong feelings about the sexual exploitation of children. As a survivor of childhood sexual abuse, I empathize with others who as children have been traumatized by an adult's compulsive sexual behavior. I've seen a lot of growth and transformation in Gerry over the past years and I can see that he sincerely regrets his offenses. Seeing Gerry's sincere remorse and the pain of regret has also helped me heal. It's given me hope and faith in a person's ability to be honest about his transgressions and heal and grow and use the insights gained to help

others. This is why I showed up in support of Gerry at his guilty-plea hearing.

I, myself am a career professional with an advanced degree. I live a good life now, but my life was a mess four years ago when I first came to the meeting for Healthy Intimate Relationships as memories of my childhood sexual abuse began to come to the surface. I had PTSD. I didn't sleep at all that first year, but my healing has occurred incrementally over the past four years and each valuable nugget of wisdom and truth shared by Gerry has been invaluable to my healing and recovery from childhood sexual abuse.

Gerry has also served our meeting well as the "speaker seeker" (someone who brings in speakers to our meeting every month) and also as our treasurer and he's faithfully carried out those duties for the past four years. Through his honest shares and service at our meeting, he's shown that he wants to make restitution by helping people. It's hard to know exactly how many people he's helped in the time he's been a regular and constant presence at our meetings, but he's played a big part in my life being changed for the better and countless others as well. Gerry is in a unique position to help people having done the work to understand his trauma and addiction and clearly express his journey of healing. I would like to think that he'd be able to continue coming to serve in this way at our meetings and in the recovery community and be of benefit to other survivors of childhood sexual trauma and couples in recovery, too. This would be my fondest hope.

I believe in redemption and that Gerry is the model of that. I'll always be grateful to him and hope that his sentencing will reflect the person he has become through the work he's done on improving himself, and his work in serving and being of benefit to the recovery community.

Sincerely,

Robin Mackey

# EXHIBIT G-60

Will Jacobs
3229 Clement Ave
Stockton, CA 95204
(209) 943-2035

1/19/2017

To whom it may concern,

I have been a published author since 1983. I have written for the National Lampoon, DC
Comics, and the movie industry. I have owned and operated a book store (Avalon Books)
since 1992 and am the co-owner of a small publisher, Atomic Drop Press. I have been
married for 27 years and have two grown sons.

I have been a close friend and professional partner of Gerard Jones since 1978. We have
written four published books together, two screenplays, a graphic novel series that ran for
six years, and worked closely together on the aforementioned Atomic Drop Press. We've
gotten to know each other's families, gone on camping trips together, and stayed
overnight at each other's homes too many times to count.

In the nearly 40 years of our friendship I've never known him to be anything but a person
of integrity and decency. He's quick to own up to his mistakes and strive to be a better
person. He's the most even-tempered person I've ever known. He's intelligent, funny,
and the best of company.

I have never in all those years heard Gerry say anything off-color or lewd about a minor.
I have never seen him look salaciously at one. Had he done so our friendship would not
have lasted a week, let alone four decades. In my opinion he's been an excellent father to
his only son. When my boys were growing up, I never hesitated to leave them alone with
him. Nor would I hesitate to leave him alone with my five year-old grandson today.

Sincerely,

Will Jacobs

**Avalon Books**
**Will Jacobs**
3229 Clement Ave.
Stockton, CA 95201
209-943-2035
avalonbooks@sbcglobal.net

July 30, 2018

Hon. Vince Chhabria
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102

Dear Judge Chhabria,

Having now spent the better part of two years watching Gerard Jones face the mistakes of his past and the uncertainties of his future, I want to say some things about him.

I've known the man for forty years, since I was 23 and he was still 20. We've written eight published books together, along with magazine articles, graphic novels, and screenplays. We've spent time with each other's families, talked each other through challenges in our marriages, and watched each other's sons grow up. I know him as well as I know anyone, and I've always known him to be one of the most decent people around, concerned about everyone around him and committed to doing the right thing.

Of course it was a shock when he was arrested on child pornography charges. It was a shock learning about his involvement with a 17-year-old girl years ago. I've had to incorporate a lot of new information into my vision of him. But now that all his secrets are out and he's showing up for the consequences, my faith in him has been more than justified.

He's talked about the factors that led him to where he ended up—internet addiction, stimulants, morbid curiosity, isolation, secrecy—but never used them as excuses. He's never played the victim or the misunderstood innocent. When he was lost in that insanity he managed to rationalize his way into thinking he was doing no harm, but he's called that out as pure self-deception. He's said he's grateful that everything's been exposed, through the press as well as the courts, so that he's forced to live his life completely in the open now. In all his words and actions I see a man committed to living in the truth.

And he wants to make things right. When he talks, I hear that coming straight from a real guilt and disgust at what he did. Where I see it with my own eyes is in the book he's writing about addiction, *Bonds of Shame*. He's writing as much as he can before he goes to prison, when I'll help pull it together for publication. This won't be any exploitative memoir or self-justification. Gerard Jones is a respected nonfiction writer. When he tackled the topic of children and mass media in *Killing Monsters* in 2002, he incorporated his own experience as a father with

interviews with experts and mountains of research. A leading adolescent-psychology expert wrote the Foreword, a prestigious publisher brought it out, it earned rave reviews from teachers and therapists, and it's still being used in media courses 16 years later. He didn't write that book for profit—the same amount of time writing graphic novels would have earned him a lot more—but because he wanted to help people by shedding light on a misunderstood subject. He's attacking this new book with the same seriousness, and this time with even more intensity of purpose: this one is about balancing his own moral scales.

Gerard and I have been talking and meeting a lot since his arrest: finishing a couple of coauthored projects, editing books for my publishing company, discussing *Bonds of Shame*, and exploring this strange, awful turn his life has taken. Every time we meet, I see a man who's woken up from fantasy, dug into his issues, owned his behavior, opened himself to a new spirituality, and rededicated his life. He screwed up badly—he knows it and everyone around him knows it. Now he's bringing all his intellect, skill, decency, and courage to making up for it by serving other people. I hope he's given as much opportunity as possible to do just that.

Sincerely,

Will Jacobs

# EXHIBIT G-61

February 26, 2017
The Grotto
490 Second Street
Suite 200
San Francisco, CA 94107

To Whom it May Concern,

I am an author of four books., and a longtime member of the San Francisco Writers'
Grotto. I was also a firefighter here in San Francisco for many years. I'm writing on
behalf of Gerry Jones, who has been a colleague of mine since 2005.

I know Gerry to be a guy who always has a good word to say to people around him.
He and I were part of a writing group within the Grotto, where we regularly hashed
out our writing challenges, our personal roadblocks, and our hopes and dreams.
Gerry was a good listener and a generous participant. While I am a successful writer,
I shed my tears, as artists do, during setbacks, and more than once Gerry stopped
me in the hall to inquire how things were going. He made me feel comfortable and
accepted, and never embarrassed. I'm well aware of the charges against Gerry and I
have never seen any inappropriate behavior toward children. I think of Gerry fondly
and with respect to this day.

Caroline Paul

# EXHIBIT G-62

March 7, 2017

To whom it may concern:

I'm a writer and longtime member of the San Francisco Writers' Grotto, where I came to know Gerard Jones. As long as I've known him he's been a supportive and friendly presence, gracious with newcomers and humble about whatever writing challenge he was currently facing.

Over the years I heard him speak with great devotion about his son. I always appreciated how conscientiously he spoke about parenting. I got the sense his students at the Grotto benefitted from a similar level of thoughtfulness.

Sincerely,

Chris Colin

# EXHIBIT G-63

# *CHRISTOPHER D. COOK*

**Author, Award-Winning Journalist and Consultant    ·    www.christopherdcook.com**

**To whom it may concern:**

**I am writing to offer my personal testimony and experience with Gerry (Gerard) Jones, whom I have known for several years as a fellow writer and author in the San Francisco Writers' Grotto community.  I understand he is facing serious charges, and while I cannot speak to those, I want to offer my support for Gerry as a person I have always experienced to be of fine upstanding character, and great integrity.  In my experience, I have never known or suspected Gerry of any inappropriate activity of any kind toward children, or toward others for that matter.  All I can add is that, as a fellow author and writer and member of the San Francisco writing community, I have long known Gerry as a person of significant integrity, social grace and generosity, and kindness, and have never witnessed or suspected anything inappropriate coming from him, in any context.**

**I appreciate the opportunity to offer my support for Gerry's character, and thank you for your consideration.**

**While I'm unable to sign this letter as I type it on my computer, I verify that I'm writing this of my own free volition on March 9, 2017, 7:40 pm PST.**

**Sincerely,**

**Christopher D. Cook**
**415-504-0325**
**Christopher-d-cook@hotmail.com**

**The Writers' Grotto · 490 2nd St., Suite 200 · San Francisco, CA 94107**

# EXHIBIT G-64

**Elizabeth Bernstein**
**39 Cable Roadway**
**Sausalito, CA 94965**

March 7, 2017

To Whom It May Concern:

I am a fiction writer and freelance book editor who has lived in the Bay Area my whole life. Gerard Jones and I joined the San Francisco Writers' Grotto at the same time nearly a decade ago. The Grotto is a collective where professional writers rent office space and are part of a community. We have lunch together in the lunchroom, teach classes at night, host events, and generally support each other in our writing careers. In addition to being Gerry's colleague at the Grotto, I shared an office with him there for several years.

In all our time together, I have known Gerry to be a kind, generous, loyal, trustworthy and non-judgmental friend. He was always available to lend an ear when I had a problem or concern. He was genuinely interested and never too busy to try to help.

Once, we had an organizational consultant come to the Grotto and run a seminar on productivity, and Gerry and I both participated. After that class, a group of about 10 of us continued to meet for many months to rally and support each other in our careers. We also broke into pairs, and Gerry and I were what we called "Accoutabilibuddies" – partners who met weekly in person or by phone who cheered each other on and helped each other sort through road blocks. Again, Gerry's support was always unwavering.

I have also had many conversations with Gerry about his son and I know how much he cherishes and takes seriously his parental responsibility.

I am aware that he is before you now facing very serious charges. There are few people I would stand behind without hesitation, through any hardship in life. Gerard Jones is one of them. Today, as always, I'm proud to call Gerard Jones my friend.

Sincerely,

Elizabeth Bernstein

# EXHIBIT G-65

# ETHAN WATTERS

January 15, 2017

To whom it may concern:

My name is Ethan Watters and I'm one of the founders of the San Francisco Writers' Grotto, a shared workspace for journalists, fiction writers and storytellers. For several years Gerry Jones was a valued and cherished member of our community. He participated and added to group events and was a respected and sought after teacher. We have never had a complaint from any of his students as to the appropriateness of his behavior.

I understand the serious legal circumstances that have brought Gerry before you. I know him personally as a friend and fine community member. I know him also as an excellent teacher and as a father deeply concerned with the educational difficulties of his son. His reputation as a friend and a colleague among the over 100 members of the Grotto was excellent.

Sincerely,

Ethan Watters

490 SECOND STREET, # 200 SAN FRANCISCO, CA 415-515-5506 ETHANW1@MINDSPRING.COM

# EXHIBIT G-66

**James Hudnall**
4424 44th Street, #148, San Diego, CA 92115
619-940-9404  james.hudnall@gmail.com



1/26/2017

To whom it may concern,

My name is James Hudnall, and I have been a professional writer and software developer for over three decades. I have known Gerard Jones since the late 1980s. Approximately 30 years. We met each other through the fact that we both lived in the Bay Area at that time and worked in the comic book business.

We have worked together for two different companies over the years, Viz Communications and Malibu Comics. In all the time I have known Gerry, I have never seen any behavior or attitude that was the least bit salacious or strange. He's never even indicated anything, through his humor or his personal interactions with myself or others, that was in any way out of the ordinary or remotely questionable.

So these charges against him are very surprising in the least. I can only say that in my experience he has always been a good guy. I saw him last year at a convention here in San Diego with his wife. My impression of him hadn't changed.

He is somewhat of a scholar and is working on historical books these days.

Sincerely,

James Hudnall

# EXHIBIT G-67

# Badger Breen Real Estate

artistic living since 2004

424 Euclid Ave. Oakland CA 94610 510.444.0247 510.206.6656

To Whom it May Concern,

I met Gerard Jones in the late '80s while working in the comic book field in my 20s. We entered a creative collaboration that lasted over 20 years, producing stories for non-profit organizations as well as major publishers that brought such unusual topics as jazz, gentrification, union organizing and modern art into the field of comics.

Since leaving comics I have worked as a Union organizer for artists, taught web development for over a decade at The Academy of Art San Francisco and own and manage a four-plex in Adams Point, Oakland CA. Over that time our friendship has continued.

During my adult life I have been heavily involved in social justice as an activist, from Central American peace to Single Payer health care and currently am on the steering committee of Rebuild the Hope, a National organization of Obama campaign graduates. Some of the clients I have worked with include Legal Aid in Washington State, the ACLU, charter schools and the Oakland Mural Project. Schools often ask me to talk on drawing comics, meditation and political activism. Many of these projects have included Gerard as a writer.

I have watched as Gerard helped younger artists and writers succeed in the field and become part of the comics community. We've discussed the challenges of teaching as he volunteered at Dave Eggers' 826 Valencia in mentoring and workshops. As we both had young boys, parenting and Thomas the Tank Engine began to dominate our talk. Slowly the problems of negotiating public and private school, kids with challenges of their own became the main topic for many years. Reflecting on all the changes we have been through from medical conditions, parenthood to creating comics I don't think there is any topic we haven't brushed up against.

I've seen Gerard's deep love for his son and family, concern for other children and certainly trust him with my own son easily with no fears at all.

Mark Badger

# EXHIBIT G-68

404 Koerber Ave.
Akron, OH 44314
330/745-9811
mwb52@aol.com
February 15, 2017

To Whom It May Concern:

I have been a professional writer for almost forty years. Though I have written such novels as Star Trek: Gemini, Majician/51 and Once a Wizard..., I have contributed the majority of my work to the field of comic books where I have created and written such titles as Batman and the Outsiders, The Maze Agency, Mantra and Camelot 3000. (Most of these titles have Wikipedia pages, as do I.) If you saw the 2016 movie Suicide Squad, you saw a character of my creation, the female samurai Katana. (I even have a blink-and-you'll-miss-it credit at the film's very end.) I live in Akron, Ohio, where I have my own house (and the mortgage to prove it).

I have known Gerard Jones since 1990; we first met when collaborating on scripts for DC Comics (the publishers of Superman). In 1992 we were both asked to create new comic book titles and characters and collaborate with other creators on a self-contained publishing super-hero line called the Ultraverse. These titles were all interconnected and required a fair amount of consultation with the other "Founding Fathers" of the Ultraverse, so Gerry and I often spoke over the phone when we couldn't meet in person (in those days I lived in the Los Angeles area).

I have always enjoyed my time spent with Gerry, both on a personal and professional basis. I have been impressed by his integrity, and have enjoyed our seemingly-endless discussions on the history of comics and popular literature. These have led to another mutual interest -- campaigning for benefits for older comic book creators. Many of these early comic book creators have no pensions of any kind, so this service is not only generous, it is necessary. The creators who have finally received additional income in the form of reprint or merchandising payments are very grateful for this service.

Thanks for your attention; please contact me if I can supply any further information.

Sincerely,

Mike W. Barr

# EXHIBIT G-69

Jennie Kajiko
690 Long Bridge St. #420
San Francisco, CA 94158
August 6, 2018

Dear Judge Chhabria,

I first began dating Gerard Jones in June of 1975, when we were both at the end of high school. From the beginning I seriously considered him as a long-term partner. He was bright, considerate, generous, interesting and more self-aware than any other boy I'd known. We took our time making the big decision, though. It was ten years later, after we'd both gotten to know ourselves better, that we finally moved in together and made marriage plans. Seven years after that we had our son Nicky, who is still one of the joys of our life.

Through all these years, Gerry and I have always had a strong friendship. Day to day, he has always been an excellent partner: considerate and loving, willing to work hard and earn enough that we could buy a house in Noe Valley and I could take five years off work to be a stay-at-home mom. He was a great father. After I went back to work, Gerry became the primary hands-on parent. During the ten years when our son's life was disrupted by chronic migraines and nausea, Gerry prioritized helping Nicky over everything else in his life.

But we had our hard times. We both had issues with codependency and weak boundaries. Hardest of all, Gerry had issues left over from his childhood that led him to be compulsively, even addictively drawn to the attention and approval of women. Mostly this went no further than friendships, but twice I discovered he had cheated on me, in 1991 and 2000. Both times I had to reassess my choice in my life partner. The second time we separated for over a year. But both times we worked on our relationship and both times we made real improvements. Unfortunately, Gerry still didn't know how to dig into his deepest issues. When he started doing research on a possible book about youth cultures on the internet he fell into his old pattern in the worst possible way, not just betraying me but leading a 17-year-old girl into an extremely inappropriate relationship.

That time I was certain he had ended our marriage forever. But we joined a "Healthy Intimate Relationships" group, at first just to help each other heal from our wounds and try to salvage a friendship from the wreckage, and we began to see how we might be able to use this trauma to build a whole new relationship. Gerry finally threw himself into the painful work of truly dealing with his childhood wounds and addiction to women's approval. I also started dealing with my own codependency.

It took time, but the results were wonderful. I could see Gerry changing. His relationships with other people and myself were transformed. I could see myself changing also. Ultimately our marriage was stronger and richer than ever. When our son moved out and we sold our house and downsized, and when it looked like Gerry's efforts to build his career as a serious nonfiction writer were going to work out, we began looking forward to what promised to be the best time of our lives.

Crushingly—frustratingly—infuriatingly—Gerry didn't deal with his pornography issues. Like so many addicts, he clung hard to that "one last addiction." He allowed his shame to stop him from

telling anyone that he was falling into binges of internet porn use. He convinced himself that they weren't a serious problem, they were a by-product of the exhausting work on his book, that he could handle them and nothing terrible could come of them. He also never told anyone how much Ritalin he was taking or that his interests were drifting toward what he rationalized to himself as "research" into teenage cultures on line. So he blew our lives up again. He did things that he himself found wrong and horrifying. He subjected us—and our son—to terrible shame and pain. And he's earned himself a prison sentence.

But God acts in mysterious ways. This awful event has turned out to be what he needed to break free of all his secrets. Everyone knows everything now. Every day of his life he talks to other people about what he did. His computer is being monitored, which he says makes him feel safe and accountable. He's broken through the shame that used to paralyze him and learned that the way to make amends for his wrongs is to be of service to other people. He's turning his career toward writing about the disease that led him there. I've watched him change with his arrest and the publicity of his crimes, the first truly honest therapy of his life and his amazing work with Sex Addicts Anonymous. I've watched him as he's realized how much he needs to feel useful to others, be part of a community and work on his spirituality. I was at his side when he was baptized into a loving church community, a moment that changed both our lives for the better.

With all these terrible events swirling around us, Gerry has been more loving, responsible and grounded than I've ever seen him. It's like he's finally become the Gerry he was always meant to be but that his secrets wouldn't let him be. As we say in recovery, "You're only as sick as your secrets."

In the midst of all this awfulness there have been gifts for me too. I'd already learned a lot about codependency, addiction and recovery before this happened, but I've learned a lot more now. I have a compassion for addicts that I've never known before and I see how addicts in recovery are of such value to others. I'm able to be of service in my own recovery programs, especially to other partners of sex addicts who've had their own lives turned upside down by their partners' compulsive behavior.

It breaks my heart that Gerry and I will have to be apart for years. But I know we'll be okay. He'll show up for what he has to show up for. He'll do his best to make amends to society and be of service to his fellow inmates. Then he'll come back and get to work helping other addicts and helping the world understand this horrible disease. And I'll be here with him.

Yours sincerely,

# EXHIBIT G-70

The Honorable Vince Chhabria
United States District Court
450 Golden Gate Avenue
San Francisco, CA 94102

July 22, 2018

Your honor:

My name is Nicholas Jones, I'm 25 years old and I'm Gerard Jones's son. I live in Davis, California with my girlfriend of three years, where I produce music for local bands and online customers. I'm currently in my last term of a bachelor's degree program in music production through Berklee College of Music.

My dad has been a present, caring and loving father to me all my life. I lived under his roof until the age of 22, and he was there by my side throughout my youth. He's supported me both financially and emotionally, and nurtured my creative passions and academic endeavors. Throughout my life I've struggled with cyclical vomiting syndrome, a chronic illness which causes frequent debilitating episodes of nausea and vomiting, and my dad has always been one of the invaluable pillars that I've relied on to get me through that struggle.

Growing up, my dad was always well liked and trusted by my friends. We hosted many a sleepover and party at our house, and my classmates and peers were always eager to come over. When I was in elementary school my friends and I would play make-believe games, with fantastical lore and made up names. My friends would often insist on making my dad into a character and drafting him to participate in our shenanigans. My school held an annual getaway towards the end of each school year, where students and parents would spend a weekend at a summer camp. My dad would always volunteer to chaperone my grade's boys' bunk for a night, and my friends all told me those were the best camp nights they'd had.

In the last few years, since I've been an adult, my dad has been very honest and up front with me about his struggles with sex and internet addiction. I've known that he has difficulty controlling certain urges which go against his own morals and values, and I've been acutely aware of the strides he's made in correcting his behavior. I've seen first hand his dedication to bettering himself, his uphill but successful battle to regain his self control, and also the deep regret for his actions that he carries with him. He is a dedicated husband and partner to my mother and the last thing he would ever want to do is betray or hurt her. I see his renewed commitment to my mom every time we're together, and I can feel the strength and faithfulness of their bond.

The relationship I have with my dad now is as strong as when I was child. He has stayed involved in my life and is always there to make sure I'm getting along ok. He is someone I always know I can open up to and go to for support.

I know that my dad is a flawed person, but that doesn't change the fact that he is good and well intentioned at heart. I can say without a doubt that his actions were due to moments of weakness, not depravity. He is a much stronger man now, one who sticks firmly to the values of decency and good faith that I know he has always aspired to, and I don't see him ever regressing down that same path of addictive behavior again.

Sincerely,

# EXHIBIT H-1

**Will Jacobs**
3229 Clement Avenue
Stockton, CA 95204
May 28, 2018


Seth Chazin Law Offices
1604 Solano Avenue
Albany, CA 94706

Dear Mr. Chazin,

I have coauthored six published books with Gerard Jones, from 1983 until this year, brought out by Crown Publishing, Prima Press and other firms. We have also cowritten many short pieces published in *The National Lampoon, The Realist* and other periodicals. I will be assisting in the completion of Gerard's current book, *Bonds of Shame*, concerning internet pornography addiction, editing his draft and shepherding it to publication after he has been incarcerated.

I believe this will be an important book, based on his own honestly-told experience and incorporating the experiences of other addicts, written with the assistance of Randy Weled, a licensed sex-addiction therapist. Gerard is an exceptional writer and communicator, and it is clear to me that his goal with this book is to make amends for his past actions by helping others.

Gerard and I are also currently revising a collection of politically satirical short stories, *The Mystery of the Changing Times*, slated for publication from Avalon Books later this year.

I hope Gerard will be allowed to remain in the community for a few more months, long enough not only to complete those revisions but, more importantly, his draft of *Bonds of Shame*.

Yours truly,

Will Jacobs

# EXHIBIT H-2

**Dale R. Walker**
**2203 Broderick Street**
**San Francisco, CA 94115**
dale@dalewalker.com
**415-663-6060**
**January 20, 2018**

Mr. Seth Chazin
1604 Solano Ave.
Albany, CA 94707

Dear Mr. Chazin,

I am writing to encourage whatever will expedite the completion and publication of Gerard Jones' book, *Nation of Faith and Flesh: The Moral War that Shaped America*. I understand the work has been held up by legal procedures surrounding the criminal charges Mr. Jones is facing, of which I am well aware.

As I currently serve on the boards of the Graduate Theological Union, the Pacific Vision Foundation and the Beneficial State Bank, I have a strong interest in social-impact ventures. Although my background is in finance, I have recently turned my career toward advocacy of social and economic justice. I hold a Masters Degree in Globalization and Development from the University of London, School of Oriental and African Studies, and have just completed a Fellowship in the 2017 Harvard Advanced Leadership Institute. My writing has appeared in the *San Francisco Chronicle* and elsewhere.

In light of that, I have been an especially interested reader and advisor on Mr. Jones' book in progress. I have found it to be a highly accessible and eye-opening history of the birth of the social reform movement in America during the early 19th Century. His narrative is especially revealing of, and sympathetic to, the role of churches and religious leaders in promoting universal education, moral improvement, urban reform and racial equality. Mr. Jones' writing is compelling and his research has clearly been exhaustive. I believe this will be an important work of popular history, helping Americans to understand the origins of many of the current struggles to improve our society.

Sincerely,

Dale R. Walker

# EXHIBIT H-3



## ST. JAMES EPISCOPAL CHURCH

*A joyful, inclusive community*

January 17, 2018

Seth Chazin Law Partners
1604 Solano Ave.
Albany, CA 94707

Dear Mr. Chazin,

I am pleased to have been among the readers and advisers for Gerard Jones' book-in-process, *Nation of Faith and Flesh: The Moral War That Shaped America*, and am writing now to express my hope that circumstances will allow the author to complete it. I am fully aware of the criminal charges he is facing.

As a priest of the Episcopal Church since 2002, as well as a leader in faith-based community organizing, I can say without hesitation that Gerard's book is an important contribution to our understanding of the role of religion in public life.  It is a revelatory look at the origins of America's social-justice and moral-reform movements, primarily in the Christian activism that preceded the Civil War. By weaving realistic but sympathetic—at times even heroic—portraits of the religious leaders who fought to free the slaves and uplift the poor, Gerard gives a human face to both the importance and the difficulties of bringing a spiritual commitment to the improvement of society.

The book is extensively researched and detailed, but it is also written as a lively narrative that should reach a wide audience. I believe it may contribute significantly to understanding the roots of many of our contemporary social conflicts, and offer an important perspective on the positive contribution that religion can make in society. I'm very much looking forward to being able to read it in full.

Sincerely,

The Rev. John L. Kirkley
Rector

**ST. JAMES EPISCOPAL CHURCH**
4620 California St.  San Francisco, CA 94118
(415) 751-1198   stjames@stjamessf.org
www.stjamessf.org

# EXHIBIT H-4

## FRANK LOVECE
### 301 Cathedral Parkway, #3G
### New York, NY 10026
### (646) 242-6361

Seth N. Chazin Law Offices
1604 Solano Ave.
Albany, CA 94706                                February 1, 2018

Dear Mr. Chazin:

My name is Frank Lovece, and I have been a professional acquaintance of Gerard Jones for some years. Among other things, he was one of the select writing and editing professionals who contributed encomiums to the hardcover book *Stan Lee's 'God Woke,'* which I edited and which won the 2017 *Independent Publisher* Independent Book of the Year Voices Award.

Like Gerry, I am a freelance writer myself -- currently for the newspaper *Newsday* and the magazine *Film Journal*, and in the past for periodicals including the *Los Angeles Times*, *Entertainment Weekly*, *TV Guide*, *Sound & Vision*, *Redbook*, *Parents* and many others. As well, I am the author of several books from such legacy publishers as Simon & Schuster, Warner Books and HarperCollins.

The book of which I am proudest is *Lost and Found* (Filipacchi Publishing, 2005), done in conjunction with the National Center for Missing and Exploited Children. For this book, on which I collaborated with the internationally renowned photographer Matthew Jordan Smith, I interviewed nearly two dozen parents of missing -- and in some excruciatingly tragic cases murdered -- children. I also spoke with some children who had survived such kidnappings. And I myself am the parent of two boys. So trust I do not take lightly the allegations against Gerry; trust also I have a visceral understanding of the seriousness and tragedy of exploited children.

In full awareness of this, I express my hope as a writer, as an author, and as a citizen that Gerard Jones be allowed to finish his nonfiction book *Nation of Faith and Flesh: The Moral War That Shaped America*. This is a serious book about the intersection of religion and culture, on which Gerry has worked for years and which -- I strongly note -- is completely unrelated to his charges.

Gerry's past work speaks for it itself; in particular, *Men of Tomorrow: Geeks, Gangsters, and the Birth of the Comic Book* (Basic Books, 2005) was critically acclaimed in such venues as *The New Yorker*, *Business Week* (now *Bloomberg Businessweek*) and *Kirkus Reviews*. He is a notable and important nonfiction author. I ask that the government please release his *Nation of Faith and Flesh* so that he may continue his livelihood.

Cordially,

Frank Lovece

# EXHIBIT I

**From:** Osborn, Meredith (USACAN) [mailto:Meredith.Osborn@usdoj.gov]
**Sent:** Friday, March 02, 2018 3:41 PM
**To:** crimatty@earthlink.net
**Subject:** RE: Jones

Okay. Out of an abundance of caution, I have drafted the attached pretrial conference statement. Let me know if you have any comments or changes.

Meredith B. Osborn

Assistant United States Attorney

Northern District of California

Desk: (415) 436-6774

Cell: (415) 802-9093

**From:** crimatty@earthlink.net [mailto:crimatty@earthlink.net]
**Sent:** Friday, March 2, 2018 3:21 PM
**To:** Osborn, Meredith (USACAN) <mosborn1@usa.doj.gov>
**Subject:** Re: Jones

Thanks Meredith. I will reach out to him. Just a heads up that if Mr. Jones decides to enter a plea, I am not available until the 12th to do the plea.

Seth P. Chazin

Attorney at Law

Law Offices of Seth P. Chazin

1164 Solano Avenue

Albany, CA 94706

360 Ritch Street, Suite 201

San Francisco, CA 94701

Tele: (510) 507-8100

    (415) 222-6188

Facsimile: (510) 525-0087

On Mar 2, 2018, at 2:37 PM, Osborn, Meredith (USACAN) <Meredith.Osborn@usdoj.gov> wrote:

> Seth,
>
> Dan Kaleba, the Deputy Criminal Chief, has agreed to speak with you on Monday. His email address is dkaleba@usa.doj.gov and his phone number is (415) 436-7164. You can reach out directly to him to arrange a time to talk.
>
> Thank you,
>
> Meredith
>
>
> Meredith B. Osborn
>
> Assistant United States Attorney
>
> Northern District of California
>
> Desk: (415) 436-6774
>
> Cell: (415) 802-9093

---

> **From:** Seth Chazin [mailto:crimatty@earthlink.net]
> **Sent:** Friday, March 2, 2018 12:41 PM
> **To:** Osborn, Meredith (USACAN) <mosborn1@usa.doj.gov>
> **Cc:** Hoffman, Hallie (USACAN) <HHoffman@usa.doj.gov>
> **Subject:** RE: Jones
>
>
> Meredith/Hallie,
>
> I thought that there was room to move on at least either the distribution enhancement or the mandatory remand?  I know I am being a pain, but may I speak with the criminal chief about this?  We are feeling that we are being pushed into having to plead open to the court, which honestly we would prefer not to do.

Thanks,

Seth


**Seth P. Chazin**

Attorney at Law

Certified Criminal Law Specialist

_____


**LAW OFFICES OF SETH P. CHAZIN**

1164 Solano Avenue

Albany  CA  94706


360 Ritch Street, Suite 201

San Francisco  CA  94107


**T** 510.507.8100

**F** 510.525.0087

www.bayarea-attorney.com


Confidentiality Notice:  This message and/or its attachments, from Seth P. Chazin, Attorney at Law, may contain confidential and/or privileged information or attorney work-product pursuant to California Evidence Code Section 952 and California Code of Civil Procedure Section 2018 and is for the sole use of the intended recipient (s) in the message. If you believe you have received this message in error and/or you are NOT an authorized recipient, please notify the sender immediately by return electronic mail or contact us at (510) 507-8100, and please delete it without further review, disclosure, or copying. This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.


**From:** Osborn, Meredith (USACAN) [mailto:Meredith.Osborn@usdoj.gov]
**Sent:** Friday, March 02, 2018 9:38 AM
**To:** Seth Chazin

**Cc:** Hoffman, Hallie (USACAN)
**Subject:** RE: Jones


Seth,


Thank you for your email. We have carefully considered your position, and appreciate your vigorous efforts on behalf of your client.  Nonetheless, our office continues to disagree about the strength and merits of the distribution charge. Hallie discussed the plea again with our Deputy Criminal Chief after our conversation on Wednesday, and he reiterated that the plea agreement as approved will not change. I understand this may be disappointing to your client, but as Hallie said, we view it as a significant concession that you can argue below the Guidelines range, without a mandatory minimum sentence.


All of the factors that you have noted are appropriate to argue at sentencing, but they do not change the seriousness of the crimes your client committed and do not impact our position on the plea agreement. I would note, however, that your client was investigated by the government in 2014 for crimes against minors, went into treatment at that time, and yet still committed the offenses charged in this case.


Finally, I have already spent significant time preparing for trial in this case, including sending out trial subpoenas. If your client pleads guilty at any time after March 9, I will not move for the third point for acceptance of responsibility.


Please let me know if you would like to schedule a change of plea next week.


Thank you,

Meredith


Meredith B. Osborn

Assistant United States Attorney

Northern District of California

Desk: (415) 436-6774

Cell: (415) 802-9093

---

**From:** Seth Chazin [mailto:crimatty@earthlink.net]
**Sent:** Friday, March 2, 2018 12:50 AM
**To:** Osborn, Meredith (USACAN) <mosborn1@usa.doj.gov>
**Cc:** Hoffman, Hallie (USACAN) <HHoffman@usa.doj.gov>
**Subject:** RE: Jones

Meredith,

Thanks for the update on the extension.  I understand that we may disagree on the import of the report you provided regarding the information obtained from Google, but overall the overriding questions are: is there proof beyond a reasonable doubt that Mr. Jones distributed CP and can the enhancement for distribution be shown by even a preponderance of the evidence (though we would argue that a higher standard of proof is required), and I would submit in each instance the answer is no.  That said I hope we are able to work something out with your office.

Please know that we don't condone the production or use of CP whatsoever; but the ultimate issue is what is a fair and just disposition of this case?  Mr. Jones is <u>extremely</u> remorseful, and has done all that he can within his power to make things right and to make sure he remains both crime free and a contributing member of society.  And he has gone a step beyond that - he has been working with many others for some time now to make sure that others do not offend or re-offend – acting as a speaker to others who have addictions to pornography and sponsoring <u>four</u> other members in his recovery group.  So there are some redeeming qualities to this man and I hope your office will consider that in making its decisions as to a proposal to resolve the case.  I would also that ask your office take into consideration the information we provided regarding Mr. Jones' use of Ritalin (as prescribed by his doctor) and the coinciding onset of the specific behaviors which led to the offense conduct.

Thanks,

Seth

**Seth P. Chazin**

Attorney at Law

Certified Criminal Law Specialist

_____

**LAW OFFICES OF SETH P. CHAZIN**

1164 Solano Avenue

Albany  CA  94706

360 Ritch Street, Suite 201

San Francisco  CA  94107

☎ 510.507.8100

🖷 510.525.0087

www.bayarea-attorney.com

Confidentiality Notice:  This message and/or its attachments, from Seth P. Chazin, Attorney at Law, may contain confidential and/or privileged information or attorney work-product pursuant to California Evidence Code Section 952 and California Code of Civil Procedure Section 2018 and is for the sole use of the intended recipient (s) in the message. If you believe you have received this message in error and/or you are NOT an authorized recipient, please notify the sender immediately by return electronic mail or contact us at (510) 507-8100, and please delete it without further review, disclosure, or copying. This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

**From:** Osborn, Meredith (USACAN) [mailto:Meredith.Osborn@usdoj.gov]
**Sent:** Thursday, March 01, 2018 11:40 AM
**To:** Seth Chazin
**Cc:** Hoffman, Hallie (USACAN)
**Subject:** RE: Jones

Seth,

Our criminal chief has authorized an extension to the plea agreement until next Friday, March 9. I see your concern about the Court not moving the trial date, but I think that's a risk you are running regardless of what the stipulation says. The fact is, you are the one seeking this extension because you are seeking a better deal for your client than the one that is on the table. But you should not be laboring under an expectation that the deal is going to change.

I also disagree that the report we provided on Monday materially changes the case. In fact, it is inconsistent with the explanation that you gave earlier that involved your client deleting his account. Moreover, the transcript that you provided simply reiterates that this was not the same incident that your client described to the officers. Notably, the video your client uploaded was not a "masturbation webcam video," it was not first deleted by your client but rather rejected by YouTube, and despite claiming that "uploading is not something I've done, really," your client also admitted to uploading numerous images of his victim in England and using a well-known image sharing website. All of these facts contradict your claim that the upload was merely a mistake, rather than part of a pattern of behavior.

Nonetheless, I have slightly modified the language of the stipulation to reflect that you are seeking additional time to "negotiate" (instead of consider) the government's plea offer, and giving the Court the date it expires.

Thank you,

Meredith



Meredith B. Osborn

Assistant United States Attorney

Northern District of California

Desk: (415) 436-6774

Cell: (415) 802-9093

---

**From:** Seth Chazin [mailto:crimatty@earthlink.net]
**Sent:** Thursday, March 1, 2018 11:01 AM
**To:** Osborn, Meredith (USACAN) <mosborn1@usa.doj.gov>
**Cc:** Hoffman, Hallie (USACAN) <HHoffman@usa.doj.gov>
**Subject:** RE: Jones


Meredith/Hallie,

I reviewed you r changes but I am feeling a bit confused.  Please help me to understand where we are at.  Although things were a bit rushed at the end of the call yesterday, my understanding is that Hallie is going to go to the criminal chief concerning the possibility of getting an extension of time for the government's offer to a week from tomorrow and some relaxation of the inclusion of the 2 level enhancement regarding distribution and/or the mandatory surrender clause.  Is that not the case?  One of my major concerns is, as you have re-written it, I could see that the court could easily deny the request for the continuance of the trial as lacking sufficient good cause.

Thanks,

Seth


**Seth P. Chazin**

Attorney at Law

Certified Criminal Law Specialist

_____


**LAW OFFICES OF SETH P. CHAZIN**

1164 Solano Avenue

Albany  CA  94706

360 Ritch Street, Suite 201

San Francisco  CA  94107

**T** 510.507.8100

**F** 510.525.0087

www.bayarea-attorney.com

Confidentiality Notice:  This message and/or its attachments, from Seth P. Chazin, Attorney at Law, may contain confidential and/or privileged information or attorney work-product pursuant to California Evidence Code Section 952 and California Code of Civil Procedure Section 2018 and is for the sole use of the intended recipient (s) in the message. If you believe you have received this message in error and/or you are NOT an authorized recipient, please notify the sender immediately by return electronic mail or contact us at (510) 507-8100, and please delete it without further review, disclosure, or copying. This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

---

**From:** Osborn, Meredith (USACAN) [mailto:Meredith.Osborn@usdoj.gov]
**Sent:** Thursday, March 01, 2018 9:48 AM
**To:** Seth Chazin
**Cc:** Hoffman, Hallie (USACAN)
**Subject:** RE: Jones

Seth,

Please see a revised version of the stipulation. I believe your version inaccurately represents the state of affairs. The government does not need more time to seek approval of the plea agreement – there is a final approved plea agreement that expires tomorrow. While we have indicated we may extend that deadline until next Friday, there is also no promise that the terms of the agreement will change.

Thank you,

Meredith

Meredith B. Osborn

Assistant United States Attorney

Northern District of California

Desk: (415) 436-6774

Cell: (415) 802-9093

---

**From:** Seth Chazin [mailto:crimatty@earthlink.net]
**Sent:** Wednesday, February 28, 2018 7:36 PM
**To:** Osborn, Meredith (USACAN) <mosborn1@usa.doj.gov>
**Cc:** Hoffman, Hallie (USACAN) <HHoffman@usa.doj.gov>
**Subject:** Jones

Meredith,

Attached please find a stip and proposed order.  Please feel free to make any necessary changes if you believe I may have left anything out.  Just let me know where you made any additions or changes, and assuming I have no objection to any proposed changes, we will file it with the court.

 One question though, do you think we need to email Kristen first to check on the dates?  If so would you like me to do that, or do you want to?

Regards,

Seth


**Seth P. Chazin**

Attorney at Law

Certified Criminal Law Specialist

_____


**LAW OFFICES OF SETH P. CHAZIN**

1164 Solano Avenue

Albany  CA  94706


360 Ritch Street, Suite 201

San Francisco  CA  94107


☎ 510.507.8100

F 510.525.0087

www.bayarea-attorney.com

Confidentiality Notice:  This message and/or its attachments, from Seth P. Chazin, Attorney at Law, may contain confidential and/or privileged information or attorney work-product pursuant to California Evidence Code Section 952 and California Code of Civil Procedure Section 2018 and is for the sole use of the intended recipient (s) in the message. If you believe you have received this message in error and/or you are NOT an authorized recipient, please notify the sender immediately by return electronic mail or contact us at (510) 507-8100, and please delete it without further review, disclosure, or copying. This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

**Joint Pretrial Conf Statement (Mar. 2018).docx**
66K

**From:** Seth Chazin [mailto:crimatty@earthlink.net]
**Sent:** Friday, March 16, 2018 10:41 AM
**To:** 'Osborn, Meredith (USACAN)'
**Subject:** RE: U.S. v. Jones

Thanks for getting back to me.  I am calling Kristen now to find out when Judge Chhabria is available for a change of plea.  I am fine with a stip to vacate the trial date and set it for a change of plea.

Seth

**Seth P. Chazin**

Attorney at Law

Certified Criminal Law Specialist

_____

**LAW OFFICES OF SETH P. CHAZIN**

1164 Solano Avenue

Albany  CA  94706

360 Ritch Street, Suite 201

San Francisco  CA  94107

**T** 510.507.8100

**F** 510.525.0087

www.bayarea-attorney.com

Confidentiality Notice: This message and/or its attachments, from Seth P. Chazin, Attorney at Law, may contain confidential and/or privileged information or attorney work-product pursuant to California Evidence Code Section 952 and California Code of Civil Procedure Section 2018 and is for the sole use of the intended recipient (s) in the message. If you believe you have received this message in error and/or you are NOT an authorized recipient, please notify the sender immediately by return electronic mail or contact us at (510) 507-8100, and please delete it without further review, disclosure, or copying. This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

**From:** Osborn, Meredith (USACAN) [mailto:Meredith.Osborn@usdoj.gov]
**Sent:** Friday, March 16, 2018 10:07 AM
**To:** crimatty@earthlink.net
**Subject:** RE: U.S. v. Jones

Seth,

It is our position that the distribution did occur – at the very least to YouTube itself – because the video was uploaded to YouTube even if it was eventually rejected by the service for further publication on its site. The proof of this is that the video was flagged by Google, and then referred it to NCMEC.

Further, under the guidelines, distribution means "any act, including possession with intent to distribute. . . related to the transfer of material involving the sexual exploitation of a minor." USSG 2G2.2 Application Note 1.  Your client's conduct appears to fit squarely within that definition.

Please let me know how you would like to proceed.

Thank you,

Meredith

Meredith B. Osborn

Assistant United States Attorney

Northern District of California

Desk: (415) 436-6774

Cell: (415) 802-9093

---

**From:** crimatty@earthlink.net [mailto:crimatty@earthlink.net]
**Sent:** Thursday, March 15, 2018 5:13 PM
**To:** Osborn, Meredith (USACAN) <mosborn1@usa.doj.gov>
**Subject:** Re: U.S. v. Jones

Meredith,

Thanks for getting back to me. Is there any explanation as to why he/your office won't dispense with the distribution enhancement when there is an insufficient legal and factual basis to support its application? It would be helpful to have some understanding beyond just that your office's position has not changed.

Thanks,

Seth

Seth P. Chazin

Attorney at Law

Law Offices of Seth P. Chazin

1164 Solano Avenue

Albany, CA 94706

360 Ritch Street, Suite 201

San Francisco, CA 94701

Tele: (510) 507-8100

      (415) 222-6188

Facsimile: (510) 525-0087

On Mar 15, 2018, at 5:08 PM, Osborn, Meredith (USACAN) <Meredith.Osborn@usdoj.gov> wrote:

> Seth,
>
> I spoke with Dan Kaleba today, and our position on the plea offer has not changed. If your client would like to enter into the proposed plea agreement with the government, I suggest we enter into a stipulation tomorrow vacating the trial date and setting a date for the change of plea as soon as next week. The plea offer will otherwise expire by COB tomorrow.
>
> Thank you,

Meredith

Meredith B. Osborn

Assistant United States Attorney

Northern District of California

Desk: (415) 436-6774

Cell: (415) 802-9093

# EXHIBIT J




# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

02/26/2018 12:49 EST                                                                 Page 1 of 3

**CASE NUMBER**
SF07QD14SF0019

**CASE OPENED**
5/22/2014

**CURRENT CASE TITLE**
JONES, GERARD

**REPORT TITLE**
GOOGLE/YOUTUBE SEARCH
WARRANT INFORMATION

**REPORTED BY**
Dana Unger
SPECIAL AGENT

**APPROVED BY**
Christina Barfuss
SPECIAL AGENT

**DATE APPROVED**
2/26/2018

## SYNOPSIS

In April 2014, the HSI Cyber Crimes Center (C3), forwarded information to HIS San Francisco (HSI/SF) regarding the user MIRTHFUL and the associated email accounts jonesgerard57@gmail.com and mirth12345@yahoo.com. The user MIRTHFUL was identified on a foreign website and suspected of sharing images of child pornography and commenting on his sexual relationship with a minor in the UK.
Investigative information developed by HSI/C3 and HSI/SF indicated that GERARD JONES of San Francisco, CA was the user of the MIRTHFUL account. In December 2016, the San Francisco Police Department (SFPD) contacted HSI/SF regarding new information obtained on GERARD JONES.

This Report of Investigation (ROI) documents communication with the legal department at Google Inc.

| Current Case Title | ROI Number | Date Approved |
| --- | --- | --- |
| JONES, GERARD | SF07QD14SF0019-015 | 2/26/2018 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



02/26/2018 12:49 EST                                                                          Page 2 of 3

## DETAILS OF INVESTIGATION

In April 2017, a search warrant was issued to Google Inc. for records relating to the YouTube account belonging to GERARD JONES.  The search warrant requested the following records and/or information:

(1) Any and all account/user information;

(2) Any and all videos uploaded, downloaded, or viewed;

(3) Any and all transfer activity of videos uploaded, downloaded, or viewed, which includes e-mailing the videos or hyperlinks of the videos;

(4) Any and all user comments;

(5) Any and all views, comments, or responses;

(6) Any and all transactional log records of all file transfer activity (including uploading, downloading, viewing, modifying, e-mailing, etc.);

(7) Any and all reporting of the videos, user comments, or responses;

(8) Any and all of the information sought in 1-7 above connected to the

following file: livtg113KEs.mp4

(Original URL Where File was Located https://admin.youtube.com/video_search?vids=livtg113KEs&action_show=1)

In April 2017, Google Inc. provided the requested records and what was available at that time.  Special Agent (SA) Dana Unger contacted the legal department at Google Inc. numerous times for clarification on the records provided.  Of particular interest was the date and time the account was deleted, who the account was deleted by, what type of YouTube account (public or private), and any information relating to the upload of the child pornography video.

On or about December 28, 2017, SA Unger spoke with Google legal counsel and learned the following:

- The YouTube account and all related Gmail accounts were deleted by Google
- The upload of the video was initially rejected due to the length of the video
- The user took a step to delete the video after attempting to upload it

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| JONES, GERARD | SF07QD14SF0019-015 | 2/26/2018 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.




# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

02/26/2018 12:49 EST                                                                            Page 3 of 3

- The video was rejected and then reviewed by Google and therefore not  public
- A NCMEC CyberTip was filed following the review of the video, which depicted child pornography

According to Google Inc. counsel, a lot of the information relating to the account was no longer available since they had deleted the account and did not preserve the records following the initial investigation by the SFPD.

SA Unger reviewed the CyberTip and asked Google if they could explain why the original filename associated with the file was "2013-08-14 15-00-56.3GP" but the uploaded filename shows "livtg113KEs.mp4."  Google Inc. was unable to provide an explanation for the filename change.

The additional information section of the CyberTip report states the following:

Title: Bathtime fun!

Description: Thanks for all the subscriptions and comments!  I'll keep uploading if people want more.

It should be noted that the Google Inc. does not enter descriptions or titles of videos uploaded to YouTube.

The HSI/SF investigation continues.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| JONES, GERARD | SF07QD14SF0019-015 | 2/26/2018 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# EXHIBIT K

56:10

*SFPD: Tell me about the darkest thing you uploaded.*

I'm trying to remember…if I uploaded any (unintelligible). I once uploaded a video that…well, let's see. I uploaded videos like the girls in leotards and stuff. I once uploaded a video…not of a girl masturbating…
(pause)
Sorry, I… (unintelligible)

*SFPD: That's okay.*

GJ: I try to make this stuff leave my head.
(pause)
I…I might have…I'm not sure…I can't be sure…

*SFPD: Think about the last video you uploaded. What do you think that was?*
*(pause)*
*SFPD: (Mostly unintelligible, something about "actively in a binge.")*

GJ: Yeah. Yeah. Recently I'd gone back into imgsrc. Which are not videos, just still photographs.
(pause)
I think…I think the only videos I've ever uploaded were to YouTube, were to that YouTube site. I wouldn't have uploaded a video to…  What am I remembering?
(pause)
Um…I'm remembering something.
(pause)
On the YouTube site, I was uploading pictures of girls doing yoga and stuff…and I accidentally went to one of the masturbation webcam videos. And I uploaded that to YouTube.

*SFPD: So you had it in your library or…*

GJ: Yes. And then I deleted it. Immediately. Because it scared me. And it was not what I meant to do. And so I deleted it. I closed the account. And that was actually the end of that binge. That scared me out of that binge.

*SFPD: Was the girl masturbating on the website?*

GJ: You know, I'm honestly…not sure, because I clicked on, you know, just the file, to see what it was. And this thing appeared, and I remember seeing a girl exposed…or like a young girl exposed. And I thought, oh shit. That's not what I wanted to do. So I killed it. I killed all that.

*SFPD: When was that?*

GJ: Well, the YouTube thing was very brief. That was the LeotardLoverrr2008. (Unintelligible.) Um…that was recent, I think. And I feel like that was…um…again, I try to attach this stuff to the rest of my life, and it doesn't, it doesn't…I can't make it match, you know? But…um…that was within the last year…

SFPD: And you're saying that that was the last thing you uploaded?

GJ: Um…no. Let's see. I got back into the image board. I uploaded 12 pictures of girls that I felt were completely legal. Because you have to put 12 pictures on your account to have an account.

SFPD: Oh. I see.

GJ: I picked 12 girls who were just random web-find girls. I've done very little uploading. Uploading is not something I've done, really. Because like I said, it's not what I…

SFPD: I know. But if you upload on YouTube, who…?

GJ: I know…

SFPD: Who sees it?

1:00:45

(Here the interview turns to another subject.)